**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:                                        Chapter 11

FONTAINEBLEAU LAS VEGAS
HOLDINGS, LLC, ET AL.,[1]                     Case No.  09-21481-BKC-AJC

           Debtors.                           (Jointly Administered)
_____/

**DECLARATION OF HOWARD C. KARAWAN IN SUPPORT OF**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Howard C. Karawan, being duly sworn, depose and state as follows:

1.       I am the Chief Operating Officer and the Chief Restructuring Officer of Fontainebleau Resorts, LLC ("Fontainebleau Resorts" or "FBR"), the indirect parent company and manager of Fontainebleau Las Vegas Holdings, LLC ("Resort Holdings"), Fontainebleau Las Vegas, LLC ("Resort") and Fontainebleau Las Vegas Capital Corp. ("Capital"; and, together with Resort Holdings and Resort, the "Resort Debtors").  I also serve as the Chief Operating Officer and the Chief Restructuring Officer of three affiliates of the Resort Debtors, namely Fontainebleau Las Vegas Retail Parent, LLC ("Retail Parent"), Fontainebleau Las Vegas Retail Mezzanine, LLC ("Retail Mezzanine") and Fontainebleau Las Vegas Retail, LLC ("Retail"; and, together with Retail Parent and Retail Mezzanine, the "Retail Entities")[2].  The Resort Debtors and the Retail Entities are referred to collectively as the "Debtors").

---

[1]       The last four digits of each Debtor's tax identification number are: (i) Fontainebleau Las Vegas Holdings, LLC [9337]; (ii) Fontainebleau Las Vegas, LLC [9332]; and (iii) Fontainebleau Las Vegas Capital Corp. [7822].  The Debtors' current mailing address is 19950 West Country Club Drive, Aventura, Florida  33180.

[2]       Although chapter 11 cases for the Retail Entities have not been filed concurrently with those of the Resort Debtors, it is nonetheless anticipated that the Retail Entities will be filing petitions for relief under chapter 11 shortly, and that the bankruptcy cases of the Resort Debtors and the Retail Entities will be jointly administered.

2.     I have been the Chief Operating Officer of Fontainebleau Resorts since September 2007 and was officially designated the Chief Restructuring Officer in May 2009.

3.     I am familiar with each of the matters set forth below based on personal knowledge, from review of the Debtors' relevant business records, information supplied to me by others at the Debtors' businesses, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If I were called to testify, I could and would testify competently to the facts set forth herein.

4.     On June 9, 2009 (the "Petition Date"), each of the Resort Debtors filed voluntary petitions for relief (the "Chapter 11 Cases") under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court").  Each of the Resort Debtors continues to operate its business and manage its affairs and prospects as a debtor in possession.

5.     This Declaration describes the business of the Debtors, the circumstances surrounding the commencement of the Resort Debtors' Chapter 11 Cases, and the relevant facts for the purpose of supporting the First Day Motions (as defined below).  Nothing herein is intended to be or should be construed as an admission of the validity of claims, security interests, liens, contractual defaults or any other rights or interests that may be asserted against the Resort Debtors.  The statements made herein regarding debts, obligations, defaults and liens represent only assertions made by creditors to the Resort Debtors or that the Resort Debtors anticipate will be made by creditors and does not constitute a belief on the part of the Resort Debtors that these assertions are true or accurate.

## BACKGROUND

### My Background and Experience

6.      I completed post-graduate studies and obtained a Master's of Business Administration degree with a concentration in finance and marketing from the State University of New York.  At the age of 24, I became one of the youngest Directors of Marketing at Hyatt Hotels.  Prior to joining FBR, I was President of Kerzner International's destination resort business.  I had responsibility for the development of Kerzner's Atlantis at Paradise Island in the Bahamas.  I was also involved with project planning for Kerzner's Atlantis project in Dubai and strategic direction of Kerzner's international One&Only Resorts.

### The Debtors' Business and Ownership Structure

7.      Until recently, the Resort Debtors were actively engaged in ongoing construction and development of "Fontainebleau Las Vegas," conceived as a signature "Tier A" casino hotel resort with gaming, lodging, convention and entertainment amenities (the "Project").  Upon completion of construction, the Resort Debtors anticipate that the Project will support 6,000 full-time jobs at the Project and 2,000 additional jobs elsewhere in Las Vegas.  The Project is situated on approximately 24.4 acres at the sites of the former El Rancho Hotel and Algiers Hotel on the north end of the Las Vegas Strip.  The current plans for the Project include a 63-story glass skyscraper, featuring, among other things: (a) approximately 3,815 stylishly furnished guest rooms;[3] (b) an approximately 100,000 square-foot casino with an approximately 40-foot tall ceiling, featuring 1,700 slot machines, 125 table games, a 14-table poker room and a race and sports book; (c) approximately 394,000 square feet of class "A" convention, meeting and pre-

---

[3]      Original plans for the Project included 933 luxury hotel-condominium suites.  The Resort Debtors have determined that market conditions are so highly unfavorable at the present time that the sale of hotel-condominium suites is not desirable.  The Resort Debtors may reincorporate hotel-condominiums in the Project if market conditions become more favorable in the future.

function space; (d) an approximately 60,000 square-foot state-of-the-art spa; (e) a rooftop pool; and (f) a state-of-the-art theater featuring live entertainment and shows.  At the time that construction of the Project was reduced to a stabilization effort as a result of the unjustified failure of certain of the Debtors' lenders to fulfill their loan commitments, the Project was approximately 70% complete.

8.      The Retail Entities have been engaged in the development of approximately 286,500 square feet of the Project's retail component, consisting of signature restaurants, marquee nightclubs and related amenities (the "Retail Component").    The Retail Component is the subject of a Master Lease Agreement dated as of June 6, 2007, by and among Resort, as lessor, and Retail, as lessee (the "Retail Component Lease").

9.      The Debtors' business strategy is to create an architecturally and experientially significant destination resort appealing to sophisticated travel consumers with high levels of discretionary income and a desire for luxury and aesthetic quality.  The Debtors intend to reflect the Fontainebleau brand[4] and image in their lodging, convention and entertainment offerings, including (i) luxury hotel rooms and suites, (ii) high-tech convention and meeting amenities, (iii) signature restaurants and lounges, (iv) upscale entertainment venues, (v) state-of-the-art spa facilities, (vi) high-end retail outlets, and (vii) gaming.

10.     The chart attached as Exhibit "A" hereto illustrates the organizational structure of the Debtors, their parent entities and certain affiliated entities. The chart does not contain all of Fontainebleau Resorts' subsidiaries.  By way of example, the Fontainebleau family of companies

---

[4]      Resort and Retail are non-exclusive licensees of the trademarks and service marks related to the "Fontainebleau."  The trademarks and service marks are owned by Fontainebleau Resort Properties II, LLC, a non-debtor affiliate.

includes a joint venture partner in Fontainebleau Miami Beach[5] which is among the most dynamic destination resorts in the world.

11.     Each Resort Debtor is a member managed limited liability company, except for Capital, which is a Delaware corporation.  FBR, the indirect parent of each Resort Debtor, operates through a "Board of Managers" which, in turn, is responsible for all major business decisions for each Resort Debtor, other than Capital.  Capital's board of directors currently consists of two members, each of whom is also on the Board of Managers of FBR.

12.     FBR is headquartered in Miami, Florida.  All major decisions in respect of the Project have been and are made by the Board of Managers of FBR.  The Board of Managers has continuously exercised its ultimate control over the management, business activities (including the design and development of the Project) and capital structure/financing of the Debtors. Overall responsibility within the Fontainebleau family of companies for managing, directing and coordinating reorganization efforts has been entrusted to me by the Board of Managers. My office is in Miami, Florida. I report directly to the Board of Managers and generally work side-by-side with members of the Board of Managers, including the ultimate controlling person of the Fontainebleau family of companies and Chairman of FBR, Jeffery Soffer, and Albert Kotite, an Executive Vice President of FBR.  Mr. Kotite has his office in Miami, Florida.  All other personnel critical to the reorganization of the Debtors either work from or report to others situated in Miami, Florida.  As a consequence, all critical decisions in respect of the Project – operational and restructuring – are and shall be made in Miami, Florida.  Accordingly, I am advised and believe that venue is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

---

[5]     Fontainebleau Miami JV Member, LLC.

## THE DEBTORS' FINANCING STRUCTURE

### A.    The Resort Debtors

13.    On June 6, 2007 (the "Closing Date"), Resort and Fontainebleau Las Vegas II, LLC,[6] as borrowers, and Bank of America, N.A., as Administrative Agent, Issuing Lender and Swing Line Lender, as well as various other lenders thereto, entered into a $1.85 billion senior secured credit facility (the "Senior Credit Facility"), comprised of a seven-year, $700 million term loan facility (the "Term Loan Facility") which was fully funded on the Closing Date, a seven-year, $350 million delay draw term loan facility (the "Delayed Draw Facility") and a five-year, $800 million revolving credit facility (the "Revolver Facility"; the Revolver Facility, the Term Loan Facility and the Delayed Draw Facility being collectively referred to as the "Facilities").  As of the Petition Date, approximately $700 million is outstanding under the Term Loan Facility; approximately $336.7 million is outstanding under the Delayed Draw Facility;[7] and, other than letters of credit in the aggregate face amount of approximately $13 million, nothing is outstanding under the Revolver Facility.[8]  The Senior Credit Facility is secured by a first priority lien on substantially all of the Project's assets, other than the air rights comprising the Retail Component of the Project, which serves as collateral for the Retail Loans (as defined below).  The Senior Credit Facility is guaranteed by Resort Holdings, which is the direct parent of Capital and Resort, Capital, FBR and Fontainebleau Resort Properties I, LLC ("FRP"), the direct parent of the Resort Holdings.  In addition, Turnberry Residential Limited Partner, L.P. ("TRD") provided a completion guaranty in respect of construction of the Project.

---

[6]    On February 4, 2009, Fontainebleau Las Vegas II, LLC merged into Resort.

[7]    Of that amount, approximately $136.5 million is held in the Bank Proceeds Account (as hereinafter defined) and has not been advanced to the Resort Debtors for use in the Project.

[8]    As will be discussed in greater detail, it was the unjustified and impermissible failure and refusal of the lenders which committed to make revolving loans under the Revolver Facility that ultimately resulted in the suspension of construction of the Project and the chapter 11 proceedings of the Resort Debtors.

14. The Senior Credit Facility provides two related mechanisms for funding the Project. First, Resort must submit a notice of borrowing under the Delayed Draw Facility and/or the Revolver Facility, as applicable (each, a "<u>Notice of Borrowing</u>") which obligates the respective lenders to transfer the requested funds into an account (the "<u>Bank Proceeds Account</u>") that is subject to the Disbursement Agreement (as hereinafter defined). Second, Resort must submit an advance request (each, an "<u>Advance Request</u>"), typically monthly, to secure disbursements from the Bank Proceeds Account that can then be used to pay the costs of the Project.

15. In addition, on the Closing Date, Resort Holdings and Capital, jointly and severally, issued $675 million of 10.25% Second Mortgage Notes Due 2015 (the "<u>Junior Mortgage Notes</u>"), for which Wells Fargo Bank, National Association serves as Trustee. The Junior Mortgage Notes are secured primarily by a second priority mortgage lien on the Project, other than the air rights comprising the Retail Component of the Project, and is guaranteed by Resort, FRP and FBR. As of the Petition Date, the full $675 million principal amount of the Junior Mortgage Notes and accrued interest thereon, is outstanding.

16. The Junior Mortgage Notes and the Senior Credit Facility are subject to an intercreditor agreement among the various lenders thereto.

17. The Senior Credit Facility, the Junior Mortgage Notes and the Mortgage Loan (as defined below) are subject of a Master Disbursement Agreement (the "<u>Disbursement Agreement</u>"), among the Debtors, the Administrative Agent under the Senior Credit Facility, the Trustee under the Junior Mortgage Notes, and Lehman Brothers Holdings, Inc. ("<u>Lehman</u>") as Agent under the Retail Loans, that established the conditions to and the order of funding of such credit facilities.

**B.      The Retail Entities**

18.      On June 6, 2007, Retail, as borrower, and Lehman,[9] individually and as Agent for one or more Co-Lenders, entered into a $315 million construction loan (the "<u>Mortgage Loan</u>"), is presently secured by the Retail Component Lease.  The Mortgage Loan matures on October 9, 2010, subject to certain rights to extend the maturity, and is guaranteed, in part, by FBR.  As described above, the Mortgage Loan is subject to the Disbursement Agreement.

19.      As contemplated by the Mortgage Loan, Lehman syndicated a portion of the Mortgage Loan to Union Labor Life Insurance Company ("<u>ULLICO</u>"), Mitsui Trust Company, and National City Bank (collectively with ULLICO, the "<u>Co-Lenders</u>").  Lehman, as agent and split note holder, and the Co-Lenders, as split note holders, are parties to a Co-Lending Agreement.  After the syndication, on information and belief, Lehman retained 68.26% of the Retail Loan.

20.      On September 15, 2008, Lehman filed for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York.  Since December 2008, Lehman has failed and refused to make any advances under the Mortgage Loan.  As a consequence, ULLICO agreed to fund above and beyond its own funding commitment in respect of several monthly draws under the Mortgage Loan (the "<u>Defaulted Funding Loans</u>").  As of the Petition Date, the outstanding principal balance of the Defaulted Funding Loans is approximately $5.7 million, and the loans are guaranteed by FBR and TRD, and secured by the pledge of certain interests.

---

[9]      On September 15, 2008, Lehman and a number of its affiliates and subsidiaries filed for chapter 11 protection in the United States Bankruptcy Court for the Southern District of New York (Case No. 08-13555).

21.      As of the Petition Date, approximately $165 million of principal is outstanding on the Mortgage Loan.  Of the remaining $105 million of undrawn funds on the Mortgage Loan, $66 million is allocable to Lehman and $39 million is allocable to the non-Lehman Co-Lenders.

22.      In addition, on the Closing Date, Retail Mezzanine, as borrower, and Lehman, individually and as Agent for one or more Co-Lenders, entered into a $85 million PIK secured loan (the "Mezzanine Loan"; and, together with the Mortgage Loan, the "Retail Loans"), secured by, among things, Retail Mezzanine's membership interests in Retail.  In addition, Retail Parent has pledged its 100% membership interest in Retail Mezzanine as collateral for the Mezzanine Loan.  The Mezzanine Loan was fully funded on the Closing Date and matures on October 9, 2009, subject to certain rights to extend the maturity, and is guaranteed, in part, by Jeffrey Soffer and FBR.  The Mezzanine Loan is not subject to the Disbursement Agreement.

23.      As of the Petition Date, approximately $114 million of principal and PIK interest is outstanding on the Mezzanine Loan.

## EVENTS LEADING UP TO THE CHAPTER 11 CASES AND RELATED CONSEQUENCES

24.      The bankruptcy of Lehman and its subsequent failure to fund its commitment under the Mortgage Loan necessitated the search for additional funding sources.  However, the demise of Lehman also marked a cataclysmic global decline in the credit markets, making it exceedingly difficult to find financing or to attract an equity investment.  Making matters more difficult, the general decline in the economy has taken its toll on Las Vegas which likewise affects investment and credit risks.  Nonetheless, FBR has been intensely focused on those efforts ever since.  To assist, the Debtors and their affiliates engaged investment bankers and

other advisors to advise them and to identify sources of equity and credit. Numerous confidentiality agreements have been executed with diverse parties. That process continues.

25.    The Lehman experience, the insolvency and the ensuing FDIC receivership of one of the lenders under the Delayed Draw Facility, and the continuing downward macro-economic spiral also engendered concerns that bank members of the Senior Credit Facility might become unable or unwilling to meet their respective commitments under the Delayed Draw Facility and the Revolver Facility.

26.    Reference is made to the Complaint filed in the Adversary Proceeding No. 09-01621-ap-AJC [D.E. #1] commenced by Resort in these cases contemporaneously herewith. The Complaint specifically describes the defaults and wrongful termination by the bank members of the Senior Credit Facility with respect to their commitment to fund the Revolver Facility. The Complaint seeks specific performance of these bank members' obligations, as well as enormous damages resulting from their malfeasance.

27.    As a consequence of the bank members' breaches of the Senior Credit Facility, the Resort Debtors have been left with virtually no source of funding the continuing construction of the Project. Try as they might to find new sources of working capital, to encourage existing lenders to meet their funding commitments, or to obtain further financial accommodations from existing lenders, the Debtors were ultimately compelled to virtually cease construction of the Project and the Retail Component. As a consequence, most laborers and materialmen have left the jobsite and many of them have filed mechanic liens against the Project. As of the Petition Date, there were approximately $403 million of payables outstanding in respect of the Project that might result in mechanic liens against the Project.[10]    It is my understanding that under

---

[10]    On June 4, 2009, Turnberry West Construction, Inc., the general contractor on the Project, filed a claim of lien against the Project for $668,990,933.27.

Nevada law, duly perfected mechanic liens against the Project may prime the mortgage liens of existing lenders.

28.     At my direction, the Resort Debtors have also terminated the employment of approximately 40 employees, are implementing significant across-the-board salary reductions, and have reallocated certain personnel.  We continue to evaluate cost saving opportunities that will not jeopardize the value of the Project or our ability to resume construction.  However, it has become painfully clear that the Project likely will not be completed by the scheduled opening date in January 2010.[11]  As a consequence, we are in cancellation/rescheduling discussions with groups which have made bookings for January through March 2010 and, out of an abundance of caution, April 2010.

## FACTS IN SUPPORT OF FIRST DAY MOTIONS

29.     Concurrently with the filing of the Chapter 11 Cases, the Resort Debtors filed a number of motions for immediate and necessary relief (the "First Day Motions").  I have reviewed the First Day Motions and I believe that the relief sought in each of the First Day Motions is necessary to enable the Resort Debtors to operate in chapter 11 and preserve and maximize value of the Project for all constituencies.  The factual background in support of the First Day Motions is set forth herein.

### *Ex Parte* Motion by the Resort Debtors for Joint Administration

30.     As discussed above, the Resort Debtors consist of Resort Holdings and five of its affiliates, all of whom are ultimately controlled by the Board of Managers of the parent company, FBR, as two of the Resort Debtors are limited liability companies that are member managed, and the third has a board of directors that is comprised of the same members as the

---

[11]     Under the Mortgage Loan, March 31, 2010 is the Outside Opening Date.

11

Board of Managers of FBR. The Resort Debtors share key financial and operational systems, as well as local management to oversee day-to-day operations.

31.     The Resort Debtors anticipate that a multitude of creditors and parties in interest will be involved in their chapter 11 bankruptcy cases, many of whom may have overlapping claims and interests in several of the Resort Debtors' estates. Joint administration of these cases will obviate the need for the filing and service of duplicative notices, motions, applications, hearings, and orders. Moreover, joint administration will reduce the administrative burden on this Court, by freeing the Court from the burden of scheduling duplicative hearings, entering duplicative orders, and maintaining redundant files, and will also save the Resort Debtors' estates considerable time and expense.

32.     The Resort Debtors believe that the requested relief is needed immediately in order to avoid the substantial costs of duplicative mailing expenses that debtors traditionally incur after the filing of a chapter 11 petition. The procedural benefits of joint administration will not adversely affect creditors and other parties in interest, but rather will ultimately benefit all creditors since it will reduce costs and the administrative burden of maintaining the estates.

**Debtors' Motion for Orders (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (II) Providing Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 362, and 363 of the Bankruptcy Code, and (III) Scheduling Final Hearing**

33.     The Resort Debtors require the use of cash on deposit or maintained in bank accounts identified in Section 2.2 of the Disbursement Agreement (the "Cash Collateral") to, among other things, pay present operating expenses, including payroll and vendors, maintain insurance coverage, taxes, utilities, security and other essential expenses essential to the preservation of the Project.

34.     The Debtors and their financial advisors undertook extensive efforts to obtain debtor-in-possession financing for the purpose of paying their anticipated expenses of administration in the Chapter 11 Cases.  While the Debtors obtained expressions of interest in providing such financing, the Debtors did not receive commitments for the same by the Petition Date.  Moreover, the expressions of interest received imposed conditions that made it difficult, if not impossible, to timely access the proposed financing.

35.     The Debtors also requested the use of Cash Collateral from lenders under the Term Loan and Delayed Draw Facilities (collectively, the "Term Lenders") which have the first priority lien and security interest in the Cash Collateral.  The Debtors' counsel and financial advisors extensively negotiated the terms upon which the Debtors can use the Cash Collateral with counsel for certain of the Term Lenders.  Such negotiations were at arms' length and in good faith. By the Petition Date, a group of the Term Lenders comprising the holders of approximately $350 million of the Term Loan and Delayed Draw Facilities consented to the Debtors' use of the Cash Collateral.  Moreover, the Debtors' were encouraged to believe that additional Term Lenders would likewise consent by the date of the hearing on the Debtors' emergency motion for leave to use the Cash Collateral. Thus, the Debtors' anticipate that Term Lenders holding over 51% of the Term Loan and Delayed Draw Facilities will consent to the Debtors' use of the Cash Collateral by the hearing.

36.     The Debtors will suffer immediate and irreparable harm if they cannot obtain use of the Cash Collateral.  Among other things, the Debtors have payroll obligations that must be met almost immediately.  The failure to meet those payroll obligations may well result in the loss of critical employees vital to the Project and to the Debtors' reorganization efforts.  Likewise, the

failure to pay insurances, taxes, utilities, security and other ordinary and necessary expenses may impair the maintenance of the Project until such time as construction may be resumed.

**Emergency Motion by the Debtors for Entry of an Order (A) Authorizing the Debtors to Maintain Their Existing Cash Management System, Bank Accounts, and Business Forms, (B) Granting Administrative Expense Priority to Postpetition Intercompany Claims and Authorizing Continued Intercompany Arrangements and Historical Practices; and (C) Waiving Investment and Deposit Requirements**

37.     To facilitate efficient operations, in the ordinary course of business, and as required by the Resort Debtors' loan documents, the Resort Debtors maintain a cash management system (the "Cash Management System") allowing them to collect, transfer, and disburse funds pursuant to a disbursement agreement.   The Cash Management System provides significant benefits to the Resort Debtors, including the ability to: (a) control and centrally manage corporate funds; (b) invest idle cash; (c) ensure the availability of funds when necessary; (d) reduce administrative costs by facilitating the movement of funds and the development of more timely and accurate balance and presentment information; (e) provide the necessary accounting controls to enable the Resort Debtors, as well as creditors and the Court, if necessary, to trace funds through the system and to ensure that all transactions are adequately documented and readily ascertainable, whether prepetition or postpetition; and (f) fulfill contractual obligations of the Credit Facilities, the Notes, as well as to facilitate any DIP financing agreements that may be approved by this Court.   The cash management procedures employed by the Resort Debtors constitute ordinary, usual and essential business practices, and are similar to those used by other corporate enterprises in the same industry.

38.     The Resort Debtors' Cash Management System consists generally of the following accounts described below (collectively, the "Bank Accounts").

## Debtor-Controlled Bank of America Accounts

39.    *Resort Payment Account (*2813)* – In accordance with practices prior to the Petition Date, Monthly Disbursements are deposited into this account.  The funds are then disbursed to pay costs of the Project in accordance with the applicable Advance Request or transferred to the Construction Payable Account (see below), Cash Management Account (see below) or Payroll Account to pay costs of the Project.

40.    *Construction Payable Account* (*2853) – This account is funded from the Resort Payment Account and used as a disbursement account to pay construction costs.

41.    *Cash Management Account* (*2450) – This impressed account is funded from the Resort Payment Account and used to pay Project costs between regularly scheduled disbursements and is replenished on a revolving basis up to $6 million at any given time.

42.    *Payroll Account* (*1021) – This account is funded from the Resort Payment Account and used to pay Resort's payroll.

43.    *General Account* (*8730) – This account is used for customer deposits received by Resort.

44.    *Credit Card Deposit Account* (*8743) – This account was set up to receive credit card deposits when Resort starts to take reservations.

45.    *Retail Payment Account* (*3826) – This account is not active.

## Bank-Controlled Accounts

### Resort Accounts at Bank of America, N.A.

46.    *Bank Funding Accounts* (*6005) – This account was established for the initial funding under the Credit Facilities, and currently has a zero balance.

47.    *Resort Loss Proceeds Account* (*5959) – This account was set up to receive all loss proceeds received by Resort and applied to pay for Project costs in respect of Resort,

including the costs to repair or replace the property that was damaged or destroyed.  In limited circumstances, amounts held in this account could be applied to the prepayment of indebtedness under the Senior Credit Facility or Junior Mortgage Notes.

48.    *Second Mortgage Funding Account* (*5954) – The net proceeds of the Junior Mortgage Notes were deposited into this Account and applied, from time to time, to the payment of the Project's costs.

49.    *Completion Guarantee Proceeds Account* (*6968) – This account was set up to receive any drawings on the completion guarantee provided by TRD or any replacement completion guarantor.  There are no funds currently in this account.

50.    *Bonded Condo Proceeds Account* (*5997) – This account was set up to receive the proceeds of deposits for the purchase of condominiums to the extent such deposits have been bonded.  There are no funds currently in this account.

**Resort Accounts at Columbia Investments**[12]

51.    *Equity Funding Account* (*0385) – This account is used for equity contributions. However, previous equity contributions have been used to pay construction costs of the Project and the account currently has a zero balance.

52.    *Bank Proceeds Account* (*0384) – All funds advanced from time to time by the participating lenders under the Senior Credit Facility are deposited in this account. Upon approval of an Advance Request, certain amounts on deposit in this account are transferred to the Resort Payment Account and used to pay the Project's costs, to fund the Cash Management Account, or to pay interest on the Senior Credit Facility.  Currently, there is approximately $136.6 million in this account, which was funded under the Delayed Draw Term Facility.

---

[12]    Columbia Investments is an affiliate of Bank of America, N.A.

53.     *Liquidity Reserve Account* (*0382) – As security for Resort's obligation to complete the Project, Resort has $50 million on deposit in this account which serves as cash collateral for the Senior Credit Facility.  The interest earned from this account is used to pay a portion of the Advance Request.

**Resort Accounts at Wells Fargo**

54.     *Second Mortgage Proceeds Account* (*8800) – This is a trust account held at Wells Fargo bank that received proceeds of the Junior Mortgage Notes.  Such proceeds were subsequently used to pay costs of the Project.  There are no funds presently in this account.

55.     *10.25% Second Mortgage Notes Due 2015 Account* (*6200) – This is a trust account held at Wells Fargo Bank that received proceeds of the Notes.  Such proceeds were subsequently used to pay costs of the Project.  There are no funds presently in this account.

56.     The operation of the Resort Debtors' business requires that the Cash Management System continue. Requiring the Resort Debtors to adopt new, segmented cash management systems at this critical stage of these Chapter 11 Cases would be unduly expensive, create unnecessary administrative problems, and negatively impact the usual and ordinary operations of the Resort Debtors, This impact would be much more disruptive than productive.  The Resort Debtors' treasury, accounting, and bookkeeping employees would be forced to focus nearly exclusively upon immediately opening new accounts and revising cash management procedures, instead of upon their many other usual daily responsibilities.  These distractions would hinder the Resort Debtors' smooth transition into chapter 11.

57.     Importantly, parties in interest would not be harmed by the Resort Debtors' maintenance of the Cash Management System.  The Resort Debtors will immediately undertake measures to ensure that they will not make payments inadvertently on any prepetition debt, unless otherwise authorized by the Court.

58.     The Cash Management System allows the Resort Debtors to centrally manage all of their cash-flow needs and includes the necessary accounting controls to enable the Resort Debtors, as well as creditors and the Court, if necessary, to trace funds through the system and to ensure that all transactions are adequately documented and readily ascertainable.  The Resort Debtors will continue to maintain detailed records reflecting all transfers of funds between themselves so that all intercompany transactions can be readily ascertained.  Consequently, maintenance of the existing Cash Management System during these Chapter 11 Cases is in the best interests of all creditors and other parties in interest.

59.     In order to avoid delays in payments to administrative creditors, to ensure as smooth a transition into chapter 11 as possible with minimal disruption, and to aid in the Resort Debtors' efforts to successfully and rapidly complete these cases, it is important that the Resort Debtors be permitted to continue to maintain their existing Bank Accounts and, if necessary, open new accounts, wherever they are needed, all in the ordinary course of business and as provided in the existing agreements between the Resort Debtors and the various banks regarding the Bank Accounts.

60.     The Resort Debtors use a wide variety of business forms.  In order to minimize expenses to the estates, and to minimize disruption of their businesses, the Resort Debtors also request that they be authorized to continue to use all correspondence, business forms (including, but not limited to, letterhead, stationary, purchase orders, employment applications, invoices, etc.) and checks in the form that they exist immediately prior to the Petition Date (collectively, the "Business Forms"), without reference to the Resort Debtors' status as debtors-in-possession. Because of the complex nature of the Resort Debtors' business operations, use of new business

forms would greatly increase the Resort Debtors' costs and add significantly to the administrative burdens of transitioning to operations under chapter 11.

61.     Parties doing business with the Resort Debtors will undoubtedly be aware of the Resort Debtors' status as chapter 11 debtors-in-possession as a result of the size and notoriety of these cases, and from coverage of these cases by the press.  Moreover, each of the parties with whom the Resort Debtors do business will also receive notices of the commencement of these cases.  Because of the nature and scope of the Resort Debtors' business operations and the large number of vendors, customers and other parties with whom the Resort Debtors deal on a regular basis, it is necessary that the Resort Debtors be permitted to continue to use their existing Business Forms without alteration or change.

62.     If the Resort Debtors were required to change their Business Forms, it would be unduly expensive and burdensome to the Resort Debtors' estates and disruptive to the Resort Debtors' business operations and would not confer any benefit on those dealing with the Resort Debtors. For these reasons, the Resort Debtors request that they be authorized to use existing checks and Business Forms without being required to place the label "debtor-in-possession" on each.

63.     Each of the Bank Accounts are swept nightly and invested in conservative investments with the primary goal of protecting principal, and the secondary goal of maximizing yield and liquidity.

64.     The Resort Debtors believe that the institutions at which the Bank Accounts are maintained are financially stable.  Both Bank of America, N.A. and Wells Fargo Bank, N.A. are approved depositories pursuant to the U.S. Trustee's List of Approved Depositories for Region 21, dated as of April 15, 2009.  Columbia Investments is an affiliate of Bank of America, N.A.

All such deposits and investments are prudent and designed to yield the maximum reasonable net return on the funds invested, taking into account the safety of such deposits and investments.

65.     The Resort Debtors believe that it is in the best interests of the estates and creditors for the Resort Debtors to continue their prepetition practice of investing excess cash as they did prior to the bankruptcy. The yield on investments under these prepetition practices will be substantially greater than that which can be obtained under the restrictions contained in Section 345(b) of the Bankruptcy Code.  Indeed, the Resort Debtors estimate that, given the amount of cash that is or will be in the estates, the Resort Debtors would lose a substantial amount of money if limited to direct investment in government securities.

66.     The Resort Debtors believe that investments made in accordance with their standard prepetition investment procedures provide the protection required by Section 345(b) of the Bankruptcy Code, notwithstanding the absence of a "corporate surety" requirement. First, these procedures permit investments only in investment or money market accounts maintained at stable institutions (which are insured), and such accounts are widely regarded as one of the safest forms of investment. Moreover, any corporate surety that might be obtained to guarantee the safety of such investments would likely not have significantly greater strength than the private entities in which the Resort Debtors would continue to invest. Finally, the requirement of obtaining a bond secured by the undertaking of a corporate surety from each of the numerous institutions with which the Resort Debtors deposit or invests funds would be prohibitively expensive and administratively burdensome, and could offset much of the gain derived from investing in private as well as federal or federally guaranteed securities.

67.     Accordingly, the Resort Debtors seek an order (a) authorizing the Resort Debtors to maintain their existing Cash Management System, Bank Accounts, and Business Forms;

(b) granting administrative expense priority to postpetition intercompany claims and authorizing continued intercompany arrangements and historical practices; and (c) waiving the Resort Debtors' compliance with investment and deposit requirements of § 345(b) of the Bankruptcy Code and the U.S. Trustee's operating guidelines.

**Emergency Motion by Debtors for Entry of an Order (I) Authorizing the Debtors to Pay (A) Prepetition Wages, Salaries, and Employee Benefits and (B) Prepetition Withholding Obligations, (II) Authorizing Continuation of Employee Benefit Plans and Programs Postpetition, and (III) Directing All Banks to Honor Payments of Prepetition Employee Obligations (the "Wage Motion")**

68.     In order to maintain the level of excellence typical of the Fontainebleau brand name, Resort has engaged the services of employees in various sectors, including, inter alia, information technology, sales and marketing, legal services, purchasing, and design development.   Since April 2009, Resort has undergone significant reductions in force, eliminating approximately one-third of its total workforce and has begun to implement the reduction of the salaries of the remaining employees.   The remaining employees are crucial to the continued marketing and development of the Project facilities and thus to the viability of the Project as a going concern.

69.     The Resort Debtors believe that it is in the best interests of the estates for this Court to: (a) authorize the Resort Debtors to pay or otherwise honor the Resort Debtors' various employee-related prepetition obligations (including, but not limited to, claims for wages, salaries, vacation, leave obligations, unpaid reimbursable expenses, and federal and state withholding obligations) to, or for the benefit of, current employees (each an "Employee" and collectively, the "Employees"), (b) authorize the Resort Debtors to continue postpetition the employee benefit plans and programs in effect immediately prior to the filing of this case (including, but not limited to, medical, dental, vision, prescription drug, life insurance, and

21

disability benefits), and (c) direct all banks to honor prepetition checks for payment of the Resort Debtors' prepetition employee obligations.

### A.    **The Workforce**

70.    The Employees perform a variety of critical functions, all directed towards completion of the ongoing construction of the Project, development of current and future operations of the Resort Debtors' businesses, and sales and marketing of the Project as a world-class casino resort.[13]    The Employees also perform many administrative, accounting, marketing, purchasing, supervisory, and management tasks.  The Employees' skills, institutional knowledge, and understanding of the Resort Debtors' operations are essential to the effective restructuring of the Resort Debtors' business.  To ensure timely completion of the Project and a successful opening of the resort and gaming facilities, Resort has retained a sufficient number of Employees to open and operate the Project immediately upon completion.  The collective expertise of these Employees, many of whom are highly specialized within the gaming industry, is instrumental to the Project's success as a going concern.

71.    If prepetition Employee obligations and Employee benefits are not received by the Employees in the ordinary course, they will suffer extreme personal hardship and, in many cases, will be unable to pay their basic living expenses.  Such a result obviously would destroy Employee morale and result in unmanageable Employee turnover, causing immediate and pervasive damage to the Resort Debtors' business operations.  Further, any significant Employee departures could seriously jeopardize the crux of the Resort Debtors' current business, namely, construction and design development of the Project.  Any significant deterioration in morale at this time would substantially and adversely affect the Resort Debtors and their ability to

---

[13]    Approximately 40% of the Project's business is expected to be generated from corporate and association groups that make their meeting and conference commitments up to three years in advance, which necessitates Resort maintaining a sales and marketing effort prior to the opening of the Project.

reorganize, thereby resulting in immediate and irreparable harm to the Resort Debtors, their estates, and creditors.

72.     With a few exceptions, the compensation, benefit, and reimbursement amounts that the Resort Debtors seek to pay the Employees do not exceed the sum of $10,950 per Employee (not including accrued vacation).

**B.     Employee Compensation.**

73.     <u>Wages and Salaries</u>.  As of the Petition Date, the Resort Debtors' workforce consisted of approximately 115 Employees located in Florida, Nevada, California, and Virginia. Resort employs all Employees on either a salaried or hourly basis.[14]  Resort pays its Employees (the collective payments, the "<u>Employee Compensation</u>") either biweekly (collectively, the "<u>Biweekly Employees</u>") or semimonthly (collectively, the "<u>Semimonthly Employees</u>").  Resort has a combined total of approximately 88 Biweekly Employees (12 of whom are paid hourly)[15] and 27 salaried Semimonthly Employees.

74.     <u>Employment Agreements</u>.  Approximately 23 Employees have employment agreements with Resort.  All of these Employees are executive, senior management, or supervisory level employees.  A number of executives are eligible for bonuses upon a substantially complete and timely opening of the Project and thereafter.

75.     <u>Payment Schedule and Average Payroll</u>.  The Biweekly Employees are paid every two weeks, which equates to 26 pay periods in a calendar year, and are paid four days in arrears. The Semimonthly Employees are paid twice a month, which equates to 24 pay periods in a calendar year, and are current when paid.

---

[14]     Of the 115 Employees, 114 are full-time employees and one is a part-time employee.

[15]     All hourly employees are Biweekly Employees.  The rest of the Employees (both Biweekly and Semimonthly) are salaried.

76.    The gross amount of the Resort Debtors' average Biweekly Employee payroll is approximately $351,000.    The gross amount of the Resort Debtors' average Semimonthly Employee payroll is approximately $152,071.    The combined total of both payrolls is approximately $503,071.

77.    <u>Overtime</u>.    Certain of the Employees are eligible for overtime and, when necessary, their pay is adjusted accordingly.    At present, the Resort Debtors do not owe overtime pay to any Biweekly Employees.    The year-to-date totals for 2009 overtime pay is approximately $4,850 for Biweekly Employees.    No overtime pay has been allocated to current Semimonthly Employees for this calendar year.

78.    Biweekly Employees received their most recent paychecks on May 29, 2009, which includes payments of all amounts owed through May 24, 2009.    Semimonthly Employees received their last paychecks on May 29, 2009 for work through May 31, 2009.    Biweekly Employees are scheduled to receive their next paychecks on June 12, 2009, and Semimonthly Employees are scheduled to receive their next paychecks on June 15, 2009.

79.    The Resort Debtors seek authority to pay the outstanding amounts owed as of the Petition Date for accrued Employee Compensation, including unpaid wages, salaries, and adjustments thereto.

**C.    <u>Vacation, Holiday Benefits, and Other Leave Obligations</u>.**

80.    The Resort Debtors provide vacation time to Employees ("<u>Vacation Time</u>") under two different policies: (i) a paid time off policy and (ii) a vacation policy.

81.    <u>Paid Time Off Policy for Biweekly Employees</u>.    Biweekly Employees are provided Vacation Time pursuant to a paid time off ("<u>PTO</u>") policy.    This policy covers all forms of time off from work, including holidays, vacation and sick days.    Biweekly Employees earn

PTO time for each regular hour of work (not including overtime hours) plus hours taken for PTO. Biweekly Employees can apply no more than 40 hours per workweek towards the PTO policy. Biweekly Employees begin to accrue PTO on each such Employee's respective hire date (a.k.a. the "anniversary" date), with the accrual continuing over a 12-month rolling period. The actual rate of PTO accrual is based upon length of the particular Employee's service with Resort. All full-time employees earn PTO hours according to the schedule below:

| Completed Years of Service | PTO Days Per Year | Hourly Accrual | Hours Earned in a 80-Hour Pay Period |
|---|---|---|---|
| Hire Date to 1 Year | 19 | 0.07308 | 5.85 |
| 2 – 5 years | 21 | 0.08077 | 6.46 |
| 5 – 12 Years | 25 | 0.09618 | 7.69 |
| 12+ Years | 28 | 0.10769 | 8.62 |

82.      Biweekly Employees may carry over up to 40 hours from one anniversary year to the next. All other PTO hours must be taken during the relevant twelve month period or such hours are forfeited. Although accrued PTO hours may be used during a Biweekly Employee's first year of employment, PTO hours do not vest until the Biweekly Employee's first anniversary date. Separated employees may receive payment for any unused vested PTO hours. As of the Petition Date, current Biweekly Employees have accrued approximately $440,121 in earned but unused PTO hours. Approximately $177,115 of this PTO time has vested and would thus need to be paid in the event of the relevant Employees' departure.

83.      <u>Vacation Policy for Semimonthly Employees</u>. Semimonthly Employees accrue Vacation Time semimonthly at an annual rate of two to four weeks per year in most cases based upon years of service with Resort. However, four Employees have been credited with a past employer's years of service. Semimonthly Employees must use accrued Vacation Time during

the twelve months immediately following completion of each year of continuous employment. Semimonthly Employees may not carry over Vacation Time into the subsequent year and taking pay in lieu of unused Vacation Time is not permitted absent termination.  Upon termination, Resort pays Semimonthly Employees in good standing who have completed at least one year of full-time employment the value of their accrued, unused Vacation Time.  Semimonthly Employees working less than 1,900 hours during their anniversary year are entitled to a partial vacation determined by the number of hours worked.  As of the Petition Date, current Semimonthly Employees have accrued approximately $203,858 in earned but unused Vacation Time.  Approximately $184,041 of this time has been earned by Employees with more than one year of service with Resort.

84.    Paid Holidays.  Semimonthly Employees are also compensated for eight holidays per year and Employees are paid for up to twenty days spent in jury duty (less the amount earned as juror) per year.  Employees are also entitled to certain other paid leave, much of which is required by law, i.e. the Family and Medical Leave Act (FMLA).

85.    Military Leave.  Any Employee who is a member of the United States Army, Navy, Air Force, Marines, Coast Guard, National Guard, Reserves, or Public Health Service is entitled to an unpaid leave of absence for military service, training, or related obligations in accordance with applicable law.  Employees on military leave may substitute their accrued paid leave time for unpaid leave.

86.    Bereavement.  Biweekly Employees may receive three days of bereavement leave for the death of immediate family members.  Semimonthly Employees are not entitled to bereavement leave.

87.     The Debtors seek authority to honor the PTO, vacation, military, bereavement, and other applicable leave obligations to current Employees in the ordinary course of the Resort Debtors' business.

**D.      Deductions, Payroll Taxes and Withholding Obligations.**

88.     <u>Deductions</u>.   In the ordinary course of its business, Resort deducts certain amounts from the Employees' paychecks in each pay period, including, without limitation, garnishments, child support, and other pre-tax and after-tax deductions payable pursuant to certain of the Employee Benefit Plans and Programs discussed herein (such as an Employee's share of insurance premiums) (collectively, the "<u>Deductions</u>").   Resort remits the amount of the Deductions to the appropriate third-party recipients.   As of the Petition Date, approximately $5,130 in Deductions were accrued but unremitted to the third-party recipients.

89.     <u>Payroll Taxes</u>.   In addition, Resort is required by law to withhold amounts related to federal, state and local income taxes, Social Security, and Medicare taxes from an Employee's wages for remittance to the appropriate federal, state or local taxing authority (collectively, the "<u>Withheld Amounts</u>").   Resort must then match from its own funds the required remittances for Social Security and Medicare taxes and subsequently pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (the "<u>Employer Payroll Tax Contributions</u>," and together with the Withheld Amounts, the "<u>Payroll Taxes</u>").   The Resort Debtors estimate that approximately $150,494[16] in Payroll Taxes have accrued but remain unpaid as of the Petition Date.   Resort's average monthly submission for Payroll Taxes[17] is $303,261.

---

[16]     This figure includes approximately $35,127 in Employer Payroll Tax Contributions.

[17]     The Debtors submit that Payroll Taxes, to the extent that they remain in the Debtors' possession, constitute amounts held in trust and therefore, are not property of the Debtors' bankruptcy estates.

90. <u>Withholding Obligations</u>.    Resort pays all Payroll Taxes and Deductions (collectively, the "<u>Withholding Obligations</u>") directly to applicable taxing authorities and third parties.  As of the Petition Date, Resort may not have completed the process of forwarding certain Withholding Obligations to the appropriate third party recipients.

91.    The Resort Debtors request that they be authorized to remit any Withholding Obligations accrued but unpaid as of the Petition Date to the appropriate third parties and to continue to make such deductions from the Employees' paychecks postpetition and to remit such Withholding Obligations to the appropriate third party recipients.

### E.    Reimbursement Obligations.

92.    Most Employee work-related expenses are incurred on the Employees' personal credit cards.  It is the Resort Debtors' policy to reimburse Employees for certain expenses within the scope of their employment, including expenses for travel, mileage, lodging, meals and entertainment, supplies, cellular phone, gas, car rental, and other miscellaneous expenses.  Reasonable reimbursable expenses are incurred on the Resort Debtors' behalf and with the understanding that the Resort Debtors will reimburse such expenses.  The Resort Debtors request authority to pay such accrued reasonable prepetition reimbursement amounts, and to continue to reimburse such expenses as they are incurred postpetition.

### F.    Employee Benefit Plans and Programs.

93.    The Resort Debtors offer Employees many standard employee benefits, including health insurance, dental insurance, disability and life insurance, workers' compensation insurance, and other benefits (collectively, the "<u>Employee Benefit Plans and Programs</u>") through its parent company, Fontainebleau Resorts.    Although the contracts associated with the Employee Benefit Plans and Programs are between Fontainebleau Resorts and the applicable

providers (collectively, the "Providers"), Resort pays the premiums and payments for such plans directly to the Providers.

94.     Health, Dental, and Vision Insurance Plans.   Through the above-mentioned association with Fontainebleau Resorts, Resort offers all Employees one of four voluntary health insurance plans, two dental insurance plans, and a prescription vision insurance plan.   The health insurance plans for non-Florida Employees include two PPO plans and one HMO plan, administered by Health Plan of Nevada and Sierra Health and Life.   The health insurance plan for Florida Employees is through Humana Healthcare.   Each of the health insurance plans includes a prescription drug coverage plan.   Guardian Life Insurance Co. ("Guardian") administers the dental and vision plans.

95.     Payment Schedule.   Resort pays all of the employer obligations for its benefit programs on a current basis.   Mid-month, the Providers of the various Employee Benefits and Programs submit a consolidated bill to Fontainebleau Resorts and Resort for coverage in the month to follow.   Each company pays its respective share early in the following month, with such payment relating to the coverage which is actually being provided for that month.

96.     Employer Contribution.   Resort pays approximately 85% of the premium for the Employees electing either of the PPO plans and approximately 90% of the premium for Employees electing the HMO plan.   Employees are responsible for the payment of 70%-85% of the premiums under the dental and vision insurance plans, with the actual percentage depending upon whether the applicable Employee has a spouse and/or other dependents included on his or her particular plan.   Similarly, the amount of each Employee's contribution to his or her health insurance coverage varies depending upon the plan in which the Employee elects to participate and whether or not the Employee's spouse or dependents are covered. Resort's monthly

contribution (including both Employee and employer contributions) is approximately $88,209 for health insurance premiums and a combined total of approximately $12,509 for dental plan premiums and vision premiums.  All premiums for such benefit plans have been paid through May 31, 2009.

97.    The Resort Debtors anticipate that, as of the Petition Date, some Employees have filed claims under the health, dental, and vision insurance plans that are as yet unpaid.  If the Resort Debtors are not authorized to honor Resort's various obligations under the insurance programs, these Employees will likely not be reimbursed nor have their benefit claims paid.  Consequently, certain Employees may become primarily obligated for the payment of these claims in cases where Providers of health care have not been reimbursed.  These Employees may also face termination of health services.

98.    <u>Disability and Life Insurance</u>.  The Debtors also provide basic life and accidental death and dismemberment insurance ("<u>Life and AD&D Insurance</u>") to all Employees through Guardian.  The premiums are fully paid by Resort.  Such insurance entitles all Employees hired prior to January 1, 2009 and certain Executive Director level Employees hired after January 1, 2009 (collectively, the "<u>Group I Employees</u>") to a life insurance benefit of up to one year's salary not to exceed $750,000.  Employees hired after January 1, 2009 who are below the Executive Director level (the "<u>Group IV Employees</u>") are entitled to a maximum benefit of $20,000.  All Employees may purchase supplemental life insurance for themselves and/or their dependents at their own expense. The current monthly premium for Life and AD&D Insurance remitted by Resort is approximately $3,056.

99.    For Group I Employees, Resort also provides employer-paid long- and short-term disability plans ("<u>Disability Insurance</u>").  Resort allows Group IV Employees to purchase

Disability Insurance at their own cost and likewise permits Group I Employees to purchase supplemental Disability Insurance as they elect. Resort pays premiums of approximately $12,255 per month for short- and long-term disability insurance benefits for the Employees.

100.   <u>Workers Compensation Insurance Program</u>.   The Resort Debtors also carry workers compensation insurance provided by Hartford (a.k.a. Twin City Fire Insurance Co.) and premiums on such policy are paid through August 9, 2009.

101.   <u>401(k) Program</u>.   The Resort Debtors' direct and indirect parent, Fontainebleau Resorts, also maintains a retirement savings plan (the "<u>401(k) Plan</u>") meeting the requirements of section 401(k) of the Internal Revenue Code for the benefit of eligible employees, including Employees of the Debtors. The 401(k) Plan allows for automatic pre-tax salary deductions of eligible compensation up to the limits set by the Internal Revenue Code. Approximately 71 Employees currently participate in the 401(k) Plan. For both Semimonthly and Biweekly Employees, Resort withheld a combined total of approximately $17,145 in the last pay period of May 2009 for employee 401(k) contributions. The Resort Debtors are currently not making any matching contributions to such plan. The 401(k) plan is administered by Fontainebleau Resorts.

102.   <u>Exec-U-Care Coverage</u>.   Four Employees are eligible for Exec-U-Care, a form of supplemental insurance coverage for certain key employees. This program covers the majority of all out of pocket health costs incurred by enrollees. Resort pays Exec-U-Care claim charges for these Employees when due. The amount currently outstanding is the sum of $3,192.67. Historically, the Debtors have incurred on average approximately $1,126.20 per month in Exec-U-Care charges.

103.   <u>Car Allowance</u>.  Two of Resort's executives receive an automobile allowance as part of their negotiated compensation packages.  Resort currently pays $1,400 per applicable pay period for existing automobile allowances to these Employees.

104.   The Resort Debtors believe that it is critical that they be authorized to continue making payments for the Employee Benefit Plans and Programs on a regular basis as and when they come due.  For example, if the Resort Debtors fail to pay insurance premiums, certain Providers may seek payment directly from the Employees and might refuse to provide continuing medical services or treatment.  Employees and their dependents who have sought health care services in reliance on their insurance could become financially devastated if their medical services are affected by the Resort Debtors' bankruptcy filing.  Moreover, the morale of the Employees would be seriously undermined if Employee Benefit Plans and Programs are interrupted.

105.   The Resort Debtors' ability to remain engaged in a highly competitive business depends on their ability to retain existing skilled and dedicated employees. Absent the relief requested herein, the Employees and their families will suffer undue hardship and consequently, the Employees may be forced to seek employment elsewhere.  The requested funds requested are essential for the Employees and their families to be able to continue to meet their financial obligations and to maintain their life and health insurance. Since the Resort Debtors' ability to preserve their going concern value and to maximize the value of their assets for all creditors of its estate is inextricably linked with Resort's ability to retain its dedicated and loyal Employees, all creditors will be adversely affected if the Resort Debtors are not permitted to timely pay their obligations under the Employee Benefit Plans and Programs.  It is thus critical that any hardship

and disruption to Employees caused by these Chapter 11 Cases be minimized in order to preserve Employee morale and maintain the Resort Debtors' workforce.

106.    Accordingly, the Resort Debtors request authority (a) to pay the appropriate parties any unpaid prepetition obligations, including monthly maintenance or administrative fees, associated with the Employee Benefit Plans and Programs, and (b) to continue paying all premiums, expenses, and employee wage deductions related to the Employee Benefit Plans and Programs when due.

**G.    Direction to Banks.**

107.    With the exception of approximately three Employees, payroll for both Biweekly and Semimonthly Employees is effectuated through electronic fund transfers.

108.    Accordingly, the Resort Debtors also seek an order authorizing and directing all banks to receive, process, honor and pay any and all checks or electronic transfers drawn on Resort's payroll and general disbursement accounts related to ordinary course Employee compensation, Employee reimbursement obligations, Employee Benefit Plans and Programs, Deductions, Payroll Taxes and premiums and fees in respect of workers' compensation insurance, as outlined above, whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

**Debtors' Emergency Motion to (A) File Under Seal Exhibit "B" to Wage Motion and (B) Set an In Camera Hearing for Consideration Thereof.**

109.    Exhibit B to the Wage Motion (the "Wage Motion Exhibit") provides a detailed list of (a) the names of the Employees, (b) the amount due to each Employee as of the Petition Date, (c) the amounts withheld from each Employee's wages, including all applicable payroll taxes and related benefits, (d) the period of time for which such prepetition wages are due, and

(e) whether the Employee is presently employed by Resorts.  Additionally, the Wage Motion Exhibit also identifies any Employees who may hold insider status.

110.    Within the gaming and resort industry, salaries are highly confidential, as the pool of skilled persons within this specialized area of industry is limited.  Since all employers, including competitors of the Resort Debtors, naturally wish to obtain the most talented employees available, the information contained in the Wage Motion Exhibit is highly sensitive. The Resort Debtors need the continued support of their employees throughout the chapter 11 process.  Accordingly, the Resort Debtors seek entry of an order authorizing the Resort Debtors to file the Wage Motion Exhibit under seal in order to maintain as confidential the information contained in the Wage Motion Exhibit.

**Motion by Debtors for Entry of an Order (I) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service (II) Deeming Utility Companies Adequately Assured for Future Payment and Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utility Motion")**

111.    In connection with its daily operations, Resort uses electricity, natural gas, telephone and telecommunication, water, waste removal, and other utility services from approximately nine utility providers through approximately thirty different accounts with an average monthly aggregate cost of approximately $180,913.[18]  A complete list of the companies that provide these utility services (each, a "Utility Provider" and collectively, the "Utility Providers") is annexed to the Utility Motion as Exhibit "B" ("Utility Provider List").  As of the Petition Date, the Debtor believes they have no past due utilities payments due to the Utility Providers.

---

[18]    The amount assumes Resort's portion of the accounts listed in Exhibit "B" to the Utilities Motion that are shared with its non-debtor affiliate.

112.    Prior to the Petition Date, certain of the Utility Providers (the "<u>Assured Utility</u> <u>Providers</u>") were provided letters of credit or deposits from the Debtors as security for future services to be provided by such Utility Provider (collectively, the "<u>Pre-Petition Security</u> <u>Deposits</u>").  A list containing the Pre-Petition Security Deposits is attached to the Utility Motion as Exhibit "C".  As of the Petition Date, the Assured Utility Providers include Southwest Gas Corporation ("<u>SW Gas</u>"), NV Energy, and Las Vegas Valley Water District ("<u>LVVWD</u>").

113.    On August 13, 2008, Resort provided SW Gas with an irrevocable standby letter of credit (the "<u>SW LOC</u>") in the amount of $754,672 to secure utility services.  The termination date of the SW LOC is currently August 31, 2009.  The SW LOC provides that it will automatically renew without amendment for a period of one year upon each successive expiration date, but in no event later than August 2016, unless Bank of America ("<u>BOA</u>") provides thirty days' notice of its intent not to renew the SW LOC for any additional period.  In addition to the SW LOC, SW Gas currently holds two deposits totaling approximately $8,130 for the benefit of Resort (the "<u>SW Gas Cash Deposits</u>").  The combined average monthly invoices for all SW Gas accounts maintained by Resort was approximately $572.

114.    On February 3, 2009, Resort provided NV Energy with an irrevocable standby letter of credit (the "<u>NV Energy LOC</u>") in the amount of $855,000.  The NV Energy LOC provides that it will automatically renew without amendment for a period of one year from the date of signing or any future expiration date, unless BOA provides sixty days' notice of its intent not to automatically extend the NV Energy LOC.  The combined total of Resort's most recently monthly invoices for all relevant NV Energy accounts was approximately $156,000.

115.    LVVWD currently holds two deposits (the "<u>LVVWD Deposit</u>") in the aggregate amount of $5,250 for the benefit of Resort.  The combined total of Resort's most recently monthly invoices for all relevant LVVWD accounts was approximately $1,773.

116.    None of the other Utility Providers (the "<u>Other Utility Providers</u>") currently holds a deposit from Resort.

117.    The Utility Providers service the Resort Debtors' properties, including the Project and corporate offices.  Preserving utility services on an uninterrupted basis is essential to the Resort Debtors' ongoing operations and, therefore, to the success of their reorganization.  Any interruption of utility services, even for a brief period of time, would disrupt the Resort Debtors' ability to continue to construct the Project, thereby negatively impacting the estate.  Such a result could seriously jeopardize the Resort Debtors' reorganization efforts and, ultimately, value and creditor recoveries.  It is, therefore, critical that utility services continue uninterrupted during these Chapter 11 Cases.

118.    The Resort Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner.  Should the use of cash collateral be approved by this Court, the Resort Debtors expect that they will have ample liquidity, based upon borrowings, to pay their postpetition obligations to their Utility Providers.  Moreover, the Resort Debtors submit that the Assured Utility Providers are adequately protected by the Pre-Petition Security Deposits.

119.    Nevertheless, to provide additional assurance of payment for future services to the Other Utility Providers, the Resort Debtors will deposit $25,000, a sum in excess of the Debtors' estimated cost of their aggregate monthly utility consumption of the Other Utility Providers, into an interest-bearing account (the "<u>Utility Deposit Account</u>") for the benefit of the Other Utility Providers.  The Utility Deposit Account will provide still further assurance of future payment,

over and above the Resort Debtors' ability to pay for future utility services in the ordinary course of business, based upon their cash on hand and cash flow from operations (collectively, with the Utility Deposit Account and Pre-Petition Security Deposits, the "<u>Proposed Adequate Assurance</u>").

120.    The Resort Debtors submit that the Proposed Adequate Assurance package provides sufficient protection to all Utility Providers.  Specifically, the Resort Debtors submit that the SW LOC, SW Gas Cash Deposits, the NV Energy LOC, and the LVVWD Deposit provide ample assurance of payment and thus respectfully request that SW Gas, NV Energy, and LVVWD be deemed adequately assured by the Pre-Petition Security Deposits.

121.    Accordingly, the Resort Debtors request entry of an order (i) prohibiting all Utility Providers from altering, refusing, or discontinuing service to the Resort Debtors on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Resort Debtors' Proposed Adequate Assurance (as defined in the above-named motion), (ii) deeming the Assured Utility Providers adequately assured of future payment by the Prepetition Security Deposits, (iii) deeming the Other Utility Providers assured of future payment by the Utility Deposit Account, and (iv) establishing procedures for determining requests for additional adequate assurance.

**<u>Debtors' Emergency Motion for an Order, (I) Authorizing, But Not Requiring, the Debtors to (a) Continue Their Existing Insurance Programs, and (b) Pay Certain Obligations in Respect Thereof, and (II) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "Insurance Motion")</u>**

122.    The Resort Debtors request entry of an order authorizing the Resort Debtors to (a) continue Resort's Owner Controlled Insurance Program (the "<u>OCIP</u>") for construction of the Project, which includes a workers' compensation program (the "<u>Workers' Compensation</u>

Program")[19] and a builder's risk program (the "Builder's Risk Program"),  as well as general liability, excess liability, contractor's pollution liability, and environmental site liability programs, and (b) continue all of the Resort Debtors' various insurance programs for, among other things, property, general liability, automobile, umbrella, excess liability, professional liability, crime, employment practices liability, directors' and officers' liability, and fiduciary liability (collectively, the "General Insurance Programs," and, together with the Workers' Compensation and Builder's Risk Programs, the "Insurance Programs") uninterrupted, and (c) honor certain of their undisputed prepetition obligations thereunder (collectively, the "Insurance Obligations")[.20]

**The Resort Debtors' OCIP and Related Obligations**

123.    The OCIP.  The Resort Debtors are required to maintain various forms of insurance coverage for all persons working on the Project site (collectively, the "Insured Parties") for claims arising from or related to their employment on the Project.  Under applicable Nevada law, programs similar to the OCIP are created to manage claims on projects with a construction budget of over $50 million.  Generally, an OCIP is a single insurance program that covers the owner, all enrolled contractors, and their enrolled subcontractors under a single insurance contract.  The benefits of an OCIP include reduced project cost and owner-controlled safety standards.[21]

---

[19]     The Resort Debtors have separately requested relief for workers' compensation payments for Resort employees in the Wage Motion, filed concurrently herewith.

[20]     In addition to the Insurance Programs discussed in this section, the Resort Debtors maintain numerous insurance programs with respect to, among other things, medical, prescription, dental, vision, and other health-related benefits and life, accidental death and dismemberment, and other welfare-related benefits. These policies are addressed in the Wage Motion.

[21]     Within certain states, including Nevada, it has become very difficult (and generally very expensive) for subcontractors to obtain workers' compensation insurance on larger projects, primarily due to the recent increase in construction litigation claims.  By using an OCIP, a project owner can reduce overall insurance costs significantly.  Further, by using an OCIP, the owner is also able to offer all qualified contractors and

124.    In the case of Resort, all contractors and subcontractors performing work at the Project site must enroll in the OCIP in order to provide their employees with appropriate work-related insurance coverage.  All other professionals, suppliers, and materialmen performing work at the Project site must also enroll, including, *inter alia*, architects, interior designers, engineers, vendors, suppliers, fabricators, and material dealers.  Persons not performing work at the Project site are excluded from coverage, as are workers who merely transport or deliver materials to or from the site and workers who specifically deal in hazardous materials and/or waste removal.

125.    OCIP Premium Payments and Cost-Sharing.  Since the OCIP covers various parties working at the Project site for multiple types of potential liability, the cost of such coverage is distributed amongst the Insured Parties in proportion to their actual cost, duration, and nature of participation in the Project.  Thus, although Resort is responsible for upfront payment of premiums as the contracting "Owner" under the policy, this cost has been and will continue to be ratably distributed amongst all Insured Parties over the course of Project construction.  Resort obtains reimbursement from the Insured Parties that are employers by deducting a ratable portion of the premium cost from each construction payment made to the Insured Parties (as set forth more fully below).

126.    In June 2007, Resort contracted for initial OCIP coverage and paid the first set of premiums (each, an "OCIP Premium") to the OCIP plan administrator, Aon Risk Services ("Aon").  In order to reimburse Resort for this and other subsequent upfront OCIP Premiums paid by Resort in advance of coverage, Aon continually recalculates the various premium percentages owed by each of the Insured Parties based upon the relevant Insured Party's

---

subcontractors the option of participating in the project, as opposed to only those contractors and subcontractors who can obtain affordable insurance.  Finally, an OCIP permits the owner to implement and enforce uniform safety standards, which provides yet another benefit to all parties involved.

payroll.[22]    Thus, as construction progresses, Aon monitors and assesses the proportionate required contribution from each of the Insured Parties.  Resort subsequently deducts the required premium amount, plus a small fee, from each Insured Party's portion of Resort's advance request. By following this process, Resort will recoup its initial cash investment for OCIP Premiums, and all Insured Parties are continuously provided with adequate workers' compensation coverage as required by applicable state law.   In the ordinary course of business, Resort will continue postpetition to deduct each Insured Party's ratable share of the prepaid OCIP Premiums from the amount that would otherwise be paid to the party by Resort for work completed on the Project.

127.    In anticipation of a completion date in late 2009, Resort solicited OCIP coverage through March 2010.  Pursuant to the terms of the OCIP, Resort has currently prepaid all OCIP Premiums.[23]

128.    <u>Workers' Compensation Program</u>.  The OCIP includes comprehensive workers' compensation coverage for all persons actively working at the Project site, including, but not limited to, enrolled contractors, subcontractors, vendors, suppliers, materialmen, architects, designers, engineers, and other similar service providers.  Such coverage is separate from the workers' compensation program for employees of the Resort Debtors and is intended to cover claims arising from injuries incurred at the Project location by persons who are not direct employees of the Resort Debtors.

129.    <u>Builders' Risk Program</u>.  As part of the OCIP, Resort also maintains insurance coverage for certain non-personal injury claims related to construction of the Project, including, *inter alia*, theft of construction materials, property damage, and similar claims.

---

[22]        The Insured Parties submit monthly payroll reports to Aon as part of the general OCIP administration process.

[23]        Upon completion of the Project, Aon will audit the total project costs and has the right to assess a supplemental premium.

130.     Other OCIP Programs.   Included within the OCIP are several other insurance programs that are intended to cover claims arising from or related to construction of the Project, including programs for general liability, excess liability, professional liability, contractor's pollution liability, and environmental site liability (collectively, the "Other OCIP Programs"). The cost of such coverage is included in the OCIP Premiums and, accordingly, all necessary premiums for such additional coverage have been prepaid by Resort as noted above.

131.     OCIP Deductibles and Open Claims.   Resort has a $250,000 deductible (the "Deductible") per incident under both the Workers' Compensation and Builder's Risk Programs of the OCIP.   Claimants are required to seek payment from the OCIP.   For the last twelve months, Resort has paid an average cost of $161,000 in deductibles for filed claims.  Resort has estimated that its obligations associated with open claims is approximately $2,095,000 as of the Petition Date.  Under the terms of the OCIP, Resort would be obligated to pay amounts up to the deductible for each such open claim.

132.     The OCIP Letter of Credit and Claims Escrow.   As part of its OCIP obligations, Resort obtained a letter of credit (the "OCIP LOC") from Bank of America in the amount of $11,750,000 for the benefit of multiple insurance providers that provide coverage for the OCIP.

133.     In addition to the OCIP LOC, when the OCIP was established, Resort funded a claims escrow of $250,000 with AIG.  AIG pays valid claims from this account, and Resort then replenishes the account to bring it back up to the $250,000 threshold.  Resort has booked a reserve of approximately $2,094,528 for open OCIP claims as of the Petition Date.

**The Debtors' General Insurance Programs and Related Obligations**

134.     General Insurance Programs.   In addition to the OCIP, the Resort Debtors maintain the General Insurance Programs to help manage the risks associated with their business.

The General Insurance Programs collectively are intended to provide coverage for Resort and its employees in connection with the Resort Debtors' general business operations.  A list of all insurance policies and the dates in which the policies are in force is attached to the Insurance Motion as Exhibit "C".[24]

135.    Continuation of the General Insurance Programs policies is essential to the ongoing operation of the Resort Debtors' businesses and is also required under the U.S. Trustee guidelines.   Accordingly, the Resort Debtors submit that it is both appropriate and necessary for Resort to (i) be authorized to pay any prepetition obligations associated with the OCIP and General Insurance Programs, including the payment of deductibles associated with such claims, and (ii) continue the OCIP and General Insurance Programs in the ordinary course of the Resort Debtors' business.

136.    The nature of the Resort Debtors' businesses and the extent of their operations make it essential for the Resort Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis.  The nonpayment of any premiums, deductibles, or related fees under one of the Insurance Programs could provoke one or more of the carriers under the Insurance Programs to terminate or decline to renew one or more aspects of the Insurance Programs, or to refuse to enter into new insurance agreements with the Resort Debtors in the future.  If the Insurance Programs are allowed to lapse without renewal, then the Resort Debtors could be exposed to substantial liability.  This exposure would almost certainly have an extremely negative impact on the Resort Debtors' ability to successfully reorganize.  Furthermore, the Resort Debtors would be required to obtain replacement policies on an expedited basis at what they expect to be a

---

[24]    A number of the policies have the Debtors' non-debtor affiliate, Fontainebleau Resorts, LLC, as an additional insured party under such policies.

significantly higher cost to their estates.  Accordingly, it is in the best interests of all creditors for the Resort Debtors to make all payments with respect to the Insurance Programs.

137.    Moreover, the Insurance Programs are vital to the Resort Debtors' continued operations since applicable state law mandates that the Resort Debtors maintain workers' compensation coverage for persons working at the Project site.  Failure by the Resort Debtors to pay the any necessary open prepetition claims or future premiums associated with the OCIP would potentially expose the Resort Debtors to substantial liability in fines by the state workers' compensation board.

138.    Finally, pursuant to the guidelines established by the United States Trustee for the Southern District of Florida (the "U.S. Trustee"), the Resort Debtors are obligated to remain current with respect to certain of their primary Insurance Programs.  Therefore, the continuation of the Insurance Programs on an uninterrupted basis and the payment of all prepetition and postpetition Insurance Obligations arising under the Insurance Programs are both essential to preserve the Resort Debtors' businesses and to comply with U.S. Trustee guidelines.

**Application by Debtors for Interim and Final Order Authorizing the Employment and Retention of Scott L. Baena and the Law Firm of Bilzin Sumberg Baena Price & Axelrod LLP as Counsel for the Debtors Nunc Pro Tunc to the Petition Date and for Entry of a Final Order on or After June 29, 2009**

139.    The Resort Debtors seek immediate entry of an interim order, and entry of a final order on or after June 29, 2009 authorizing the Resort Debtors to employ and retain Scott L. Baena, Esq. and the law firm of Bilzin Sumberg Baena Price & Axelrod LLP ("Bilzin Sumberg") as its general bankruptcy counsel in these Chapter 11 Cases.  The Resort Debtors request authority to employ Bilzin Sumberg under a general retainer because of the extensive legal services that will be required in connection with these Chapter 11 Cases and the firm's familiarity with the Resort Debtors' business operations.

140.    Mr. Baena and Bilzin Sumberg are well-known to this Court.  Mr. Baena has practiced in the areas of creditors' rights, workouts and restructurings, secured transactions, and bankruptcy for over 35 years.  He has represented numerous high-profile clients in some of the largest bankruptcy cases ever filed in this jurisdiction and elsewhere.  Mr. Baena is constantly recognized as "tops in his field" by his peers and by national and international rating associations such as Chambers Partners, Best Lawyers in America, Martindale-Hubbell, and Florida Trend. He is the only bankruptcy lawyer in Florida included for six consecutive years in the K & A Restructuring Register of the top 100 restructuring professionals in the United States.

141.    Likewise, Bilzin Sumberg has achieved national recognition for its restructuring and bankruptcy practice.  Chambers Partners most recently ranked the firm in the highest tier of bankruptcy groups situated in Florida.  The depth of the firm's restructuring and bankruptcy practice derives from the senior members of the practice group, including Mindy A. Mora, Jay M. Sakalo, Matthew I. Kramer, and Jason Z. Jones, all seasoned and highly regarded bankruptcy professionals, who – like Mr. Baena – handle matters throughout the United States.

142.    Prior to commencement of these Chapter 11 Cases, the Resort Debtors sought the services of Bilzin Sumberg with respect to, among other things, advice regarding restructuring matters in general, and preparation for the potential commencement and prosecution of chapter 11 cases on behalf of the Debtors.  The Resort Debtors believe that continued representation by its prepetition restructuring counsel, Bilzin Sumberg, is critical to the Resort Debtors' efforts to restructure its businesses because Bilzin Sumberg has extensive experience and expertise in complex commercial reorganization cases and has become familiar with the Debtors' business, legal and financial affairs.  Accordingly, Bilzin Sumberg is well-suited and uniquely able to guide the Resort Debtors through the chapter 11 process in an efficient and timely manner.

**Application by Debtors for Interim Order Authorizing the Employment and Retention of Buchanan Ingersoll & Rooney, P.C. as Special Counsel to the Debtors *Nunc Pro Tunc* to the Petition Date and for Entry of a Final Order**

143.    The Resort Debtors seek entry of an order (i) authorizing the employment and retention of Buchanan Ingersoll & Rooney PC ("Buchanan") as special counsel to the Resort Debtors *nunc pro tunc* to the Petition Date, and (ii) approving the terms and conditions under which Buchanan will be retained and compensated.

144.    The Resort Debtors seek to retain Buchanan as special counsel because of its intimate knowledge of the Debtors' business and operations. Since the inception of the Debtors in 2005, Buchanan has represented certain of the Debtors and non-debtor affiliates (collectively, "FB Entities") on a variety of matters, including general advice and legal services relating to the following practice areas: corporate, financing, tax, real estate, intellectual property, litigation, employment, construction and government relations matters (collectively, the "Buchanan Matters"). The Resort Debtors believe that the employment of Buchanan as special counsel for the Resort Debtors will enable the Resort Debtors to avoid the unnecessary delay and expense otherwise attendant to another law firm familiarizing itself with the Buchanan Matters. As a result of its knowledge and experience, it is unquestionable that the postpetition employment of Buchanan as special counsel to provide FB Entities with advice and services relating to the Buchanan Matters during the bankruptcy is in the best interests of the Resort Debtors and the Resort Debtors' estates.

145.    In addition to seeking to retain Buchanan as special counsel with respect to the Buchanan Matters, by separate Application filed herein, the Resort Debtors have filed applications to employ, among others, (i) Bilzin Sumberg, as the Resort Debtors' general bankruptcy counsel, (ii) Kasowitz Benson Torres & Friedman LLP, as special litigation counsel,

and (iii) Moelis & Company LLC and Citadel Derivatives Group LLC as investment bankers and financial advisors to the Resort Debtors.  The Resort Debtors will ensure that Buchanan will coordinate with the Resort Debtors' other professionals to ensure that services are, to the maximum extent possible, complementary and not duplicative.

**Application by Debtor for Entry of an Interim Order Authorizing the Employment and Retention of Kasowitz Benson Torres as Special Litigation Counsel**

146.    The Resort Debtors seek to retain Kasowitz Benson Torres & Friedman LLP ("Kasowitz Benson") as special litigation counsel because of Kasowitz Benson's extensive experience in matters concerning complex bankruptcy and commercial litigation.  Kasowitz Benson is a 300 attorney litigation firm based in New York City which has acted as lead counsel in numerous lawsuits on behalf of debtors against lenders. Among the "lender liability" cases handled by Kasowitz Benson are those in the bankruptcy cases of Adelphia, Le Natures, Refco, Hechinger Stores, FoxMeyer Drug Company, Fruit of the Loom, Enron, Sunbeam and NextWave Telecom.  All of these cases have involved hundred million to multi-billion dollar damage claims and those that have been resolved have yielded substantial benefits.  Accordingly, Kasowitz Benson is well suited to deal effectively with many of the potential legal issues that may arise in the Chapter 11 Cases, including prosecution of the Credit Agreement Litigation described below.

147.    Further, Kasowitz Benson currently represents Resort in connection with numerous aspects of dealing with its lenders and related issues.  In that capacity, among other things, Kasowitz Benson represents Resort in litigation against certain of Resort's lenders pending in the United States District Court for the District of Nevada, initially commenced in Nevada State Court on April 23, 2009 and removed by the defendants to federal court on May 13, 2009, captioned *Fontainebleau Las Vegas LLC v. Bank of America, N.A.*, Case No. 2:09-cv-

00860-RLH-GWF.  Contemporaneously with the filing of a chapter 11 petition by Resort, the complaint filed in Nevada has been withdrawn without prejudice and a substantially similar complaint has been filed as an adversary proceeding in this Court (the "Credit Agreement Litigation").

148.    Kasowitz Benson maintains offices in New York, Houston, Atlanta, San Francisco, Newark, and Miami.  Kasowitz Benson's principal areas of practice include, among others, general litigation and creditors' rights and bankruptcy.

149.    The proposed lead attorneys at Kasowitz Benson on this matter are Marc E. Kasowitz and David M. Friedman.  Mr. Kasowitz, the founding and managing partner of the firm, is widely regarded as one of the nation's preeminent business litigators and trial lawyers. He has been recognized in several publications as one of the nation's leading litigators and trial lawyers, including in Chambers USA ("bright and skilled" and "respected") and Law Dragon 500 ("the cream of the crop"), and was ranked among The American Lawyer's "Forty-Five Under 45."  Mr. Kasowitz has an extensive background as national trial counsel in complex litigation, including in the areas of bank finance, leveraged-buyouts, fraudulent conveyance, RICO, corporate governance, trade secret misappropriation, antitrust, securities, mass tort, breach of contract and other commercial cases.

150.    Mr. Friedman, the head of Kasowitz Benson's bankruptcy group, has represented, among others, debtors-in-possession, commercial lenders in complex real estate and industrial bankruptcies and informal restructurings, committees of creditors and equity security holders, hedge funds, high-yield mutual funds and other distressed investors, trustees in bankruptcy and acquirers of distressed businesses.  He has published articles and lectured on novel and complex areas of bankruptcy law.  Since the inception of its publication, Chambers has ranked Mr.

Friedman as one of the "Leading Individuals" in the United States in Bankruptcy/Restructuring. He is perennially listed as one of the "Best Lawyers in New York" and as one of the top bankruptcy lawyers in the United States in the "K&A Restructuring Register."  In 2007 and 2008, Lawdragon named Mr. Friedman one of the 500 leading lawyers in the United States.  Mr. Friedman has served as lead lawyer on many of the Kasowitz Benson lender-liability matters discussed above.

151.    The Resort Debtors seek to retain Kasowitz Benson on an interim and final basis as special litigation counsel to assist in the prosecution of the Chapter 11 Cases, the Credit Agreement Litigation and other necessary matters.  In particular, the Resort Debtors anticipate that Kasowitz Benson will provide the following professional services, among others, for the Debtors:

> a.    advise Resort regarding the pending Credit Agreement Litigation and all matters related thereto, including the continued prosecution of the Credit Agreement Litigation against all non-settling defendants;

> b.    commence and conduct any and all litigation necessary or appropriate, as directed by the Resort Debtors, to assert rights held by the Resort Debtors, including without limitation any litigation within the bankruptcy cases in adversary proceedings or contested matters in connection with the Prepetition Credit Agreement and/or any DIP Financing Agreement or contested cash collateral usage, as well as litigation to protect assets of the Resort Debtors' chapter 11 estates, confirm a plan of reorganization, or otherwise further the goal of completing the Resort Debtors' successful reorganization; and

> c.    advise the Resort Debtors with respect to any possible settlement of potential claims by or against the Resort Debtors' estates.

152.    The services of Kasowitz Benson are necessary and appropriate to enable the Resort Debtors to execute their duties as debtors and debtors-in-possession faithfully and are in the best interest of the Resort Debtors, their estates, and creditors.  It is proposed that Kasowitz

Benson be employed to render such services as requested by the Resort Debtors and agreed to by Kasowitz Benson pursuant to the terms of the Engagement Letter.

153.    In addition to seeking to retain Kasowitz Benson as special litigation counsel, by separate Application filed herein, the Resort Debtors have filed applications to employ, among others, (i) Bilzin Sumberg, as the Resort Debtors' general bankruptcy counsel, (ii) Buchanan as special counsel, and (iii) Moelis & Company LLC and Citadel Investment Group, L.L.C. as investment bankers and financial advisors to the Resort Debtors.  The Resort Debtors will ensure that Kasowitz Benson will coordinate with the Resort Debtors' other professionals to ensure that services are, to the maximum extent possible, complementary and not duplicative.

**Application by Debtor for Entry of an Interim Order Authorizing the Employment and Retention of Moelis & Company LLC as Financial Advisors and Investment Bankers to the Debtor *Nunc Pro Tunc* to the Petition Date and for Entry of a Final Order**

154.    The Resort Debtors require the expertise and services of a financial advisor and investment banker to assist in the restructure of outstanding debt obligations, raising additional capital and/or consummating a sale transaction, in a short timeframe, to facilitate the Resort Debtors' reorganization and emergence from chapter 11.

155.    Moelis & Company LLC ("Moelis") is an investment banking firm with its principal office located at 245 Park Avenue, 32nd Floor, New York, New York 10167.  Moelis is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation. Moelis was founded in 2007 and is a wholly-owned subsidiary of Moelis & Company Holdings LLC.   Moelis' chief executive officer is Kenneth D. Moelis and the Recapitalization & Restructuring Group is co-headed by Thane W. Carlston and William Q.

Derrough.  Moelis & Company Holdings LLC, together with its subsidiaries, has approximately 150 employees located in offices in New York, Los Angeles, Boston, Chicago and London.

156.    Moelis provides a broad range of corporate advisory services to its clients, including, without limitation, services pertaining to: (i) general financial advice; (ii) mergers, acquisitions, and divestitures; (iii) corporate restructurings; (iv) special committee assignments; and (v) capital raising.  Moelis and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

157.    Prior to the Petition Date, Moelis's professionals have worked closely with the Debtors' management and other professionals and have become well-acquainted with the Debtors' operations, debt structure, creditors and business and operations.  Accordingly, Moelis has developed significant and relevant experience and expertise regarding the Resort Debtors and their business that will assist it in providing effective and efficient services throughout the Chapter 11 Cases.

158.    Based on the breadth of Moelis' experience in this area and excellent reputation in providing financial advisory and investment banking services in complex chapter 11 cases such as these, the Resort Debtors, after due deliberation, determined it would be in the best interest of their estates, creditors and stakeholders to retain Moelis as their financial advisor and investment banker in the Resort Debtors' Chapter 11 Cases.  The Resort Debtors believe that Moelis is qualified and uniquely situated to perform the work required to facilitate the Resort Debtors' restructuring activities and exit from chapter 11.

**Application by Debtor for Entry of an Interim Order Authorizing the Employment and Retention of Citadel Derivatives Group LLC as Financial Advisors and Investment Bankers to the Debtor *Nunc Pro Tunc* to the Petition Date and for Entry of a Final Order**

159.     The Resort Debtors require the expertise and services of a financial advisor and investment banker to assist in the restructure of outstanding debt obligations, raising additional capital and/or consummating a sale transaction, in a short timeframe, to facilitate the Resort Debtors' reorganization and emergence from chapter 11.   Accordingly, the Resort Debtors believe that the retention of Citadel Derivatives Group LLC ("CDRG") is necessary and will be critical to the overall success of the reorganization efforts.

160.     Founded in 1990, Citadel Investment Group, L.L.C. ("Citadel") is a diverse global financial institution focused on financial services and investment strategies located at 131 South Dearborn Street, Suite 3200, Chicago, Illinois 60603. Citadel's investment banking services are provided by CDRG, a broker-dealer with the United States Securities and Exchange Commission and a member of the Financial Industry Regulatory Authority.

161.     CDRG is led by three senior investment bankers, Todd Kaplan, Brian Maier and Carl Mayer, each of whom joined CDRG from Merrill Lynch.  At Merrill Lynch, Todd Kaplan was head of Global Leveraged Finance, Capital Markets & Financing, Global Principal Investments and Corporate Finance, and Head of Capital Commitments; Brian Maier was Group Head of Consumer Industries and Equity Private Placements; and Carl Mayer was Head of Leveraged Finance Capital Markets.  Each of these principals has over 20 years of experience providing financial advisory, mergers, acquisitions and divestiture services.  In addition, CDRG has substantial experience in balance sheet restructurings and debt and equity capital raising services for clients across a wide range of industries, with a particular expertise in the gaming and lodging sector.

162.    CDRG's professionals have represented numerous gaming and lodging clients including: Fontainebleau Resorts, Harrah's Entertainment, MGM Mirage, International Game Technology, Kerzner International, Wynn Resorts, Trump Entertainment Resorts, Penn National Gaming, Boyd Gaming, Stations Casino, Isle of Capri, Mandalay Resorts Group, Greektown Casino, Seminole Tribe of Florida, Mashantucket Pequot (Foxwoods), Seneca Nation, Mohegan Tribal Gaming Authority (Mohegan Sun), Waterford Gaming, Yonkers Raceway, BLB Management Services, Intrawest Corporation, Cannery Casino Resorts, French Lick Resorts and Casino, San Pasqual, Chukchansi Economic Development Authority, Cabazon Band of Mission Indians, Galaxy Entertainment (Macau), MotorCity Casinos, Gulfside Casino Resorts, Hollywood Casinos, and Bally's Las Vegas.

163.    Based on the breadth of CDRG's experience in this area and excellent reputation in providing financial advisory and investment banking services to numerous hotel and gaming companies, the Resort Debtors, after due deliberation, determined it would be in the best interest of their estates, creditors and stakeholders to retain CDRG as their financial advisor and investment banker in the Chapter 11 Cases.  As such, the Resort Debtors believe that CDRG is qualified and uniquely situated to perform the work required to facilitate the Resort Debtors' restructuring activities and exit from chapter 11.

164.    The services to be provided by CDRG will be undertaken concurrently with the services of Moelis.  The Resort Debtors believe it is in the best interests of these estates to retain both CDRG and Moelis as financial advisors and investment bankers to the Debtors.  Each of these entities has critical, but distinct, expertise necessary to assist the Resort Debtors in effectuating a Restructuring Transaction, Capital Transaction or Sales Transaction.  In addition, the Resort Debtors recognize that each of these entities possess differing industry knowledge and

relationships that will be utilized for the benefit of the Debtors.  Furthermore, CDRG will coordinate any services performed (or to be performed) with Moelis, counsel for the Resort Debtors and other professionals as appropriate to ensure resources are not expended on duplication of effort.  Moreover, the combined aggregate fees that could be awarded to CDRG and Moelis in the event a Restructuring Transaction, Capital Transaction or Sale Transaction is consummated was specifically negotiated with the recognition and acknowledgment that both advisors would be engaged.

**Emergency Motion for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Notice, Claims and Balloting Agent**

165.    The Resort Debtors have more than 1600 potential creditors.  Although the office of the Clerk of the United States Bankruptcy Court for the Southern District of Florida (the "Clerk's Office") ordinarily would serve notice on the Resort Debtors' creditors and other parties in interest and administer claims against the Resort Debtors, the Clerk's Office may not have the resources to undertake such tasks, especially in light of the sheer magnitude of the Resort Debtors' creditor body and the tight timelines that frequently arise in chapter 11 cases.

166.    As specialists in legal administration services, Kurtzman Carson Consultants LLC ("KCC") provides comprehensive solutions to design legal notice programs and manage claims issues for chapter 11 cases.  With respect to chapter 11 case management, KCC specializes in noticing, claims processing, balloting and other administrative tasks necessary to operate chapter 11 cases effectively.  KCC is well-recognized as a specialist in performing these functions and has been retained in numerous chapter 11 cases of significant size, both in the Southern District of Florida and in other districts.  See, e.g., *In re Mercedes Homes, Inc.,* Case No. 09-11191 (Bankr. S.D. Fla. Jan. 29, 2009); *In re TOUSA, Inc.,* Case No. 08-10928 (Bankr. S.D. Fla. Jan. 31, 2008); *In re Levitt & Sons, LLC*, Case No. 07-19845 (Bankr. S.D. Fla. Nov. 14, 2007), *In re*

*All Am. Semiconductor, Inc.*, No. 07-12963 (Bankr. S.D. Fla. May 25, 2007); *see also In re Circuit City Stores, Inc.,* No. 08-36563 (Bankr. E.D. Va. Nov. 12, 2008); *In re Gottschalks Inc.*, Case No. 09-10157 (Bankr. D. Del. Jan. 15, 2009); *In re Aleris Int'l Inc.,* Case No. 09-10478 (Bankr. D. Del. Feb. 13. 2009); *In re HPG Int'l, Inc.,* Case No. 09-10231 (Bankr. D. Del. Jan. 27, 2009); *In re Wash. Mut., Inc.,* Case No. 08-12229 (Bankr. D. Del. Oct. 30, 2008); *In re Motor Coach Indus. Int'l, Inc.,* Case No. 08-12136 (Bankr. D. Del. Sept. 16, 2008); *In re Boscov's, Inc.,* Case No. 08-11637 (Bankr. D. Del. Aug. 5, 2008); *In re Mervyn's Holdings, LLC,* Case No. 08-11586 (Bankr. D. Del. July 30, 2008).

167. Accordingly, the Resort Debtors propose to engage KCC to act as the Debtors' notice, claims and balloting agent. The Resort Debtors respectfully submit that the retention of KCC is the most effective and efficient manner of noticing the thousands of creditors and parties in interest of the filing of the Resort Debtors' Chapter 11 Cases and other developments in the Chapter 11 Cases. In that capacity, KCC will transmit, receive, docket and maintain proofs of claim filed in connection with these Chapter 11 Cases and solicit ballots in favor of the Resort Debtors' chapter 11 plan.

**Emergency Motion for an Order Establishing Omnibus Hearing Dates and Certain Notice, Case Management and Administrative Procedures Pursuant to Section 105(a) of the Bankruptcy Code, Procedures and Local Bankruptcy Rule 2002-1 (the "Notice and Case Management Motion")**

168. The Resort Debtors expect there to be a substantial number of creditors and parties-in interest in these cases and that many of such parties will be filing requests for service of filings. The Resort Debtors also expect numerous motions, applications, orders, and other such documents to be filed in these cases that will need to be served on some or all of these parties.

169.    Given the size of these cases, the Resort Debtors believe it necessary to establish clear and streamlined procedures, in the form of the "Notice, Case Management, and Administrative Procedures" (the "Case Management Procedures") attached as Schedule 1 to Exhibit A of the Notice and Case Management Motion, in order to facilitate the efficient administration of these cases.  Specifically, the Case Management Procedures will benefit the Resort Debtors, the Court and all parties-in-interest by, among other things:

   a.    Reducing the need for emergency hearings and requests for expedited relief;

   b.    Fostering consensual resolution of important matters;

   c.    Assuring prompt receipt of appropriate notice affecting parties' interests;

   d.    Providing ample opportunity to parties-in-interest to prepare for and respond to matters before this Court;

   e.    Reducing the substantial administrative and financial burden that would otherwise be placed on the Resort Debtors and parties-in-interest who file documents in these cases; and

   f.    Reducing administrative burdens on the Court and the Clerk's office.

170.    The Resort Debtors propose to serve the Case Management Procedures on the master service list (the "Master Service List") maintained in accordance with Local Rule 2002-1(H) and the Case Management Procedures.  Additionally, on the last day of each calendar month, or as soon thereafter as is practicable, the Resort Debtors shall cause a copy of the Case Management Procedures to be served on each party that has filed a notice of appearance or request for notice in these cases during the preceding calendar month.  Further, the Case Management Procedures will be available, free of charge, (a) directly from the website to be maintained by KCC, the Resort Debtors' proposed notice, balloting and claims agent, in connection with these cases (www.kccllc.net/FBLV) or (b) by contacting KCC directly.  Should the Case Management Procedures be modified in any respect during the pendency of these cases,

the Resort Debtors will redistribute the modified Case Management Procedures to the Master Service List.

## Debtor's Motion to Establish Procedures to Permit Monthly Payment of Interim Fee Applications of Chapter 11 Professionals

171.    The Resort Debtors request that the Court enter an order establishing procedures (the "Procedures") for compensating and reimbursing professionals on a monthly basis comparable to those established in complex chapter 11 cases in this District and elsewhere.

172.    In connection with these Chapter 11 Cases, the Debtors are filing applications to retain (i) Bilzin Sumberg as general bankruptcy counsel, (ii) KCC as claims, noticing and balloting agent, (iii) Moelis as financial advisors and investment bankers, (iv) CRDG and Moelis as financial advisors and investment bankers, (v) Buchanan as special corporate, tax, and lobbying counsel, and (vi) Kasowitz Benson as special litigation counsel.  As this case progresses, the Resort Debtors may seek to employ additional professionals in the future.

173.    The Procedures will enable the Court and parties-in-interest to more effectively monitor fees incurred, and the Resort Debtors to spread out payment of professional fees, rather than suffer larger depletions to cash flow on an irregular basis.  Because of the likelihood that the Resort Debtors may seek to employ additional professionals, the process of such professional fee applications may well be burdensome on the Resort Debtors, these professionals, and the Court. Thus, implementation of the Procedures will provide a streamlined and efficient method for compensating professionals and, as stated, such procedures will allow the Court and parties-in-interest to monitor fees sought by and paid to such professionals.  Moreover, the Procedures will ensure against imposition upon estate professionals to finance the Resort Debtors' Chapter 11 Cases.

174.     The requested Procedures would require all professionals retained with Court approval to present a detailed statement of services rendered and expenses incurred for the prior month to counsel for the Resort Debtors, counsel for the Official Committee of Unsecured Creditors, if one is established, counsel to any other appointed committee, counsel to the Resort Debtors' postpetition lenders, and the United States Trustee.  If no timely objection is filed, the Procedures require the Resort Debtors to promptly pay 80% of the amount of fees incurred for the month and 100% of out-of-pocket expenses for the month.  These payments and allowance of payment of a 20% holdback will be subject to the Court's subsequent approval as part of the normal interim fee application process (i.e. every 120 days).

175.     The Resort Debtors will include all payments made to Professionals as contemplated herein in their monthly operating reports, identifying the amount paid to each Professional.  Additionally, the Procedures will enable all parties to closely monitor costs of administration, and will enable the Resort Debtors to maintain a more level cash flow availability and implement efficient cash management.

**Motion for Entry of an Order Authorizing the Retention of Compensation of Certain Professionals in the Ordinary Course of Business Nunc Pro Tunc to the Petition Date**

176.     The Resort Debtors employ various attorneys, accountants, appraisers, and other professionals in the ordinary course of their business (each, an "OCP" and, collectively, the "OCPs").  The OCPs provide services for the Resort Debtors in a variety of matters unrelated to these Chapter 11 Cases, including legal services with regard to specialized areas of the law such as real estate and gaming, accounting services, auditing and tax services, and certain consulting services.

177.     The Resort Debtors submit that the continued employment and compensation of the OCPs is in the best interests of their estates, creditors, and other parties in interest.  Although

the Resort Debtors anticipate that the OCPs will wish to continue to represent the Resort Debtors on an ongoing basis, some may not be in a position to do so if the Resort Debtors cannot pay them on a regular basis.  Without the background knowledge, expertise, and familiarity that the OCPs have relative to the Resort Debtors and their operations, the Resort Debtors undoubtedly would incur additional and unnecessary expenses in educating replacement professionals about the Resort Debtors' business and financial operations.

178.   The Resort Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Resort Debtors' businesses.  Moreover, in light of the substantial number of OCPs, and the significant costs associated with the preparation of employment applications for professionals who will receive relatively modest fees, the Resort Debtors submit that it would be impractical, inefficient, and extremely costly for the Resort Debtors and their legal advisors to prepare and submit individual applications and proposed retention orders for each OCP.

179.   Moreover, in light of the substantial number of OCPs and the significant costs associated with the preparation of employment applications for professionals who will receive relatively modest fees, the Resort Debtors submit that it would be impractical, inefficient, and extremely costly for the Resort Debtors and their legal advisors to prepare and submit individual applications and proposed retention orders for each OCP.  The Resort Debtors seek permission to continue to employ the OCPs postpetition and to retain any new OCP postpetition without requiring each OCP to file a formal application for employment or compensation pursuant to §§ 327, 328, 329 or 330 of the Bankruptcy Code.  Specifically, with respect to the OCPs, the Resort Debtors request that (i) the Court dispense with the requirement of individual employment applications and retention orders, and (ii) each OCP be retained as of the Petition

Date on terms substantially similar to those in effect prior to the Petition Date, but subject to the terms and procedures outlined in the above-named motion (the "Compensation Procedures").

180.    Although some of the OCPs may hold relatively small unsecured claims against one or more of the Resort Debtors in connection with services rendered to such Debtor prepetition, the Resort Debtors do not believe that any of the OCPs have an interest materially adverse to the Resort Debtors, their creditors or other parties in interest.

181.    Therefore, the Resort Debtors submit it is in the best interest of all creditors and parties in interest to avoid any disruption in the professional services that are required for the day-to-day operation of the Resort Debtors' businesses by retaining and compensating the OCPs in accordance with the Compensation Procedures.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Further deponent says not.

Howard C. Karawan

EXHIBIT "A"

