**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:                                                    Chapter 11

FONTAINEBLEAU LAS VEGAS
HOLDINGS, LLC, ET AL.,[1]                    Case No.  09-21481-BKC-AJC


                    Debtors.                   (Jointly Administered)
_____/

**DEBTORS' EMERGENCY MOTION FOR AN ORDER (I) AUTHORIZING, BUT NOT REQUIRING, THE DEBTORS TO (A) CONTINUE THEIR EXISTING INSURANCE PROGRAMS AND (B) PAY CERTAIN PREPETITION OBLIGATIONS IN RESPECT THEREOF, AND (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**

**EMERGENCY HEARING REQUESTED**
**PURSUANT TO LOCAL RULE 9013-1(F) AND (K)**

**Basis for Emergency Relief**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") request an emergency hearing in this matter on or before June 11, 2009, to permit the Debtors to continue their existing insurance programs in the ordinary course of business.  The Debtors respectfully request that the Court waive the provisions of Rule 9075-1(B) of the Local Rules for the United States Bankruptcy Court for the Southern District of Florida (the "Local Rules"), which requires an affirmative statement that the Debtors made a bona fide effort to resolve the issues raised in this motion, as the relief requested herein is urgent in nature and does not lend itself to advance resolution.

Fontainebleau Las Vegas Holdings, LLC ("Resort Holdings"), Fontainebleau Las Vegas, LLC ("Resort") and Fontainebleau Las Vegas Capital Corp. ("Capital"; and, together with Resort Holdings and Resort, the "Debtors"), by and through undersigned counsel, file this motion (the

---

[1]        The last four digits of each Debtor's tax identification number are: (i) Fontainebleau Las Vegas Holdings, LLC [9337]; (ii) Fontainebleau Las Vegas, LLC [9332]; and (iii) Fontainebleau Las Vegas Capital Corp. [7822].  The Debtors' current mailing address is 19950 West Country Club Drive, Aventura, Florida  33180.

"Motion") for an order, (I) authorizing, but not requiring, the Debtors to (a) continue their existing insurance programs, and (b) pay certain obligations in respect thereof, and (II) authorizing financial institutions to honor and process checks and transfers related to such obligations.  In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      This Court has jurisdiction over these cases (the "Chapter 11 Cases") pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper in this district pursuant to 28 U.S.C. § 1408.

## BACKGROUND

2.      On June 9, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11, title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

3.      The Debtors are operating their business and managing their affairs as debtors in possession.  11 U.S.C. §§ 1107(a) and 1108.

4.      No trustee, examiner, or committee has been appointed or requested in these Chapter 11 Cases.

5.      Concurrently herewith, the Debtors have filed their *Ex Parte Motion by Debtors for Joint Administration* pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1(B) of the Local Rules.

6.      Until recently, the Debtors were actively engaged in ongoing construction and development of "Fontainebleau Las Vegas," conceived as a signature "Tier A" casino hotel resort with gaming, lodging, convention and entertainment amenities (the "Project").  Upon completion of construction, the Debtors anticipate that the Project will support 6,000 full-time jobs at the Project and 2,000 additional jobs elsewhere in Las Vegas.

7.      The Project is situated on approximately 24.4 acres at the sites of the former El Rancho Hotel and Algiers Hotel on the north end of the Las Vegas Strip.  The current plans for the Project include a 63-story glass skyscraper, featuring, among other things: (a) approximately 3,815 stylishly furnished guest rooms;[2] (b) an approximately 100,000 square-foot casino with an approximately 40-foot tall ceiling, featuring 1,700 slot machines, 125 table games, a 14-table poker room and a race and sports book; (c) approximately 394,000 square feet of class "A" convention, meeting and pre-function space; (d) an approximately 60,000 square-foot state-of-the-art spa; (e) a rooftop pool; and (f) a state-of-the-art theater featuring live entertainment and shows.   At the time that construction of the Project was reduced to a stabilization effort as a result of the unjustified failure of certain of the Debtors' lenders to fulfill their loan commitments, the Project was approximately 70% complete.

8.      The Debtors' non-debtor affiliates, Fontainebleau Las Vegas Retail Parent, LLC ("Retail Parent"), Fontainebleau Las Vegas Retail Mezzanine, LLC ("Retail Mezzanine") and Fontainebleau Las Vegas Retail, LLC ("Retail"; and, together with Retail Parent and Retail Mezzanine, the "Retail Entities"),[3] have been engaged in the development of approximately 286,500 square feet of the Project's retail component, consisting of signature restaurants, marquee nightclubs and related amenities (the "Retail Component").

9.      The Retail Entities are lessees under a long term lease from Resort of approximately 286,500 square feet of the Project's Retail Component, which when completed is

---

[2]      Original plans for the Project included 933 luxury hotel-condominium suites.  The Debtors have determined that market conditions are so highly unfavorable at the present time that the sale of hotel-condominium suites is not desirable.  The Debtors may reincorporate hotel-condominiums in the Project if market conditions become more favorable in the future.

[3]      Although chapter 11 cases for the Retail Entities have not been filed concurrently with those of the Debtors, it is nonetheless anticipated that the Retail Entities will be filing petitions for relief under chapter 11 shortly, and that the bankruptcy cases of the Debtors and the Retail Entities will be jointly administered.

anticipated to consist of signature restaurants, marquee nightclubs, and related amenities (the "Retail Space").

10.     The Debtors' business strategy is to create an architecturally and experientially significant destination resort appealing to sophisticated travel consumers with high levels of discretionary income and a desire for luxury and aesthetic quality.  The Debtors intend to reflect the Fontainebleau brand[4] and image in their lodging, convention and entertainment offerings, including (i) luxury hotel rooms and suites, (ii) high-tech convention and meeting amenities, (iii) signature restaurants and lounges, (iv) upscale entertainment venues, (v) state-of-the-art spa facilities, (vi) high-end retail outlets, and (vii) gaming.

11.     In support of this and other first day motions, the Debtors incorporate by reference the factual statements contained in the *Declaration of Howard C. Karawan in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [D.E. #5] (the "Karawan Declaration").

## RELIEF REQUESTED

12.     By this Motion, the Debtors request, pursuant to §§ 105(a), 362(d), 363(b), and 503(b) of the Bankruptcy Code, entry of an order substantially in the form attached hereto as Exhibit "A", authorizing the Debtors to (a) continue Resort's Owner Controlled Insurance Program (the "OCIP") for construction of the Project, which includes a workers' compensation program (the "Workers' Compensation Program")[5] and a builder's risk program (the "Builder's

---

[4]     Resort and Retail are non-exclusive licensees of the trademarks and service marks related to the "Fontainebleau."  The trademarks and service marks are owned by Fontainebleau Resort Properties II, LLC, a non-debtor affiliate.

[5]     The Debtors have separately requested relief for workers' compensation payments for Resort employees in the *Emergency Motion by Debtors for Order (I) Authorizing the Debtors to Pay (A) Prepetition Wages, Salaries, and Employee Benefits and (B) Prepetition Withholding Obligations, (II) Authorizing Continuation of Employee Benefit Plans and Programs Postpetition, and (III) Directing All Banks to Honor Payments of Prepetition Employee Obligations*, filed concurrently herewith.

Risk Program"),  as well as general liability, excess liability, contractor's pollution liability, and environmental site liability programs, and (b) continue all of the Debtors' various insurance programs for, among other things, property, general liability, automobile, umbrella, excess liability, professional liability, crime, employment practices liability, directors' and officers' liability, and fiduciary liability (collectively, the "General Insurance Programs," and, together with the Workers' Compensation and Builder's Risk Programs, the "Insurance Programs") uninterrupted, and (c) honor certain of their undisputed prepetition obligations thereunder (collectively, the "Insurance Obligations").[6]

### The Debtors' OCIP and Related Obligations

13.     The OCIP.  The Debtors are required to maintain various forms of insurance coverage for all persons working on the Project site (collectively, the "Insured Parties") for claims arising from or related to their employment on the Project.  Under applicable Nevada law, programs similar to the OCIP are created to manage claims on projects with a construction budget of over $50 million.  Generally, an OCIP is a single insurance program that covers the owner, all enrolled contractors, and their enrolled subcontractors under a single insurance contract.  The benefits of an OCIP include reduced project cost and owner-controlled safety standards.[7]

---

[6]         In addition to the Insurance Programs discussed herein, the Debtors maintain numerous insurance programs with respect to, among other things, medical, prescription, dental, vision, and other health-related benefits and life, accidental death and dismemberment, and other welfare-related benefits.  These policies are addressed in a separate motion filed contemporaneously herewith regarding the Debtors' employee wage policies and benefits programs.

[7]         Within certain states, including Nevada, it has become very difficult (and generally very expensive) for subcontractors to obtain workers' compensation insurance on larger projects, primarily due to the recent increase in construction litigation claims.  By using an OCIP, a project owner can reduce overall insurance costs significantly.  Further, by using an OCIP, the owner is also able to offer all qualified contractors and subcontractors the option of participating in the project, as opposed to only those contractors and subcontractors who can obtain affordable insurance.  Finally, an OCIP permits the owner to implement and enforce uniform safety standards, which provides yet another benefit to all parties involved.

14.     In the case of Resort, all contractors and subcontractors performing work at the Project site must enroll in the OCIP in order to provide their employees with appropriate work-related insurance coverage.  All other professionals, suppliers, and materialmen performing work at the Project site must also enroll, including, *inter alia*, architects, interior designers, engineers, vendors, suppliers, fabricators, and material dealers.  Persons not performing work at the Project site are excluded from coverage, as are workers who merely transport or deliver materials to or from the site and workers who specifically deal in hazardous materials and/or waste removal.

15.     OCIP Premium Payments and Cost-Sharing.  Since the OCIP covers various parties working at the Project site for multiple types of potential liability, the cost of such coverage is distributed amongst the Insured Parties in proportion to their actual cost, duration, and nature of participation in the Project.  Thus, although Resort is responsible for upfront payment of premiums as the contracting "Owner" under the policy, this cost has been and will continue to be ratably distributed amongst all Insured Parties over the course of Project construction.  Resort obtains reimbursement from the Insured Parties that are employers by deducting a ratable portion of the premium cost from each construction payment made to the Insured Parties (as set forth more fully below).

16.     In June 2007, Resort contracted for initial OCIP coverage and paid the first set of premiums (each, an "OCIP Premium") to the OCIP plan administrator, Aon Risk Services ("Aon").  In order to reimburse Resort for this and other subsequent upfront OCIP Premiums paid by Resort in advance of coverage, Aon continually recalculates the various premium percentages owed by each of the Insured Parties based upon the relevant Insured Party's payroll.[8] Thus, as construction progresses, Aon monitors and assesses the proportionate required

---

[8]     The Insured Parties submit monthly payroll reports to Aon as part of the general OCIP administration process.

contribution from each of the Insured Parties.  Resort subsequently deducts the required premium amount, plus a small fee, from each Insured Party's portion of Resort's advance request.  By following this process, Resort will recoup its initial cash investment for OCIP Premiums, and all Insured Parties are continuously provided with adequate workers' compensation coverage as required by applicable state law.  In the ordinary course of business, Resort will continue postpetition to deduct each Insured Party's ratable share of the prepaid OCIP Premiums from the amount that would otherwise be paid to the party by Resort for work completed on the Project.

17.     In anticipation of a completion date in late 2009, Resort solicited OCIP coverage through March 2010.  Pursuant to the terms of the OCIP, Resort has currently prepaid all OCIP Premiums.[9]

18.     Workers' Compensation Program.  The OCIP includes comprehensive workers' compensation coverage for all persons actively working at the Project site, including, but not limited to, enrolled contractors, subcontractors, vendors, suppliers, materialmen, architects, designers, engineers, and other similar service providers.  Such coverage is separate from the workers' compensation program for employees of the Debtors and is intended to cover claims arising from injuries incurred at the Project location by persons who are not direct employees of the Debtors.

19.     Builders' Risk Program.  As part of the OCIP, Resort also maintains insurance coverage for certain non-personal injury claims related to construction of the Project, including, *inter alia*, theft of construction materials, property damage, and similar claims.

20.     Other OCIP Programs.  Included within the OCIP are several other insurance programs that are intended to cover claims arising from or related to construction of the Project,

---

[9]     Upon completion of the Project, Aon will audit the total project costs and has the right to assess a supplemental premium.

including programs for general liability, excess liability, professional liability, contractor's pollution liability, and environmental site liability (collectively, the "Other OCIP Programs"). The cost of such coverage is included in the OCIP Premiums and, accordingly, all necessary premiums for such additional coverage have been prepaid by Resort as noted above.

21.    OCIP Deductibles and Open Claims.   Resort has a $250,000 deductible (the "Deductible") per incident under both the Workers' Compensation and Builder's Risk Programs of the OCIP.   Claimants are required to seek payment from the OCIP.   For the last twelve months, Resort has paid an average cost of $ 161,000 in deductibles for filed claims.  Resort has estimated that its obligations associated with open claims is approximately $2,095,000 as of the Petition Date.  Under the terms of the OCIP, Resort would be obligated to pay amounts up to the deductible for each such open claim.

22.    The OCIP Letter of Credit and Claims Escrow.  As part of its OCIP obligations, Resort obtained a letter of credit (the "OCIP LOC") from Bank of America in the amount of $11,750,000 for the benefit of multiple insurance providers that provide coverage for the OCIP.

23.    In addition to the OCIP LOC, when the OCIP was established, Resort funded a claims escrow of $250,000 with AIG.  AIG pays valid claims from this account, and Resort then replenishes the account to bring it back up to the $250,000 threshold.  Resort has booked a reserve of approximately $2,094,528 for open OCIP claims as of the Petition Date.

**The Debtors' General Insurance Programs and Related Obligations**

24.    General Insurance Programs.  In addition to the OCIP, the Debtors maintain the General Insurance Programs to help manage the risks associated with their business.  The General Insurance Programs collectively are intended to provide coverage for Resort and its

employees in connection with the Debtors' general business operations.  A list of all insurance policies and applicable policy periods is attached to this Motion as Exhibit "B".[10]

25.    Continuation of the General Insurance Programs policies is essential to the ongoing operation of the Debtors' businesses and is also required under the U.S. Trustee guidelines.   Accordingly, the Debtors submit that it is both appropriate and necessary for Resort to (i) be authorized to pay any prepetition obligations associated with the OCIP and General Insurance Programs, including the payment of deductibles associated with such claims, and (ii) continue the OCIP and General Insurance Programs in the ordinary course of the Debtors' business.

## BASIS FOR RELIEF

**A.    Cause Exists to Authorize the Continuation of the Debtors' Insurance Programs and Payment of Any Prepetition Insurance Obligations**

26.    Pursuant to § 503(b)(l) of the Bankruptcy Code, a debtor may incur, and the court, after notice and a hearing, shall allow as administrative expenses, among other things, "the actual, necessary costs and expenses of preserving the estate."  In addition, pursuant to § 363(b) of the Bankruptcy Code, a debtor may, in the exercise of its sound business judgment and after notice and a hearing, use property of the estate outside of the ordinary course of business. Section 105(a) of the Bankruptcy Code further provides as follows:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte,* taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

27.    The Debtors submit that the use of the estates' funds for payment of the Insurance

---

[10]    A number of the policies have the Debtors' non-debtor affiliate, Fontainebleau Resorts, LLC, as an additional insured party under such policies.

Obligations is permitted by §§ 503(b)(l), 363(b), and 105(a) as a necessary cost of preserving the estates.

28.     The Debtors will have postpetition obligations under their Insurance Programs in the ordinary course of business; however, to the extent that any future payments involve Insurance Obligations, such payments are necessary and appropriate and may be authorized under §§ 363(b) and 105(a) of the Bankruptcy Code pursuant to the "doctrine of necessity."  The "doctrine of necessity" permits a bankruptcy court to exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code.  *See In re Lehigh New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (where payment of prepetition claim is essential to the ongoing operations of the debtor, payment may be authorized out of the corpus of the estate); *In re Ionosphere Clubs, Inc.,* 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) (discussing bankruptcy court authorization of payment of prepetition wages); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (D. Del. 1999) (authorizing payment to vendors whose goods were essential to debtors' reorganization efforts); *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor.").  The rationale for the "doctrine of necessity" is consistent with the paramount goal of chapter 11, namely, "facilitating the continued operation and rehabilitation of the debtor."  *Ionosphere Clubs*, 98 B.R. at 176.  Accordingly, pursuant to §§ 105(a) and 363(b) of the Bankruptcy Code, this Court is empowered to grant the relief requested herein.

29.     The nature of the Debtors' businesses and the extent of their operations make it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis.  The nonpayment of any premiums, deductibles, or related fees under one of the Insurance

Programs could provoke one or more of the carriers under the Insurance Programs to terminate or decline to renew one or more aspects of the Insurance Programs, or to refuse to enter into new insurance agreements with the Debtors in the future.  If the Insurance Programs are allowed to lapse without renewal, then the Debtors could be exposed to substantial liability.  This exposure would almost certainly have an extremely negative impact on the Debtors' ability to successfully reorganize.  Furthermore, the Debtors would be required to obtain replacement policies on an expedited basis at what they expect to be a significantly higher cost to their estates.  Accordingly, it is in the best interests of all creditors for the Debtors to make all payments with respect to the Insurance Programs.

30.     Moreover, the Insurance Programs are vital to the Debtors' continued operations since applicable state law mandates that the Debtors maintain workers' compensation coverage for persons working at the Project site.  Failure by the Debtors to pay the any necessary open prepetition claims or future premiums associated with the OCIP may potentially expose the Debtors to substantial liability in fines by the state workers' compensation board.

31.     Finally, pursuant to the guidelines established by the United States Trustee for the Southern District of Florida (the "U.S. Trustee"), the Debtors are obligated to remain current with respect to certain of their primary Insurance Programs.  Therefore, the continuation of the Insurance Programs on an uninterrupted basis and the payment of all prepetition and postpetition Insurance Obligations arising under the Insurance Programs are both essential to preserve the Debtors' businesses and to comply with U.S. Trustee guidelines.

32.     Courts have granted the relief requested herein in other large chapter 11 cases in this district and other districts.  *See, e.g., In re Gemini Cargo Logistics, Inc.*, Case No. 06-10870 (Bankr. S.D. Fla. Mar. 17, 2006) [D.E. # 66]; *In re SemCrude, L.P.,* Case No. 08-11525 (Bankr.

D. Del. July 23, 2008) [D.E. #60]; *In re Vertis Holdings, Inc.,* 08-11460 (Bankr. D. Del. July 16, 2008) [D.E. #47]; *In re Landsource Cmtys. Dev. LLC,* 08-11111 (Bankr. D. Del. July 10, 2008) [D.E. #202]; *In re Sharper Image Corp.,* Case No. 08-10322 (Bankr. D. Del. Feb. 20, 2008) [D.E. #11]; *In re Charys Holding Company, Inc.,* Case No. 08-10289 (Bankr. D. Del. Feb. 15, 2008) [D.E. #23]; *In re Am. LaFrance, LLC,* Case No. 08-10178 (Bankr. D. Del. Jan. 30, 2008) [D.E. #30]; *In re World Health Alternatives, Inc.,* Case No. 06-10166 (Bankr. D. Del. Mar. 15, 2006) [D.E. #150]; *In re Winn-Dixie Stores, Inc.,* Case No. 05-11063 (Bankr. S.D.N.Y. Mar. 15, 2005) [D.E. #432].

33.    Accordingly, by this Motion, the Debtors seek authority, pursuant to §§ 503(b)(l), 363(b), and 105(a) of the Bankruptcy Code to honor their Insurance Obligations and continue their Insurance Programs uninterrupted, as such programs were in effect as of the Commencement Date.

**B.    Request for Authority for Banks to Honor and Pay Checks Issued and Electronic Funds Transferred to Pay Insurance Obligations**

34.    The Debtors further request that the Court authorize and direct all applicable banks and other financial institutions to receive, process, honor, and pay any and all checks drawn or electronic funds transferred to pay Insurance Obligations, whether such checks were presented prior to or after the Petition Date; *provided, however,* such checks or electronic transfers are identified by the Debtors as relating directly to the authorized payment of Insurance Obligations.  The Debtors also seek authority to issue new postpetition checks, or effect new electronic fund transfers, on account of the Insurance Obligations to replace any prepetition checks or electronic fund transfer requests that may be dishonored or rejected as a result of the commencement of the Debtors' Chapter 11 Cases.  Should the proposed use of cash collateral be approved by this Court, the Debtors expect that they will have ample liquidity, based upon

borrowings, to pay their postpetition obligations to pay such amounts as they become due in the ordinary course of the Debtors' businesses.

35.    Bankruptcy Rule 6003 provides that to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to 20 days after the Petition Date.  FED. R. BANKR. P. 6003.  As described above and in the Karawan Declaration, the Debtors' business operations rely heavily on the Insurance Programs.  The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors, as described herein, and that Bankruptcy Rule 6003 has been satisfied.  Further, the Debtors submit that the information provided herein and on the attached exhibits amply meets the requirements of Local Rule 9013-1(K).

36.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

37.    As set forth above and in greater detail in the Karawan Declaration, the relief requested herein is appropriate as such relief will assist the Debtors in their restructuring efforts, with the least possible disruption or harm to their businesses.  Based on the foregoing, the Debtors submit that the relief requested is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted in all respects.

## RESERVATION OF RIGHTS

38.    Nothing contained herein is intended or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under § 365 of the Bankruptcy Code.  Likewise, if this Court

grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim.

<u>**NOTICE**</u>

39.     The Debtors have provided notice of this motion to all parties on the Master Service List as defined in Local Rule 2002-1(H) and all parties known to be directly affected by the relief requested herein.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto as Exhibit "A", granting the relief requested in this Motion, and such other and further relief as is just and proper.

Dated: June 10, 2009

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).

Respectfully submitted,
BILZIN SUMBERG BAENA PRICE & AXELROD LLP
*Proposed Counsel for the Debtors*
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131
Telephone: (305) 374-7580
Facsimile: (305) 375-7593

By: /s/  Scott L. Baena

Scott L. Baena
Fla. Bar No. 186445
sbaena@bilzin.com
Mindy A. Mora
Fla. Bar No. 678910
mmora@bilzin.com
Jay M. Sakalo
Fla. Bar No. 0156310
jsakalo@bilzin.com
Jason Z. Jones
Fla. Bar No. 186554
jjones@bilzin.com

# Exhibit A

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:                                      Chapter 11

FONTAINEBLEAU LAS VEGAS
HOLDINGS, LLC, ET AL.,[1]              Case No.  09-21481-BKC-AJC

              Debtors.                   (Jointly Administered)
_____/

**[PROPOSED] ORDER GRANTING DEBTORS' EMERGENCY MOTION FOR AN
ORDER (I) AUTHORIZING, BUT NOT REQUIRING, THE DEBTORS TO
(A) CONTINUE THEIR EXISTING INSURANCE PROGRAMS AND (B) PAY
CERTAIN PREPETITION OBLIGATIONS IN RESPECT THEREOF, AND
(II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND
PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**

---

[1]          The last four digits of each Debtor's tax identification number are: (i) Fontainebleau Las Vegas Holdings, LLC [9337]; (ii) Fontainebleau Las Vegas, LLC [9332]; and (iii) Fontainebleau Las Vegas Capital Corp. [7822].  The Debtors' current mailing address is 19950 West Country Club Drive, Aventura, Florida  33180.

THIS CAUSE came for hearing before the Court on June [__], 2009 at [__] a.m./ p.m. in Miami, Florida upon consideration of the motion (the "Motion")[2] [D.E. #___] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for entry of an order (I) authorizing, but not requiring, the Debtors to (a) continue their existing insurance programs, and (b) pay certain obligations in respect thereof, and (II) authorizing financial institutions to honor and process checks and transfers related to such obligations; and upon consideration of the *Declaration of Howard C. Karawan in Support of Debtors' Chapter 11 Petitions and First Day Pleadings*; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and all other parties in interest; and due and sufficient notice of the Motion having been given; and it appearing that no other or further notice need be provided; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and after due deliberation and sufficient cause appearing therefor, it is:

**ORDERED** as follows:

1.       The Motion is **GRANTED**.

2.       The Debtors are hereby authorized to maintain their Insurance Programs without interruption, on the same basis, which includes the (i) Workers' Compensation Program,[3] (ii) Builder's Risk Program, and (iii) general liability, excess liability, contractor's pollution liability,

---

[2]          Capitalized terms not otherwise defined herein have the meanings ascribed to them in the motion.

[3]          The Debtors have separately requested relief for workers' compensation payments for Resort employees in the *Emergency Motion by Debtors for Order (I) Authorizing the Debtors to Pay (A) Prepetition Wages, Salaries, and Employee Benefits and (B) Prepetition Withholding Obligations, (II) Authorizing Continuation of Employee Benefit Plans and Programs Postpetition, and (III) Directing All Banks to Honor Payments of Prepetition Employee Obligations*, filed concurrently herewith.

and environmental site liability programs, as well as the General Insurance Programs, and in accordance with the same practices and procedures as were in effect prior to the commencement of the Debtors' Chapter 11 Cases.

3.     The Debtors are authorized, but not required, to pay, in their sole discretion, any and all Insurance Obligations that were due and payable or related to the period before the commencement of these Chapter 11 Cases without further order of the Court.

4.     The authority granted pursuant to this Order is expressly subject to and limited to the extent set forth in the *Interim Order (I) Authorizing Use Of Cash Collateral Pursuant To Section 363 Of Bankruptcy Code, (II) Providing Adequate Protection To Prepetition Secured Parties Pursuant To Sections 361, 362, And 363, Of Bankruptcy Code, And (III) Scheduling Final Hearing* (the "Cash Collateral Order") or any subsequent interim or final Cash Collateral Order.

5.     The requirements for emergency motions set forth in Local Rule 9075-1 are satisfied by the contents of the Motion or otherwise deemed waived.

6.     Nothing in this Order or any action taken by the Debtor in furtherance of the implementation hereof shall be deemed an approval of the assumption or rejection of any executory contract or unexpired lease pursuant to § 365 of the Bankruptcy Code.

7.     Nothing in this Order shall impair the ability of the Debtors or appropriate party in interest to contest any claim of any creditor pursuant to applicable law or otherwise dispute, contest, setoff, or recoup any claim, or assert any rights, claims, or defenses related thereto.

8.      The banks or financial institutions are authorized, when requested by the Debtors and in the Debtors' sole discretion, to receive, process, honor, and pay all checks drawn on or direct deposit and funds transfer instructions relating to the Debtors' accounts and any other

transfers that are related to any premiums, claims, deductibles, retrospective adjustments, administrative and broker's fees, and all other obligations arising under the Insurance Programs including those Insurance Obligations that were due and payable or related to the period before the commencement of these Chapter 11 Cases, and the costs and expenses incident thereto; *provided* that sufficient funds are available in the accounts to make such payments.

9.     Bankruptcy Rule 6003 has been satisfied because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors as provided in the Motion.

10.     Notwithstanding the possible applicability of Rules 6004(h), 7062 or 9014 of the Federal Rules of Bankruptcy Procedure, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.  To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these cases the terms and conditions of this Order shall govern.

11.     Notice of the Motion as provided therein shall be deemed sufficient and the requirements of Bankruptcy Rule 6004(a) are hereby waived.

12.     The Court retains jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

# # #

Submitted by:

Bilzin Sumberg Baena Price & Axelrod LLP
Scott L. Baena (Florida Bar No. 186445)
200 S. Biscayne Boulevard, Suite 2500
Miami, FL 33131
Telephone: (305) 374-7580
Facsimile: (305) 375-7593

Copies to:

4

Scott L. Baena
*(Attorney Baena shall upon receipt serve a copy of this Order upon all interested parties and file a certificate of service.)*

# Exhibit B

Fontainebleau
2008 - 2009
Summary

| | Carriers/Policy # | Policy Period |
|---|---|---|
| **Package**<br>Named Insureds:<br>Fontainebleau Resorts LLC<br>Fountainebleau Las Vegas LLC<br>Krystle Towers LLC | Chubb Insurance Group<br>(Federal Insurance Company)<br><br>35646264 | 08/09/08 - 08/09/09 |
| **Automobile**<br>Named Insured:<br>Fontainebleau Resorts LLC | Chubb Insurance Group<br>(Federal Insurance Company)<br>73537635 | 08/09/08 - 08/09/09 |
| **Workers Compensation**<br>Named Insureds:<br>Fontainebleau Resorts LLC<br>Fontainebleau Las Vegas, LLC | Hartford (Twin City Fire Insurance Co)<br><br>53WECFV5122 | 08/09/08 - 08/09/09 |
| **Umbrella**<br>Named Insureds:<br>Fontainebleau Resorts LLC<br>Fountainebleau Las Vegas LLC<br>Krystle Towers LLC | Chubb (Federal Insurance Company)<br><br>79840017 | 08/09/08 - 08/09/09 |
| **Excess Liability** (Layer 2)<br>Named Insureds:<br>Fontainebleau Resorts LLC<br>Fountainebleau Las Vegas LLC<br>Krystle Towers LLC | Great American Insurance Company<br><br>TUE7779419 | 08/09/08 - 08/09/09 |
| **Excess Liability** (Layer 3)<br>Named Insureds:<br>Fontainebleau Resorts LLC<br>Fountainebleau Las Vegas LLC<br>Krystle Towers LLC | CNA<br>(Continental Casualty Company)<br><br>L4012209172 | 08/09/08 - 08/09/09 |

Fontainebleau
2008 - 2009
Summary

| Directors & Officers Liability | | |
|---|---|---|
| Named Insured:<br>Fontainebleau Resorts LLC | | |
| Layer #<br>1 - $15m Primary Layer | AIG (National Union Fire Ins)<br>17664009 | 04/09/09 - 04/09/10 |
| 2 - $15m over $15m | XL Specialty<br>ELU110686609 | 04/09/09 - 04/09/10 |
| 3 - $10m over $30m | Navigators<br>NY09DOL249589NV | 04/09/09 - 04/09/10 |
| 4 - $10m over $40m | Catlin<br>XSP951030409<br>Plus Surplus Lines Tax/Fee | 04/09/09 - 04/09/10 |
| 5 - $15m over $50m | Executive Risk Indemnity<br>82100312 | 04/09/09 - 04/09/10 |
| 6 - $10m over $65m | Great American<br>DFX3911916 | 04/09/09 - 04/09/10 |

| Crime | Great American Insurance Co.<br>CAS3792772 | 08/09/08 - 08/09/09 |
|---|---|---|

| Employment Practices Liability | AIG<br>(National Union Fire Insurance)<br>11449453 | 08/09/08 - 08/09/09 |
|---|---|---|

| Fiduciary Liability<br>Nevada | Chubb<br>(Federal Insurance Company)<br>82088515 | 08/09/08 - 08/09/09 |
|---|---|---|

| Fiduciary Liability<br>Florida | Chubb<br>(Federal Insurance Company)<br>82106086 | 08/09/08 - 08/09/09 |
|---|---|---|