1                   UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF FLORIDA
2

3

4

5
        IN RE:                        CASE NO. 09-21481-BKC-AJC
6
        FONTAINEBLEAU LAS VEGAS
7       HOLDINGS, LLC,

8                    Debtor.
        _____/
9

10
                    ALL MOTIONS ON THE CALENDAR
11
         (7), (8), (9), (11), (12), (13), (14), (15), (16),
12            (26), (27), (28), (29), (30), (37)

13

14                        June 11, 2009

15

16            The  above-entitled  cause came on for

17      hearing  before  the   HONORABLE A JAY CRISTOL,  one

18      of the judges of the UNITED STATES BANKRUPTCY COURT,

19      in and for  the  SOUTHERN  DISTRICT  OF  FLORIDA, at

20      51 SW 1st Avenue,  Miami,  Dade  County,  Florida on

21      Thursday,   June 11, 2009,  commencing  at  or about

22      3:00 p.m., and  the  following proceedings were had:

23

24                        Reported By:  Margaret Franzen

25


        OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
1                    APPEARANCES:

2

3          BILZIN SUMBERG BAENA PRICE & AXELROD, by
                   SCOTT L. BAENA, ESQUIRE
4               MINDY MORA, ATTORNEY-AT-LAW
                  JASON Z. JONES, ESQUIRE
5               on behalf of the Debtors

6

7          KASOWITZ BENSON TORRES & FRIEDMAN, by
           DAVID M. FRIEDMAN, ESQUIRE (Via Telephone)
8               Proposed Litigation Counsel
                  on behalf of the Debtors

9

10
        WHITNEY THIER, ATTORNEY-AT-LAW (Via Telephone)
11               In-house Counsel
                  on behalf of the Debtors

12

13
                 SITRICK AND COMPANY, by
14    ANITA-MARIE LAURIE, ATTORNEY-AT-LAW (Via Telephone)
                Communications Counsel
15               on behalf of the Debtors

16

17               BERGER SINGERMAN, by
             PAUL S. SINGERMAN, ESQUIRE
18    on behalf of Jeffrey Soffer, Turnberry Residential,
           L.P. and Turnberry West Construction, Inc.

19

20
                 AKERMAN SENTERFITT, by
21           JAMES H. FIERBERG, ESQUIRE
             MICHAEL I. GOLDBERG, ESQUIRE
22                     and
             HENNIGAN BENNETT & DORMAN, by
23             BRUCE BENNETT, ESQUIRE
             SIDNEY P. LEVINSON, ESQUIRE
24    on behalf of the Term Lender Steering Group

25
                 Continued......

        OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875
```

```
 1                      HUNTON & WILLIAMS, by
                    CRAIG V. RASILE, ESQUIRE
 2                 KEVIN M. ECKHARDT, ESQUIRE
                              and
 3             ALAN MARTIN, ESQUIRE (Via Telephone)
                   on behalf of Bank of America
 4

 5
           STEARNS WEAVER MILLER WEISSLER & ALHADEFF, by
 6                 HAROLD D. MOOREFIELD, ESQUIRE
                              and
 7             KENNETH NOBLE, ESQUIRE (Via Telephone)
                   on behalf of Bank of Scotland
 8

 9
                  KOZYAK TROPIN & THROCKMORTON, by
10                 JOHN W. KOZYAK, ESQUIRE
                   DAVID ROSENDORF, ESQUIRE
11                            and
               AKIN GUMP STRAUSS HAUER & FELD, by
12                 STEVEN M. PESNER, ESQUIRE
               on behalf of Apollo Investment Fund XII
13

14
                ANDREW KRESS, ESQUIRE (Via Telephone)
15                 on behalf of Hsh Nordbank

16

17             DERRICK HOFFMAN, ESQUIRE (Via Telephone)
                   on behalf of Moelis & Company
18

19
                SANDEEP QUSBA, ESQUIRE (Via Telephone)
20         on behalf of Barclays Bank, Deutsche Bank Trust
              Company Americas, JP Morgan Chase Bank and
21                   Royal Bank of Scotland

22

23                      SKADDEN ARPS, by
               VAN DURRER, ESQUIRE (Via Telephone)
24                 ADLAI HARDIN, ESQUIRE
                   on behalf of Crowne Limited
25
                              Continued......


           OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875
```

```
 1

 2          OFFICE OF THE UNITED STATES TRUSTEE, by
        STEVEN TURNER, ASSISTANT UNITED STATES TRUSTEE
 3            JOHANNA ARMENGOL, ATTORNEY-AT-LAW
                   Attorneys/Advisors
 4          on behalf of the United States Trustee

 5

 6                 ALSO PRESENT:

 7

                   JEFFREY SOFFER
 8                 RAYMOND PARELLO
                   HOWARD KARAWAN
 9                 ALBERT KOTITE
            MARK LEFEVER (Via Telephone)
10                 ROLAND DE LFORN
            BARBRA CARGILL (Via Telephone)
11                 - - - - - - -

12

13              E X H I B I T S

14   Debtors' Number 1...........................Page 33

15

16

17

18

19

20

21

22

23

24

25


        OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875
```

1            THE COURT:  Good afternoon, ladies and

2    gentlemen.  We have a request for some telephone

3    participation, so let's get those folks on the

4    line before we start.

5            (Thereupon, the Court called into the

6    conference call, after which the following

7    proceedings were had:)

8            THE COURT:  Hello, this is

9    Judge Cristol.  I understand there are 16 people

10   out there in telephone land and we have a few

11   more here in the courtroom.

12           Mr. Baena, are you ready to proceed?

13           MR. BAENA:  May it please the Court,

14   Scott Baena on behalf of the debtors.  We are

15   ready to proceed.

16           THE COURT:  I wonder if we should take

17   appearances or if that will push this matter over

18   to tomorrow.

19           MR. BAENA:  I think we better get them

20   on the record, Judge.

21           THE COURT:  All right.  Let's ask those

22   folks out in the world of the telephone to state

23   your name, you don't need to state your law firm,

24   just state your name and who you represent.

25           MR. FRIEDMAN:  Your Honor, this is

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    David Friedman.  I am special -- proposed special

2    litigation counsel to the debtors.

3              MR. KRESS:  Andrew Kress, K-r-e-s-s, as

4    in Sam, counsel for Hsh Nordbank.

5              MR. NOBLE:  Ken Noble for Bank of

6    Scotland.

7              THE COURT:  Who was for Bank of

8    Scotland?

9              MR. NOBLE:  Ken Noble.

10             THE COURT:  Noble, N-o-b-l-e?

11             MR. HOFFMAN:  Good afternoon, your

12   Honor.  Derrick Hoffman on behalf of Moelis &

13   Company, LLC, the proposed financial advisor and

14   investment banker for the debtors.

15             MR. QUSBA:  Your Honor, Sandeep Qusba,

16   Q-u-s-b as in boy-a, counsel for Barclays Bank,

17   Deutsche Bank Trust Company Americas, JP Morgan

18   Chase Bank and Royal Bank of Scotland.

19             THE COURT:  Very well.

20             MR. MARTIN:  Good afternoon, your

21   Honor.  Alan Martin, M-a-r-t-i-n, on behalf of

22   Bank of America.  Craig Rasile of Hunton &

23   Williams, I believe, is in the courtroom, as

24   well.

25             THE COURT:  Very well.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1          MR. DURRER:  Your Honor, Van Durrer

2    from Skadden Arps for Crowne, Limited.   My

3    colleague, Adlai Hardin, is also in the

4    courtroom, your Honor.

5          THE COURT:  Very well.

6          MS. THIER:  This is Whitney Thier from

7    Fontainebleau, internal counsel.

8          MS. LAURIE:  Anita-Marie Laurie,

9    Sitrick and Company, communications counsel for

10   Fontainebleau.

11         MR. LEFFEVER:  Mark Lefever ---

12         THE COURT:  Spell that.

13         MR. LEFEVER:  L-e-f-e-v-e-r, CFO of

14   Fontainebleau Las Vegas.

15         THE COURT:  That's ten.  Supposedly

16   there's 16 people out there.  Anybody else that

17   hasn't stated an appearance?

18         Very well, let's go to the courtroom.

19   Mr. Baena, would you state your appearance?

20         MR. BAENA:  Good afternoon, your Honor.

21   Scott Baena, Mindy Mora and Jason Jones on behalf

22   of the debtors.

23         MR. FIERBERG:  Good afternoon, your

24   Honor.  James Fierberg from Akerman Senterfitt.

25   With me in the courtroom is Mike Goldberg, my

1    partner.  We represent the group of term lenders

2    who have made their advances and are referred

3    to -- some of them are referred to in the papers

4    as the term lender steering group.

5              I'd like to introduce the Court to

6    Bruce Bennett and Sid Levinson, who are from

7    Los Angeles, and I'd ask that they be allowed

8    ore tenus to appear pro hac vice.  We will file

9    papers on their behalf.

10             THE COURT:  Very well.  Anyone have any

11   objection?  Let's take a vote.  All those in

12   favor?  Congratulations, you've been elected to

13   the Bankruptcy Bar of the Southern District of

14   Florida by a vote of 17 to 16.

15             MR. LEVINSON:  Thank you.

16             MR. BAENA:  Don't forget the dues,

17   Judge.

18             THE COURT:  Anyone else?

19             MR. KOZYAK:  Yes, your Honor.

20   John Kozyak and David Rosendorf, and

21   Mr. Steve Pesner from the Akin Gump firm in

22   New York, on behalf of Apollo Investment Fund

23   VII, L.P.

24             MR. SINGERMAN:  Good afternoon, your

25   Honor.  May it please the Court, I'm

1    Paul Singerman from Berger Singerman.  Our firm

2    is counsel to Jeffrey Soffer, Turnberry

3    Residential, L.P. and Turnberry West Construction

4    Inc.

5            MR. MOOREFIELD:  Good afternoon, Judge.

6    Hal Moorefield, local counsel for Bank of

7    Scotland.

8            MR. RASILE:  Good afternoon, your

9    Honor.  Craig Rasile of Hunton & Williams for

10   Bank of America, N.A. and with me in the

11   courtroom is Kevin Eckhardt of Hunton & Williams.

12           THE COURT:  Very well.

13           MS. ARMENGOL:  Good afternoon, your

14   Honor.  Johanna Armengol.  Here in the courtroom

15   is the Assistant, Steven Turner, and senior

16   analyst, Roland Del Forn for the U.S. Trustee.

17           THE COURT:  Anyone else?  All right.

18   Are we ready to proceed?

19           MR. BAENA:  We are, your Honor.

20           THE COURT:  All right.  I received from

21   you, Mr. Baena, a book with 26 exhibits.  I've

22   done my best to scan it.  I have not had time to

23   read every document thoroughly.  It appears to me

24   that some of these matters are definitely first

25   day motions and a few items, I'm not so sure we

1   need to resolve today, but let's take them as

2   they're on the calendar and deal with them.

3           MR. BAENA:  Thank you, your Honor.

4           If I may, Judge, as long as we've

5   missed a couple of people in the room, I'd like

6   to take this opportunity to introduce them.

7           THE COURT:  Okay.

8           MR. BAENA:  I'd like to introduce the

9   Court to Mr. Jeffrey Soffer.  Mr. Soffer is the

10  ultimate controlling person of the debtors.  He's

11  chairman of the board of mangers of Fontainebleau

12  Resorts, LLC, which is the ultimate parent of the

13  debtor, Fontainebleau Las Vegas Holding, LLC and

14  he is also a director of Fontainebleau Las Vegas

15  Capital, which is also one of the debtors.

16          We have also Mr. Ray Parello, who is

17  likewise a director of Fontainebleau Resorts,

18  LLC.

19          Next to Mr. Parello, we have

20  Mr. Howard Karawan.  Mr. Karawan is the chief

21  restructuring officer of the debtors.  I'll say

22  more about him in a moment.

23          Then we also have Albert Kotite.

24  Mr. Kotite is the executive vice-president, as

25  well as a member of the board of managers of

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    Fontainebleau Resorts, LLC and a director of the

2    debtor, Fontainebleau Las Vegas Capital.

3         Thank you.  I introduce you because

4    you'll be seeing these people frequently.  This

5    is the team that is working on the restructuring

6    of the debtor.

7         Judge, I certainly do appreciate the

8    opportunity you've afforded us to present our

9    first day papers today.  I am schfitzing, not

10   because of the fear of the kern in front of you,

11   but because of the rush to get here, I guess.

12         I'm cautiously optimistic, as well,

13   that this is not going to be a contentious

14   hearing, as the matters before you today should

15   not be controversial.  I recognize that an

16   objection was just filed by Bank of America, a

17   limited objection, to one of the requests for

18   relief, but I do believe we will resolve that

19   summarily on argument.

20         We're not asking for extensive relief

21   today, Judge.  We're not seeking to alter

22   anybody's rights or interests today.  We don't

23   seek any relief that we consider by any means to

24   be unconventional.  All we seek to accomplish

25   today is to preserve certain critical mass and to

1   facilitate a short range bankruptcy plan, which

2   I'll describe to your Honor in a few moments.

3          Judge, I venture to say, that virtually

4   everybody in this room knew of the Fontainebleau

5   Hotel on Miami Beach before we summoned them here

6   for this hearing today.  And since 1954, as your

7   Honor well knows, the Fontainebleau name has

8   loomed large on the skyline of Miami.

9          THE COURT:  In 1954 I was aboard the

10  aircraft carrier Princeton in the South China Sea

11  and received newspaper clippings from my parents

12  of the Fontainebleau being opened and as I

13  recall, the mayor of Fontainebleau being

14  invited -- France being invited to attend the

15  opening ceremony.  So I'm familiar with the

16  Fontainebleau.

17         MR. BAENA:  Well, then you know, as

18  well, Judge, that few places in our community

19  have garnered such an iconic status as that

20  remarkable edifice, which was conceived up by

21  Ben Novack, designed by Morris Lapidus, and I

22  would say masterfully updated and expanded by

23  Jeffrey Soffer.

24         And while that business and that

25  property is not part of this bankruptcy

1  proceeding, the brand that has emerged from that

2  property is very much at the center of this case.

3  At bottom, it is the Fontainebleau brand that

4  we're here to seek to promote and preserve in

5  these bankruptcy cases.

6         What I'd like to do, your Honor, is

7  give you a very brief overview of the debtors and

8  the project, a brief explanation of their capital

9  structure, a brief description of how we got

10  here, and a brief preview of our short-term

11  bankruptcy plan, and then I'd like to address our

12  first day motions.

13         THE COURT:  Well, before we go into

14  that, maybe I can save you some time from reading

15  your papers.  Tell me if I'm correct, that we're

16  dealing with a project on 24 acres in Las Vegas

17  to build 3815 hotel rooms and what, 979 condo

18  units and a rather large hundred thousand square

19  foot casino and retail space, and a spa and in a

20  63 story building.

21         According to the petitions and papers

22  on file, it appears that we're dealing with about

23  a billion eight hundred thousand -- oh, pardon

24  me, eight hundred million dollars in numbers and

25  as Everette Dirksen once said, you know,

1    20 million here, 30 million there, pretty soon

2    you're talking about real money.

3         MR. BAENA:  You may have understated

4    what's involved, Judge, in all due respect, and I

5    will get here in a moment.

6         THE COURT:  In any event, I'll start

7    right out by saying that this is a huge project

8    and certainly the number -- the people involved,

9    the structure involved and the fact that this is

10   a building under construction, the Court

11   understands that buildings 70 percent complete

12   are not like wine, they don't get better with

13   age, and that this case has got to move quickly.

14        If all the folks involved are wise

15   enough to analyze the situation and understand

16   where it's at and work together, I hope we'll

17   have a successful and quick emergence of a

18   solution to this problem.

19        On the other hand, if people find that

20   they feel they have to litigate and be

21   contentious, then we very well might have a less

22   happy ending, so go on.

23        MR. BAENA:  I'm prepared to hand up my

24   orders for these first day motions, Judge.

25        Let me at least take a second, though,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   to -- you're absolutely right, Judge, you've hit

2   it on all fours.  This is an extremely large,

3   complicated project that is 70 percent complete

4   and needs to get finished.

5           I'd like to describe to you who the

6   debtors are, just so you have that in mind as we

7   go through this process.  It's relatively simple.

8   Fontainebleau Las Vegas Holdings, LLC, is the

9   parent of the -- of the other two debtors.

10  Holdings' only assets are its interests in the

11  other two debtors.  Fontainebleau Las Vegas

12  Capital has no assets.

13          Holdings and Capital essentially were

14  the issuers of certain publicly traded junior

15  mortgage notes.  That's the purpose of their

16  existence.

17          Fontainebleau Las Vegas, LLC is where

18  the project resides.  It is the owner and the

19  developer of the property.

20          Holdings and Capital are member managed

21  LLCs and thus, the board of mangers of

22  Fontainebleau Resorts, that ultimate parent,

23  serves as the manager of those debtors.

24          As I mentioned earlier, Mr. Soffer and

25  Mr. Kotite are members of the board of mangers,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    as well as directors of Capital because it is a

2    corporation.

3              I'd like to give you an overview, as

4    well, Judge, of the capital structure of the

5    debtors because it's going to become pertinent to

6    matters that we're going to be discussing today.

7              THE COURT:  Well, correct me if I'm

8    wrong, the debtors apparently have 17 bank

9    accounts, seven of them, have been reported, have

10   zero balances.  There's one with 136.6 million

11   and one with 50 million, and there's eight

12   accounts where you didn't say whether you had any

13   money in them or not.

14             Of this 200 million, is that cash

15   collateral or is that ---

16             MR. BAENA:  Yes.

17             THE COURT:  Is there any unrestricted

18   cash?

19             MR. BAENA:  No.

20             THE COURT:  Okay.

21             MR. BAENA:  If I may approach, Judge --

22             THE COURT:  You may.

23             MR. BAENA:  -- I'd like to give you a

24   hand out.  I'm just going to take this in small

25   pieces, Judge.  We don't have to go through an

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    exposition on the loan documents and rights and

2    intercreditor agreements, I just want you to

3    understand what the capital structure looks like.

4    The project was financed under two different loan

5    facilities back in June of 2007.  The first was a

6    senior loan facility.

7            THE COURT:  That was the 700 million?

8            MR. BAENA:  Actually, it has three

9    pieces.  It's secured by a first lien on the

10    project and it has three pieces.  The first piece

11    was the $700 million term loan.  That was funded

12    at the closing on June -- in June 2007.

13            THE COURT:  And then you've got another

14    300 million.

15            MR. BAENA:  The second piece is what we

16    call the delay draw term loan, that's

17    $337 million, give or take, and that was funded,

18    as well.  That's the second piece.  Of that

19    $337 million, Judge, 137 million sits in one of

20    those bank accounts that you referred to, we call

21    it the bank proceeds account, and it is cash

22    collateral, and a very small piece of that is

23    what we'll be asking for leave to use today with

24    the permission of the term lenders and the delay

25    draw term lenders that Mr. Bennett represents.

```
1              Another, approximately, $5 million of
2    the delayed draw term loan resides in a different
3    bank account that we call the resort payment
4    account.  That's also cash collateral for the
5    term loan and the delay draw term loan and we
6    also propose to use it with the permission of
7    Mr. Bennett's clients.
8              The third piece of the senior loan is a
9    lot more controversial.  The third piece was a
10   revolving loan commitment of $800 million that
11   was to be provided by certain banks, revolving
12   lenders.  Unfortunately, however, other than,
13   approximately, $13 million of letters of credit
14   that were issued by the revolving lenders under
15   the revolving facility, the revolving lenders
16   have, simply stated, impermissibly refused to
17   fund any revolving loans to us.  Indeed, they
18   terminated -- they contend that they terminated
19   their commitment to do so.  More on that in a
20   minute.
21             Bank of America and Mr. Rasile's
22   client, Mr. Martin's client, serves as the
23   administrative agent of the senior loan facility.
24   It's also a revolving lender, one of the folks
25   that refused to lend.  It recently issued a
```

1  notice of its resignation as administrative agent

2  and a process is under way to replace them with

3  Wilmington Trust and Mr. Bennett and I will

4  likely be back here shortly with motions and

5  proposed orders to effectuate that transition.

6          In addition to the senior loan, we have

7  a second mortgage loan and that was pursuant to

8  $675 million of publicly issued junior notes.

9  Wells Fargo serves as the trustee for the junior

10 note holders.  That was fully funded.

11         There is a retail component, as you

12 alluded to, to this building.  That component,

13 however, is not before you.  That component is

14 being constructed by three other companies that

15 are affiliates of the debtors.  They are

16 responsible for the construction of the retail

17 component and they're also responsible for

18 certain shared costs between the hotel and the

19 retail component.

20         It's like the proverbial hole in the

21 donut, as it is an essential piece of the overall

22 package, but without the hotel, it doesn't really

23 exist.  We will likely be filing those three

24 affiliates shortly.

25         Retail construction was separately

1    financed, and I just need to briefly mention this

2    because it goes to why we're here.  It was

3    separately financed under two facilities.  The

4    first was a mezzanine loan, that was provided by,

5    yes, we're very lucky, Lehman Brothers.

6              The second piece was a mortgage loan, a

7    senior mortgage loan, likewise, originally

8    provided by Lehman Brothers, but then syndicated

9    out.

10              Of course, on September 15, 2008,

11    Lehman Brothers itself filed bankruptcy, and that

12    has, as a result, caused it to default on its

13    funding commitments under the mortgage loan.  The

14    mezz loan was fully funded.  That left a hole in

15    the funding of the retail component of

16    approximately a $105 million.

17              The non-Lehman lenders under the

18    mortgage loan have met their commitments and one

19    even gave us short-term loans to fund several

20    draws that Lehman wouldn't fund.  Those lenders

21    still have unfunded commitments of about

22    $39 million, that's on top of the 105 that we're

23    not getting from Lehman presently.

24              On the Resorts side, the Resort debtors

25    have other debt that's been incurred in

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    connection with both the project and in the day

2    to day operations of the debtors.  First, we have

3    $365 million of project payables that should have

4    been funded under the revolving loan facility,

5    but for the default of our revolving lenders.

6              The holders of those claims may have

7    mechanic lien rights against the project.

8              THE COURT:  And you've indicated that

9    under Nevada law that they may be able to prime

10   the first mortgage?

11             MR. BAENA:  They may.  They may.  It's

12   a fact -- a fact determination that hasn't been

13   made and as we sort through this, we're likely to

14   come back to the Court with a proposal for a

15   mechanism for determining the validity and extent

16   of those liens.

17             There is a process under Nevada law,

18   whereby somebody providing labor or material to a

19   construction project, prior to the recordation of

20   a mortgage on that project, would prime the

21   project even if -- so long as, I should say,

22   somebody was working notoriously and openly on

23   that -- on that project before the mortgage was

24   filed.

25             THE COURT:  Do they have a procedure,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    such as we have in Florida, involving a notice of

2    commencement?

3            MR. BAENA:  They have a -- they have

4    their own form, but not really.  It's a very,

5    very different law than ours, Judge.

6            If somebody was working openly and

7    notoriously on the project before the lien -- the

8    mortgage lien was filed, everybody else that

9    works on that project thereafter may relate back

10   to that first person's work, but there is a --

11   it's a Byzantine mechanic lien statute and I'm

12   sure we'll be addressing it on -- on many

13   occasions during this proceeding to determine the

14   validity, priority and extent of those liens.

15           Moreover, the liens that have been

16   filed, or purportedly filed against the project,

17   may not be liens against the resort, they may be

18   liens against the retail component and we have to

19   sort that out, as well.  So within that

20   $365 million, I really can't tell what the value

21   of the mechanic lien rights are.  We just know we

22   have payables.

23           In addition to that, we have general

24   unsecured claims, the garden variety general

25   unsecured claims that you would expect, of about

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   $37 million.

2          I suspect you're getting the

3   impression, a good impression about how we got

4   here.  When Lehman defaulted on the retail side,

5   it set into motion a series of events that we

6   simply could not overcome or resolve, especially

7   given the macro economic circumstances of our

8   economic environment that ensued immediately

9   after Lehman went into bankruptcy, leaving us

10  literally without any alternative sources of

11  funding due to the complete absence of credit for

12  projects like this.

13          In addition to the demise of Lehman,

14  one of the delay draw lenders was a bank that was

15  liquidated by the FDIC, creating another unfunded

16  piece for us of about $15 million and then, of

17  course, we had the refusal of the revolving

18  lenders to fund almost $800 million by their

19  illegitimate attempt to terminate their loan

20  commitments, which stripped us in the aggregate

21  of almost a billion dollars and any chance of

22  getting through the last mile of construction of

23  this project.

24          I wish to assure the Court that we

25  spent months trying to turn the spicket back on

1    to no avail.

2              Ultimately, we -- we sued the revolving

3    lenders, but the pace of that sort of litigation,

4    your Honor, in a non-bankruptcy environment,

5    really undermines its usefulness.  So we came

6    here and we have brought that litigation with us

7    and it will serve as a centerpiece of this

8    bankruptcy, as I'll discuss in just a moment.

9              Among other things we want to

10   accomplish today, is the retention of the law

11   firm of Kasowitz Benson Torres & Friedman.

12   Mr. Friedman made his appearance on the

13   telephone.  They are our exceedingly capable

14   litigation counsel that have been representing us

15   in that litigation.

16             I cannot overstate the significance of

17   that litigation, not simply because of its

18   potential to provide the estate with a

19   significant damage recovery, but also because

20   under current market conditions, a favorable

21   resolution of this litigation may well be the

22   only means by which we obtain funds to resume

23   construction of this project.

24             THE COURT:  I haven't had a chance to

25   look at that.  I understand that's a separate

1    adversary.

2                MR. BAENA:  Yes, sir.

3                THE COURT:  What is being sought in

4    that adversary?  What is the relief?

5                MR. BAENA:  I'll let Mr. Friedman

6    describe that to you if you'd like, your Honor.

7                THE COURT:  Mr. Friedman, can you

8    advise the Court as to what relief is being

9    sought in that adversary?

10               MR. FRIEDMAN:  Yes, your Honor, it

11   would be my pleasure.  The complaint seeks

12   various forms of relief, but in the short term

13   the most important relief that we seek is a

14   turnover, essentially, under Section 541 and 542

15   of the Bankruptcy Code, of the funding that we

16   claim and we believe we can prove, was property

17   of the estate prior to the petition based upon

18   the draw that the debtors made upon a loan that

19   was -- that draw did not require anything other

20   than a draw notice to the banks and the debtors

21   right to that funding was unconditional,

22   unequivocal and absolute --

23               THE COURT:  How much is that?

24               MR. FRIEDMAN:  -- and we seek to prove

25   that to your Honor.

1            THE COURT:  How much is that?

2            MR. FRIEDMAN:  It's about $660 million.

3            THE COURT:  I see.  Okay.

4            MR. FRIEDMAN:  Your Honor, we have

5    filed a motion for partial summary judgment,

6    which turns on the request for borrowing that we

7    made on March 2nd, which was denied by the

8    revolving lenders.

9            The denial was based solely upon an

10   interpretation of the contract.  There were no

11   facts involved, simply we have a difference with

12   the revolvers on how to interpret our entitlement

13   to draw under the credit agreement ---

14           THE COURT:  Well, let's not try the

15   lawsuit today, but you've told me what I need to

16   know about that lawsuit.

17           Thank you, sir.

18           MR. FRIEDMAN:  You're welcome, your

19   Honor.

20           THE COURT:  Go on, Mr. Baena.

21           MR. BAENA:  Thank you.  That brings me,

22   Judge, to sharing with you our short term

23   bankruptcy work plan.  I think, as the Court

24   knows from our prior case experience together, I

25   view the first 30 days of a Chapter 11 case as a

1    period for staging, so that we put into place or

2    at least set into motion, the pieces that will be

3    critical to a successful reorganization.

4            In this case I think there are three

5    critical things that we need to accomplish over

6    the next 30 days.  First and foremost, we need to

7    kick start the litigation.  In regard to the

8    motion for summary judgment, we would -- we have

9    also filed, or Mr. Friedman has also filed, a

10   motion asking the Court to schedule a case

11   management conference at your earliest

12   convenience next week, in order to establish a

13   preliminary schedule upon which the adversary

14   proceeding will proceed.  I would hope that we

15   could get a date and time for that hearing before

16   we leave today.

17           Secondly, we need to stabilize the

18   project.  Construction ground to a halt early

19   last month and we will not be able, obviously, to

20   resume construction until we have sufficient

21   funding.  That is going to take a while.

22           Before we stopped construction on that

23   project, we had 3,000 people working on that

24   project, and it will take time just to get them

25   and their equipment back to the job site.  In the

1    interim, we have a $2 billion investment to

2    protect in the Las Vegas desert.  That, too, will

3    cost money, but once again, I think our term

4    lenders are like minded and also realize the

5    importance of protecting their collateral.  We

6    have made a proposal to them already for the

7    preservation of the collateral that would entail

8    the use -- the further use of cash collateral.

9    That proposal needs to be vetted by professionals

10   on a number of levels, but I'm hopeful that a

11   consensual stabilization program will emerge

12   within the next four months -- four weeks.

13            And thirdly, we need to resolve, and

14   this is our challenge, we need to resolve the

15   pre-filing issues concerning the retail

16   affiliates so that we can get those before you,

17   as well.

18            Naturally, we will also continue to

19   explore alternatives for a transaction that will

20   facilitate the completion of the project,

21   although we do not see a terminal date for that

22   occurring over the next 30 days.

23            Nonetheless, we're optimistic about the

24   ultimate outcome of this case and remain of the

25   unalterable view that the project needs to be

1    completed.  It will not be easy, but we will --

2    we are assisted in these efforts by very capable

3    professionals, including our financial advisors,

4    Moelis & Company and Citadel Group.

5            Those are my preliminary comments,

6    Judge.  If you have any questions up to now, I'd

7    be happy to answer them, otherwise we can proceed

8    with first day motions.

9            THE COURT:  One of the bank accounts

10    was, in essence, an escrow account to hold

11    deposits of people purchasing condominiums.

12    They've indicated in your papers that there's

13    zero in that account.

14            Is there or are there any purchaser

15    deposits that are in escrow anywhere?

16            MR. BAENA:  No, no, sir.

17            THE COURT:  Okay.

18            MR. BAENA:  When market conditions

19    changed, the debtors did not undertake to market

20    the condominium hotel units.

21            THE COURT:  I just wanted to know if we

22    had that constituency out there.

23            MR. BAENA:  No, sir.

24            THE COURT:  They're not there.  Okay.

25            MR. BAENA:  No, sir.

1            THE COURT:  I see you have pictures of
2    the project.
3            MR. BAENA:  I do, Judge.
4            THE COURT:  Just help me locate the
5    project.  It's -- it's on Las Vegas Boulevard --
6            MR. BAENA:  North end of the strip.
7            THE COURT:  -- north end, so it's north
8    of Wynn.
9            MR. KARAWAN:  Yeah, it's about three
10   blocks north of Wynn on the east ---
11           THE COURT:  On the east or west side?
12           MR. KARAWAN:  On the east side.  Do you
13   know where Circus Circus is?
14           THE COURT:  Yes.
15           MR. KARAWAN:  It's directly across the
16   strip from Circus Circus.  This -- there are
17   three -- there are three main components to the
18   project, if I may?
19           THE COURT:  You may.  I can see it from
20   over there.
21           MR. KARAWAN:  Okay.  You got it?
22   There's three main components to the project, one
23   is the tower, that's the 63 stories.  The 3815
24   rooms includes the condominiums.  We're actually
25   on the bottom floor, up to about floor 14,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    already have carpeting laid and have the light

2    fixtures in, so fairly well advanced.

3            The second portion of the project is

4    the garage and convention center.  That, too, is

5    fairly well along and in front of the tower,

6    here, is what we call the podium.  It sits on

7    about 12 acres.  The ground floor houses the

8    casino.  The second level is the retail.  It's

9    about ten stories high, but there's three public

10   levels.  The second area is the retail, about

11   200,000 square feet and then the top is a very

12   integrated pool and entertainment, nightclubs and

13   restaurant facility, sort of a contemporary

14   version of what Morris Lapidus did here some 55

15   years ago.

16            THE COURT:  Very well.

17            MR. BAENA:  Your Honor, I'd like to

18   provide the Court with a register for a single

19   exhibit that we intend to use today.

20            THE COURT:  Very well, present it.

21   Thank you.

22            MR. BAENA:  It's the first day

23   affidavit of Mr. Howard Karawan.  Mr. Karawan was

24   just describing the project to you and he is the

25   chief restructuring officer of the debtor.  And I

1    should start by saying that the debtors and their

2    affiliates enjoy a real depth of resources and

3    one such resource is Mr. Karawan, who was

4    originally hired in 2007 to serve as the chief

5    operating officer of Fontainebleau Resorts and

6    all of its hotel assets system wide.

7         Mr. Karawan has extensive hotel

8    experience that started with Hyatt, and most

9    recently, as president of Kerzner International,

10   a major destination resort business.  Among other

11   things, Mr. Karawan developed the Atlantis at

12   Paradise Island, planned the Atlantis in Dubai

13   and developed the strategic direction of the

14   Kerzner organization's one and only resorts

15   worldwide.

16        When -- when the debtors descended into

17   the abyss of their lenders' defaults, and it

18   became apparent -- and it became of paramount

19   importance to manage the process of development

20   of the project while in extremis, as well as to

21   negotiate with lenders, strategic and financial

22   hopefuls, and to poise the debtors for bankruptcy

23   and reorganization, Mr. Karawan clearly emerged

24   as the best possible choice for CRO.  It simply

25   made no sense to look elsewhere.

1            Moreover, with the benefit of

2    Mr. Kotite's extraordinary experience in finance

3    and recapitalizations, we are benefitted by the

4    fact that Mr. Kotite and Mr. Karawan work well

5    together and certainly compliment one another's

6    expertise.

7            Mr. Karawan's affidavit, which is the

8    sole exhibit referred to in that register --

9            THE COURT:  That's Tab 8 in your

10   register?

11           MR. BAENA:  Yes, sir.  -- provides the

12   details of the factual backgrounds I've already

13   discussed with you, and serves, I think, as ample

14   testimony on the matters before the Court today.

15   I would offer his affidavit as our exhibit and,

16   of course, Mr. Karawan is available for

17   cross-examination.

18           THE COURT:  Very well, is there anyone

19   present or on the telephone who has any objection

20   to admitting the affidavit into evidence for this

21   hearing?

22           Hearing no objection, the affidavit is

23   admitted as Debtors' Exhibit 1.

24           (Thereupon, Debtors' Exhibit Number 1 was

25       admitted into evidence.)

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1              MR. BAENA:  Thank you, your Honor.

2              I'd like to start, then, Judge, with

3    the emergency motion for leave to use cash

4    collateral, which is Court Docket Number 12 and

5    Tab 13 in our first day binder.

6              Until I received an objection today

7    just before the hearing, in fact, from Bank of

8    America, I thought this would be an entirely

9    non-controversial hearing, but they did object

10   and we'll -- we'll need to deal with that.  I

11   think it's relatively simple to do so.

12             The motion is based on, as I said, the

13   consent of the term and delay draw lenders,

14   represented by Mr. Bennett.  When we actually

15   reached agreement on the terms of the use of

16   their cash collateral, there were some

17   340 million term lenders that were aligned on

18   a -- or served on a steering committee of term

19   lenders that had consented to the terms that we

20   agreed upon.

21             We indicated in our moving papers that

22   we anticipated that others would follow and we

23   have been apprised by Mr. Bennett that some

24   $630 million of outstanding senior loans or

25   holders of outstanding senior loans, which has

1    the first lien interest in cash collateral that

2    we're seeking to use, have consented to the terms

3    of the proposed use that we have before you

4    today.  Attached to the motion is an agreed upon

5    budget for the first four weeks of this case.

6           I don't want to sound jaded, your

7    Honor, but in the overall scheme of things what

8    we seek to use is a very small amount of money of

9    approximately $8.2 million.

10           Moreover, there's nothing revolutionary

11    about what we wish to use the money for, all of

12    which I would characterize as the minimal cost of

13    administration of these estates to maintain a

14    critical mass of employees, services, including

15    security, insurances, taxes and rent for storage

16    facilities where we maintain project equipment

17    and furniture, fixtures and other equipment.

18           In exchange for the use of cash

19    collateral, we are offering the senior lenders,

20    the term lenders and anybody else entitled to it,

21    an interest in that cash collateral, a

22    replacement lien on the same collateral they had

23    an interest in prepetition and that lien is to be

24    pari passu with their existing lien, so we are

25    not priming anybody.

1          We have offered them, as well, a super

2    priority administrative claim to the extent of

3    any diminution in the value of the senior

4    lenders' collateral, and we have agreed to pay

5    their fees and interest coming due under the

6    senior loan facility as we are likely obligated

7    to do in any event.

8          Because the second liens have a

9    subordinate interest in the cash, we propose --

10   that we're proposing to use, we're likewise

11   offering to provide them with a replacement lien

12   in the same collateral that they had a

13   prepetition lien on, which will also be pari

14   passu with their prepetition liens.

15         The cash we seek to use is, as I said

16   earlier, the $5 million in the Resort payment

17   account and the balance, I presume, will come

18   from the bank proceeds account, where we have

19   approximately $137 million.

20         We are proposing to come back to the

21   Court for either a further interim order or a

22   final order on the use of cash collateral before

23   the July 4th weekend and we would respectfully

24   ask the Court to set that hearing date today.

25         THE COURT:  On that point, you

1    mentioned July 4th -- pre-July 4th hearing date

2    and it's 18 minutes of 4:00.  Our calendar clerk

3    leaves at 4:00, so I think it would be

4    appropriate to --

5              MR. BAENA:  That would be great.

6              THE COURT:  -- get that date right now

7    and you talked about having another date.

8              MR. BAENA:  Yes, sir.  We'd like to

9    have a date next week at your earliest --

10              THE COURT:  That would be for

11    scheduling in the adversary.

12              MR. BAENA:  -- convenience for a

13    scheduling conference.  Yes, sir.

14              THE COURT:  All right.  You folks in

15    telephone land, I'm going to have to put you on

16    hold for a moment while I deal with the calendar

17    clerk and then we'll advise you of what dates she

18    has available.  I'll be right back.

19              (Thereupon, the Court contacts its calendar

20         clerk, after which the following proceedings

21         were had:)

22              MS. CARGILL:  Yes, Judge.

23              THE COURT:  Hi, Barb.  We need two

24    dates, please.  First we need a date next week

25    for the adversary in this Fontainebleau case for

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    a scheduling hearing, I think 30 minutes will be

2    adequate.

3              MS. CARGILL:  How about June 17th at

4    3:00?

5              THE COURT:  Mr. Baena, June 17th at

6    3:00, does that work?

7              MR. BAENA:  Wednesday, yes, sir.

8              THE COURT:  Okay.  That's Wednesday,

9    June 17th at 3:00 p.m., and now we need a date

10   prior to the July 4th weekend for a cash

11   collateral hearing.

12             MR. BAENA:  Judge, people will be able

13   to participate by phone at the hearing?

14             THE COURT:  We'll try to accommodate

15   everyone --

16             MR. BAENA:  Thank you, Judge.

17             THE COURT:  -- as best we can.  What do

18   you got prior to July 4, probably be -- let's

19   see.

20             MS. CARGILL:  You know what,

21   Judge Cristol, how about three o'clock on

22   June 30th?

23             THE COURT:  Does that work, June 30th

24   at 3:00?  That's a Tuesday.

25             MR. BAENA:  Yeah, that's fine.  Thank

1    you, Judge.

2            THE COURT:  Okay.

3            MS. CARGILL:  And that's going to be

4    what?

5            THE COURT:  That's cash collateral

6    continued from today, it may be either a final or

7    further interim.

8            MS. CARGILL:  Okay.

9            THE COURT:  Tuesday, 30 June, and that

10   was also at 3:00 you said, Barb?

11           MS. CARGILL:  Yes, sir.

12           THE COURT:  All right.  Then do we need

13   anything else in the way of dates from

14   Ms. Cargill at this time?

15           MR. BAENA:  Those are the only dates we

16   need right now, your Honor.

17           THE COURT:  All right.  Barbara, thank

18   you.

19           MR. BAENA:  Mr. Rasile, I think, though

20   would like to --

21           THE COURT:  Oh, pardon me, Mr. Rasile.

22           MR. BAENA:  -- throw some water on

23   this.

24           MR. RASILE:  Yes, your Honor.  I've got

25   to cool off Mr. Baena while he's on a roll.

1          Your Honor, my litigation counsel for

2    Bank of America is not on the phone.  He's a

3    partner at -- Dan Cantor at O'Melveny & Myers in

4    New York.  I don't know what his availability is.

5          So the Court is aware, your Honor, I

6    believe the debtor in possession filed the

7    adversary complaint against the revolving

8    lenders, of which Bank of America is included, on

9    Tuesday, the petition date.

10          Since then they've already amended it

11    to include another count and they've also filed a

12    motion for summary judgment.  We haven't been

13    served with the first complaint, let alone the

14    amended complaint yet.

15          THE COURT:  Well, we'll serve you after

16    the summary judgment hearing, that will make it

17    easier for them.

18          MR. RASILE:  Well, I just told -- I

19    told Mr. Baena, why don't we just try it

20    tomorrow?

21          MR. BAENA:  Good by me.

22          MR. RASILE:  I know he's ready to go,

23    that's what scares me, but I would just like to

24    be able to consult with our co-counsel, if you

25    don't mind, your Honor.  Maybe I could ask him

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
1    to, you know, pipe in on the call.  I know he had
2    issues with the motion for the scheduling
3    conference.  I think it was filed under 105 of
4    the Code and we haven't seen any of this stuff
5    except what we've been pulling off of Pacer.
6            THE COURT:  Well, if there's a problem,
7    let us know and we'll attempt to accommodate it.
8    Is it possible that -- let me see, Mr. Martin, is
9    he in touch -- is he from that firm?
10           MR. RASILE:  No, your Honor, he's with
11   a different firm.  He's with the Sheppard &
12   Mullin firm in California.
13           THE COURT:  Who can make that inquiry?
14   It would be helpful if we could do it right now
15   so that everyone knows what's going on, rather
16   than trying to send out notice, as you can see,
17   multitudes of various people.
18           MR. RASILE:  If it's acceptable to your
19   Honor, I will have Mr. Eckhardt of my office go
20   in the hallway and try to reach Mr. Cantor.
21           THE COURT:  All right.  Try and do
22   that.
23           MR. RASILE:  See if we can get him on
24   the phone.
25           THE COURT:  As I say, remember Barbara
```

1    is leaving in about 13 minutes, so if you can get

2    back to me right away, if not, we may have to do

3    it on notice, but it would be helpful if people

4    knew today when they left rather than relying on

5    some piece of paper or electronic notice they may

6    or may not get.

7              Check it out, Mr. Rasile.

8              MR. RASILE:  Understood.

9              MR. BAENA:  It wouldn't be the first

10   deadline they missed, Judge.

11             THE COURT:  All right.  Let me go back

12   and talk to the folks that are on the phone.

13             MR. RASILE:  Could I make an ore tenus

14   motion for sanctions now?

15             THE COURT:  Telephone land, the Court

16   is back and we have -- tentatively have two

17   dates.  The first date we've obtained for a

18   scheduling conference in the adversary is

19   Wednesday, June 17th at three o'clock and the

20   second date we've obtained for a continued or

21   additional cash collateral hearing is Tuesday,

22   the 30th of June, at three o'clock.

23             There seems to be no problem with the

24   30 June hearing.  Mr. Rasile, on behalf of Bank

25   of America, was concerned about the availability

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   of one of the lawyers who's not present here now

2   and he's trying to check on whether or not that's

3   a problem.  Hopefully we'll know that before

4   four o'clock.

5           In the meantime, please make notes of

6   those two dates and then we can go back to

7   Mr. Baena and let him proceed.

8           MR. KRESS:  Your Honor, this is Andrew

9   Kress, may I be heard with respect to the

10  scheduling conference for next week?

11          THE COURT:  And who is this.

12          MR. KRESS:  Andrew Kress.

13          THE COURT:  Hsh North; is that right?

14          MR. KRESS:  Yes, Judge.  First of all,

15  the complaint that has been filed in the

16  Bankruptcy Court has yet to be served on any of

17  the defendants.  The motion for partial summary

18  judgment has not been served on any of the

19  defendants.  The motion for a -- to establish the

20  scheduling order, likewise, has yet to be served

21  on any of the defendants.

22          I think that as a matter of due

23  process, the parties have the right to at least

24  have an opportunity to review, consider, discuss

25  with their clients these documents before being

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    rushed to come to court to start talking about

2    scheduling conferences.

3            THE COURT:  Well, the scheduling

4    conference ---

5            MR. KRESS:  I understand -- I

6    understand Mr. Baena would like to move this

7    process quickly, but there is minimum amount of

8    due process that the parties are entitled to,

9    your Honor.

10           THE COURT:  Well, we're certainly not

11   going to deny anyone due process, but no one's

12   rights will be impaired by holding a scheduling

13   conference.  It may be that at the scheduling

14   conference it will be determined that we have to

15   adjourn it to a later date.  It may be that

16   certain things can be agreed upon, but we have a

17   situation here where time is a critical factor

18   and it's important that we move as rapidly as

19   possible.

20           Now, to wait and see when we should set

21   one and then start setting it up, is not nearly

22   as effective as setting one now and if there's a

23   reason why we can't do it or conclude it or

24   partially conclude it, we'll deal with it then

25   and everyone will have their due process rights

1  protected and no one will have their position

2  impaired because of the lack of notice or a lack

3  of ability to proceed.

4          And so I understand your position,

5  Mr. Kress, but I will maintain that date pending

6  a report from Mr. Rasile, who has just returned.

7  Any luck, Mr. Rasile?

8          MR. RASILE:  Yes, your Honor.

9  Mr. Cantor is available on the 17th at 3:00 p.m.,

10  but we only speak with respect to this adversary

11  on behalf of Bank of America and Merrill Lynch,

12  who are named defendants.  I can't speak for all

13  the others.  I believe there's about 10 or 11

14  defendants in that lawsuit.

15          THE COURT:  I understand, and as

16  pointed out by -- aptly pointed out by Mr. Kress,

17  maybe we're premature, but if we are, we'll

18  adjourn the hearing to a date when everybody has

19  had adequate notice, opportunity to prepare and

20  appear and present.

21          So we'll leave the date set, but that

22  doesn't mean that we're going to conclude it that

23  day, that means that we're trying to move as

24  rapidly as we can.

25          Anything further, Mr. Kress?

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1            MR. KRESS:  No, your Honor.

2            THE COURT:  Very well.  Go ahead,

3    Mr. Baena.

4            MR. BAENA:  Thank you very much, Judge.

5            Just one more point about the use of

6    cash collateral so that it -- it's not

7    overlooked, and that is that the proposal

8    preserves the rights of a committee to

9    investigate and pursue claims against the lender,

10   providing them the usual 60 days from the

11   appointment of the committee or 75 days from the

12   petition date, whichever is earlier, all of which

13   is, as I said, pretty typical.

14           The only objection that we received was

15   a limited objection from Mr. Rasile's client,

16   Bank of America, but in this instance, they're

17   being their old schizophrenic self and they're

18   doing it as the administrative agent.

19           They are -- the objection is

20   troublesome and astonishing, I might add, on a

21   number of levels.  First of all, as they point

22   out, they've resigned.  They have sought to be

23   replaced because ---

24           THE COURT:  Pardon me, if they resigned

25   as the representative, do they still have a dog

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    in the fight, do they have any money outstanding

2    or are they still a creditor?

3         MR. BAENA:  They have an interest in

4    about three and a half million dollars of letters

5    of credit.

6         THE COURT:  Oh, we can't consider

7    anything under $10 million in this case.

8         MR. BAENA:  I wouldn't even, in this

9    case, bend down to pick up three and a half

10    million dollars, Judge.

11         But this motion, this objection is made

12    as administrative agent and not as a holder of

13    any claim and it's just interesting how we heard

14    him not representing the revolvers two seconds

15    ago, and now they file an objection on the -- on

16    behalf of the revolvers, none of whom have seen

17    fit to likewise make the same objection.

18         Moreover, they were among those who

19    terminated their revolving loan commitment and

20    even if we -- we were to humor them in this

21    capacity, they couldn't object to this loan --

22    these terms because they have no dog in this

23    fight.

24         THE COURT:  You're not looking to use

25    their cash collateral?

1          MR. BAENA:  That is correct, Judge.

2          THE COURT:  Okay.  Thank you.

3          MR. BAENA:  And if they have any

4    interest, I would submit that that interest ought

5    to be viewed with some circumspect given their

6    failure to fund.

7          The objection really is predicated on

8    two points, as I understand it, the first is that

9    we don't have a sufficient critical mass of term

10   lenders in agreement about the use of the money.

11   It's sort of an out of body experience to listen

12   to this agent, who speaks for the revolvers,

13   complain that the term lenders, who are in favor

14   of this, might not be bona fide in their effort

15   to preserve their own collateral in this -- in

16   this situation.  It's -- it hurts my head to

17   think about the argument.

18         They complain, nonetheless, that the

19   critical mass should be at least 50 percent.

20   This is why we've had so much trouble with them,

21   630 over one million exceeds 51 percent.  So I

22   don't think that that's truly an issue.

23         The second point is that they complain

24   that there's some unfairness now in respect of

25   those who issued those letters of credit, again,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1  their schizophrenia, despite the fact that they

2  say they're filing this as the agent.

3      The fact of the matter is, if they had

4  spent a little bit of time with the document, we

5  took great pains, Mr. Bennett and I, to ensure

6  that if they really have an interest in cash,

7  they not be treated dissimilarly and the defined

8  terms gives anybody who is a lender with an

9  interest in that cash their rateable interest in

10  that replacement lien, which is pari passu with

11  the first lien.

12      So this objection is limited, it's

13  limited to being no good, and we don't have to

14  worry about it too much.

15      THE COURT:  Do you think we ought to

16  let Mr. Rasile respond or do you think you just

17  want to do it your way?

18      MR. BAENA:  I've known him for 30

19  years, Judge, I'd rather not see him embarrass

20  himself.

21      THE COURT:  Mr. Rasile, are you or

22  Mr. Kress going to speak for Bank of America?

23      MR. RASILE:  I'm going to give it a

24  shot, your Honor, if I may?

25      Thank you, your Honor.  I know that

1   Mr. Baena has a sufficient level of

2   sophistication after 50 or 60 years of practicing

3   law in this jurisdiction to know exactly what the

4   role of an administrative agent is in a loan

5   facility of this size and magnitude.  He didn't

6   go into too much detail about the credit

7   agreement itself, your Honor, but it's not a

8   simple $10 million loan to buy, you know, a strip

9   mall where Sals' Sandwich Shop is the anchor.

10          This is a $1.85 billion loan facility

11   that -- it's structured in traunches.  Although

12   it doesn't talk about traunches, it's the three

13   pieces that Mr. Baena articulated ---

14          THE COURT:  Traunches is a dirty word

15   these days.

16          MR. RASILE:  I know.  I know.  But

17   the -- it's the -- there's two term loan

18   components and then there is the revolving

19   component, as Mr. Baena articulated, and B of A

20   was the administrative agent for the entire loan

21   for all three traunches.

22          THE COURT:  Is it correct, Mr. Baena

23   says they've resigned?

24          MR. RASILE:  Well, your Honor, we have

25   resigned by letter of May 7 to the term lenders,

1    I think represented by Mr. Bennett.  The problem

2    is, is that there is no successor agent that has

3    come in formally under a new agreement to take

4    over for our position as agent here and the

5    problem is, is that technically, we believe, and

6    the reason we filed the limited objection, is

7    that we still have an obligation to the term loan

8    lenders and revolvers who are not present before

9    your Honor today.

10          And Mr. Baena is correct, we are

11    wearing multiple hats here.  We are -- B of A was

12    a participant in the term loan, they're going to

13    be a participant in the revolver, and they're the

14    agent.  It's not an unusual structure of loans in

15    this size, your Honor.

16          B of A has sold its piece of the debt

17    and the term and it is resigning because of this

18    potential conflict situation created by virtue of

19    the lawsuit, but until there's a new agent

20    involved under a new agreement, which you heard

21    Mr. Baena just articulate that they're going to

22    come to court and, I guess, get court approval of

23    that replacement agreement, we still have

24    obligations, fiduciary obligations, to everyone.

25          The reason it's a limited objection,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   your Honor, is that ---

2           THE COURT:  What's it limited to?

3           MR. RASILE:  Well, it's limited to the

4   fact that the -- Mr. Bennett does not represent a

5   hundred percent of the lenders before your Honor.

6   Yesterday he didn't even represent a majority.

7   I'm pleased to hear that they've gotten closer to

8   a majority, I guess they're closer to 66 2/3rd

9   percent of the term loan lenders, and the term

10  loan lenders are all in, your Honor.  They have

11  fully funded more than a billion dollars.

12          You heard Mr. Baena say that right now

13  I believe Mr. Bennett speaks for lenders who hold

14  $630 million of this term debt.  There's still

15  another 300, $400 million worth of lenders that

16  haven't been heard here.

17          THE COURT:  Assume that your objection

18  on behalf of Bank of America is persuasive and we

19  deny the use of cash collateral, what do we do

20  then?

21          MR. RASILE:  Well, your Honor, we ---

22          THE COURT:  What about this billion

23  dollar project standing out there naked ready to

24  be vandalized, deteriorated?  Do we just leave it

25  there until when?

```
 1              MR. RASILE:  Well, your Honor, I
 2   believe that there -- there have been discussions
 3   and negotiations about how do we get hard hats
 4   back on the project to finish it.  And I can't go
 5   into those discussions today, but we are not
 6   consenting, for the benefit of the minority of
 7   the lenders that we represent as an
 8   administrative agent here today, we are not
 9   consenting to the use of this cash collateral
10   because they haven't spoken ---
11              THE COURT:  But you're saying -- you're
12   not saying it's your cash collateral, are you?
13              MR. RASILE:  No.  Well, it could be --
14   it could be ---
15              THE COURT:  You're not consenting to
16   the people whose cash collateral is sought to be
17   used, and who are essentially at least 66 percent
18   of, more or less --
19              MR. RASILE:  That's correct.
20              THE COURT:  -- consented to the use of
21   that cash collateral, you're objecting on their
22   behalf?
23              MR. RASILE:  Well, I'm objecting on
24   behalf of the folks who aren't here that we have
25   a fiduciary duty to, your Honor, and that would
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   be, there's 300 or $400,000 ---

2        THE COURT:  Well, what duty do you have

3   to protect the project so this thing doesn't

4   become worth, say, 200 million instead of

5   two billion?

6        MR. RASILE:  Well, it's not our

7   project.  It's not our project, your Honor, and

8   we're going to be obviously litigating what our

9   rights are, probably sooner rather than later if

10  Mr. Baena has his way, but we -- we are not --

11  the purpose of our objection isn't that we're not

12  consenting to this use on behalf of those folks.

13  We ---

14       THE COURT:  Well, I think there's a

15  difference, Mr. Rasile, between not consenting

16  and objecting.  No one ever said you were

17  consenting that I heard in the motion, but that's

18  passive.  But you're affirmatively objecting and

19  I want to know what we're going to do.

20       Assuming you persuade me that we

21  shouldn't allow the use of cash collateral, what

22  are we going to do with this project while you do

23  what?

24       MR. RASILE:  Well, I think what we

25  should do and what an agent would do is try to

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   get closer to a hundred percent consent, your

2   Honor.  I mean, under the Code, the 361 and 363,

3   the debtor can only use this cash collateral if

4   A, he gets a hundred percent consent of all the

5   lenders who have an interest in it, right, or he

6   can demonstrate that the other -- those who don't

7   consent are adequately protected.

8            Mr. Bennett allowed Mr. Baena to put in

9   his motion to use cash collateral that -- in

10  Paragraph 37 that they don't believe that -- the

11  term lenders don't believe that the debtor can

12  provide adequate protection for anybody.  They're

13  consenting.  They represent $630 million of the

14  debt.

15           We're telling you that we don't know if

16  the other $400 million in debt would consent.  We

17  clearly know that they're not providing adequate

18  protection for those folks.  So that's the

19  essence of our objection.

20           We did a reservation of rights on

21  behalf of the people that are not here, your

22  Honor, that was one -- also one part of the

23  objection that Mr. Baena forgot to argue on my

24  behalf.  We are reserving rights for any lenders

25  who are not present before you today to come in

1   and assert arguments at a final hearing and I

2   mean, obviously, this is just going to be an

3   interim order.

4          We did go through the extra step to

5   take a stab at a black line cash collateral

6   order, which we attached as an exhibit to our

7   objection, so that if Mr. Baena would have an

8   opportunity to take a look at this and see if

9   it's good enough to get us to, you know, the

10   final hearing.

11          So that's -- and we apologize, your

12   Honor, but, you know, we just got hit by this

13   storm as quickly as everybody else did, so ---

14          THE COURT:  Anything else, Mr. Rasile?

15          MR. RASILE:  Nope, that's it, your

16   Honor.

17          THE COURT:  All right.

18          MR. RASILE:  I'll answer any questions.

19          THE COURT:  Mr. Moorefield, do you have

20   something to add?

21          MR. MOOREFIELD:  Yes, your Honor, if I

22   might?  Judge, if you will indulge me, I have

23   been retained now for almost three hours on

24   behalf of Bank of Scotland.

25          THE COURT:  You should be ready to

1    submit your fee application.

2            MR. MOOREFIELD:  Yes, sir.  Yes, sir,

3    and I rise on behalf of Bank of Scotland, who I

4    understand, and their lead counsel is on the

5    phone ---

6            THE COURT:  Mr. Noble is representing

7    them out in telephone land --

8            MR. MOOREFIELD:  Yes, sir, and he's

9    on ---

10           THE COURT:  -- and Mr. Moorefield is

11   representing them here in the courtroom.

12           MR. MOOREFIELD:  Yes, sir, and I'm sure

13   that Mr. Noble and all the other excellent

14   attorneys in the room who know more about the

15   case than I do, will correct me if I misstate

16   anything, but forgive me for not having filed a

17   specific objection.

18           We rise to raise one point in respect

19   of the cash collateral motion, Judge, that we

20   want to have you carry over to the final hearing.

21   It has nothing to do with the operational budget.

22   In fact, I don't even see a line item in the

23   budget for this use, it has nothing to do with

24   the debtors' need to use the money to further the

25   construction of the project, it has to do with

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1  the potential payment of attorneys' fees to the

2  Hennigan Bennett & Dorman firm, and perhaps the

3  Akerman Senterfitt firm, of the cash collateral.

4  That is detailed on Page 15 of the motion at

5  Paragraph 28(a).

6          As Mr. Rasile alluded to, those firms

7  apparently represent a term lender steering

8  group.  Bank of Scotland is both a term lender,

9  as I understand it, and so it has an interest in

10  the cash collateral, and is also one of the

11  revolver banks, which is one of the defendants in

12  the adversary proceeding Mr. Baena tried to try

13  before you earlier today.

14          And it strikes us, Judge, that Bank of

15  Scotland is not a member of that steering

16  committee.  I don't know if that steering

17  committee is an official committee under the loan

18  documents, if they can act on behalf of the full

19  approximately $1 billion of the lenders.

20          THE COURT:  How much is in the budget

21  for them?

22          MR. MOOREFIELD:  I didn't see anything

23  in the budget, but ---

24          THE COURT:  Well, then, what's the

25  problem?

1            MR. MOOREFIELD:  Well, Judge, they --

2    they ask that it be included in the interim cash

3    collateral order, that the fees of these lenders'

4    committee counsel, who I don't think speak for

5    all the term lenders, be authorized to be paid

6    and it strikes us that that's an odd use of cash

7    collateral to pay the lenders' counsel.

8            Perhaps that will be a committee that

9    will be formed before this Court.  Perhaps that

10   will be a committee that is really authorized to

11   act on behalf of all the term lenders under the

12   loan documents.  But if there's nothing in the

13   budget and we have that clarification, and we can

14   carry that one issue over to the final hearing so

15   that at least I can understand what that

16   relationship is, and that's our clarification,

17   perhaps, more than objection.

18           I do want to add one other point, your

19   Honor.  As I understand it, the Hennigan Bennett

20   firm, on behalf of some of the term lenders, have

21   filed suit against other lenders that are

22   involved in this case over the issues in this

23   case, perhaps those that Mr. Baena eloquently

24   explained to your Honor, and if there's going to

25   be internecine warfare between creditors who both

1    have an interest in the cash collateral, if

2    that's accurate, it strikes me a bit unfair to

3    have the debtor pay one side and not both sides.

4            But in any case ---

5            THE COURT:  Let's assume that at this

6    point, unless I hear differently from Mr. Baena,

7    if there's nothing to be paid to them under this

8    original $8 million plus disbursement, then I

9    think it certainly can carry over until such time

10   as there's a specific request to pay that

11   specific money.

12           MR. MOOREFIELD:  Thanks, Judge.

13           THE COURT:  Is there anything in here

14   for them, Mr. Baena?

15           MR. BAENA:  There is nothing in the

16   budget for them, your Honor.

17           THE COURT:  Then that ought to take

18   care of Mr. Moorefield's concern and

19   Mr. Moorefield, tell your client that they have

20   some terrific ads on TV.

21           MR. MOOREFIELD:  Yes, sir.  Thank you.

22           MR. BENNETT:  Your Honor, I rise for

23   two reasons.  I want to make a couple of

24   housekeeping clean ups of some of the things that

25   have been said.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1          THE COURT:  Well, wait.  Are you coming

2     in on this issue --

3          MR. BENNETT:  Yes.

4          THE COURT:  -- of the objection or ---

5          MR. BENNETT:  I'm coming in on the

6     objection, but I have just a couple little things

7     to clean up the record just in case there's an

8     appeal, just to make sure the numbers are right.

9          First of all, a very small thing from

10    the beginning.  The order that's before you, the

11    proposed order that's before you that we agreed

12    to with the debtors, specifies that the cash

13    collateral that is being used is cash collateral

14    in the Resort payment account.  So at the

15    beginning Mr. Baena ---

16          THE COURT:  That's $5 million.

17          MR. BENNETT:  It's -- no, it's actually

18    a little more than that at this point.

19          MR. BAENA:  May I?

20          THE COURT:  Yes.

21          (Thereupon, Mr. Baena confers with

22        Mr. Bennett off the record.)

23          MR. BENNETT:  All right.  The -- we've

24    got to fix the order, but it's -- it will be

25    revised to say that the -- that the amount in the

1    Resort payment account will be exhausted first

2    and if there's more that is necessary, it will

3    come from the other account.

4            Secondly, there have been a lot of

5    numbers thrown around about how to view the term

6    loan lenders represented by my office.  The 630

7    number is correct, 630 million.  Now, how does

8    that relate to all of the possible calculations

9    of the amount outstanding?  Okay.  One way to

10   look at the amount outstanding is just the term

11   amount that's already been drawn, plus the

12   letters of credit which are outstanding, but to

13   the best of my knowledge, have not been drawn

14   down by the recipients of the letters of credit.

15   That denominator, if you looked at it that --

16   that way, would be about 1050.  So the 630

17   divided by the 1050, it's not quite 66 percent,

18   it's vastly more than half.

19           The other way to look at the numbers

20   actually is revealed by the schedule that

21   Mr. Baena handed up.  There's a number on this

22   schedule that I've actually never seen before and

23   can't verify, which is the $49 million of swaps,

24   collars and cash management transactions.  I'm

25   not saying the number is wrong, just a number I

1     haven't seen before.

2              If you include that as outstanding

3     under the credit facility, I'm not conceding or

4     denying that that's the case, then you would have

5     a denominator which was as large as one billion

6     099, call it one billion one.  The 630 is

7     still -- is not 2/3rds of that, the 630 is more

8     than half of that.

9              And I would also point out to your

10    Honor that in -- in the order, I don't have the

11    paragraph handy, what we were careful to say is

12    that the lenders, they're not identified as

13    clients of the firm, but the lenders that have

14    gotten together in the steering group and the

15    other lenders who are happy to be represented by

16    the steering group, but have also been consulted

17    on this matter, have consented and the order is

18    also crystal clear that the others did not

19    consent.

20             Interesting point, my friend

21    representing the bank with the great ads didn't

22    stand up and say he objects, he stood up and said

23    he wanted all kinds of modifications.

24             Finally, with respect to the objection

25    which your Honor has kicked over or is inclined

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    to kick over, and that's fine with me, but I do

2    not want the record to stand with the completely

3    inaccurate rendition of what's happening here.

4            The loan agreement, as most loan

5    agreements in the world, simple or as complicated

6    as this one, has in it provisions that provide

7    all lenders, in the event there is a default, are

8    entitled to attorneys' fees if they have them and

9    if they are reasonable.

10           And it is very frequent in this world

11   that when all the lenders have the right to do

12   it and debtors don't want to pay each and every

13   lender to have separate counsel, the debtors say,

14   you organize, we'll pay one group for the

15   organized group.  It's perfectly permitted under

16   the loan documents, the fees become a secured

17   claim.  It's a very standard feature, whether or

18   not there's an official committee that's been

19   appointed.

20           Now, I do want to talk about the other

21   lawsuit so that your Honor has a complete

22   picture, particularly for today, and going into

23   the hearings that are going to come up next week.

24   There is a lawsuit pending in the District of

25   Nevada.  It is by -- on behalf of our clients'

1    term lenders.  It is against all of the revolver

2    lenders that refuse to fund.

3            There is also an interesting additional

4    piece that Mr. Baena didn't mention.  There is a

5    relatively small amount, but more than a hundred

6    million dollars, of term loan lenders who were

7    revolver lenders, and as revolver lenders they

8    didn't fund, as term lenders at an earlier time,

9    they did fund.

10            THE COURT:  Now they're suing

11    themselves.

12            MR. BENNETT:  Well, no.  The term --

13    the -- they are not suing themselves because the

14    only -- the term lenders who did the suing do not

15    include any that are also revolvers.

16            THE COURT:  I see.

17            MR. BENNETT:  And the legal point that

18    I want to make sure your Honor takes away, which

19    will be opposed, no doubt, is that it is a basic

20    contract law principle that when a party breaches

21    a material obligation under the contract, they're

22    no longer entitled to demand any performance

23    under that contract.  And, in fact, this rule has

24    been applied to bank loan agreements such as this

25    one under New York law.

1              So one of the positions that we take,

2    and you will hear a lot more about, is that by

3    breaching their obligation as revolving lenders,

4    they've given up their right to recover as term

5    lenders.

6              THE COURT:  So then I guess we've got

7    to give you a summary judgment on that right

8    now --

9              MR. BENNETT:  Well, I wasn't ---

10             THE COURT:  -- or you think we can wait

11   until we get a little further?

12             MR. BENNETT:  Your Honor, if I've got a

13   one percent chance of getting it, I'll ask for

14   it, but I understand that that's not before you

15   today.

16             But if -- I do want to make sure that

17   at least the alignment is clear, so that people

18   don't make something confusing that's actually

19   not very confusing and very straightforward under

20   the documents.

21             THE COURT:  With this many lawyers

22   involved, I'm sure we can make this quite

23   confusing.

24             Anything else?

25             MR. BENNETT:  Not at this time, your

1    Honor.  Thank you.

2              THE COURT:  All right.  Then,

3    Mr. Rasile, do you have any response to

4    Mr. Bennett's remarks?

5              MR. RASILE:  No, I just appreciate

6    Mr. Bennett taking the time to educate us and the

7    Court on, you know, the total dollar amount of

8    the debt that he represents.

9              As I mentioned previously, though, I'm

10   not that concerned about his folks, your Honor,

11   he's -- they're adequately represented,

12   obviously.  We're more concerned, as the agent,

13   for the folks who are not here.  And Mr. Bennett

14   did make an interesting point about the

15   $49 million line item on Mr. Baena's term sheet.

16   You'll see it says Las Vegas swaps, collars and

17   cash management transactions.  I believe

18   $20 million of that liability is held by Bank of

19   America.  We do have $3 million of LC exposure

20   and there are other lenders who are part of the

21   revolvers and terms who are participants in all

22   this, so that's why we're here, more or less on

23   their behalf.

24              The building -- this asset, your Honor,

25   is not like a, I guess a container of shrimp on

1    the pier in Miami.  I'm sure you've heard that a

2    thousand times.

3            THE COURT:  Oh, I think it is, it is.

4    A building partially completed standing out there

5    unprotected and unfinished is very similar to a

6    carload of shrimp without refrigeration.

7            MR. RASILE:  Your Honor, currently

8    there is -- there is -- there is security there.

9    This building is insured.  It's been coated for

10   protection under the sun.  I know that the

11   Fontainebleau folks haven't let this building

12   deteriorate.

13           So it would be -- we would respectfully

14   request we continue this, since you're going to

15   have a hearing on this not too long from now,

16   that we give the -- create the ability for other

17   lenders who may be affected by the relief to be

18   heard.

19           If not -- if the Court is going to

20   overrule it, your Honor, as I mentioned, we would

21   just request the Court acknowledge our

22   reservation of rights for those folks so they can

23   come in here before the final hearing and

24   secondly, that Mr. Baena and his colleagues take

25   a look at the revisions that we made to the

1    interim cash collateral order.

2            THE COURT:  Thank you, Mr. Rasile.

3            Having heard the objection of

4    Mr. Rasile on behalf of Bank of America and

5    having heard the commentary of Mr. Moorefield,

6    the Court has determined that the issue raised by

7    Mr. Moorefield is not really before us today

8    because there's nothing being paid in the

9    direction about which he was concerned.

10            As to the objection of Bank of America,

11    the Court overrules the objection.  If this was a

12    request to use $800 million, I might be inclined

13    to wait a week.  If it were $80 million, I'd be

14    less inclined.  Eight million bucks, I think that

15    in this case, and what is involved and the amount

16    that is being requested, is so minimal that it

17    would be foolhardy not to provide these funds to

18    make sure that the building gets the best

19    possible protection until our next cash

20    collateral hearing, so the objection of Bank of

21    America is overruled.

22            You asked for a reservation of rights.

23    I'm neither enhancing or impairing anyone's

24    rights, other than by granting the use of the

25    cash collateral as agreed.  So whatever rights

1    your clients or people that aren't your clients

2    have, have not been impaired, other than to the

3    extent of the cash collateral -- interim cash

4    collateral order that we are about to enter.

5            Mr. Baena, can we go forward?

6            MR. BAENA:  We may.

7            MR. QUSBA:  Your Honor --

8            THE COURT:  Yes.

9            MR. QUSBA:  -- it's Sandeep Qusba from

10   Simpson Thatcher, counsel for a number of the

11   revolving banks and some of which hold hedge

12   exposures, which I think have been referenced by

13   a number of counsel in the courtroom.

14           I just want to confirm, I think Bank of

15   America's objection included an attachment with

16   black line proposed changes to the interim cash

17   collateral order, including references, clear

18   references to the hedge exposure being entitled

19   to the adequate protection liens and adequate

20   protection obligations that are being given to, I

21   guess, term and revolver lenders.

22           In that circumstance, I just want to

23   clarify that Mr. Baena or the debtors do not have

24   an objection to at least that portion of it.  It

25   wasn't clear to me.

1          THE COURT:  Mr. Baena, can you respond?

2          MR. BAENA:  Yes, your Honor.

3          I don't think it's necessary, Judge.

4    The way that the document is written, it -- it

5    extends the same entitlements in respect of the

6    replacement lien to what we define as prepetition

7    secured parties.  The prepetition secured parties

8    are defined to include all the -- all the lenders

9    who are party to the senior loan facility, which

10   would include those folks and, therefore, they're

11   covered if they have an interest in cash.

12          I'm with Mr. Bennett, we don't concede

13   that right now, but to the extent they have an

14   interest, to the extent they're a senior lender,

15   they're being treated ratably with all the term

16   lenders and all the letter of credit issuers in

17   respect of the prepetition and postpetition

18   collateral and the rights in cash.

19          THE COURT:  Well, then, based on your

20   representation and interpretation, that should

21   resolve your problem, sir.  That is, although

22   they may not be conceding your right, they are

23   agreeing that the interpretation of the order

24   includes your rights -- I mean your -- the rights

25   of those parties, if they have the rights and

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   we're not adjudicating ---

2          MR. QUSBA:  Fair enough, your Honor.  I

3   mean, just to be clear, I think the way the

4   definitions work in the debtors' proposed order

5   and in their motion papers, it's not clear at all

6   that the hedge counter parties would be picked

7   up.

8          THE COURT:  Well, it's now clear on the

9   record.

10          MR. QUSBA:  In the collateral

11   agreement, your Honor, the hedge parties,

12   specified hedge affiliates, which are often

13   affiliates of the lenders who are party to the

14   credit agreement, are covered as secured parties.

15   But based on Mr. Baena's representation, that to

16   the extent we're entitled to adequate protection,

17   we're being given adequate protection just as

18   anyone else, revolver and term, I'll accept that

19   and we even clean up the language, if necessary,

20   at the final order.  I, too, would like to

21   reserve rights for our clients, your Honor.

22          THE COURT:  Thank you.  All right.

23   Mr. Baena.

24          MR. BAENA:  Thank you.  I also don't

25   think it necessary, Judge, to modify the proposed

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    order that we've submitted to the Court to cover

2    the issue of what bank account we are obtaining

3    the money from.

4             Mr. Bennett's partner, Mr. Levinson and

5    I, took care of that in Paragraph 4(c) of the

6    proposed order, to permit this cascade use of

7    cash from the different accounts.

8             THE COURT:  So then it goes the way he

9    wanted it to go, first out of the --

10            MR. BAENA:  Yes, sir.

11            THE COURT:  -- the account --

12            MR. BAENA:  The Resort account.

13            THE COURT:  -- the Resort account.

14            MR. BAENA:  Yes.

15            THE COURT:  Okay.  What's next?

16            MR. BAENA:  I'm going to pass.

17            THE COURT:  There are some people that

18   want to get home by midnight, so let's see if we

19   can move a little.

20            MS. MORA:  Thank you, your Honor.

21            We're going to try to roll through the

22   rest of the motions as quickly as we can.

23            The first motion we'd like to take up

24   with the Court is the motion with respect to

25   prepetition wages.  This is an emergency motion

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    filed as Court Paper 9, authorizing the debtors

2    to pay prepetition wages, salaries and employee

3    benefits, to pay prepetition withholding

4    obligations, to authorize the continuation of

5    employee benefit plans and programs postpetition,

6    and directing all banks to honor payments made by

7    the debtors with respect to those prepetition

8    employee obligations.

9              Judge, as I'm sure you're aware ---

10             THE COURT:  I'm looking for that on the

11   calendar and I'm having trouble finding it.

12             MS. MORA:  Your Honor, it is right --

13   it's Court Paper 9.  On my copy of the calendar

14   it's the third motion listed.

15             THE COURT:  My third motion shows

16   continuing existing insurance policies.

17             THE COURT REPORTER:  Page 5, Judge.

18             THE COURT:  Oh, Page 5.  Pardon me, the

19   court reporter was astute enough to find that for

20   us.

21             MS. MORA:  May I proceed?

22             THE COURT:  You may.  Yes.  Okay.  I've

23   got it now.  Go ahead.

24             MS. MORA:  Thank you, Judge.  As you

25   can appreciate with an enterprise like this, the

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1  debtors' workforce is essential to the debtors'

2  ongoing ---

3          THE COURT:  Okay.  First question, how

4  many dollars are we talking about?

5          MS. MORA:  Judge, we're talking about

6  various dollars for various programs that the

7  debtor has.

8          THE COURT:  All right.  Anything --

9  anybody getting more than the statutory priority?

10         MS. MORA:  No, your Honor, no one is

11  getting ---

12         THE COURT:  Any insider getting paid?

13         MS. MORA:  With respect to the wages,

14  Judge, there's nobody who is an insider and

15  nobody getting more than the statutory priority.

16         THE COURT:  All right.

17         MS. MORA:  We have, your Honor, a

18  companion motion, which is Court Paper Number 11,

19  asking for authority to file the wage motion

20  exhibit ---

21         THE COURT:  And we'll get to that in a

22  moment, but let's talk about the wages and

23  salaries and employee benefits and particularly,

24  the withholding.  It appears there's no reason

25  why that should not be granted.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1          Anyone wish to be heard in

2     disagreement?

3          There being no one, that motion is

4     granted.  You may present an order.

5          MS. MORA:  Thank you, your Honor.  That

6     would include our request to pay vacation accrual

7     amounts, withholding obligations, payroll taxes.

8          THE COURT:  You said they're all within

9     the -- within the cap; right?

10          MS. MORA:  The wages are all within the

11    cap, your Honor.  These are other amounts in

12    excess of the cap.  They're all outlined in

13    particularity in our motion.  There are different

14    amounts, some of which are accrued amounts, which

15    may be used -- for example, the vacation accrual

16    would not actually be a paid amount unless the

17    employee is terminated.  At this point, it's just

18    an accrued amount.

19          There are amounts due with respect to

20    other employee benefit plans.  For example,

21    amounts that have been accrued, your Honor, for

22    disability and life insurance premiums, where

23    they're employee contributions that have been

24    deducted from the employees' wages, 401-K

25    contributions, which have been deducted from

1    employee wages, other supplemental benefits

2    outlined with particularity in the motion.

3            THE COURT:  Well, like the 401-K

4    deduction, it's not really even your money, that

5    certainly should be paid.

6            MS. MORA:  That's correct, your Honor.

7            THE COURT:  In fact, it would be a

8    crime if you didn't pay it.

9            MS. MORA:  That's correct, your Honor.

10   So our motion also seeks authority to pay those

11   amounts, as well.

12           THE COURT:  Okay.  There being no

13   objection -- just a moment, there may be an

14   objection.

15           Oh, no, no, there's not.  Okay.

16   Granted.

17           MS. MORA:  Thank you, your Honor.

18           THE COURT:  Now let's talk about the

19   next matter.

20           MS. MORA:  Well, Court Paper 11 is our

21   emergency motion to seal the exhibit.  The

22   exhibit contains ---

23           THE COURT:  Okay.  Let me ask you a

24   question, why do you need it sealed, as opposed

25   to just not filing it?  The reason I bring this

1    up is because if you file it, I don't see a big

2    deal in ordering it sealed, but when this case

3    closes and the file is ready to be shipped off to

4    the archives, the clerk automatically unseals the

5    document.

6            So if that will do no harm, that it

7    becomes public knowledge somewhere down the line

8    after the case is closed, then we can go ahead

9    with your seal idea.  On the other hand, it might

10   be -- I mean, if there is some reason why this

11   should remain forever secret, then I think it

12   would be a better idea not to file it and, of

13   course, if there's a need for an in camera

14   inspection, that can be done by bringing the

15   document to Court and presenting it and taking

16   away.  Once it gets into that system, I can't

17   guarantee you the secrecy forever.

18           MS. MORA:  Thank you, your Honor, I

19   appreciate that.  In fact, our motion did request

20   an in camera inspection by the Court as an

21   alternative to just filing it under seal.

22           The U.S. Trustee has also requested,

23   however, that if -- for a copy of this document

24   and requested that the order direct the

25   U.S. Trustee to keep this document confidential

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    and not release it to any party except authorized

2    law enforcement officials who may seek production

3    of the document.

4            THE COURT:  If that suits you, that's

5    no problem for me.

6            MS. MORA:  Okay.

7            THE COURT:  Is that the way you want to

8    go, in camera with the Court and the confidential

9    agreement with the U.S. Trustee?

10            MS. MORA:  That's correct, your Honor.

11    If I may approach for the in camera inspection?

12            THE COURT:  Do we have to do it now?

13            MS. MORA:  We don't.

14            THE COURT:  Okay.  We'll do it at

15    another time.  Let's get on with these other

16    motions.

17            MS. MORA:  Court Paper 13, your Honor,

18    is our emergency motion requesting the

19    authorization, but not requiring the debtors to

20    continue their insurance programs to pay certain

21    prepetition obligations related to these programs

22    and authorizing financial institutions to honor

23    and process the checks and transfers related to

24    these obligations.

25            THE COURT:  Very well.  Is this money

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    coming out of the cash collateral?

2            MS. MORA:  Yes, your Honor.  There is a

3    line item budget --

4            THE COURT:  Okay.

5            MS. MORA:  -- in the cash collateral.

6    It's described ---

7            THE COURT:  So you have the money to

8    make the payments.

9            MS. MORA:  There are claims that are

10   made under what's called the OCIP program, the

11   Owner Controlled Insurance Program, which covers

12   all of the company's workers' compensation and

13   builders' risk program.  There's approximately

14   $2.1 million in outstanding claims that are

15   within the deductible limits that the debtor is

16   responsible for and the budget contemplates

17   approximately $200,000 of payments during the

18   four-week period, which may be paid from the

19   budget.

20           THE COURT:  Very well, any objection?

21   There being none, granted.

22           Next.

23           MS. MORA:  Your Honor, Court Paper

24   Number 14 is our motion with respect to --

25           THE COURT:  Utilities.

1          MS. MORA:  -- utilities.  We'd like to

2    continue that to the June 30th hearing.

3          THE COURT:  Does that mean you're

4    having no problem with your utility providers?

5          MS. MORA:  Not until we call them and

6    tell them we filed, your Honor.

7          THE COURT:  Very well, then you'll draw

8    an order continuing that to the 30th of June.

9    Thank you.

10          Next.

11          MS. MORA:  Okay.  Your Honor, that

12    takes us to certain retention matters.  We are

13    seeking interim and final orders, at this time

14    just an interim order, with respect to each of

15    the professionals for whom the retention

16    applications were filed.

17          THE COURT:  The first one is

18    Scott Baena and you may know him.

19          MS. MORA:  For 23 years, your Honor.

20          THE COURT:  Okay.  What about it, the

21    U.S. Trustee have any objection?

22          MS. MORA:  The only objection raised by

23    the U.S. Trustee was to request that the issue

24    that we raised with respect to our retainer, that

25    the retainers be Evergreen retainers, and that's

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   with respect to all of the professionals, your

2   Honor, be deferred until the final hearing and we

3   don't have a problem with that.

4            THE COURT:  The U.S. Trustee okay?

5            MS. ARMENGOL:  Yes, your Honor.  We're

6   requesting that the Evergreen component of all

7   the professionals, the retention of all

8   professionals, be rolled over until a final

9   hearing.

10           THE COURT:  So we're granting the

11  motion except for the Evergreen provision, and I

12  might mention that I have dealt with Evergreen

13  requests in the past by allowing them, but not

14  allowing the waiver of the 120 days, so think

15  about it.

16           MS. MORA:  Your Honor, the one concern

17  we do have in this case, of course, is that there

18  is not a carve out in this case for professional

19  fees, and that's why the issue of the Evergreen

20  retainer is particularly important, but we can

21  take that up at the final hearing.

22           THE COURT:  We'll talk about it when we

23  come back and you may draw the order granting the

24  retention.

25           MS. MORA:  Thank you.  Court Paper ---

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1          THE COURT:  Now, there is a second --

2    wait, we had a telephone request here -- oh, I'm

3    sorry, no, that's the original telephone request.

4          What's next?

5          MS. MORA:  Court Paper 27, your Honor,

6    the retention of Kasowitz Benson Torres &

7    Friedman, as special litigation counsel.  You

8    previously heard from Mr. Friedman with respect

9    to the adversary proceeding.  This firm is being

10   retained to handle not only the adversary

11   proceeding, which is Adversary Proceeding

12   09-1621, but various contested matters that we

13   expect to arise in these cases.

14          This retention is pursuant to 327(e).

15   This firm has acted as lead counsel in numerous

16   lawsuits on behalf of various debtors, not

17   just -- not capital D Debtors, but borrowers,

18   against lenders, so we think they're well suited,

19   in particular, to handle the pending adversary

20   proceeding.

21          THE COURT:  This is paper filed under

22   Tab 19, I believe, is that -- no, no, I'm sorry.

23          MS. MORA:  No, your Honor.

24          THE COURT:  No, not 19.

25          MS. MORA:  Kasowitz is at 23, your

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    Honor.

2             THE COURT:  23, okay, and according to

3    the schedule filed in that request, senior

4    partners get a thousand bucks an hour and

5    paralegals get $225 an hour?

6             MS. MORA:  Your Honor, this is a firm

7    based in New York with offices all around the

8    country.  The partners that we happen to be

9    dealing with on this matter are situate in the

10   New York office.

11            THE COURT:  Well, the point is, when

12   you -- when you come in under 330, the Court

13   determines what -- makes the final determination.

14   Since they're coming in under 327, is this a

15   proposal that the estate be bound by these fees

16   or do they still get reviewed by the Court?

17            MS. MORA:  Well, your Honor ---

18            MR. FRIEDMAN:  Your Honor, it's

19   David Friedman.  We will certainly agree to be

20   bound by your Honor's ultimate review of our fee

21   application.

22            THE COURT:  All right.  Then that seems

23   to solve that problem.  Anyone else wish to be

24   heard on that issue?  Then we'll grant the motion

25   and you may submit an order.


         OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1          MS. MORA:  Thank you, your Honor.

2          THE COURT:  Next.

3          MS. MORA:  Next is ---

4          THE COURT:  And you ought to note that

5     the order was granted subject to a clarification

6     on the record by Mr. Friedman.

7          MS. MORA:  Yes, I will, your Honor.

8          THE COURT:  Okay.

9          MS. MORA:  And in addition, the issue

10    on the Evergreen retainer and deferring that

11    until the final hearing also pertains to this law

12    firm.

13         THE COURT:  Very well.

14         MS. MORA:  Next, your Honor, is

15    Court Paper 16, that's in the binder we provided

16    you at Tab 21, that's Buchanan Ingersoll &

17    Rooney's retention application.  Buchanan

18    Ingersoll has been representing the debtors

19    prepetition with respect to corporate finance,

20    tax, real estate, intellectual property,

21    employment, construction and government relation

22    matters.

23         THE COURT:  These are the people that

24    want a $25,000 monthly payment?

25         MS. MORA:  Two different ways they're

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    being retained, your Honor.  One is on an hourly

2    basis with respect to most of those matters that

3    I've described.  Their government relations

4    practice has a separate engagement term.  That

5    professional, who's not a lawyer, is being

6    retained to assist the debtor in seeking grants

7    with respect to TARP money and the terms of that

8    engagement were on the basis of the payment of a

9    monthly retainer of 25 -- monthly payment of

10   $25,000.

11           So the retention generally is under

12   327(e) and 330, but solely with respect to the

13   government relations matter, under 328(a).

14           THE COURT:  Anyone else wish to be

15   heard?

16           MS. MORA:  And likewise, your Honor,

17   this ---

18           THE COURT:  So do I understand you

19   correctly, they're going to be paid hourly for

20   some work and they're also going to get $25,000 a

21   month in addition to whatever their hourly

22   billing is?

23           MS. MORA:  That's correct, your Honor.

24   The 25,000 is solely for the services being

25   provided to obtain what we hope will be millions

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    of dollars in TARP money to be used in connection

2    with the construction of the project.

3              THE COURT:  If nothing is obtained, do

4    you still pay $25,000 a month, for how long,

5    forever?

6              MS. MORA:  Well, no, your Honor.  There

7    will be a determination made whether or not the

8    services are going to lead to a fruitful benefit.

9              THE COURT:  Is there a need to include

10   this matter today?  I'm not inclined to grant

11   these blanket payments without the normal

12   procedure that we follow under 330 in the usual

13   cases.

14             I don't mind the hourly engagement, but

15   I'd like to learn more about what's worth 25,000

16   bucks a month.

17             MS. MORA:  Your Honor, we could arrange

18   at the next hearing, the final hearing on this,

19   to have Mr. Rubin, who is the professional

20   responsible for the government relations

21   practice, available to address the Court with

22   respect to the services being provided to the

23   debtor.

24             THE COURT:  Which one is this?  This is

25   Court Paper --

1              MS. MORA:  Court Paper 16.

2              THE COURT:  -- 16.

3              MS. MORA:  Your Honor, on the calendar

4    I had, it was right after cash collateral.

5              THE COURT:  I've got cash collateral --

6    oh, here it is, Court Paper 16.  Oh, I see, it's

7    mixed in.  It's kind of --

8              MS. MORA:  Blends right in.

9              THE COURT:  -- stuck into the cash

10   collateral segment, which we've already dealt

11   with.  So we're going to carry the whole thing

12   over or just the 25,000?

13             MS. MORA:  Just the 25,000, your Honor.

14             THE COURT:  Okay.

15             MS. MORA:  All right.  Next one, your

16   Honor, two similar applications, they are Court

17   Papers 28 with respect to the retention of

18   Citadel Derivatives Group and Court Paper 37 with

19   respect to the retention of Moelis & Company.

20   These two firms are both serving as financial

21   advisors and investment bankers for the debtors.

22             THE COURT:  Why do we need two

23   financial advisors and two investment bankers?

24             MS. MORA:  Judge, we anticipated that

25   was going to be a question raised by the Court.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    These two firms have very different expertise and

2    contacts within the industries in which they

3    are -- they specialize.  Citadel has particular

4    expertise in the hospitality industry and

5    contacts at the highest level with various

6    players in that industry.

7            Moelis group has contacts and a network

8    within the gaming industry and also has extensive

9    Chapter 11 financial advisory services to provide

10   to the debtor.

11           These two firms are essentially

12   splitting the customary monthly fee that normally

13   would have been earned by one investment banker.

14           THE COURT:  In your motions you have

15   what they're going to do and you list Items A

16   through R.  They're identical in both motions, so

17   isn't this a duplication of services?

18           MS. MORA:  Your Honor, we have

19   instructed these investment bankers not to

20   duplicate services.  They are working closely

21   with one another and dividing up the work that

22   has to be done.  We've worked with both firms for

23   a number of months now prepetition and have

24   observed firsthand that there has not been a

25   duplication of efforts, they've divided up

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   assignments and have been working very

2   effectively with one another.

3           THE COURT:  And one firm gets a

4   $9 million cap and the other gets a $15 million

5   cap.

6           MS. MORA:  Well, let me address, on an

7   interim basis, your Honor, we are only seeking

8   approval at this point of the monthly fees and

9   the indemnification provisions.  With respect ---

10          THE COURT:  What does the U.S. Trustee

11  think about the indemnification provisions?

12          MS. ARMENGOL:  Your Honor --

13          MS. MORA:  Let me yield the podium.

14          MS. ARMENGOL:  -- we have not had a

15  chance to review the indemnification language in

16  detail.  We requested that that portion also be

17  rolled over.  That's our request today.  I think

18  this is a committee issue.  We need to look at

19  the language and we would agree to an interim

20  order in regards to the monthly component of it,

21  but the transactional fee and the indemnification

22  language should be rolled over, your Honor.

23          THE COURT:  Now, as to the monthly, is

24  this a -- how is the monthly amount calculated?

25  Is this under the concept of 330 or is this ---

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1              MS. MORA:  This is a 328 retention,

2    your Honor.

3              THE COURT:  328.  So you're going to go

4    for a flat fee per month --

5              MS. MORA:  It's a flat fee.

6              THE COURT:  -- without any showing of

7    whether they did anything at all?

8              MS. MORA:  Your Honor, they're working,

9    trust me.

10             THE COURT:  Maybe they are, but we have

11   a duty to make sure that they are compensated

12   appropriately for what they do, but that they not

13   get money for things that they have not done for

14   the sake of the people down the line in the

15   creditor chain.

16             A number of years ago Judge Lifland in

17   New York came out with a position in the Southern

18   District of New York whereby he wouldn't just go

19   on a flat fee for investment bankers and I

20   followed them -- we followed them here in the

21   Southern District of Florida.

22             I'm a little nervous about the idea of

23   just shelling out X dollars a month without any

24   understanding or report as to what was paid for

25   and what was not.

1          MS. MORA:  Well, your Honor, what we

2     are requiring, and we'll get into this in a

3     moment, there are interim compensation procedures

4     that we're going to address in a subsequent

5     motion, and what's going to be required on a

6     monthly basis is for these professionals, as well

7     as the other professionals, in order to continue

8     getting their monthly fees, to provide a

9     description of the services that are being

10    rendered on a monthly basis.

11          THE COURT:  And if they provide the

12    description and you don't like it or I don't like

13    it, do they still get the money or do we talk

14    about it or how does it work?

15          MS. MORA:  Well, your Honor,

16    unfortunately the way the investment banking

17    world works these days, the investment bankers

18    have come to expect these monthly flat fees.

19    These are similar to the fees that this Court

20    approved ---

21          THE COURT:  Back years ago when we

22    brought that up and they said, oh, well, if

23    you're going to make us account for what we do,

24    we're not going to take any more cases, but they

25    did.

1          MS. MORA:  Your Honor, I appreciate

2    that.  This is similar to the same fee terms that

3    were approved by this Court in the Tradewind

4    Airlines case for Fieldstone Aviation; by

5    Judge Olson in the TOUSA case, with respect to

6    the investment bankers that were approved in that

7    case.

8          Your Honor, we are actively working

9    with these folks.  We really need them motivated

10   and geared up to be able to work with us as we

11   try to find alternative financing or additional

12   financing to get the project up and going.  They

13   are providing critical services at this point.

14          In addition, they're also working with

15   the debtors to facilitate the preparation of

16   schedules that are due to be filed this month

17   with the Court, and certainly on an interim

18   basis, your Honor, we can assure the Court that

19   during the month of June they will be actively

20   working and earning every penny of what we

21   propose that they will incur for this month's

22   fees.

23          And so we'd request, at least on an

24   interim basis, that the Court approve the monthly

25   fees.  We can certainly take up the issue raised

1    by the Court at the final hearing.

2              With respect to the issue of the

3    indemnification, it's the same type of

4    indemnification provision that this Court

5    approved in the Tradewinds' matter.  There is a

6    carve out for any liability arising out of gross

7    negligence, willful misconduct, or fraud by these

8    professionals.

9              I would further note, your Honor, that

10   this is simply an administrative claim, if there

11   was any kind of indemnification claim that's

12   going to arise, and at this point, with the

13   millions and millions of dollars of secured

14   claims that are ahead of any administrative

15   claimant, the indemnification provision

16   personally to the debtors, while it makes the

17   investment bankers happy and willing to provide

18   the services, we don't believe is going to

19   provide them with much, but it's something that

20   they're insisting upon.

21             THE COURT:  Anyone else wish to be

22   heard?

23             MR. HOFFMAN:  Yes, your Honor.  This is

24   Derrick Hoffman on behalf of Moelis & Company,

25   LLC.  We just want to make sure that this is --

1   just clarify for the record that this is, you

2   know, approval on an interim basis and per the

3   terms of the engagement letter.  Moelis is

4   reserving all rights to have the fees and

5   expenses reviewed under Section 328 only, and not

6   subject to Section 330(a) review, but that will

7   be an issue for the -- for the final hearing.

8              THE COURT:  Anyone else wish to be

9   heard?

10             All right.  With reservation, the Court

11  will grant, I guess, both motions.  One is for

12  Citadel; is that right?

13             MS. MORA:  That's correct, your Honor.

14             THE COURT:  But as an interim approval,

15  and the other one is for Moelis.  Let me see,

16  where is Moelis on here?

17             MS. MORA:  Moelis is Court Paper ---

18             MR. BAENA:  37.

19             THE COURT:  37.  It must be in here

20  somewhere.  Oh, here it is, I got it.  So both of

21  those will be granted on an interim basis.

22             Okay.  What's next?

23             MS. MORA:  Judge, we're in the home

24  stretch.  Court Paper 29, this is a motion with

25  respect to the retention of ordinary course

1    professionals.  It's in your binder at Tab 16.

2    Prepetition, your Honor, the debtors had been

3    using a number of professionals in their

4    day-to-day business operations, this included a

5    gaming advisor, a lead tax credit advisor, a PR

6    advisor, real property advisor with respect to

7    local Nevada issues, auditors, lead counsel and

8    real estate counsel.  They are listed in a

9    schedule attached to this motion.

10          What we're requesting, your Honor, is

11    for the Court to authorize the continued

12    employment, as this is in the best interest of

13    the estate, it avoids having to educate

14    replacement professionals about the debtors'

15    business and financial operations and avoids

16    disruption in the professional services that are

17    required for the day-to-day operations of the

18    debtors' business.

19          By comparison, these are relatively

20    modest fees that are expected to be incurred.

21    The procedures that we've set up is that the

22    debtors will be able to pay these professionals a

23    hundred percent of their reasonable fees and

24    expenses after the ordinary course professional

25    submits a declaration of disinterestedness and

1    submits an invoice with reasonable detail about

2    the nature of the services they provided the

3    debtor.

4            The ordinary course professionals' fees

5    will not exceed more than -- will not exceed

6    $50,000 per month on average over a rolling

7    three-month period, and any payments in excess of

8    that will come before the Court for approval

9    under 330.

10           Within 20 days after the order

11   approving this motion is entered, the ordinary

12   course professional will have to execute, file

13   and serve a declaration of disinterestedness.

14   Parties in interest will have ten days to object

15   and then beginning July 1, and on the first

16   business day of each calendar quarter thereafter,

17   the debtor will file a schedule of the amounts

18   paid to each ordinary course professional during

19   the preceding three months and describe the

20   nature of the services that were provided during

21   that period.

22           THE COURT:  Very well, anyone else wish

23   to be heard?  On the basis that it's a

24   three-month limitation to start, we'll grant the

25   motion.  You may submit an order.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1             MS. MORA:  Thank you, your Honor.

2             THE COURT:  What's next?

3             MS. MORA:  Court Paper 30, your Honor,

4    I'd like to continue to June 30th.  This is the

5    motion with respect to --

6             THE COURT:  Payment of --

7             MS. MORA:  -- interim fees.

8             THE COURT:  -- interim fees.  Okay.

9             MS. MORA:  We'll continue that to 6/30.

10   And then the last matter, your Honor, is another

11   retention matter.  That's with respect to

12   Kurtzman Carson Consultants, Court Paper 26.

13            THE COURT:  Court Paper 26.

14            MS. MORA:  And it's in your binder as

15   Item 22.  The debtors are seeking to retain

16   Kurtzman Carson Consultants as ---

17            THE COURT:  Oh, these are the ballot

18   agents.

19            MS. MORA:  Yes.

20            THE COURT:  Oh, okay.  I don't think

21   that's very controversial, what about it?  Anyone

22   wish to be heard?

23            MS. ARMENGOL:  Your Honor, one comment,

24   and I don't think I previewed this with Ms. Mora,

25   and I do apologize.

1          I believe there's a small Evergreen

2     component to their retention also.  That

3     component I would request that it be rolled over

4     also.

5          THE COURT:  Any problem?  We're not

6     going to be balloting this week, are we?

7          MS. MORA:  We're not going to be, your

8     Honor.  They are doing noticing services, but we

9     can take up the Evergreen retainer at the June 30

10    hearing.

11         THE COURT:  Very well.  Then that's --

12    wait a second, I lost it.

13         MS. MORA:  Your Honor, we actually have

14    orders that we can hand up with respect to a

15    number of these matters.

16         THE COURT:  All right.  We'll get them

17    in a moment.  Have we completed -- just a second,

18    I've lost -- what was that Court Paper Number

19    that we just dealt with on the balloting?

20         MS. MORA:  22.

21         THE COURT:  22.  Just a second.

22         MS. MORA:  The only thing we should

23    have left, your Honor, is cash management, which

24    my partner, Mr. Jason Jones, is going to handle.

25         THE COURT:  All right.  I don't know

1   why I can't find 22 on here.  Okay.  Which one is

2   the cash management?

3           MR. JONES:  This is Docket Entry Number

4   7.

5           THE COURT:  Oh, okay.  Have you

6   discussed this with the U.S. Trustee?

7           MR. JONES:  Yes, your Honor.  Not only

8   did we discuss it with the U.S. Trustee, but we

9   also discussed it with Bank of America, as well,

10  as the steering term lender committee.

11          THE COURT:  All right.  Anyone have any

12  objections?

13          MR. JONES:  Well, your Honor, after

14  discussions we've made a couple of changes to the

15  order and I'd like to just go over those and put

16  those on the record.

17          THE COURT:  Very well.

18          MR. JONES:  First, the debtor can keep

19  its existing cash management systems and bank

20  accounts through July 6th as transitions to the

21  use of the D.I.P. accounts that will be opened in

22  conjunction with this interim order.

23          The debtor has agreed to open

24  collateralized debtor-in-possession accounts with

25  approved depositories within seven days of this

1   order, and all deposits will be -- will then

2   be -- I'm sorry, all deposits will then be placed

3   in a new DIP account.

4           The debtor consents not to use the

5   inactive accounts that are listed in the motion

6   without further order of the Court and the

7   interim order deletes reference to giving

8   administrative priority for any intercompany

9   transactions.

10          And then the last change is that

11  whatever lien rights that are in the accounts now

12  would be transferred over to new accounts that

13  are opened.

14          So with those changes we would request

15  that an interim order be entered on that basis.

16          THE COURT:  Very well.  Anyone else

17  wish to be heard?

18          MS. ARMENGOL:  Your Honor, Johanna

19  Armengol, for the record.  Judge, I want to make

20  sure that the debtor acknowledges and the

21  creditors understand that there is going to be --

22  there's two bank controlled accounts with cash

23  collateral money in it, one holds $136 million.

24          THE COURT:  And 600,000.

25          MS. ARMENGOL:  And 600,000, and the

1    other one is a $50 million account.

2              Judge, it's not controlled -- they're

3    not controlled by the debtors.  However, this

4    money is not secured.  It's not adequately

5    collateralized pursuant to our guidelines and

6    given the climate, the banking climate in the

7    present times, your Honor, we are concerned that

8    this money is at risk.

9              This is money that ultimately the

10   debtors will be responsible for, even though they

11   haven't touched it, and we are -- if the Court is

12   comfortable with approving the order, we will

13   agree to a 345 waiver of 30 days to look into the

14   issues further.

15             THE COURT:  Is that satisfactory?

16             MR. JONES:  Yes, your Honor.

17             THE COURT:  So ordered.  Okay.  Now,

18   before we start passing up the orders, Mr. Baena,

19   this is a serious matter and a complicated

20   matter.  It may require court time.  I believe in

21   cases of this magnitude that what we normally do

22   when we start out, we set up a series of status

23   conferences and I propose we do that right now.

24             My question to you is:  Do we need

25   status conferences once a week, once every two

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    weeks, how often?

2          MR. BAENA:  Judge, we did not file the

3    usual motion asking for those omnibus hearing

4    dates and status conferences because we wanted to

5    get through this one-month period to figure out

6    where we are.  There's not going to be a lot to

7    report over the next four weeks, except the

8    status of negotiations.  Happy to do it, but you

9    can see the crowd that this case is drawing and

10   the expense that's attendant to it.

11         THE COURT:  I understand, but

12   nevertheless, if you need court time, I want you

13   to have it.

14         MR. BAENA:  I appreciate that.

15         THE COURT:  And when we book it in

16   advance, it's yours.  If there's a whole bunch of

17   other stuff that's already clogged the calendar

18   and you need a hearing, it may involve a delay.

19         So I am not telling you, I'm offering

20   you.

21         MR. BAENA:  I appreciate it.

22         THE COURT:  What do you want?

23         MR. BAENA:  I don't want to take it

24   right now, Judge.  I'm not going to take the

25   offer right now.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1           THE COURT:  Oh, okay.  Then that seems

2    to take care of that.

3           MR. BAENA:  Thank you.

4           THE COURT:  Then what else do we have

5    to do here today than sign the orders that we've

6    already announced granted?

7           MS. MORA:  Your Honor, there are a few

8    orders that we'd like to hand up.  We have orders

9    on wages, the insurance programs, cash collateral

10   and on the ordinary course professionals.

11          As a result of agreements reached today

12   with the U.S. Trustee or reservations announced

13   by the Court, we're going to modify a few of the

14   other orders and upload those to the Court.

15          With respect to the wage exhibit motion

16   where we asked to file it under seal, we're going

17   to deny the motion to the extent we sought to

18   file it under seal, and just provide an

19   opportunity for the Court to do an in camera

20   inspection at the Court's request.

21          THE COURT:  Okay, and for those of you

22   who are unaware, the National Conference of

23   Bankruptcy Judges this year is holding its annual

24   meeting in Las Vegas, just a few blocks down the

25   street at the Paris.  So I'm planning on

1  attending, and if you'd like, Mr. Baena, I can

2  pack a hammer and a few nails and try to be of

3  some assistance.

4         MR. BAENA:  We certainly would be happy

5  to give the Court a field trip to the project.

6         MS. MORA:  If I may approach, your

7  Honor?

8         THE COURT:  You may.  Would you like

9  these orders now, Ms. Mora?

10         MS. MORA:  Sure, Judge.

11         THE COURT:  Okay.  I think you've got a

12  few minutes to get them in there.  I don't think

13  they're going to get docketed today.

14         MS. MORA:  The wage motion is the one

15  that's the most important, your Honor, because we

16  have payroll tomorrow and of course, cash

17  collateral, so we can get the money to pay the

18  payroll.

19         THE COURT:  Very well.  All of the four

20  orders presented have been signed.  You may take

21  them to Ms. Rolph and move on.

22         Anything further that needs to be

23  brought before the Court today, Mr. Baena?

24         MR. BAENA:  No.  Thank you, Judge,

25  again for your time and for the attention that we

1   received.

2          THE COURT:  And anyone in telephone

3   land with anything?

4          Then being nothing further to come

5   before the Court today, we'll call this hearing

6   adjourned.  Thank you all and good luck.

7          (Thereupon, the hearing was concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATION

2

3    STATE OF FLORIDA:

4    COUNTY  OF  DADE:

5

6              I, Margaret Franzen, Shorthand Reporter

7    and  Notary  Public in  and for the State of Florida

8    at  Large,  do  hereby  certify  that  the  foregoing

9    proceedings  were  taken  before  me  at the date and

10   place  as  stated  in  the caption hereto on  Page 1;

11   that the  foregoing  computer-aided transcription  is

12   a true record of my  stenographic notes taken at said

13   proceedings.

14              WITNESS  my  hand  this  16th  day  of

15   June, 2009.

16

17

18   _____

                Margaret Franzen
19        Court Reporter and Notary Public
        in and for the State of Florida at Large
20        My Commission Expires:  April 14, 2010

21

22

23

24

25

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875