**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:                                                  Chapter 11

FONTAINEBLEAU LAS VEGAS
HOLDINGS, LLC, ET AL.,[1]                    Case No.  09-21481-BKC-AJC

_____ Debtors. _____                  (Jointly Administered)
_____/

**DEBTORS' OPPOSITION TO MOTION FOR**
**TRANSFER OF VENUE OF THE CHAPTER 11**
**CASES TO THE DISTRICT OF NEVADA**

Fontainebleau Las Vegas Holdings, LLC and its affiliated debtor entities (collectively, the "Debtors"), debtors and debtors in possession, in response to the motion (the "Motion") (D.E. # 133) seeking to transfer venue of the Debtors' properly venued Chapter 11 Cases to the District of Nevada by certain purported holders of mechanics' and materialmens' liens (the "Movants"),[2] respectfully represent as follows:

**PRELIMINARY STATEMENT**

Contrary to the allegations in the Motion, these cases indisputably belong in Miami under 28 U.S.C. §§ 1408 and 1412.  The Movants have identified the wrong facts and applied the wrong law in their effort to transfer these chapter 11 cases to Nevada.  The Movants focus on the interrelationships of the Debtors and their affiliates as the principal basis for the requested relief,

_____

[1]  The last four digits of each Debtor's tax identification number are: (i) Fontainebleau Las Vegas Holdings, LLC [9337]; (ii) Fontainebleau Las Vegas, LLC [9332]; and (iii) Fontainebleau Las Vegas Capital Corp. [7822].  The Debtors' mailing address is 19950 West Country Club Drive, Aventura, Florida  33180.

[2]  The Movants claim to hold approximately $111,000,000 in mechanics' and materialmens' liens against the Project (defined below).  Upon closer examination, certain of the Movants apparently have filed liens for work they have not as yet even performed.

altogether ignoring the reality of how member managed limited liability companies are governed generally and the Debtors' governance mechanisms.   Moreover, they neglect to identify the facts which are critical to informing the determination of venue in bankruptcy.   These facts are as follows:

First, there is no decision being made in respect of the Project by anyone anywhere other than in Miami.  The Board of Managers (the "Board of Managers") of Fontainebleau Resorts, LLC ("FBR") and Howard Karawan, FBR's Chief Restructuring Officer and Chief Operating Officer and the Chief Restructuring Officer of each Debtor, make all decisions concerning the Project from Miami.  Three of the four members of the Board of Managers are world renowned large-scale developers – Jeffrey Soffer, Ray Parello, and Bruce Weiner.  The Board of Managers meets at least twice a week to manage the Debtors' reorganization process.  Since the inception of the Project, the Board of Managers has been critically involved in every aspect of the Project.  Most recently, since the collapse of Lehman Brothers – the largest lender to the "retail" affiliates – in 2008, and the Revolver Lenders' subsequent refusal to fund their $800 million of financing commitments to the Debtors, the members of the Board of Managers have continuously met with lenders in these cases and utilized their relationships to meet with other sources of credit and equity all over the world; they have authorized and approved the reductions in the Debtors' workforce; they have been intimately involved in the development of the stabilization model the Debtors wish to employ; and they are considering design alternatives to ameliorate the cost of construction.

Second, the Movants represent less than 5% of the over $2 billion in claims in these cases.  Indeed, while the Movants left the door open for others to support the Motion, no other creditor has joined the Motion to date.  In fact, the Motion is *not* supported by the Debtors' senior

Term Loan lenders holding claims in excess of $1 billion, or by the Official Committee of Unsecured Creditors whose members (including two which are based in Nevada) hold claims of more than $700 million.  The dollar value of claims in these cases is held to a large extent by those who do not reside in or even near Nevada.  The below irrefutable facts demonstrate the geographic diversity of the Debtors' substantial claims pool:

- The Debtors' creditors are both national and international in scope (including London, Milan, Tokyo and Paris).

- The largest undersecured creditor, U.S. Bank, as Trustee, in respect of the Second Mortgage Notes is headquartered in St. Paul, Minnesota.  This claim is estimated at $675,000,000.

- Fourteen of the Debtors' 20 largest unsecured creditors on a consolidated basis are headquartered in states other than Nevada, including Florida, Illinois, California, Maryland, Georgia, Ohio, and Michigan.

- None of the parties to the adversary proceeding (the "Adversary Proceeding")[3] between the Debtors and the Revolver Lenders reside in Nevada and counsel is located in Florida, New York, California and Illinois.

- Three of the five members of the Official Committee of Unsecured Creditors reside outside of Nevada and notwithstanding that two members do reside in Nevada, the Committee has chosen to oppose the transfer of venue.

- The financial parties capable of restoring the Debtors' business are located throughout the world and not exclusively in Nevada.

- Bank of America, N.A., as Administrative Agent, Issuing Lender and Swing Line Lender, and Wilmington Trust Company, the proposed successor Administrative Agent, as well as various other lenders that are party to the $1.85 billion senior secured credit facility are not located in Nevada.[4]

- None of the Lenders to the Term Lender Steering Group reside in Nevada.

---

[3] Adversary Case No. 09-1621-AP-AJC (the "Adversary Proceeding").

[4] Bank of America has resigned as Administrative Agent of the Credit Agreement.  The Debtors anticipate that Bank of America's replacement will be Wilmington Trust Company.  The Debtors are aware of only one lender from Nevada.  The lender went into receivership prior to funding any commitments under the Credit Agreement.

- The Debtors' trade vendors exist in Alabama, Arizona, California, Colorado, Connecticut, Washington, D.C., Delaware, Florida, Georgia, England, Hong Kong, Illinois, Kent, Kansas, Kentucky, Louisiana, Massachusetts, Maryland, Michigan, Minnesota, Missouri, North Carolina, New Jersey, Nevada, New York, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, and Wisconsin.

- None of the lenders to the non-Debtor affiliates which are developing the retail component of the Project are located in Nevada.  In fact, the lead lender – Lehman Brothers – is a chapter 11 debtor in the Southern District of New York.

- The majority of the equity of the Debtors' ultimate corporate parent – FBR – is held by entities located outside of Nevada.

Third, the professionals who will be appearing most in these cases are not from Las Vegas:

- Reorganization counsel for the Debtors, Bilzin Sumberg Baena Price & Axelrod LLP, is located in Miami.

- Special counsel for the Debtors, Buchanan Ingersoll & Rooney PC and Kasowitz, Benson, Torres & Friedman, LLP are located in Miami, Pittsburgh and New York.

- The Debtors' proposed financial advisory and investment banking firms Moelis & Company is located in New York, Boston, Chicago, Los Angeles, and London.

- The Debtors' proposed financial advisory and investment banking firm Citadel is located in New York, Chicago, San Francisco, London and Hong Kong.

- Kurtzman Carson Consultants, the claims agent for the Debtors, is located in New York, Memphis and Los Angeles.

- Counsel to the Official Creditors' Committee is located in Atlantic City, New Jersey, California and Florida.

- Counsel to each of the parties to the Adversary Proceeding resides in Florida, New York, California and Illinois.

- Counsel to the Term Lender Steering Committee resides in California and Florida.

4

- Counsel to each of the pre-petition lenders who have filed notices of appearance in these cases resides outside of Nevada.

- Florida counsel Berger Singerman represents the general contractor of the Project, Turnberry West Construction, Inc., Jeffrey Soffer and Turnberry Residential Limited Partner, L.P.

- Counsel to NV Energy, the Project's electricity provider, is located in Birmingham, Alabama.

Fourth, no prejudice exists to the Movants if the Court denies their Motion. This Court has acknowledged that those holding first priority liens are least at risk of receiving substantial recoveries in these cases. The Movants allege to be such holders and yet seek to transfer these cases based on perceived but unsubstantiated risks. Those least at risk of receiving payment on their claims should not dictate the venue of these cases. At bottom, the Motion seeks to ensure that mechanics' lien claims are adjudicated in a Nevada court. While the Debtors do not believe that mechanics' lien claimants would be unduly burdened by adjudicating their claims in this forum, the issue of where mechanics' liens will be determined, if at all, is entirely premature. Importantly, the Court need not transfer these cases *in toto* to preserve the Movants' ability to later argue that any adversary proceedings in respect of their claims be transferred to Nevada under 28 U.S.C. § 1412, which allows the Court to transfer proceedings within a bankruptcy case under specific circumstances. Indeed, the Debtors might themselves suggest such transfer(s) if and when it becomes necessary to determine the validity, priority and extent of any mechanics' liens, but that need not be decided now.

Given that these multi-billion dollar cases are less than a month old, and that the Debtors have focused almost exclusively on obtaining debt and equity financing to stabilize and complete the Project, the Debtors have not had the opportunity to fully develop a proposal for adjudicating mechanics' lien claims, including whether the Debtors wish to adjudicate those claims here, in

Nevada or a combination of venues.  The Debtors' are contemplating, however, a two-tiered process that would be fair to both mechanics' lien claimants and the Debtors.

First, the Debtors intend to propose a customized proof of claim form to enable the Debtors and the Court to expeditiously determine the validity, priority and extent of liens. Numerous bankruptcy courts have effectively used customized proof of claim forms to gather gateway information from claimants whose claims are particularly fact specific.  Since the customized proof of claim form would be presented by motion, mechanics' lien claimants would be afforded an opportunity to provide input into the proof of claim form.  Second, upon receipt and analysis of the proofs of claim by mechanics' lien claimants, the Debtors will then propose a case management order to address the determination of the validity, priority and extent of mechanics' lien claims.  Resolution of mechanics' lien claims could be obtained by a number of methods including, settlement, mediation or adjudication in this Court or in a Nevada court.  No matter the process ultimately proposed by the Debtors, the Movants' rights to weigh in on the process and receive payment if they possess first priority liens will be preserved.

 For these reasons and the reasons set forth below, the Debtors respectfully request that the Court deny the Motion.

## **FACTS**

On June 9, 2009 (the "Petition Date"), Fontainebleau Las Vegas Holdings, LLC ("Resort Holdings"), Fontainebleau Las Vegas, LLC ("Resort") and Fontainebleau Las Vegas Capital Corp. ("Capital") each  filed voluntary petitions for relief (the "Chapter 11 Cases") under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court").  Each of the Debtors continues to operate its business and manage its affairs and prospects as a debtor in

possession.

On June 17, 2009, the United States Trustee appointed the Official Committee of Unsecured (the "Committee").  Upon information and belief, the Committee supports this Court's retention of jurisdiction of the Chapter 11 Cases.

Until recently, the Debtors were actively engaged in ongoing construction and development of "Fontainebleau Las Vegas," conceived as a signature "Tier A" casino hotel resort with gaming, lodging, convention and entertainment amenities.  Upon completion of construction, the Debtors anticipate that the Project will support 6,000 full-time jobs at the Project and 2,000 additional jobs elsewhere in Las Vegas.[5]  As of the Petition Date, however, the Debtors employed approximately 115 employees who were located in Florida, Nevada, California, and Virginia.[6]

The Project is situated on approximately 24.4 acres at the sites of the former El Rancho Hotel and Algiers Hotel on the north end of the Las Vegas Strip.  The current plans for the Project include a 63-story glass skyscraper, featuring, among other things: (a) 3815 stylishly furnished guest rooms;  (b) an approximately 100,000 square-foot casino with an approximately 40-foot tall ceiling, featuring 1,700 slot machines, 125 table games, a 20-table poker room and a race and sports book; (c) approximately 353,000 square feet of class "A" convention, meeting and pre-function space; (d) an approximately 60,000 square-foot state-of-the-art spa; (e) a rooftop pool; and (f) a state-of-the-art theater featuring live entertainment and shows.   At the time that construction of the Project was reduced to a stabilization effort as a result of the

---

[5] *See Declaration of Howard C. Karawan in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [D.E. # 5] (the "Karawan Decl.) at 3; ¶ 7.

[6] *See Id.* at 23; ¶ 73.

unjustified failure of certain of the Debtors' lenders to fulfill their loan commitments, the Project was approximately 70% complete.[7]

The Movants' argument ignores the realities of the company governance mechanisms that were carefully constructed in order to ensure that the management of FBR and each of its subsidiary limited liability companies were managed through the Board of Managers. Indeed, it appears that the Movants simply do not understand the fundamental underpinnings of manager-managed and member-managed limited liability companies.

Pursuant to the Delaware Limited Liability Company Act, codified in Title 6, Chapter 18 of the Delaware Code (the "Delaware Act"), a limited liability company formed under the Delaware Act shall be managed by its members, unless the limited liability agreement provides that it shall be manager managed.[8] Here, the limited liability company agreement of Fontainebleau Resorts, LLC, a Delaware limited liability company, specifically provides that "[FBR] shall be managed by a Board of Managers" that acts in accordance with the terms of the agreement.[9] All of FBR's powers as a limited liability company under the Delaware Act are exercised by or under the direction of the Board of Managers.[10] Moreover, the Board of Managers has the complete and exclusive right, power and authority to manage and control all of FBR's business, affairs, assets and properties.[11]

Working down through the corporate chain below FBR, each of its direct and indirect limited liability company subsidiaries is a member managed limited liability company. Both

---

[7] *See* Karawan Decl. at 3; ¶ 7.

[8] *See* 6 Del. C. § 18-402.

[9] *See* Fourth Amended and Restated Limited Liability Company Agreement of Fontainebleau Resorts, LLC, dated as of June 6, 2007, § 5.1.

[10] *Id.*

[11] *Id.* at § 5.2.

Fontainebleau Resort Holdings, LLC and Fontainebleau Resort Properties I, LLC are Delaware limited liability companies that have not opted to be manager-managed and, therefore, by default are member-managed.[12]  Similarly, both Resort Holdings and Resort are Nevada limited liability companies that have not opted to be manager-managed and, also therefore are member-managed.[13]  Thus, each limited liability company subsidiary operates through its parent-member until you reach FBR.  As explained above, *FBR operates through the Board of Managers, and, therefore, acts as the decision making body for each of its subsidiary member-managed limited liability companies*.

Capital, a Delaware corporation, is the only indirect subsidiary of FBR that is not governed through or by the Board of Managers.  Instead, as a corporation, it is governed by its own board of directors, which in this case, is comprised of Messrs. Kotite and Soffer, two of the members of the Board of Managers.  Thus, for these purposes, that is a distinction without a difference.

FBR is headquartered in Miami, Florida.  All major decisions in respect of the Project have been and are made by the Board of Managers of FBR.  The Board of Managers has continuously exercised its ultimate control over the management, business activities (including the design and development of the Project) and capital structure/financing of the Debtors.  Overall responsibility within the Fontainebleau family of companies for managing, directing and coordinating reorganization efforts has been entrusted to the Chief Restructuring Officer, Howard Karawan, by the Board of Managers.  His office is in Miami, Florida.  He reports directly to the Board of Managers and generally works side-by-side with members of the Board

---

[12]  *See* 6 Del. C. § 18-402.

[13]  *See*  NRS 86.291(2).

of Managers, including the Chairman of FBR, Jeffery Soffer, as well as with Albert Kotite, an Executive Vice President of FBR.  The Board of Managers is also comprised of Messrs. Bruce Weiner and Ray Parello.  Messrs. Soffer, Weiner and Parello are world-renowned developers. All other personnel critical to the reorganization of the Debtors either work from or report to others situated in Miami, Florida.  No decisions are made in respect of the Project other than by the Board of Managers or Howard Karawan.  Indeed, FBR, through its Board of Managers, determined that the filing of the Chapter 11 Cases was in the best interests of each of the Debtors (other than Capital) and authorized all such acts as were necessary for each of the Debtors (other than Capital) to file chapter 11 petitions.  As explained above, Capital's decision was made by its Board of Directors.

The Declaration of Howard Karawan, attached hereto as Exhibit A, further details the tremendous efforts of the Board of Managers and Mr. Karawan in respect of the Project.  The Board of Managers meets at least twice a week to manage the Debtors' reorganization process. Since the inception of the Project, the Board of Managers has been critically involved in every aspect of the Project.  Most recently, since the collapse of Lehman Brothers – the largest lender to the "retail" affiliates – in 2008, and the Revolver Lenders' subsequent refusal to fund their $800 million of financing commitments to the Debtors, the members of the Board of Managers have continuously met with lenders in these cases and utilized their relationships to meet with other sources of credit and equity all over the world; they have authorized and approved the reductions in the Debtors' workforce; they have been intimately involved in the development of the stabilization model the Debtors wish to employ; and they are considering design alternatives to ameliorate the cost of construction.

The Board of Managers' control over the Project has continuously existed since the Project's inception. For instance, the Board of Managers authorized Resort to enter into that certain Credit Agreement dated as of June 6, 2007 (the "Credit Agreement"), with Bank of America, N.A., as Administrative Agent, and the syndicate of lenders thereunder, for senior credit facilities for the construction of the Project.[14] Jeffrey Soffer, as Executive Chairman of the Board of Managers, executed the Credit Agreement on behalf of borrowers Resort and Fontainebleau Las Vegas II, LLC.[15] The Notes executed pursuant to the Credit Agreement were each signed by Jeffrey Soffer.[16]

The Board of Managers also authorized Resort Holdings and Capital to execute that certain Indenture (the "Indenture") with Wells Fargo Bank, N.A., as Trustee, dated as of June 6, 2007, in respect of $650 million 10 ¼% Second Mortgage Notes due 2015 (the "Second Mortgage Notes").[17] Jeffrey Soffer executed the Indenture on behalf of Resort Holding in his capacity as managing member of FBR. Glenn Schaeffer, a former member of the Board of Managers, executed the Indenture on behalf of Capital.

The Credit Agreement and the Indenture provided for certain defaults in the event that Jeffrey Soffer no longer retained control of FBR. For instance, under the Credit Agreement a

---

[14] *See* Consent of the Board of Managers of Fontainebleau Equity Holdings Voteco, LLC and the Committee of the Board of Managers of Fontainebleau Resorts, LLC to Resolutions of Fontainebleau Resorts, LLC; Consent of Managing Members of Loan Parties (As Defined Below) to Resolutions of Loan Parties With Respect To the Las Vegas Senior Secured Credit Facility and Second Mortgage Notes, dated as of June 6, 2007 (the "Consent"). *See also* Resolutions of the Board of Managers of Fontainebleau Resorts, LLC, dated as of April 17, 2007.

[15] Fontainebleau Las Vegas II, LLC was a Florida limited liability company that merged into Resort.

[16] *See* $700,000,000 Initial Term Noted dated as of June 6, 2007; $350,000,000 Delay Draw Term Note dated as of June 6, 2007; $100,000,000 Revolver Note dated as of June 6, 2007; $100,000,000 Revolver Note dated as of June 6, 2007; $90,000,000 Revolver Note dated as of June 6, 2007; and $10,000,000 Swing Line Note dated as of June 6, 2007.

[17] *See* Consent. *See also* Resolutions of the Board of Managers of Fontainebleau Resorts, LLC, dated as of April 17, 2007.

default would occur upon a Change of Control.[18]    Change of Control was defined, in part, as the

Jeffrey Soffer Parties[19] no longer "directly or indirectly own[ing], beneficially and of record, and

control[ing] the power to vote, at least 35% of the Equity Interests in [FBR] having ordinary

voting power in the lection of directors or managers…."[20]   A Change of Control also occurred if

any person or group obtained "a greater percentage of the Equity Interests of [FBR] having

ordinary voting power for the election of the board of directors, managers or equivalent of [FBR]

on a fully diluted basis . . . than the Jeffrey Soffer Parties; or . . . [FBR] shall cease, directly or

indirectly, to own and control legally and beneficially all of the Equity Interests in [Resort

Holdings] . . . ."[21]   The Offering Memorandum for the Second Mortgage Notes, dated May 24,

2007 likewise emphasized the control that would be continuously exerted by Jeffrey Soffer and

the Board of Managers over the Project: "Mr. Soffer exercises significant influence over our

business policies and affairs, including the composition of Fontainebleau Resort's board of

---

[18]   *See* Credit Agreement at 116, § 8(k).

[19]   *See id.* at 24.  The term Jeffrey Soffer Parties is defined in the Credit Agreement as "collectively, Jeffrey Soffer and: (a) any 80% or more owned Subsidiary, heir, estate, lineal descendant or immediate family member, as defined in Rule 404(a) of SEC Regulation S-K as in effect on the date of this [Credit] Agreement of Jeffrey Soffer; and (b) any trust, corporation, partnership or other entity, the beneficiaries, equity owners, partners, owners or Persons beneficially holding an 80% or more controlling interest of which consist of Jeffrey Soffer and/or such other Persons referred to in (a)."

[20]   Credit Agreement at 6.

[21]   *Id.*  Other Change of Control provisions included Glenn Schaeffer no longer occupying the role of FBR Chief Executive Officer, but this condition could be waived under the Credit Agreement.  Another requirement was that Fontainebleau Las Vegas Holdings, LLC must always own all of the equity interests in Resort Holdings.  The Indenture likewise provided change of control provisions.  Under the Indenture, a change of control would occur if (a) any person other than Jeffrey Soffer or any of his Related Parties (similar definition to the Jeffrey Soffer Parties) becomes the beneficial owner of more than 50% of the outstanding voting stock of FBR; (b) any person becomes the beneficial owner of a greater percentage of voting stock of FBR than is beneficially owned by Jeffrey Soffer and his Related Parties; (c) prior to the First Qualified Equity Offering, Jeffrey Soffer and his Related Parties own less than 30% of the voting stock of FBR; (d) on and following the First Qualified Equity Offering, Jeffrey Soffer and his Related Parties own less than 15% of the outstanding voting stock of FBR; and (e) the merger, consolidation or sale of substantially all of the assets of FBR

managers, the adoption of amendments to our formation documents and the approval of a merger or sale of substantially all of our assets."[22]

## I.
## VENUE OF THE DEBTORS'
## CHAPTER 11 CASES IN THE SOUTHERN
## DISTRICT OF FLORIDA IS PROPER

A.    Pursuant to 28 U.S.C. § 1408, Venue is Proper.

For decades courts in this Circuit and elsewhere have utilized the "nerve center" test to determine the appropriate venue of a bankruptcy case.[23]  The nerve center test provides that venue of a bankruptcy case properly lies in the district where major decision making affecting the debtor has occurred.  Without any bankruptcy case authority, the Movants seek to supplant the nerve center test with the "total activities" test – a test that is utilized by district courts only to determine whether complete diversity of the citizenship exists among litigants for purposes of subject matter jurisdiction.  The total activities test combines the nerve center test with the "place of activities" test, which analyzes where the majority of the corporation's sales or production activities occur.[24]  Thirty years ago, the Fifth Circuit in *CORCO* – binding precedent in the

---

[22] Offering Memorandum at 33.

[23] *See Commonwealth of Puerto Rico v. Commonwealth Oil Refining Company, Inc. (In re Commonwealth Oil Refining Co.) ("CORCO"),* 596 F.2d 1239, 1245 (5th Cir. 1979).  *CORCO* is binding precedent on the Court.  *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).  *CORCO* was a Chapter XI case that applied statutory rules that proceeded 28 U.S.C. § 1408 and 1412.  Repealed Fed. R. Bankr. P. 116(a)(2) provided that venue could lie where the debtor "had its principal place of business or its principal assets for the preceding (six) months or for a longer portion thereof than in any other district."  Repealed Fed. R. Bankr. P. 116 also provided that a court could retain a case "in the interest of justice and for the convenience of the parties."  Notwithstanding later technical rule changes, courts continue to apply the same venue analysis as employed by *CORCO*.  *See In re Enron Corp.,* 274 B.R. 327, 344 (Bankr. S.D.N.Y. 2002) (*citing Collier on Bankruptcy,* ¶ 1014.02[2][a], 1014-4 (15th ed. Rev. 2001)).  *See also Collier on Bankruptcy* (15th Ed. Rev. ¶ 4.01[2][b]) ("For corporations, the principal place of business seems to be where important business decisions are made, sometimes referred to as the 'nerve-center'") (*citing In re Peachtree Lane Assoc., Ltd.,* 150 F.3d 788 (7th Cir. 1998); *In re Garden Manor Assoc., L.P.,* 99 B.R. 551 (Bankr. S.D.N.Y. 1988); *In re Deabel, Inc.,* 193 B.R. 739 (Bankr. E.D. Pa. 1996)).

[24] *McGinnitie v. Hobbs Group, LLC,* 420 F.3d 1234, 1239 (11th Cir. 2005).

Eleventh Circuit – explicitly stated that subject matter jurisdiction analysis is irrelevant to bankruptcy venue analysis and should not form the basis of any venue decision.[25]  Even if the Court were to rely upon the total activities test (which we think inconsistent with binding precedent in this Circuit), that test too would favor the Court's retention of jurisdiction of the Chapter 11 Cases.

Pursuant to 28 U.S.C. § 1408(1), venue of a chapter 11 case is proper when the case is commenced in the district in which the debtor is domiciled or maintains its principal place of business.  In pertinent part, the statute provides:

> A case under title 11 may be commenced in the district court for the district-
>
> (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States of the person or entity that is the subject of such cases have been located for the 180 days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district;….[26]

A debtor's venue choice is presumed correct unless rebutted by a preponderance of the evidence.[27]  It is axiomatic that the debtor's principal place of business includes the location of major decision making, often described as the debtor's nerve-center.  The seminal nerve-center cases, *CORCO* and *In re Peachtree Lane Associates, Ltd.,*[28] strongly dictate a finding that Miami constitutes the Debtors' principal place of business for purposes of bankruptcy venue.

---

[25]  596 F.2d at 1247 n.17.

[26] 28 U.S.C. §1408(1) (2009).

[27] *See In re Cauley,* 374 B.R. 311, 314 n.3 (Bankr. M.D. Fla. 2007) ("A bankruptcy case is presumed to have been filed in the proper venue.").

[28] 150 F.3d 788 (7th Cir. 1998).

14

B.    _CORCO_ and _In re Peachtree_ Rebut Much of Movants' Case.

In _CORCO_, the Fifth Circuit emphasized that the term "principal place of business" has a unique meaning in the context of bankruptcy cases.[29]  Prior to 1973 courts were split on whether venue of a bankruptcy case lied in the district where the debtor's principal assets or executive offices were located.[30]  In 1973, Congress amended the venue statute for Chapter XI cases to provide that venue may exist either where the corporation maintains its principal place of business or where its principal assets are located.[31]  As a result, the Fifth Circuit found that the location of the debtor's production facilities "has greatly diminished [in] significance."[32]  Rather, the location of decision making authority was found to be "particularly appropriate" for venue purposes in the context of financial restructurings.[33]

Over the objections of both the Government of Puerto Rico and the Puerto Rico Water Resources Authority, the Fifth Circuit held that CORCO's principal place of business existed in San Antonio, the locus of its executive offices, as opposed to Puerto Rico, the locus of its principal asset, a billion-dollar oil refinery.  In support of its holding, the Fifth Circuit found that "CORCO's corporate structure demonstrates that it manages most of its affairs from San Antonio."[34]  CORCO's executives in San Antonio, along with the senior vice president of operations who lived in Puerto Rico, prepared operating plans for the refinery.  Operations personnel at the refinery could not substantially deviate from the plan without approval from San

---

[29] 596 F.2d at 1244.

[30] _Id._ at 1245.

[31] _Id._ at 1244.

[32] _Id._ at 1245.

[33] _Id._ at 1246.

[34] _Id._

Antonio.  Loan agreements were likewise negotiated in San Antonio.[35]

The Fifth Circuit affirmed the lower courts' finding that San Antonio constituted an appropriate venue for the debtor's bankruptcy case even though numerous activities occurred in Puerto Rico, including marketing, sales, production and location of employees, the generation of invoices, the maintenance of books and records, the housing of the data processing center, audits, stockholders and directors meetings, and most of CORCO's extensive litigation.  In addressing argument that many more of the debtor's workers resided in Puerto Rico than San Antonio, the Fifth Circuit responded that, naturally, "[m]any more workers are needed to run a refinery than to manage one."[36]  Although a majority of CORCO's creditors resided in Puerto Rico, and the debtor was incorporated in Puerto Rico, those facts did not sway the Fifth Circuit from allowing the reorganization to proceed close to the debtor's nerve center.[37]

Similar to *CORCO*, the Seventh Circuit's seminal decision in *In re Peachtree Lane Associates, Ltd.,*[38] (*ignored by Movants*) found particularly appropriate the location of the debtor's primary decision makers for venue purposes since the bankruptcy case "[involved] the financial management of the debtor rather than its day-today operations."[39]  The Seventh Circuit found that the debtor's principal place of business existed in Illinois and not Texas "because it was there that the debtor's significant business decisions during the venue period were made," notwithstanding that the debtor's principal asset, a 400-unit apartment building, was located in

---

[35] *CORCO,* 596 F.2d at 1242-46.

[36] 596 F.2d at 1246.

[37] *CORCO,* 596 F.2d at 1242-46.

[38] 150 F.3d 788, 790-91 (7th Cir. 1998).

[39] *Id.* at 795 (*citing Commonwealth Oil,* 596 F.2d at 1246; *see also Capital Motor Courts v. Le Blanc Corp.,* 201 F.2d 356, 359 (2d Cir.), *cert. denied,* 345 U.S. 957, 73 S.Ct. 940, 97 L.Ed. 1378 (1953)).

Texas.[40]

While an affiliate managed the day-to-day operations of the apartment complex, the Seventh Circuit ascertained that the apartment building was controlled by the Kemper Group, "a series of limited partnerships and corporate entities that eventually linked Peachtree to the Kemper Corporation" in Illinois.[41]  The debtor established that Kemper's real estate investment committee was comprised of Illinois residents that made decisions affecting the property's disposition.  Further, the Kemper Group retained ultimate financial control over the debtor's operations, including sales negotiations and dealings with the debtor's largest secured creditor.  As an example, "Kemper executives decided that Peachtree would not pay the note when due. . . .  Kemper and its outside counsel then attempted to renegotiate certain terms of [a forbearance agreement]."[42]

Both *CORCO* and *Peachtree* amply demonstrate that venue analysis is both flexible and practical and not a binary, zero-sum exercise.  Courts may find venue appropriate in the debtor's chosen forum even though significant activities or property exist elsewhere.  In both *CORCO* and *Peachtree* (but especially *CORCO*), critical mass, including both employees necessary to run operations as well as executives to oversee operations was present near the principal asset.  Nevertheless, decisional power was concentrated in the debtors' chosen forums.  Similarly, here the Debtors do not deny that critical mass existed in Las Vegas to oversee the construction of the Project.  The locus of power, however, existed – and continues to exist – in Miami.  The Board of Managers of FBR exerted as much control over the Debtors as the Kemper Group exerted over Peachtree.

_____

[40] *Id.* at 789, 791-92.

[41] *Id.* at 790-91.

[42] *Id.* at 791.

Recognizing that the Debtors more than satisfy the nerve center test, the Movants desperately attempt to impose a test employed by district courts only in federal diversity cases. *CORCO* makes clear that subject matter jurisdiction caselaw is irrelevant to the question of venue in a bankruptcy case, however.[43]  The court in *CORCO* observed that the purpose of the diversity statute, 28 U.S.C. 1332(c)(2), is "to reduce the availability of diversity jurisdiction" while the predecessor venue statute "was intended to expand venue choices for bankruptcy proceedings."[44]  Contrary to the standards governing subject matter jurisdiction in diversity cases, the venue statute explicitly allows for "many possible locations where an entity or individual may file for bankruptcy protection."[45]  The Movants have failed to cite to any precedent contrary to *CORCO* that would allow the Court to adopt the total activities test in this context.  The "place of activities" prong of the total activities test is irrelevant to the matters at hand in any event.  The place of activities test looks to "sales or production activities," which have yet to occur in earnest as the Debtors have not even completed construction of the Project. Further, even under the total activities test, diversity of citizenship may be measured by the citizenship of the entity that controls one of the litigants.[46]  Here, the Debtors were and continue

---

[43] 596 F.2d at 1247 n.17.  *See also In re Pinehaven Assocs.,* 132 B.R. 982, 987 (Bankr. E.D.N.Y. 1991) ("The term 'venue' refers to locality, i.e., the place where a lawsuit should be heard.  Unlike the term jurisdiction, which implicates the power of a court to adjudicate, venue denotes only the place of adjudication. . . .  The venue statute governing bankruptcy cases, 28 U.S.C. § 1408, gives wide latitude to a prospective debtor.").

[44] *Id. See also In re Great Lakes Hotel Assocs.,* 154 B.R. 667, 672 n. 3 ("Where a bankruptcy action will focus on financial decisions and the formulation of a reorganization plan, the weight given factors which coincide with the 'nerve center' analysis may be greater.  Thus, the analysis of proper venue in bankruptcy cases is different than in diversity cases.") (*citing CORCO*, 596 F.3d at 1247 n.17); *In re Suzanne de Lyon, Inc.*, 125 B.R. 863, 865-66 (Bankr. S.D.N.Y. 1991) (court retained jurisdiction of case where principal "made all management and financial decisions and these decisions were relayed to the Houston Office for implementation" from New York); *In re Landmark Capital Co.*, 19 B.R. 342, 347 (Banrk. S.D.N.Y. 1982) (the place where debtor makes its major business decisions constitutes debtor's principal place of business).

[45] *In re Broady*, 247 B.R. 470, 472 (B.A.P. 8th Cir. 2000).

[46] *MacGinnitie*, 420 F.3d at 1240 ("'Every decision necessary to realize the strategic advantage offered by Hobbs' continued, passive existence was and continues to be made in HRH's Virginia corporate headquarters by

18

to be controlled by the Board of Managers from Miami.

The Movants spend much time collecting filings with the Secretaries of State of Florida, Nevada and Delaware, pointing to places of incorporation and references to principal places of business. These filings are irrelevant, however, for purposes of the venue statute since major decisions affecting the Debtors were made at all relevant times within this district.[47] If these filings were conclusive, there would be no need for the nerve center test.[48]

C.    The Cases Cited by the Movants are Distinguishable.

The Movants simply ignore *CORCO* and *Peachtree*'s nerve-center analysis. Instead, they reach for cases that lack any semblance to the facts before the Court. For instance, in *In re Newport Creamery Inc.*,[49] cited by the Movants, Judge Williamson transferred venue of the case

---

HRH officers. Thus, at the time [MacGinnitie] filed [his] complaint, the 'nerve center' of Hobbs for purposes of determining diversity, could only be in Virginia.").

[47]    *See In re Broady*, 247 B.R. 470, 473 (B.A.P. 8th Cir. 2000) (fact that debtor was domiciled in Colorado did not prevent venue of bankruptcy case in Missouri).

[48]    *See In re Eagle Pointe Ltd. Dividend Housing Ass'n Ltd. P'ship*, 350 B.R. 84, 90 (Bankr. N.D. Ind. 2006) (court allowed venue in debtor's chosen forum notwithstanding contrary assertion pre-petition to gain license). The Debtors acknowledge that in commencing the Adversary Proceeding, the amended complaint inadvertently refers to a Nevada address as the Debtors' principal place of business. This error was remedied the very next day when the Debtors' filed their *Motion for Partial Summary Judgment*, which lists in footnote 1 the correct address of the Debtors.

[49]    265 B.R. 614, 617 (Bankr. M.D. Fla. 2001). While the Movants cited to a plethora of cases, each case is factually distinguishable from these cases. *See In re Standard Tank Cleaning Corp.*, 133 B.R. 562, 565 (Bankr. E.D.N.Y. 1991) (debtor premised venue, in part, on a misrepresentation that it owned and operated property in the jurisdiction); *In re Dock of the Bay, Inc.*, 24 B.R. 811, 814 (Bankr. E.D.N.Y. 1982) (court transferred venue since the purported local person in control possessed "little knowledge of the affairs of the debtor. . . ."); *In re Great Lakes Hotel Assocs.*, 154 B.R. at 669 (most creditors located in movant's desired forum and only "basic business decisions" made in debtor's chosen forum); *In re B.L. of Miami, Inc.*, 294 B.R. 325, 333 (Bankr. D. Nev. 2003) (court *sua sponte* ordered case involving a Florida nightclub with no connections to Nevada transferred to Florida); *In re Abacus Broadcasting Corp.*, 154 B.R. 682, 687 (Bankr. W.D. Tex. 1993) (court observed that "the smell of forum shopping [was] strong indeed" given that debtor faired badly in a Utah bankruptcy court); *In re 19101 Corp.*, 74 B.R. 34, 36 (Bankr. D. R.I. 1987) (case heavily relied upon witnesses from beyond the jurisdiction); *ICMR, Inc. v. Tri-City Foods, Inc.*, 100 B.R. 51, 52 (D. Kan. 1989) (transfer appropriate, in part, where "[o]verall management of the restaurants was handled from corporate offices in Des Moines."); *In re Petrie*, 142 B.R. 404, 405 (Bankr. D. Nev. 1992) (Chapter 13 case where individual improperly filed in Nevada as opposed to Arizona for reasons of forum shopping); *In re Sporting Club at Ill. Ctr.*, 132 B.R. 792, 800 (Bankr. N.D. Ga. 1991) (debtors were not affiliates of third debtor so they could not retain their cases in chosen forum under venue statute's affiliate rule for want of any connection to forum); *In re Pinehaven Assocs.*, 132 B.R. 982, 989 (Bankr. E.D.N.Y. 1991) (the role of local, onsite hotel manager did not justify finding that debtor's general supervision emanated from venue to justify

to Rhode Island where the debtor's representatives, based in Rhode Island, could not even attend the venue hearing because of travel difficulties from Rhode Island.  Such egregious facts are plainly not before the Court.  The case is noteworthy, however, because it highlights the importance of the court's "awareness or common experience" with the customs and history of the debtor's business: "At the Hearing, counsel for the Committee referenced how he had grown up enjoying one of the Debtor's best known beverage products called an 'Awful Awful.'  Prior to the filing of this case, the court had never heard of the [d]ebtor and its Awful Awful drink and clearly has no awareness or common experience to draw upon. . . ."[50]  At the first day hearing, this Court acknowledged with nostalgic pleasure the early beginnings of the Fontainebleau Miami Beach.[51]  The Debtors acknowledge that what happens in Miami will affect the Project but equally relevant, the results of these cases will undoubtedly affect the Fontainebleau brand and, correspondingly, this community.  As undersigned counsel remarked at the first day hearings, at bottom, this case is all about the development and preservation of that iconic brand which is indigenous to Miami.

*CORCO* and *Peachtree* provide ample support for the Court's retention of jurisdiction here.  The Movants assert that "no manager of any Debtor has any connection to Florida."  This

---

maintaining jurisdiction);  *In re Pavilion Place Assocs.*, 88 B.R. 32, 36 (Bankr. S.D.N.Y. 1988) (court found that transferring case would not hamper negotiations); *In re Nantucket Apartments Assocs.,* 80 B.R. 154 (Bankr. E.D. Mo. 1987) (court transferred case involving apartment complex in Louisiana); *In re Eleven Oak Tower Ltd., P'Ship,* 59 B.R. 626, 629 (Bankr. N.D. Ill. 1986) (court transferred case where liquidation of office building appeared imminent); *In re Pickwick Place Ltd.*, 63 B.R. 290, 292 (Bankr. N.D. Ill. 1986) (witnesses dispositive of the case located beyond venue); *In re Old Delmar Corp.*, 45 B.R. 883, 885 (S.D.N.Y. 1985) (court concerned, in part, about liquidation); *In re Developers of Caguas, Inc.*, 26 B.R. 977, 979 (Bankr. E.D.N.Y. 1983) (case commenced to stay foreclosure proceeding); *In re Landmark Capital Co.*, 19 B.R. 342, 348 (Bankr. S.D.N.Y. 1982) (case transferred where debtor had only four creditors, three of which were located in Arizona), aff'd, 20 B.R. 220 (S.D.N.Y. 1982); *In re Greenridge Apartments,* 13 B.R. 510 (Bankr. D. Hawaii 1981) (case transferred, in part, because non-partnership creditors were located in Washington); *In re Condor Exploration, LLC*, 294 B.R. 370,  (Bankr. D. Colo. 2003) (involuntary chapter 7 case transferred).

[50] *Id.* at 623 n.6.

[51]  June 11, 2009 transcript at 12.

assertion is wrong. Similar to the Kemper Group, which was not a debtor in *Peachtree*, the Board of Managers has exerted tremendous control over nearly every conceivable aspect of the Debtors' operations from Miami since the Project's inception. The Board of Managers approved of nearly $2.5 billion in financing for the Project from Miami. The Board of Managers oversaw the design and construction of Project from Miami. The Board of Managers and Mr. Karawan stabilized the Project upon the Revolving Lender's breach of their commitments to provide $800 million in construction financing and approved of the filing of the Chapter 11 Cases from Miami. The Board of Managers and Mr. Karawan sought and continue to seek – and have identified – the debt and equity financing necessary to complete the Project, with assistance from their Miami-based bankruptcy counsel, Bilzin Sumberg, and other retained professionals, from Miami and New York. For these reasons, these cases are properly before the Court under 28 U.S.C. § 1408.

## II.
### TRANSFER OF THE DEBTORS' CHAPTER 11 CASES IS NEITHER IN THE INTEREST OF JUSTICE NOR FOR THE CONVENIENCE OF PARTIES

Conspicuously absent from the dogmatic arguments of the Movants is any suggestion, let alone proof, that the choice of Miami venue was motivated by some larger, improper or evil purpose or design. Even the Movants tacitly acknowledge that these cases were not filed to harass the Movants, disenfranchise their right to participate in the Chapter 11 Cases or seek leverage through forum shopping. To the contrary, these cases are here because of the close proximity between the courthouse and the Debtors' epicenter. The Chapter 11 Cases will not be advanced by burdening those most likely to appear in court with excessive travel obligations. Simply put, the Movants fail to demonstrate how transferring these cases would be economical

to the administration of these cases, convenient to all creditors, or advance the interests of justice.  This Court has recognized that the interests of mechanics' lien claimants are not front-and-center in these cases.  As the Court emphasized at the June 23, 2009, hearing in the context of its denial of certain purported mechanics' lien claimants' motion for the appointment of a mechanics' lien committee:

> From the arguments I've heard, and from my past experience, I think there's no need for a committee.  I don't see any benefit that this committee could provide to the estate.  In fact, I think that it might provide a detriment to the entities that want to be part of the committee, that  is, if the case is a success, then I presume that everyone in this community will be paid in full.  And if it's a failure, and they are, in fact, in first position, and pick up the pieces of what's left, they're either going to get paid in full, or get paid in part, and, if there isn't enough left from the crumbled ashes to pay them in full, then the costs of this committee would be coming out of their own pockets, which would not necessarily be a benefit to them.[52]

The well-protected interests of mechanics' lien claimants should not override the deference accorded the Debtors' proper choice of forum.  Under 28 U.S.C. § 1412, transfer of a bankruptcy case should occur sparingly and only in the interest of justice or for the convenience of the parties.[53]  The party moving for transfer has the burden of proving by a preponderance of the evidence that transfer is in the best interest of justice and for the convenience of the parties.[54]  "'[W]here a transfer would merely shift the inconvenience from one party to the other, or where after balancing all the factors, the equities lean[] but slightly in favor of the movant, the

---

[52]  June 23, 2009 transcript at 69 -70.

[53]  *See* 28 U.S.C. § 1412 (2009), Fed. R. Bankr. P. 1014 (2009); *See CONCO*, 596 F.2d 1239, 1241 (5th Cir. 1979) (*citing In re Fairfield P.R., Inc.*, 333 F. Supp. 1187, 1189 (D. Del. 1971); *Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1390 (2d Cir. 1990); *In re Campbell*, 242 B.R. 740, 746 (Bankr. M.D. Fla. 1999); *In re Enron Corp.*, 274 B.R. 327, 342 (Bankr. S.D.N.Y. 2002) ("Transferring venue of a bankruptcy case is not to be taken lightly."); *In re Land Stewards, L.C.*, 293 B.R. 364, 369 (Bankr. E.D. Va. 2002) ("Furthermore, in cases such as these where the existing venue is entirely appropriate, this Court exercises its power to transfer cases cautiously.").

[54]  *See In re Blumeyer*, 224 B.R. 218, 221 (Bankr. M.D. Fla. 1998).

[debtor's] choice of forum should not be disturbed.'"[55]

The six factors courts typically recite when adjudicating venue transfer motions are:

(1) the proximity of creditors of every kind to the court;

(2) the proximity of the debtor to the court;

(3) the proximity of witnesses necessary to administration of the case;

(4) the location of the assets;

(5) the economic administration of the estate; and

(6) the necessity for ancillary administration.[56]

"[T]he most important consideration is whether the requested transfer would promote the economic and efficient administration of the estate."[57]  Moreover, the interest of justice component, while somewhat duplicative of the factors enumerated above, requires consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness.[58]  None of these factors weighs in favor of transfer of venue to Nevada.

A. The Proximity of the Court to Interested Parties.

1. The Debtors, Creditors and other Parties in Interest.

The Motion drifts alone in a sea of $2 billion in claims content with the Chapter 11 Cases residing in Miami.  The Movants posit that they would be hard pressed to litigate their claims in this forum but, in reality, several of the Movants are large corporations with offices located

---

[55] *Garden Manor Assocs.,* 99 B.R. 551, 555 (Bankr. S.D.N.Y. 1988) (*quoting* 1 J. Moore, *Moore's Federal Practice* ¶ 0.145[5] at 1616 (2d ed. 1988)).

[56] *CORCO*, 596 F.2d at 1247.

[57] *Id.*

[58] *See Blumeyer*, 224 B.R. at 220.

throughout the country and, in certain instances, beyond.[59]  Only four of the seventeen Movants are located exclusively in Nevada.  As a result, Movants' alleged hardships of adjudicating their claims in Miami should be viewed with skepticism.  Indeed, to date claimants in Nevada, Idaho, Georgia, Ohio, Wisconsin, Arizona, Missouri, Oklahoma, Indiana, Michigan, Illinois, and California have filed lien notices against the Project.[60]

The Debtors do not wish to diminish the significance of the mechanics' lien community. The Debtors hope to reengage this community once the Debtors are able to resume construction of the Project.  At the same time, however, the Movants blatantly ignore the interests of at least an additional $1.8 billion of claims that possess no nexus to Nevada (*i.e.,* the Debtors' pre-petition lenders).   Neither the senior Term Loan lenders nor the Official Committee of Unsecured Creditors (which consists of at least two Nevada-based claimants) supports the Motion.  For this reason, it is insufficient for the Movants to simply calculate the number of creditors with Nevada addresses listed on the evolving creditor matrix and compare that figure to the total number of claimants listed thereon.  Rather, "in considering the proximity of creditors, this Court must examine both the number of creditors as well as the amount of claims held by such creditors."[61]  The Movants are dwarfed by the remaining dollar value of claims in these cases.

Further, the Movants ignore that they will be infrequent visitors to the courthouse.

---

[59]  *See* the Declaration of Scott L. Baena (the "Baena Decl."), attached hereto as Exhibit B, at ¶ 2(ii).

[60]  *Id.*

[61]  *In re Enron Corp.,* 274 B.R. at 345 (*citing CORCO,* 596 F.2d at 1248 ("both number and size are of equal significance in gaining acceptance of a plan and should be of equal significance in considering the convenience of creditors.").  *See also In re Green Isle Partners Ltd., S.E.,* Case No. 01-24693-BKC-RBR at 12 (Bankr. S.D. Fla. Jan. 4, 2002) (unpublished decision attached hereto as Exhibit C) ("The Movants seek to engage in a head count of the Debtor's creditors in Puerto Rico and in Florida.  An unfortunate and unwanted result of this approach is that the number of creditors become the *sine qua non* of venue without regard for any substantive analysis of the creditors' respective levels of interest and activity in a debtor's Chapter 11 case.").

Rather, the Debtors' bankruptcy and special litigation counsel, Bilzin Sumberg and Kasowitz Benson, respectively, Mr. Karawan and the Board of Managers (all of whom attend hearings in this case), other professionals of the Debtors, and parties-in-interest to the Adversary Proceeding will be appearing most frequently.  Compelling these parties to travel to Las Vegas repeatedly so that the Movants may someday litigate their claims in a Nevada court is nonsensical and wasteful.  The Movants cite to airline schedules to demonstrate the burden of travelling from Las Vegas to Miami (although presumably these schedules do not apply to those Movants residing outside of Las Vegas).  The reverse schedules are equally unappealing for the main players in these cases, who would undoubtedly travel substantially more than the Movants.  The major participants in these cases are located in Miami or New York.  This Court recognized in *TACA Int'l Airlines, S.A. v. Pan Am Int'l Airlines, S.A. (In re Pan Am Corp.)*,[62] that "the inconvenience to Pan Am of having its New York witnesses attend hearings in Miami is minimal in that travel between Miami and New York takes approximately two-and-one-half hours and can be accomplished on any multiple daily flights on numerous airlines."  The same cannot be said of travels between Las Vegas and New York.  For this reason, perhaps, none of the Debtors' pre-petition lenders have moved to transfer the Chapter 11 Cases to Nevada.

The following summary demonstrates the geographic diversity of the key creditor participants, none of whom reside in Nevada:[63]

- The Debtors' creditors are both national and international in scope (including London, Milan, Tokyo and Paris).

---

[62]  177 B.R. 1014, 1019 (Bankr. S.D. Fla. 1995).

[63]  *See* Baena Decl. at ¶ 2.

- The largest undersecured creditor, U.S. Bank, as Trustee, in respect of the Second Mortgage Notes is headquartered in St. Paul, Minnesota. This claim is estimated at $675,000,000.

- Fourteen of the Debtors' 20 largest unsecured creditors on a consolidated basis are headquartered in states other than Nevada, including Florida, Illinois, California, Maryland, Georgia, Ohio, and Michigan.

- None of the parties to the adversary proceeding (the "Adversary Proceeding")[64] between the Debtors and the Revolver Lenders reside in Nevada and counsel is located in Florida, New York, California and Illinois.

- Three of the five members of the Official Committee of Unsecured Creditors reside outside of Nevada and notwithstanding that two members do reside in Nevada, the Committee has chosen to oppose the transfer of venue.

- The financial parties capable of restoring the Debtors' business are located throughout the world and not exclusively in Nevada.

- Bank of America, N.A., as Administrative Agent, Issuing Lender and Swing Line Lender, and Wilmington Trust Company, the proposed successor Administrative Agent, as well as various other lenders that are party to the $1.85 billion senior secured credit facility are not located in Nevada.[65]

- None of the Lenders to the Term Lender Steering Group reside in Nevada.

- The Debtors' trade vendors exist in Alabama, Arizona, California, Colorado, Connecticut, Washington, D.C., Delaware, Florida, Georgia, England, Hong Kong, Illinois, Kent, Kansas, Kentucky, Louisiana, Massachusetts, Maryland, Michigan, Minnesota, Missouri, North Carolina, New Jersey, Nevada, New York, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, and Wisconsin.

- None of the lenders to the non-Debtor affiliates which are developing the retail component of the Project are located in Nevada. In fact, the lead lender – Lehman Brothers – is a chapter 11 debtor in the Southern District of New York.

---

[64] Adversary Case No. 09-1621-AP-AJC (the "Adversary Proceeding").

[65] Bank of America has resigned as Administrative Agent of the Credit Agreement. The Debtors anticipate that Bank of America's replacement will be Wilmington Trust Company. The Debtors are aware of only one lender from Nevada. The lender went into receivership prior to funding any commitments under the Credit Agreement.

- The majority of the equity of the Debtors' ultimate corporate parent – FBR – is held by entities located outside of Nevada.

The proximity between the courthouse and the debtor's physical assets becomes less important the greater the geographic dispersion among affected creditors:

> When [the six CORCO] . . . principles are applied in the context of "mega" chapter 11 cases such as the one at bar, the results are neither surprising nor unjust.  It cannot be said that debtors' business activities, especially when viewed in practical terms of who will be participating in these chapter 11 proceedings, are primarily local in nature; rather, the converse is true.  Finding that the parties in interest are located throughout the United States, and further acknowledging the reality that technological advances continue to diminish the importance of the "convenience" factor, this court declines to exercise its discretion in favor of transfer based upon the record presented.[66]

Here, the Movants have failed to identify any facts that should compel the transfer of these mega cases to Nevada.

2.    <u>Professionals Involved in the Chapter 11 Cases</u>.

The Movants also ignore that counsel to the parties most critical to the Chapter 11 Cases reside thousands of miles from Nevada:

- Reorganization counsel for the Debtors, Bilzin Sumberg Baena Price & Axelrod LLP, is located in Miami.

- Special counsel for the Debtors, Buchanan Ingersoll & Rooney PC and Kasowitz, Benson, Torres & Friedman, LLP are located in Miami, Pittsburgh and New York.

---

[66] *In re PWS Holding Corp.,* Case Nos. 98-212 (SLR) through 98-223 (SLR), 1998 Bankr. LEXIS 549, at 14-15 (Bankr. D. Del. Apr. 28, 1998) (Robinson, D.J.) (footnotes omitted) (court denied venue transfer to Alabama); *see also Texaco Inc. v. Sanders (In re Texaco Inc.),* 182 B.R. 937, 949 (Bankr. S.D.N.Y. 1995) (court denied request to transfer venue of action by Texaco against Louisiana landowners); *In re Peachtree,* 206 B.R. 913, 924 ("Although '[o]ne may perhaps have some sympathy for . . . local creditors of a . . . concern who suddenly find that its financial heart is many miles away,' *id.,* that does not permit a court to ignore the location of that financial place of business.").

- The Debtors' proposed financial advisory and investment banking firms Moelis & Company is located in New York, Boston, Chicago, Los Angeles, and London.

- The Debtors' proposed financial advisory and investment banking firm Citadel is located in New York, Chicago, San Francisco, London and Hong Kong.

- Kurtzman Carson Consultants, the claims agent for the Debtors, is located in New York, Memphis and Los Angeles.

- Counsel to the Official Creditors' Committee is located in Atlantic City, New Jersey, California and Florida.

- Counsel to each of the parties to the Adversary Proceeding resides in Florida, New York, California and Illinois.

- Counsel to the Term Lender Steering Committee resides in California and Florida.

- Counsel to each of the pre-petition lenders who have filed notices of appearance in these cases resides outside of Nevada.

- Florida counsel Berger Singerman represents the general contractor of the Project, Turnberry West Construction, Inc., Jeffrey Soffer and Turnberry Residential Limited Partner, L.P.

- Counsel to NV Energy, the Project's electricity provider, is located in Birmingham, Alabama.[67]

B.    The Location of the Debtors' Assets

1.    The Location of the Debtors' Assets is Insignificant in National Cases.

*CORCO* instructs that the Court need not overly ascribe importance to the location of the Debtors' assets since the goal of these cases is financial rehabilitation and not liquidation.[68]    In *CORCO*, the Fifth Circuit recognized the importance of CORCO's oil refinery business "to the welfare and economic stability of Puerto Rico and its people" but held that such important

---

[67] *See* Baena Decl. at ¶ 2.  Additionally, Florida counsel Ehrenstein Charbonneau & Calderin, P.A. filed a notice of appearance on behalf of several purported holders of mechanics lien claimants.

[68] *See CORCO*, 596 F.2d at 1248.

"interest is served by maintaining CORCO as a functioning refinery.  This can best be accomplished in San Antonio.  The troubles of CORCO are financial.  The people who can solve those problems for CORCO are in San Antonio." [69]  These statements are equally applicable to these cases.  The Board of Managers, Mr. Karawan, the Debtors' general bankruptcy counsel and other professionals (collectively, the Debtors' "Control Group") reside principally in Miami.  As a result, the location of those making the critical decisions to restructure (as opposed to liquidate) the Project is as worthy of consideration as the location of the Project itself.[70]  As stated by the court in *In re Garden Manor Assocs., L.P.,*[71]  "Clearly, the location of Garden Manor's asset is in Arizona, but this fact is counterbalanced by the nature of the debtor's business and the course this reorganization will necessarily have to follow, which brings us to the factor regarding the economic administration of the estate."  Respectfully, this Court should follow the logic of *In re Garden Manor Assocs., L.P.*

2.    The Location of the Debtors' Books and Records is Not Dispositive.

With respect to the Debtors' books and records, thirty years ago, the Fifth Circuit recognized that the location of a debtor's books and records is a less significant factor when

---

[69] *Id.*

[70] *See In re Green Isle Partners Ltd., S.E.*, Case No. 01-24693-BKC-RBR at 16 (Bankr. S.D. Fla. Jan. 4, 2002) (Exhibit C) ("It is without argument that the Debtor's principal asset, the Project, is situated in Puerto Rico. However, the overriding concern in this Chapter 11 case is the Debtor's financial reorganization and the location in which that will occur.") (*citing CORCO*, 596 F.2d at 1247-48); *In re Land Stewards, L.C.,* 293 B.R. 364, 371 (Bankr. E.D. Va. 2002) ("Debtors concede that all of their real property is located in Maryland, and, if liquidation should result, the real property to be liquidated is in Maryland.  However, given the goal of rehabilitation, this is not an important factor here and should not be the basis for the transfer of venue of these chapter 11 cases.");*In re International Filter Corp*., 33 B.R. 952, 956 (Bankr. S.D.N.Y. 1983) (court found that the "location of the [debtor's] assets.... [has] greater weight if the proceeding is brought in Chapter 7."); *In re United Button Co.*, 137 F. 668, 672 (D. Del. 1904) ("Proximity of place of business of the bankrupt to the court entertaining proceedings in bankruptcy, though a circumstance sometimes entitled to weight is by no means conclusive."); *In re Marina Enterprises,* 14 B.R. 327 (Bankr. S.D. Fla. 1981) (venue proper in Florida although debtor's sole asset, undeveloped land for hotel/casino, was located in New Jersey).

[71] 99 B.R. at 554.

saved in electronic form.[72]  The Debtors' books and records are generally computerized and easily accessible.  Indeed, undersigned counsel have had easy access to the Debtors' records, which are electronically stored.  In fact, the Debtors' lead undersigned bankruptcy counsel, Scott L. Baena, has not even had the need to visit the Project or the Debtors' rented offices in Las Vegas in the six months he has been representing the Debtors.[73]  As a result, the Court should ascribe no value to the fact that the Debtors' physical books and records are located in Nevada.

C.      The Proximity of Witnesses Necessary to the Administration of the Case.

The Movants provide no support for their assertion that a Nevada forum is required to adjudicate the priority of claims, claims objections, adversary proceedings, valuation and stay relief proceedings, and contested confirmation proceedings.  These generalizations do not stand muster against this Court's obvious convenience to the parties who will most regularly make appearances.[74]  The court in *Enron*, for instance, overruled objections based on witness inconvenience because "certain participants in the proceedings before this Court will be the professionals retained in these cases."[75]  Witnesses will be deposed where they reside unless they agree otherwise.  They need not even attend Court hearings if they reside more than 100 miles from Miami, but their transcribed testimony will still be useable.  As stated, the professionals most likely to appear before the Court are located in Florida and New York.

Similarly, in denying a motion to transfer venue of a case involving a debtor that owned The Ritz-Carlton San Juan Hotel, Spa and Casino, Judge Ray in *Green Isle Partners Ltd., S.E.*

---

[72] *See CORCO,* 596 F.2d at 1248.

[73] *See* Baena Decl. at ¶ 4.

[74] *See In re Campbell,* 242 B.R. 740, 747 (Bankr. M.D. Fla. 1999) ("While the Court is concerned for the convenience of witnesses in every case, this factor concerns the proximity of those witnesses necessary for administration of this estate.")

[75] 274 B.R. at 347.

found that "[i]t is a debtor's officers, accountants and other professionals who are routinely required to appear before the bankruptcy court in matters concerning the administration of the estate."[76]  The Movants fail to explain why these witnesses would be inconvenienced by a Miami forum.[77]  As an aside, counsel to several mechanics' lien claimants alleged at the June 23 hearing that those claimants may be entitled to attorneys' fees and costs in pursuing their claims.  If true, the Movants may be entitled to be reimbursed for any incremental expense in attending Court in Miami.

In any event, the following statements would appear equally as applicable here as they were in the *Enron* case:

> With respect to accessibility of this Court to all parties-in-interest, the dockets of all of the cases pending before the Southern District of New York are currently available on the internet at the Court's web-site by obtaining a PACER password. The electronic filing system allows those with an interest to have access to all pleadings filed in any case. Moreover, pursuant to the Federal Rules of Bankruptcy Procedure, any pleading that directly impacts any employee or creditor is required to be served upon such individual or entity. In addition, the Court will make every effort to afford those burdened by the cost of travel an opportunity to participate by alternative means as previously mentioned.[78]

Moreover, through the services of the Debtors' claims agent, Kurtzman Carson Consultants, LLC, all of the pleadings in the main case and the Adversary Proceeding are available at no charge to anyone with internet access at www.kccllc.net/fblv.

The Movants also raise the specter of a valuation dispute, but they offer no plausible explanation as to why this Court would not be as capable as a Nevada court in

---

[76] Case No. 01-24693-BKC-RBR at 15 (Bankr. S.D. Fla. Jan. 4, 2002) (Exhibit C).

[77] *See Reliance Ins. Co. v. Six Star, Inc.*, 155 F. Supp. 2d 49, 58 (S.D.N.Y. 2001) (movants must explain likely type of witness and reason for inconvenience).

[78] 274 B.R. at 347.  The Debtors also note that interested parties may view for free all docket entries on the claims' agent's website, http://www.kccllc.net/fblv.

valuing the Project.  Any valuation fight would almost assuredly not involve lay witnesses.  Rather, the Court would obtain the benefit of experts retained by sophisticated parties and those experts will likely be accustomed to appearing in courts all across the United States.[79]

D.    Transfer of Venue Would Not Promote the Efficient and Economic
       Administration of the Estate.

The Movants spend five pages on Nevada mechanics' lien law rather than the applicable law discussing this most critical factor.[80]  Courts uniformly examine this critical factor in terms of "'the need to obtain post-petition financing, the need to obtain financing to fund reorganization, and the location of the sources of such financing and the management personnel in charge of obtaining it.'"[81]  As the court underscored in *Enron*, and as this Court has stressed, the ability to obtain financing is "the ultimate purpose of a Chapter 11 bankruptcy case."[82]  As the Court has repeatedly acknowledged, the Debtors' ability to obtain financing to complete the Project, as opposed to the prior construction of the Project, is the centerpiece of these cases:

> As I've said before, this case is going to not rise or fall on the past efforts or potential future work to be done by this [mechanics' lien] community.  The problem in this case is a financial problem.  If the parties can work out the financing and complete the project, then everybody will be much better off."[83]

---

[79] Courts often value property outside of their designated venue.  *See, e.g., In re Beker Indus. Corp.,* 58 B.R. 725 (Bankr. S.D.N.Y. 1986) (court was entirely capable of discounted cash flow analysis of property located beyond venue).

[80] It is unclear what more the Movants would require of the Court to gain comfort in the Court's ability to correctly apply Nevada law.

[81] *In re Enron Corp.,* 274 B.R. at 348 (*quoting In re International Filter Corp.,* 33 B.R. 952, 956 (Bankr. S.D.N.Y. 1983)).  *See also In re Garden Manor Assocs., L.P., 99 B.R. 551, 554-55* (Bankr. S.D.N.Y. 1988) (court denied motion to transfer venue of case consisting of few assets in another jurisdiction because the debtor possessed the ability to raise capital, renegotiate loan terms and raise capital in chosen venue).

[82] *In re Enron,* 274 B.R. at 348.

[83] June 23, 2009 transcript at 71.

To that end, the Debtors' Control Group has worked tirelessly, both pre- and post-petition, to restructure existing indebtedness and to obtain new equity financing to complete the Project.  These efforts are all occurring in Miami.  For instance, the Debtors commenced the Adversary Proceeding in this Court against the Revolver Lenders (defined below) for failing to advance nearly $800 million in construction financing.  The Control Group, all of whom are situated in Miami, is in constant dialogue with the Term Lenders over the use of cash collateral, the stabilization of the Project, as well as with additional sources of financing and equity to enable  the Debtors to complete the Project.

No relationship exists between the proximity of the courthouse to the Project and the Debtors' ability to achieve reorganizational success.  Indeed, the Motion leaves unanswered how the singular goal of achieving a financial restructuring will be advanced by transferring these cases.   To the contrary, unlike the Movants who may be required to appear in Miami episodically, the Control Group would be required to appear in Las Vegas frequently.  In just the first three weeks of these cases, there have been three hearings and three more have already been scheduled over the next three weeks.   The constant travel will undoubtedly impede the momentum gained over the last several weeks of obtaining financing.[84]  Further, as discussed below, Nevada bankruptcy court may be incapable based on docket overload from advancing the adversary proceeding against the Revolver Lenders as promptly as possible.  The incessant tug of travel on the Control Group would undoubtedly take a substantial toll on the ability of the parties to engage in around-the-clock negotiations.  Moreover, in as much as the Debtors do not have

---

[84] *See In re Green Isle Partners Ltd., S.E.*, Case No. 01-24693-BKC-RBR at 18-19 (Bankr. S.D. Fla. Jan. 4, 2002) (Exhibit C) ("The transfer of this case to Puerto Rico will assuredly entail additional expense and inefficiencies. Upon transfer, the Debtor will be compelled to engage yet another law firm; and incur the cost of travel of its executives and professionals to Puerto Rico.  These activities will serve as distractions for the Debtor, its officers, partners and professionals from the Debtor's efforts at reorganizing its affairs during the juncture of the case when the Debtor's primary focus ought to be on finalizing a reorganization strategy, not to mention result in significant additional administrative expense.").

ongoing operations, they are without income. To date, they have survived on the use of cash collateral with the consent of lenders with an interest therein. Thus, the Control Group would be entirely dependent on the continued use of cash collateral just to defray the expense of this travel to a remote jurisdiction were these cases moved.

In essence, the "efficient and economic administration of the estate" prong leads the Court full circle to the nerve-center analysis under 28 U.S.C. § 1408. As stated, the financial heart of these Debtors resides in Miami. Restructuring negotiations will occur in Miami and occasionally in New York. Financing will occur principally out of Miami and New York where the Debtors' institutional lenders are located and not Nevada. The *Enron* court found New York an appropriate venue because "[m]ost of the entities and individuals expected to be responsible for the financial restructuring and development of a plan of reorganization in this case are located in New York or have ready access to New York, including most of the Debtors' legal and financial advisors as well as the legal and financial advisors to the Committee and the lenders."[85] Those forging this financial restructuring are similarly separated from the assets. Nevertheless, retention of jurisdiction in Miami is critical because of the city's close proximity to the Debtors' nerve center. This proximity will best ensure the preservation of the Debtors' assets.[86]

Courts sometimes consider as part of the efficient/economic administration factor whether they will be required to interpret foreign law, but foreign law, standing alone, does not warrant the transfer of a bankruptcy case. For example, *In re One-Eighty Invs., Ltd.*,[87] the court

---

[85] *In re Enron*, 274 B.R. at 349.

[86] *See In re Land Stewards, L.C.*,[86] 293 B.R. 364, 370 (Bankr. E.D. Va. 2002) (the court found debtor's chosen forum of Virginia appropriate because "[t]he ability to raise capital, renegotiate loan terms and likely sources of capital are all Virginia based . . . .").

[87] 18 B.R. 725, 729 (Bankr. N.D. Ill. 1981) ("The Bankruptcy Court for the Western District of Texas would be more familiar with such [mechanics' lien] law and perhaps could deal with these matters more efficiently

declined to transfer a case to another jurisdiction even though the court would be asked to interpret mechanics' lien rights under foreign law.  Movants have acknowledged that this Court is more than capable of becoming knowledgeable with regarding to the relevant Nevada law, so the Debtors question how the Movants would be harmed if this Court heard their claims as opposed to a Nevada bankruptcy court.

No matter which court possesses more expertise on Nevada's mechanics' lien statute, the issue is a red herring as the law itself does not appear overly complicated.  As counsel to certain purported mechanics' lien claimants, Donald H. Williams of Williams & Wiese in Las Vegas, stated at the June 23 hearing in respect of Nevada's mechanics' lien statute:

> Thank you, Judge.  The only thing I was going to state is that we want to try to be as efficient as possible here, and let me just tell you kind of what's happening in Nevada right now in State Court everyday.
>
> We are arguing these priority cases, and, in essence, we are bifurcating the cases. We are taking phase one as getting the lien claimants together and saying, okay, we have a bunch of lien claimants here, and do they have priority over the banks. We argue that before we ever get to the amount of liens.
>
> That is done very efficiently by simply – they acted like the Nevada statutes are complicated and, meanwhile, they're not complicated at all.  If you do your pre-lien notice or have an exception to that, and then you record your lien timely, and you perfect your lien timely, then your lien is good.  No question about that. . . .[88]

The Debtors view the determination of the validity, priority and extent of mechanics' liens similarly to Mr. Williams, straightforward.  The Debtors intend on proposing a customized proof of claim form for those who purport to be mechanic lienors that will allow the Court to implement procedures for prompt determinations in respect of whether claims relate back to the

---

than this Court.  This factor, however, is not sufficient to justify transfer in light of the other factors which militate against transfer.").

[88] June 23, 2009 transcript at 67-68.

period prior to the recording of deeds of trust.  The claim form is the key to the nexus between the common issues engendered by mechanics' lien claims, on the one hand, and each claimant and other classes of claimants, on the other hand.  The use of such a claim form will illuminate the path for the resolution of common and individual mechanics' lien issues.  Thereafter, with the benefit of the information obtained from the mechanics' lien proofs of claim, the Debtors will propose a case management order to determine claims, a process routinely accomplished in large bankruptcy cases.  Claimants will possess the right to object to the process, propose alternatives and even seek to remove adversary proceedings to a forum of their choosing subject, of course, to objection by the Debtors and approval of the Court.  Under these circumstances, the Movants are in no way prejudiced if the Court retains these cases.

Ironically, even if these cases are transferred to Nevada, the Nevada bankruptcy court may actually not adjudicate mechanics' lien claims.  Rather, these contested matters may be removed to state court and substantially delayed.   It defies logic why the Court would transfer the entirety of these cases to Nevada only to have the Nevada bankruptcy court abstain from ruling on mechanics' lien claims.

The Court should also consider that any transfer would result in significant delay while the Nevada court familiarizes itself with the facts, circumstances and prior orders of these cases.[89]  Although these cases are only roughly a month old, the Court has invested substantial

---

[89] *See, e.g., In re Enron*, 274 B.R. at 350 ("This Court has gained familiarity with many of the issues that have and will continue to arise in these cases. A substantial number of motions have been filed and were scheduled to be heard within the first month of these cases. Some of them have already been held and concluded. While other matters previously scheduled to have taken place by this date have subsequently been adjourned, the Court had already familiarized itself with many of the pleadings filed in those matters. In addition, the Court has been required to educate itself on a variety of issues to provide interim relief on an emergent basis."); *Manville*, 896 F.2d at 1391 (affirming bankruptcy court's decision to retain a case where the court had already "developed a substantial 'learning curve' and . . . transferring venue would have delayed the final resolution of the bankruptcy case.").

time on significant matters.[90]  The Court has also recognized the necessity of moving quickly in respect of the Adversary Proceeding and the completion of the Project.  Not only do the Debtors concur with and appreciate the Court's efforts in moving quickly, but, ironically, so do other mechanics' lien claimants.  Specifically, the Motion is actually the second motion seeking transfer of venue of the Chapter 11 Cases.  The first was filed by another purported mechanic lienor; however, that motion was withdrawn for among other stated reasons that the movant's Nevada counsel was pleased that the Court had expedited consideration of the Adversary Proceeding and it was unclear to counsel that a Nevada bankruptcy court would be able to devote the same expedited attention due to the volume of cases currently pending in the Nevada bankruptcy courts and the few number of bankruptcy judges in the unofficial Las Vegas division to handle those cases.[91]  Maintaining these cases in Miami would best promote the efficient and economic administration of the Chapter 11 Cases.

E.    <u>The Necessity for Ancillary Administration should Liquidation Result</u>.

Under *CORCO*, this Court need not ascribe much weight to this factor as the "anticipation of the failure of the Chapter 11 proceeding is an illogical basis upon which to predicate a transfer."[92]  The Debtors possess every intention of reorganizing and completing a world-class casino-resort destination.

---

[90]  *See In re Vienna Park Props.,* 128 B.R. 373, 378 (Bankr. S.D.N.Y. 1991) (court emphasized that it "placed great emphasis on the 'learning curve' issue when [it previously considered] the 'economic administration of the estate' *CORCO* factor in its prior decision denying venue transfer").

[91]  *See* Baena Decl. at ¶ 3.

[92]  *CORCO*, 596 F.2d at 1247; *see also In re Holiday Towers, Inc.,* 18 B.R. 183, 189 ("Here little, if any, evidence has been offered suggesting that the debtor is headed towards failure or liquidation.  Therefore, the Court finds that the sixth factor provides the Court with little or no guidance and is of no consequence in its determination in this case.")

F.       The Interests of Justice in Maintaining These Cases in Miami.

With respect to the "interest of justice," courts observe that the concept, naturally, is broad, flexible, and takes into account "what will promote the efficient administration of the estate, judicial economy, timeliness and fairness."[93]   The Debtors are in the best position to obtain funding to complete the Project from Miami.   Indeed, it likely will be necessary for Mr. Soffer to provide some of those funds.   Once they obtain financing and capital, then the Debtors may seek an expeditious exit from these chapter 11 proceedings and resume construction of the Project.   Only through financing and additional equity will the Debtors be able to employ 5,000 workers and generate nearly $41 million dollars per month in wages and benefits.   Until that time, however, there exists a partially constructed Project, few employees, and no revenue in Las Vegas.   There is simply no reason to rush to Las Vegas to accomplish what the Debtors' Control Group is striving to achieve in Miami.   By retaining jurisdiction closest to the Debtors' financial epicenter, these cases possess the greatest chance of success.

---

[93] *In re Enron,* 274 B.R. at 349 (*citing Manville,* 896 F.2d at 1391).

## CONCLUSION

The Motion of the Movants to transfer venue of the Chapter 11 Cases to the District of

Nevada should be denied in all respects.

DATED: July 2, 2009

<div style="margin-left: 40%;">

Respectfully submitted

**I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and that I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).**

**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
*Counsel to the Debtors*
2500 Wachovia Financial Center
200 South Biscayne Blvd, Suite 2500.
Miami, Florida 33131

Telephone: (305) 374-7580
Facsimile: (305) 374-7593

By: ___/s/ Scott L. Baena___

Scott L. Baena, Esq.
Fla. Bar No. 186445
Jay M. Sakalo
Florida Bar No. 156310
Matthew I. Kramer, Esq.
Fla. Bar No. 0937231

</div>

**EXHIBIT "A"**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

FONTAINEBLEAU LAS VEGAS
HOLDINGS, LLC, ET AL.,[1]

Debtors.

Chapter 11

Case No.  09-21481-BKC-AJC

(Jointly Administered)

_____/

DECLARATION OF HOWARD C. KARAWAN IN OPPOSITION
TO MOTION FOR TRANSFER OF VENUE OF THE
CHAPTER 11 CASES TO THE DISTRICT OF NEVADA

Howard C. Karawan, being duly sworn, hereby deposes and says:

1.    I am the Chief Operating Officer and the Chief Restructuring Officer of

Fontainebleau Resorts, LLC ("Fontainebleau Resorts" or "FBR"), the indirect parent company of

Fontainebleau Las Vegas Holdings, LLC ("Resort Holdings"), Fontainebleau Las Vegas, LLC

("Resort") and Fontainebleau Las Vegas Capital Corp. ("Capital"; and, together with Resort

Holdings and Resort, the "Debtors").  I have been the Chief Operating Officer of Fontainebleau

Resorts since September 2007 and was officially designated the Chief Restructuring Officer in

May 2009.  I also serve as the Chief Restructuring Officer of each Debtor, as well as three

affiliates of the Debtors, namely Fontainebleau Las Vegas Retail Parent, LLC, Fontainebleau Las

Vegas Retail Mezzanine, LLC and Fontainebleau Las Vegas Retail, LLC.  I submit this

Declaration in support of the Debtors' Opposition to Motion for Transfer of Venue of the

---

[1]  The last four digits of each Debtor's tax identification number are: (i) Fontainebleau Las Vegas Holdings, LLC [9337]; (ii) Fontainebleau Las Vegas, LLC [9332]; and (iii) Fontainebleau Las Vegas Capital Corp. [7822]. The Debtors' current mailing address is 19950 West Country Club Drive, Aventura, Florida  33180.

Chapter 11 Cases to the District of Nevada (the "Objection").[2]

2.    I am familiar with each of the matters set forth below based on personal knowledge, from review of the Debtors' relevant business records, information supplied to me by others at the Debtors' businesses, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called to testify, I could and would testify competently to the facts set forth herein.

3.    As I previously stated in my *Declaration in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [D.E. # 5], FBR is headquartered in Miami, Florida. All major decisions in respect of the Project have been and are made by the Board of Managers of FBR. The Board of Managers has continuously exercised its ultimate control over the management, business activities (including the design and development of the Project) and capital structure/financing of the Debtors. Overall responsibility within the Fontainebleau family of companies for managing, directing and coordinating reorganization efforts has been entrusted to me by the Board of Managers. My office is in Miami, Florida. I report directly to the Board of Managers and generally work side-by-side with members of the Board of Managers, including the Chairman of FBR, Jeffery Soffer, as well as with Albert Kotite, an Executive Vice President of FBR. The Board of Managers is also comprised of Messrs. Bruce Weiner and Ray Parello. Messrs. Soffer, Weiner and Parello are world-renowned developers. All other personnel critical to the reorganization of the Debtors either work from or report to others situated in Miami, Florida.

4.    At this stage, no decisions are made in respect of the Project other than by the Board of Managers or me. Indeed, FBR, through its Board of Managers, determined that the

---

[2]  Capitalized terms not defined herein shall have the meanings ascribed to such terms as set forth in the Objection.

filing of the Chapter 11 Cases was in the best interests of each of the Debtors (other than Capital) and authorized all such acts as were necessary for each of the Debtors (other than Capital) to file chapter 11 petitions. Capital's decision to file for chapter 11 protection was made by its Board of Directors, the members of whom also serve on the Board of Managers.

5.    The Board of Managers meets at least twice a week to manage the Debtors' reorganization process. Since the inception of the Project, the Board of Managers has been critically involved in every aspect of the Project. Most recently, since the collapse of Lehman Brothers – the largest lender to the "retail" affiliates – in 2008, and the Revolver Lenders' subsequent refusal to fund their $800 million of financing commitments to the Debtors, the members of the Board of Managers have continuously met with lenders in these cases and utilized their relationships to meet with other sources of credit and equity all over the world; they have authorized and approved the reductions in the Debtors' workforce; they have been intimately involved in the development of the stabilization model the Debtors wish to employ; and they are considering design alternatives to ameliorate the cost of construction. The Board of Managers' control over the Project has continuously existed since the Project's inception.

6.    The Debtors' Control Group has worked tirelessly, both pre- and post-petition, to restructure existing indebtedness and to obtain new equity financing to complete the Project. These efforts are all occurring in Miami. For instance, the Debtors commenced the Adversary Proceeding in this Court against the Revolver Lenders for failing to advance nearly $800 million in construction financing. The Control Group, all of whom are situated in Miami, is in constant dialogue with the Term Lenders over the use of cash collateral, the stabilization of the Project, as well as with additional sources of financing and equity to enable the Debtors to complete the Project.

3

I declare under the penalty of perjury that the foregoing is true and correct to the best of

my knowledge, information and belief.

Further deponent says not.

Howard C. Karawan

4

**EXHIBIT "B"**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                          Chapter 11

FONTAINEBLEAU LAS VEGAS
HOLDINGS, LLC, ET AL.,[1]                       Case No.  09-21481-BKC-AJC

            Debtors.                            (Jointly Administered)
_____/

### DECLARATION OF SCOTT L. BAENA IN OPPOSITION TO MOTION FOR TRANSFER OF VENUE OF THE CHAPTER 11 CASES TO THE DISTRICT OF NEVADA

Scott L. Baena, being duly sworn, hereby deposes and says:

1.      I am an attorney and partner in the law firm of Bilzin Sumberg Baena Price & Axelrod, LLP ("Bilzin Sumberg").  Bilzin Sumberg maintains offices for the practice of law at 200 Biscayne Boulevard, Suite 2500, Miami, Florida 33131.  I submit this Declaration to summarize admissible evidence from the Debtors' and certain creditors' documents, which Declaration and evidence is being submitted in support of the Debtors' Opposition to Motion for Transfer of Venue of the Chapter 11 Cases to the District of Nevada (the "Objection").[2]

2.      Based on the Debtors' books and records, the pre-petition loan documents, the statutory creditors' committee membership list, and appearances by professionals in these cases:

---

[1]  The last four digits of each Debtor's tax identification number are: (i) Fontainebleau Las Vegas Holdings, LLC [9337]; (ii) Fontainebleau Las Vegas, LLC [9332]; and (iii) Fontainebleau Las Vegas Capital Corp. [7822]. The Debtors' current mailing address is 19950 West Country Club Drive, Aventura, Florida  33180.

[2]  Capitalized terms not defined herein shall have the meanings ascribed to such terms as set forth in the Objection.

(i)      Attached as <u>Exhibit 1</u> hereto is a listing by state or country of the offices of each Movant. The list was derived from an internet search of each Movant. The results of the internet search revealed that only four of the seventeen Movants are located exclusively in Nevada.

(ii)     Based on a review of records maintained by the Debtors, non-lender claimants who have filed notices of lien rights with respect to the Project to date reside in Nevada, Idaho, Georgia, Ohio, Wisconsin, Arizona, Missouri, Oklahoma, Indiana, Michigan, Illinois, and California.

(iii)    The following reflects the geographic diversity of the Debtors' substantial claims pool:

- The Debtors' creditors are both national and international in scope (including London, Milan, Tokyo and Paris).

- The largest undersecured creditor, U.S. Bank, as Trustee, in respect of the Second Mortgage Notes is headquartered in St. Paul, Minnesota. This claim is estimated at $675,000,000.

- Fourteen of the Debtors' 20 largest unsecured creditors on a consolidated basis are headquartered in states other than Nevada, including Florida, Illinois, California, Maryland, Georgia, Ohio, and Michigan.

- None of the parties to the Adversary Proceeding between the Debtors and the Revolver Lenders reside in Nevada and counsel is located in Florida, New York, California and Illinois.

- Three of the five members of the Official Committee of Unsecured Creditors reside outside of Nevada and notwithstanding that two members do reside in Nevada, the Committee has chosen to oppose the transfer of venue.

- The financial parties capable of restoring the Debtors' business are located throughout the world and not exclusively in Nevada.

- Bank of America, N.A., as Administrative Agent, Issuing Lender and Swing Line Lender, and Wilmington Trust Company, the proposed successor Administrative Agent, as well as various other lenders that are

party to the $1.85 billion senior secured credit facility are not located in Nevada.[3]

- None of the Lenders to the Term Lender Steering Group reside in Nevada.

- The Debtors' trade vendors exist in Alabama, Arizona, California, Colorado, Connecticut, Washington, D.C., Delaware, Florida, Georgia, England, Hong Kong, Illinois, Kent, Kansas, Kentucky, Louisiana, Massachusetts, Maryland, Michigan, Minnesota, Missouri, North Carolina, New Jersey, Nevada, New York, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, and Wisconsin.

- None of the lenders to the non-Debtor affiliates which are developing the retail component of the Project are located in Nevada. In fact, the lead lender – Lehman Brothers – is a chapter 11 debtor in the Southern District of New York.

- The majority of the equity of the Debtors' ultimate corporate parent – FBR – is held by entities located outside of Nevada.

(iv)    Certain of the professionals retained in these cases include the following (*see also* Exhibit 2 hereto listing counsel of record):

- Reorganization counsel for the Debtors, Bilzin Sumberg, is located in Miami.

- Special counsel for the Debtors, Buchanan Ingersoll & Rooney PC and Kasowitz, Benson, Torres & Friedman, LLP are located in Miami, Pittsburgh and New York.

- The Debtors' proposed financial advisory and investment banking firms Moelis & Company is located in New York, Boston, Chicago, Los Angeles, and London.

- The Debtors' proposed financial advisory and investment banking firm Citadel is located in New York, Chicago, San Francisco, London and Hong Kong.

- Kurtzman Carson Consultants, the claims agent for the Debtors, is located in New York, Memphis and Los Angeles.

---

[3] Bank of America has resigned as Administrative Agent of the Credit Agreement. The Debtors anticipate that Bank of America's replacement will be Wilmington Trust Company. The Debtors are aware of only one lender from Nevada. The lender went into receivership prior to funding any commitments under the Credit Agreement.

- Counsel to the Official Creditors' Committee is located in Atlantic City, New Jersey, California and Florida.

- Counsel to each of the parties to the Adversary Proceeding resides in Florida, New York, California and Illinois.

- Counsel to the Term Lender Steering Committee resides in California and Florida.

- Counsel to each of the pre-petition lenders who have filed notices of appearance in these cases resides outside of Nevada.

- Florida counsel Berger Singerman represents the general contractor of the Project, Turnberry West Construction, Inc., Jeffrey Soffer and Turnberry Residential Limited Partner, L.P.

- Counsel to NV Energy, the Project's electricity provider, is located in Birmingham, Alabama.[4]

3.     On June 17, 2009, purported secured creditor Young Electric Sign Co. ("YESCO") filed its *Motion to Transfer Venue to the District of Nevada and Incorporated Memorandum of Law* [D.E. # 96] (the "YESCO Motion"). The YESCO Motion was filed by attorneys at Shea & Carlyon, Ltd. of Las Vegas, Nevada, and Devine Goodman Rasco & Wells, P.A. Subsequent to the filing of the YESCO Motion, I received a telephone call from Candace Carlyon, the signatory to the YESCO Motion and an attorney with Shea & Carlyon. She explained to me that YESCO was withdrawing the YESCO Motion for among other stated reasons that she was pleased that the Court had expedited consideration of the Adversary Proceeding and it was unclear to her that a Nevada bankruptcy court would be able to devote the same expedited attention due to the volume of cases currently pending in the Nevada bankruptcy courts and the few number of bankruptcy judges in the unofficial Las Vegas division to handle those cases.

_____

[4] Additionally, Florida counsel Ehrenstein Charbonneau & Calderin, P.A. filed a notice of appearance on behalf of several purported holders of mechanics lien claimants.

4.      I have been advised that the majority of the Debtors' books and records are generally computerized and easily accessible.  Indeed, Bilzin Sumberg has had easy access to the Debtors' records, which are electronically stored.  In fact, I have not even had the need to visit the Project or the Debtors' rented offices in Las Vegas in the six months I have been representing the Debtors.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Further deponent says not.

_____
Scott L. Baena

**EXHIBIT "1"**

| M&M Claimholder | Locations |
|---|---|
| Architectural Materials, Inc. | Massachusetts, Michigan, Nevada (HQ), Indiana, California, China |
| Collings Interiors | California, Nevada, China, Vietnam |
| Door-Ko, Inc | Nevada |
| Door & Hardware Management | California (3 locations), Nevada |
| Eberhard/Southwest Roofing, Inc. | California (2 locations), Nevada |
| EIDS Steel Company | Illinois |
| Eugenio Painting Company | Michigan |
| Gallagher-Kaiser Corporation | Michigan (HQ), Nevada |
| Marnell Masonry Inc | Nevada |
| Midwest Drywall Co., Inc. | Arkansas, Texas, Nebraska, Colorado, Nevada, Oklahoma, Kansas |
| Midwest Pro Painting, Inc. | Michigan (HQ), Nevada |
| Mechanical Insulation Specialists | California, Nevada (2 locations), Utah |
| Modernfold of Nevada, LLC (local distributor for Modernfold, Inc., a mulitnational corporation) | Indiana (HQ), Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Lousiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming // Over 25 affiiated international locations |
| Southern Nevada Paving, Inc. | Nevada |
| Universal Piping, Inc. | Michigan (HQ), Nevada, Tennessee |
| Edna West Associates d/b/a Mojave Electric | Nevada |
| W&W Steel, LLC of Nevada (an affiliate of W&W Steel and AFCO Steel) | Oklahoma (HQ), Texas, New Mexico, Nevada, California, Arizona, Illinois, Pennsylvania // AFCO - Arkansas (HQ), Colorado |

**EXHIBIT "2"**

Main Case Counsel List

| Party | Firm Names | States |
|---|---|---|
| Debtors | Bilzin Sumberg Baena Price Axelrod | FL |
| Bank of America, N.A | Sheppard Mullin Richter & Hampton, LLP<br>Hunton Williams LLP | CA, FL |
| Bank of Scotland plc | Katten Muchin Rosenman LLP<br>Stearns Weaver Miller Weissler Alhadeff &<br>Sitterson PA | NY, FL |
| Barclays Bank PLC, Deutsche Bank Trust Company Americas, JPMorgan Chase Bank, NA, and Royal Bank of Scotland PLC | Simpson Thacher & Bartlett LLP<br>Greenberg Traurig, P.A. | NY, FL |
| HSH Nordbank AG, New York Branch | Kaye Scholer LLP<br>Rice Pugatch Robinson & Schiller PA. | NY, FL |
| Sumitomo Mitsui Banking Corporation | Mayer Brown LLP<br>Shutts & Bowen LLP | NY, FL |
| MB Financial Bank, N.A. | Shaw Gussis Fishman Glantz Wolfman &<br>Towbin<br>Furr and Cohen, P.A. | IL, FL |
| Unsecured Creditors Committee | Fox Rothschild LLP<br>Genovese Battista & Joblove, P.A. | NJ, PA,<br>CA, FL |
| Apollo Investment Fund VII, L.P. | Akin Gump Strauss Hauer & Feld, LLP<br>Kozyak Tropin & Throckmorton, P.A. | NY, FL |
| Term Lender Steering Group | Hennigan Bennett & Dorman LLP<br>Akerman Senterfitt | NY, CA,<br>FL |
| M&M Lienholders | Gordon Silver<br>Shraiberg, Ferrara & Landau, P.A. | NV, FL |
| Young Electric Sign Company | Shea & Carlyon Ltd.<br>Devine Goodman Rasco & Wells, P.A. | NV, FL |
| Mr. Jeffrey Soffer, Turnberry Residential Limited Partner, L.P., and Turnberry West Construction Inc. | Berger Singerman, P.A. | FL |
| Minibar Systems and Minibar N.A., Inc. | Whiteford Taylor Preston, LLP | DE |
| Aderholt Specialty Company, Inc. | Markowitz, Davis, Ringel, & Trusty, P.A. | FL |
| Safe Electronics, Inc., Warner Enterprises, Inc., d/b/a Sun Valley Electric Supply Company, Bombard Electric, LLC, Desert Fire Protection Company, Powell Cabinet and Fixture Co., Austin General Contracting, Inc., and Absocold Corporation, d/b/a Econ Appliance | Ehrenstein Charbonneau Calderin | FL |
| JPRA Architects, Tracy & Ryder Landscape, Inc., Quality Cabinet & Fixture Company, Zetian Systems, Inc. Z Glass, Inc. Derr and Gruenewald Construction Co., and Graybar Electric Company, Inc. | May, Meacham, & Davell, P.A. | FL |
| United States Trustee | | FL |

Adversary Proceeding Counsel List

| PARTY | FIRM NAMES | STATES |
|---|---|---|
| Debtors | Kasowitz Benson Torres & Friedman LLP<br>Bilzin Sumberg Baena Price & Axelrod LLP | NY, FL |
| Bank of America, N.A and Merrill Lynch Capital Corporation | O'Melveny & Myers LLP<br>Hunton & Williams LLP | NY, FL |
| Bank of Scotland plc | Katten Muchin Rosenman LLP<br>Stearns Weaver Miller Weissler Alhadeff & Sitterson PA | NY, FL |
| Barclays Bank PLC, Deutsche Bank Trust Company Americas, JPMorgan Chase Bank, NA, and Royal Bank of Scotland PLC | Simpson Thacher & Bartlett LLP<br>Greenberg Traurig, P.A. | NY, FL |
| HSH Nordbank AG, New York Branch | Kaye Scholer LLP<br>Rice Pugatch Robinson & Schiller PA.. | NY, FL |
| Sumitomo Mitsui Banking Corporation | Mayer Brown LLP<br>Shutts & Bowen LLP | NY, FL |
| MB Financial Bank, N.A. | Shaw Gussis Fishman Glantz Wolfman & Towbin<br>Furr and Cohen, P.A. | IL, FL |
| Jeffrey Soffer, Turnberry Reisdential Limited Partner, L.P., and Turnberry West Construction | Berger Singerman | FL |

EXHIBIT "C"

1/4/02

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(BROWARD DIVISION)

| | | |
|---|---|---|
| In re: | ) | Case No. 01-24693-BKC-RBR |
| | ) | |
| GREEN ISLE PARTNERS LTD., S.E., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION DENYING MOTIONS
TO TRANSFER VENUE OF BANKRUPTCY CASE FILED BY
RITZ-CARLTON AND THE OFFICE OF THE UNITED STATES TRUSTEE**

On August 1, October 25 and 26, 2001, the Court conducted evidentiary hearings to

consider the Motion to Transfer Venue of Bankruptcy Case (the "Ritz-Carlton Venue

Motion") filed by The Ritz-Carlton Hotel Company, LLC and The Ritz-Carlton Hotel

Company of Puerto Rico, Inc. (collectively, "Ritz-Carlton"), as well as the Motion to

Transfer Venue of Case filed by the Office of the United States Trustee (the "UST Venue

Motion;" the Ritz-Carlton Venue Motion and the UST Venue Motion shall be referred to

collectively as the "Venue Motions"), the Supplemental Memorandum in Support of the

Ritz-Carlton Venue Motion, the Second Supplemental Memorandum in Support of the Ritz-

Carlton Venue Motion, the Memorandum of Law by Government Development Bank for

Puerto Rico ("GDB"), Puerto Rico Tourism Development Fund ("TDF") and Banco Popular

de Puerto Rico ("BPPR") in support of the Ritz-Carlton Venue Motion, the Supplemental

Memorandum of Law of BPPR in Support of the Venue Motions, the Notice of Filing

Supplemental Authority by Ritz Carlton LLC and Ritz Carlton of Puerto Rico, Inc., the

Debtor's Objection and Response to the Venue Motions, and the Objection of A.C. Coin and

Slot Service Company, Inc. to the Venue Motions.

The Court, having considered the Venue Motions, the Supplemental Memoranda filed in support thereof, and the Objections thereto, having reviewed the file in the captioned main bankruptcy case, having considered admitted evidence and argument by counsel, and being otherwise fully informed in the premises, hereby makes the following findings of fact and conclusions of law:

## PROCEDURAL BACKGROUND

On June 25, 2001 (the "Petition Date"), Green Isle Partners, Ltd., S.E. (the "Debtor") filed its petition for relief under chapter 11 of the Bankruptcy Code. CP 1. The Debtor has retained possession of its assets and is authorized to continue the operation and management of its business as a debtor-in-possession, through its agent, Ritz-Carlton, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

On July 6, 2001, Ritz-Carlton filed the Ritz-Carlton Venue Motion, requesting entry of an order transferring jurisdiction of the Debtor's bankruptcy case from the Southern District of Florida to the District of Puerto Rico. CP 30. On July 20, 2001, the United States Trustee filed the UST Venue Motion seeking identical relief to that requested by Ritz-Carlton. CP 55.

On July 30, 2001, GDB, TDF and BPPR filed their Memorandum in Support of the Ritz-Carlton Venue Motion. CP 61. On the same day, Ritz-Carlton filed its first Supplemental Memorandum in support of the Ritz-Carlton Venue Motion. CP 62.

On July 30, 2001, the Debtor filed its Objection and Response to the Venue Motions. CP 65.

On August 1, 2001, the Court conducted the initial evidentiary hearing on the Venue Motions. At the conclusion of the initial hearing, the Court continued the evidentiary

hearing on the Venue Motions to September 13, 2001. As a result of the closure of the Court on September 13, 2001 due to the September 11 terrorist attacks against the World Trade Center and the Pentagon, the continued evidentiary hearing on the Venue Motions was rescheduled to September 25, 2001.

On August 17, 2001, TDF and GDB filed the Affidavit of Javier A. Ramos in Support of their Memorandum of Law in Support of the Venue Motions. CP 100.

On September 5, 2001, the Debtor filed an Emergency Motion to Compel Compliance with Subpoena Deuces Tecum by Marriott International, Inc. and Marriott International Capital Corporation, or to Continue Hearing on the Venue Motions (the "Emergency Motion"), seeking to compel affiliates of Ritz-Carlton to produce certain documentation and to make representatives of such affiliates available for deposition. CP 114. The Court conducted a preliminary hearing on the Emergency Motion on September 7, 2001, and scheduled a further hearing on September 25, 2001. On September 17, 2001, Marriott International, Inc. and Marriott International Credit Corporation (collectively, "Marriott") filed their Response in Opposition to the Emergency Motion. CP 126. After conducting a hearing on the Emergency Motion on September 25, 2001, the Court entered an order granting in part and denying in part the Emergency Motion. CP 151. The Court rescheduled the continued evidentiary hearing on the Venue Motions until October 25, 2001. CP 152.

On September 24, 2001, BPPR filed its Supplemental Memorandum in Support of the Venue Motions. CP 137. On the same day, A.C. Coin and Slot Service Company, an unsecured creditor of the Debtor, filed its Objection to the Venue Motions. CP 139.

On September 27, 2001, Ritz-Carlton filed Supplemental Authority in Support of the Ritz-Carlton Venue Motion. CP 155. On October 23, 2001, Ritz-Carlton filed its Second Supplemental Authority in Support of the Ritz-Carlton Venue Motion. CP 191.

The Official Committee of Unsecured Creditors, composed of Advanced Roofing, Inc. and J.G.P. Engineering Group, P.A., both having offices in Florida, and Ulises Lodres Loubriel, of Puerto Rico, has expressed its indifference to the Venue Motions.

### FINDINGS OF FACT

*The Debtor and Its Assets*

The Debtor is a limited partnership organized and existing since October 14, 1994 under the laws of the State of Florida, with an office and place of business in Weston, Florida. Movants' Ex. 3. The general partner of the Debtor is Green Isle GP, Ltd., S.E. ("Green Isle GP"), a Florida limited partnership, which is also located in Weston, Florida. Movants' Ex. 3. The general partner of Green Isle GP is Aces Green Isle GP, Inc., a Delaware corporation, which is owned, indirectly, by Harvey Sandler, a resident of Boca Raton, Florida. Movants Ex. 8; Hearing Transcript, Lawrence N. Rosen, 360:3-14, 369:13-19.

The Debtor is the owner of a leasehold property, improvements and other assets near San Juan, Puerto Rico, constituting The Ritz-Carlton San Juan Hotel, Spa and Casino (the "Project"). Movant Ex. 35. The Project includes a hotel, casino and other facilities. Debtor Ex. 12; Movant Ex. 52.

*Financing of the Project*

The Project was developed and constructed using, among other funds, the proceeds of a mortgage bond issuance to Green Isle by the Puerto Rico Industrial, Tourist,

Educational, Medical and Environmental Control Facilities Financing Authority (the "AFICA Loan"). Hearing Transcript, Jaime Santos, 203:3-12. The Trustee for the bonds issued in connection with the AFICA Loan is BPPR. Hearing Transcript, Jaime Santos, 205:22-24. The AFICA Loan, in the aggregate amount of $85,135,000, is subject to the guaranty of the TDF. Hearing Transcript, Jaime Santos, 203:3-12. AFICA and BPPR are sophisticated lenders which have financed the construction of a number of hotels in Puerto Rico through public bond debt. Hearing Transcript, Jaime Santos, 199:16-17, 202:21-25, 227:2-19. The identity and residence of the bondholders are unknown[1]. Hearing Transcript, Jaime Santos, 225:6-8.

The Guaranty and Reimbursement Agreement providing for the TDF guaranty provides that the Debtor is obligated to reimburse TDF for advances under TDF's guaranty. Movant Ex. 16. The AFICA Loan, as well as the reimbursement obligations, are secured by a leasehold mortgage and lien on the Project. Movant Ex. 16, 20 and 52; Hearing Transcript, Jaime Santos, 203:8-17.

As a result of continuing losses at the Project, the Debtor has not submitted the last three payments due in respect of the AFICA Loan in September, 2000, March 2001 and September 2001, in the aggregate amount of $9.1 million, and TDF was called upon to make the payments due to BPPR, as trustee of the bonds, in order to keep the bonds current. Hearing Transcript, Javier Ramos, 254:5-18. The Debtor does not dispute that it owes TDF the amounts TDF funded to keep the bonds current. Hearing Transcript, Lawrence N. Rosen,

---

[1]    Regardless of the location of the bondholders, pursuant to the Trust Agreement executed in connection with the AFICA Loan, bondholders have relinquished their individual rights to enforce their claims for payment under the bonds against the Debtor; only the Indenture Trustee is authorized to appear in this case on behalf of the bondholders collectively.  Movants Ex. 18, Section 809, Hearing Transcript, Jaime Santos, 224:24-25, 225:1-25, 226:1-8.

382:1-12. Remarkably, although TDF notified the Debtor of the commitment to repay TDF each time TDF remitted the bond payment, TDF did not commence litigation to collect the amounts due it from the Debtor. Hearing Transcript, Javier Ramos, 263:10-15, 264:5-6. Moreover, until the advent of the Debtor's bankruptcy, TDF has not sought to obtain financial information from the Debtor since September, 2000. Hearing Transcript, Javier Ramos, 264:24-25, 265:1-18, 266:16-25, 267:1-15.

In addition to the AFICA Loan, a significant portion of the funding for both the initial construction of the Project, as well as funding necessary to cover operating losses, reserves and the like, was provided by Mr. Sandler in the aggregate amount of $31,039,490. Hearing Transcript 381:4-9; Debtor's Ex. 27.

### Operation of the Hotel and Casino

The hotel is managed by The Ritz-Carlton Hotel Company, L.L.C. ("RCHC-LLC"), a Delaware limited liability company, with its principal place of business in Atlanta, Georgia, pursuant to a written management agreement (the "Operating Agreement") executed on December 15, 1995. Movant Ex. 11; Debtor Ex. 10. RCHC-LLC has delegated or assigned its operating duties under the Operating Agreement to an affiliate which was specifically organized for such purpose, The Ritz-Carlton Hotel Company of Puerto Rico, Inc. ("RCHC-PW"), a Delaware corporation. RCHC-LLC and RCHC-PR are therefore, jointly and severally obligated under the Operating Agreement. Movants Ex. 38.

### The Debtor's Chapter 11 Case

It was the confluence of the losses; the resulting failures to remit payments owed to the Debtor's creditors; and the expense of prosecuting and defending the litigations with

- 6 -

Ritz-Carlton and the Florida Litigation, which resulted in the Debtor's bankruptcy filing. Hearing Transcript, Lawrence N. Rosen, 389:9-25, 390:1-5.

The Venue Motions do not challenge the Debtor's right to have filed for bankruptcy relief in this Court. Indeed, the Debtor's choice of this forum was entirely permissible given the Debtor's organization under the laws of the State of Florida and its offices in this District. 28 U.S.C. § 1408. The Debtor's decision to file its Chapter 11 bankruptcy case in the Southern District of Florida was predicated on the location within this district of the Debtor, the principals of the Debtor, the Debtor's primary outside counsel, and the Debtor's proposed bankruptcy counsel. Hearing Transcript, Lawrence N. Rosen, 390:17-25, 391:1-6. Since the last quarter of 1998, the Debtor's primary outside counsel, Lawrence N. Rosen, has acted as the equivalent of the chief operating officer of the Debtor without having the formal title bestowed upon him.  Hearing Transcript, Lawrence N. Rosen, 413:7-10.

Since the commencement of the Debtor's bankruptcy case, Mr. Rosen has been the individual principally involved on behalf of the Debtor in activities intended to effect the reorganization of the Debtor. Hearing Transcript, Lawrence N. Rosen, 391:7-18. Mr. Rosen's activities include investigating and analyzing various reorganization scenarios, including a sale of the Project, a structured finance transaction involving Ritz-Carlton, the rejection of the Ritz-Carlton Operating Agreement and the employment of a new manager/operator, with the Debtor obtaining subordinate financing from a third party lender. Hearing Transcript, Lawrence N. Rosen, 391:19-24, 394:21-25, 395:1-10, 396:5-22. Mr. Rosen has been involved in interviewing and selecting a national and international sales organization that specializes in the hospitality industry for the purpose of structuring a sale of the Project, as well as meeting with various candidates to assume the operation of the

hotel if the Operating Agreement between the Debtor and Ritz-Carlton is rejected.  Hearing Transcript, Lawrence N. Rosen, 392: 4-25, 393:1-11, 396:23-25, 397:1-13.  Mr. Rosen has also been involved in discussions with third parties who might participate in a structured financial transaction with Ritz-Carlton.  Hearing Transcript, Lawrence N. Rosen, 395:11-25, 396:1-4.  None of these activities have taken place in Puerto Rico.  Hearing Transcript, Lawrence N. Rosen, 398:20-24.

Ritz-Carlton personnel in Puerto Rico have not participated in the formulation of any reorganization plan for the Debtor.  Hearing Transcript, Mark Stevenson, 149:6-24.  The Debtor has determined that, based on prepetition negotiations involving the Project, any discussions it will have regarding reorganization scenarios that involve Ritz-Carlton will be with employees of the Marriott Corporation (the parent of Ritz-Carlton), which is located in Bethesda, Maryland, and which the Debtor believes is the entity that controls any decision that would be made about Ritz-Carlton participating in a reorganization of the Debtor.  Hearing Transcript, Lawrence N. Rosen, 400:2-25, 401:1.

### The Debtor's Unsecured Creditors

The Office of the United States Trustee has appointed a three-person creditors' committee in this case.  Only one member is resident in Puerto Rico.  The others reside in this District.  Movants Ex. 61.  The creditors committee announced during the hearing that it was not taking any position with respect to the Venue Motions.  Hearing Transcript, 96:15-19.

Ritz-Carlton notes the fact that nine of the creditors originally listed by the Debtor as its top twenty creditors are situated in Puerto Rico.  Movant Ex. 1.  Among the nine unsecured creditors are GE Capital and KPMG Peat Marwick, LLP, each of which maintains

a significant presence in this District. More significantly, of the remaining eleven creditors, seven reside in Florida, and the balance reside in New York or New Jersey. Since the Venue Motions were filed, the Debtor has filed an amended top twenty creditor list, and now only eight of the top twenty creditors are from Puerto Rico, six are from Florida and the remaining six are from New York, New Jersey, Nevada, Illinois or Pennsylvania. Debtor Ex. 24.

Soneet Kapila, the Debtor's bankruptcy accountant, testified that his firm analyzed the location of all of the Debtor's general unsecured creditors listed on Schedule F of the Debtor's Schedule of Assets and Liabilities. That analysis indicates that 459 creditors are located in Puerto Rico and 567 creditors are located on the mainland. Hearing Transcript, Soneet Kapila, 313:2-9.

## Conclusions of Law

### *The Applicable Standard*

The venue of bankruptcy cases is governed by 28 U.S.C. § 1408.[2] Indisputably, the Debtor had the choice of filing this Chapter 11 in either the Southern District of Florida or the District of Puerto Rico. 28 U.S.C. § 1408(1). According to the testimony of Mr. Rosen, the Debtor's *de facto* chief operating officer, the Debtor chose to file its Chapter 11 case in this District after thoughtful consideration of numerous factors, including the proximity of the Debtor's principal, officers, and reorganization professionals in this District; the concern

---

[2]    Except as otherwise provided in section 1410 of this title, a case under Title 11  may be commenced in the district court for the district –
(1) in which the domicile, residence, principal place of business in the United    States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement . . . or
(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner or partnership.
*See 28 U.S.C. § 1408 (1999).*

that a filing in Puerto Rico would engender local media attention that would unduly trouble the hotel staff and guests; the problems the Debtor anticipated with language and cultural differences in Puerto Rico; the proximity of the majority of the Debtor's unsecured creditors to this District; the likelihood that prospective buyers would be located in the United States and are more familiar and comfortable with sale proceedings in this Court and would be uncertain as to how bridge and exit financings are dealt with in Puerto Rico. Moreover, Mr. Rosen expressed the concern that the pendency of this case in Puerto Rico would have negative "political complications" for the Debtor given the involvement of GDB and TDF. In sum, the Debtor, through its General Partner, exercised its sound business judgment in determining to file this Chapter 11 case in this District, fully taking into account the best interests of its business and assets, as well as the best interests of its creditors. The Debtor's business judgment was presumptively proper. *Southeast Banking Corp. v. Bassett,* 827 F. Supp. 742, 747 (S. D. Fla. 1993), citing *International, Ins. Co. v. Johns,* 874 F.2d 1447, 1461 (11th Cir. 1989); *Cottle v. Storer Communications,* 849 F.2d 570, 574 (11th Cir. 1988).

The Venue Motions concede, as they must, that the Debtor had the prerogative to file its Chapter 11 in this District. Furthermore, the Venue Motions fail to allude to any notion that the Debtor, through its General Partner, committed an abuse of discretion, fraud, bad faith or illegality in connection with its choice of venue in this District. *See Federal Deposit Insurance Corp. v. Stahl,* 89 F.3d 1510, 1516 (11th Cir. 1996).

The Debtor's choice of venue in this District was proper. A debtor is presumptively entitled to file and retain its bankruptcy case in the district in which it has resided for the statutory period. *In re Dececco,* 224 B.R. 202 (Bankr. M.D. Fla. 1998); *see also In re Walter,* 47 B.R. 240 (Bankr. M.D. Fla. 1985) (bankruptcy court must give great weight to

- 10 -

the presumption that the debtor is entitled to retain case in venue in which he has resided for the statutory period); *28 U.S.C. § 1408.*

### *This Is the Proper Venue for the Debtor's Chapter 11*

There being no dispute that the Debtor's initial choice of the Southern District of Florida as the venue for this case was proper, by the Venue Motions, nonetheless, it is argued that transfer of the venue of this case to the District of Puerto Rico is appropriate. A bankruptcy court may transfer a Chapter 11 case only for the convenience of the parties or in the interest of justice. *See 28 U.S.C. § 1412; Fed. R. Bankr. P. 1014(a)(1).* It is the movant's burden of proving by a preponderance of the evidence that the transfer is in the best interests of justice or for the convenience of the parties. *Id; see also In re Blumeyer*, 224 B.R. 218, 221 (Bankr. M.D. Fla. 1998). A bankruptcy court should exercise its power to transfer venue cautiously. *See In re Campbell*, 242 B.R. 740, 746 (Bankr. M.D. Fla. 1999).

### *The Convenience of the Parties*

There does not appear to be any disagreement that the following factors are to be considered when determining whether to transfer a case pursuant to 28 U.S.C. § 1412 based upon the convenience of the parties:

(1)    the proximity of the creditors of every kind to the court;
(2)    the proximity of the debtor to the court;
(3)    the proximity of the witnesses necessary to the administration of the case;
(4)    the location of the assets;
(5)    the economic administration of the estate; and
(6)    the necessity for ancillary administration if bankruptcy should result.
*Blumeyer*, 224 B.R. at 220.

At best, the Movants have demonstrated that the above factors mitigate equally in favor of or against a transfer of venue. These factors fall far short of supporting the Motion

to Transfer Venue in accordance with the applicable standard of the preponderance of the evidence.

### The Proximity of Creditors of Every Kind

The Movants seek to engage in a head count of the Debtor's creditors in Puerto Rico and in Florida. An unfortunate and unwanted result of this approach is that the number of creditors become the *sine qua non* of venue without regard for any substantive analysis of the creditors' respective levels of interest and activity in a debtor's Chapter 11 case. A further unwanted outcome of relying principally on the numbers of creditors in certain locations is that creditors actively engaged in the Chapter 11 case could be disabled from participating in the case if venue is not maintained in the original forum.

Assuredly, Ritz-Carlton's interest in transferring this case to Puerto Rico is not dispositive. There is no doubt that strategic decisions being made on behalf of Ritz-Carlton concerning pending litigation and this bankruptcy are not being made by the hotel manager in San Juan, Puerto Rico, who is at this time the highest ranking Ritz-Carlton employee in Puerto Rico. Nor is the hotel manager involved in formulating a reorganization plan. Ritz-Carlton's strategies in this bankruptcy are commanded from headquarter locations, not San Juan, and implemented by its Washington, D.C. litigation counsel, similar to the manner in which Ritz-Carlton's corporate officers in Georgia and Marriott's officers in Maryland were principally responsible for the negotiation and establishment of Ritz-Carlton's relationships with the Debtor, and the litigation which ensued upon the breakdown of those relationships, Ritz-Carlton has not offered sufficient evidence that Puerto Rico is the center of gravity for its own contacts with the hotel. To the contrary, extensive activities occur on the U.S. mainland relating to the hotel, such as corporate supervision, policies and reporting; sales

activities; the central reservations system; and preferred vendors identified through the Marriott Distribution Service Program.

In a similar manner, the fact that GDB is located in Puerto Rico and would prefer to have this case proceed on GDB's own 'home turf' is not determinative of the issue of venue in this case. Neither before nor since the bankruptcy filing has GDB taken any action against the Debtor to recover its guaranty indebtedness, despite the fact that such indebtedness arose more than one year ago. GDB has appeared at virtually every hearing through its counsel, the manner in which creditors typically appear in bankruptcy cases. GDB and the Debtor have negotiated a series of interim cash collateral agreements since the commencement of this case. Recently, the Debtor and GDB have successfully reached an agreement in principal on a permanent cash collateral order by which GDB even conceded, without any involvement of this Court, that the extent of its perfected liens is considerably less than the amount initially asserted at the beginning of this case. Except for the Venue Motions, these significant bankruptcy exercises by GDB did not entail the appearance or testimony of any GDB officials or witnesses. The mere fact that GDB may prove to be among the Debtor's largest creditors is not dispositive since the number of creditors and the size of their claims are of equal significance. *In re Commonwealth Oil Refining Co., Inc.*, 59 F.2d 1239 (5th Cir. 1979).[3] Finally, the Debtor has admitted its indebtedness both under the AFICA Loans and to GDB, and both the Debtor and GDB argue that there are not foreseeable disputes among them that necessitate reference to Puerto Rican law.

---

[3]    The Eleventh Circuit is bound by pre-1981 Fifth Circuit precedent. *See Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

Even if mere numerosity of creditors was dispositive, the analysis of the composition of the Debtor's unsecured creditors, as well as the Court's own review of the Debtor's list of the top twenty unsecured creditors, demonstrates that the majority of the Debtor's unsecured creditors are located on the U.S. mainland. Although there are a number of creditors located in Puerto Rico, these creditors constitute the minority of both the Debtor's top twenty creditors and of the Debtor's general unsecured creditors. Consequently, the Venue Motions fail to demonstrate that the convenience of the Debtor's creditors will be best served by a transfer of venue to Puerto Rico. *In re Matter of Moore*, 17 B.R. 551 (Bankr. M.D. Fla. 1982).

### *The Proximity of the Debtor*

Not only is the Debtor organized under the laws of Florida and resident in this District, the Debtor has additional contacts with this District. Primarily, the ultimate person in control of the Debtor, Harvey Sandler, resides in this District. Mr. Sandler is also the Debtor's principal source of funding shortfalls, and a likely source for future funding of the Debtor. The Debtor's president resides in this District and the Debtor's general partner, Aces PR, Inc., is a Florida corporation and has its offices in this District. The Debtor's general and bankruptcy accountants are in this District. The Debtor's general counsel is in this District. The Debtor's bankruptcy and litigation counsel are in this District. The Debtor makes all business decisions concerning the Project in this District, including the approval of all capital expenditures, the approval of the annual budget (prepared by Ritz-Carlton in Atlanta) and the approval of all leases of commercial space at the Project. The Debtor's principal reorganization activities occur in or are orchestrated from this District.

- 14 -

*Proximity of Witnesses*

Ritz-Carlton has asserted that numerous entities, including governmental officials and hotel employees, may at some point be called upon to testify in this proceeding. Practical experience in Chapter 11 cases suggests otherwise. The primary authority cited by Ritz-Carlton is *In re A.R. E. Mfg. Co., Inc.*, 124 B.R. 912 (Bankr. M.D. Fla. 1991), which concerns the transfer of venue of an adversary proceeding, not a Chapter 11 case. The need for testimony in an adversary proceeding is evident, thus the facts presented in *A.R.E. Mfg* differ from those presently at bar. In *A.R.E. Mfg.*, the court determined that in the interest of fairness, it would not require a foreign defendant without a presence in Florida to defend an adversary proceeding here concerning a contract that had been negotiated and executed in the defendant's home state. Furthermore, in *A.R.E. Mfg. Co.*, all of the witnesses, documents and prior litigation were located or had occurred in California, the defendant's home state. These factors and considerations were instrumental in the decision of the Delaware District Court's decision to transfer venue in the Federal Litigation in this proceeding.

However, different considerations are paramount in a Chapter 11 case. It is a debtor's officers, accountants and other professionals who are routinely required to appear before the bankruptcy court in matters concerning the administration of the estate. The Court has no reason to expect otherwise of this case. Indeed, that has been the case so far in connection with vital bankruptcy exercises such as the authorization for the use of cash collateral, the extension of time to assume or reject certain executory contracts and unexpired leases, the retention of necessary professionals and the commencement of an adversary proceeding by the Debtor against Ritz-Carlton for claims of substantial preferential transfers.

- 15 -

Moreover, as indicated above, the Debtor does not dispute the amount of the debt due to GDB and TDF, nor could GDB identify any potential dispute that will engender litigation.

### *The Location of Assets*

It is without argument that the Debtor's principal asset, the Project, is situated in Puerto Rico. However, the overriding concern in this Chapter 11 case is the Debtor's financial reorganization and the location in which that will occur. *See Commonwealth*, 596 F.2d at 1247-48.

Assuredly, substantially all of the Debtor's efforts at reorganization will take place in this District, or on the U.S. mainland. Indeed, as a consequence of the Debtor's litigious relationship with Ritz-Carlton, it does not appear that the Debtor will be seeking or receiving any reorganization assistance from Ritz-Carlton. However, even if the Debtor was to receive reorganization assistance from Ritz-Carlton and Marriott, such assistance could be provided from corporate headquarters in Atlanta and Bethesda. The Debtor seemingly has no expectation of or interest in negotiating a plan of reorganization with the hotel manager.

With regards to the location of the Debtor's books and records, these are maintained by the Debtor in this District. Ritz-Carlton provides the Debtor with the monthly "Blue Book," a compilation of operating statements which the Debtor then integrates into its own financial records. The integration was and always has been performed by the Debtor's local accountants in Florida.

The day-to-day records of the Project are generated onsite in San Juan; however, the Ritz-Carlton staff in San Juan transmits all financial records or information electronically to Ritz-Carlton in Atlanta. Indeed, the Operating Agreement expressly authorizes Ritz-Carlton

- 16 -

to maintain its Project records in Atlanta, as well as in San Juan. Movant Ex. 11, §4.3. Moreover, daily hotel records are of little significance to the Debtor's reorganization efforts. While those records are necessary for collecting charges from guests, paying bills and maintaining the Project, the bigger picture is depicted in balance sheets and operating statements which the Debtor's professionals have retrieved and which are electronically available by and from Ritz-Carlton.[4]

Furthermore, one means of the Debtor to effect reorganization is by the sale of the Project. To this end, the Debtor is currently discussing that alternative with prospective buyers. Without exception, the prospects the Debtor deems most serious and therefore, worth pursuing, are located in the continental United States. To date, the Debtor and its professionals have conducted all sale discussions and negotiations from this District.

Consequently, while the location of the Debtor's physical assets is principally in Puerto Rico, the existence of equally significant intangible assets with ties to the U.S. mainland, renders this factor non-determinative of the issue of venue.

### The Economic Administration of the Estate

The Debtor and the Movants alike rely upon *In re Commonwealth,* 59 F.2d 1239, cited above, in support of their respective positions on the Venue Motions. In *Commonwealth*, the Debtor was incorporated and operated a petroleum refinery and petrochemical facilities in Puerto Rico. *Commonwealth,* 59 F.2d at 1241-42. Its physical plant and production facilities were located in Puerto Rico. *Id.* It sold most of its products to customers located in Puerto Rico. *Id.* at 1243. Its executive officers were located in San

---

[4] It is anticipated that the methods of transaction would apply were the Debtor to enter into an operating agreement with a new entity.

- 17 -

Antonio. *Id.* at 1241-42. All management decisions were made by the San Antonio office. *Id.* Thus, while that debtor's assets and business operations were centered in Puerto Rico, the management was centered in San Antonio. Furthermore, although the largest group of creditors resided in Puerto Rico, the debtor and its majority shareholders lived in San Antonio. *Id.* While the debtor's books and records were in Puerto Rico, they were accessible electronically. *Id.* The *Commonwealth* court reasoned that the debtor's troubles were financial in nature and best left to the debtor's management in San Antonio to resolve. Accordingly, the court concluded that economic efficiency of administration of the estate was best served by leaving the bankruptcy case in San Antonio. *Id.* at 1247.

Presently, there are only three reorganization alternatives being pursued by the Debtor. The Debtor might terminate connection with Ritz-Carlton and internally reorganize around a new license, might sell the Project, or the Debtor might restructure the Ritz-Carlton arrangement with a new partner. In any of these scenarios, the Debtor, not Ritz-Carlton, will be the instrument of reorganization and its efforts will be centered in this District, not Puerto Rico.

Ritz-Carlton's view that "[v]irtually everything of any import to the estate is located in Puerto Rico," is short-sighted. It attaches too much importance to the location of the Project and its own on-site management , which the Debtor has sought to reject. Moreover, the Movant's emphasis on location ignores the importance of the numerous executives and professionals in this District who are solely responsible for engineering the Debtor's reorganization.

The transfer of this case to Puerto Rico will assuredly entail additional expense and inefficiencies. Upon transfer, the Debtor will be compelled to engage yet another law firm;

and incur the cost of travel of its executives and professionals to Puerto Rico. These activities will serve as distractions for the Debtor, its officers, partners and professionals from the Debtor's efforts at reorganizing its affairs during the juncture of the case when the Debtor's primary focus ought be on finalizing its reorganization strategy, not to mention result in significant additional administrative expense.

<div align="center"><em>Necessity for Ancillary Administration</em></div>

The Court concurs that this factor is not accorded great weight in Chapter 11 cases.

<div align="center"><em>The Interest of Justice</em></div>

The Movants have underestimated the magnitude of the inconvenience, delay, and inefficiency of transferring this Chapter 11 case to a foreign jurisdiction. Ritz-Carlton has not provided evidence that it would be adversely affected by the pendency of the Chapter 11 case in this District. In a similar manner, neither GDB nor TDF has identified ways in which its interests would be harmed by the pendency of the Debtor's case in this District. Indeed, Mr. Ramos, the representative of TDF, testified that the enforcement activities of TDF prior to the commencement of this case consisted of notification letters to the Debtor that TDF had paid the current payments on the bonds. TDF undertook no additional monitoring or supervision of the Debtor's operations; TDF has not even so much as visited the Project or sought financial information concerning current operations. On the other hand, TDF, an entity that is regularly engaged, and indeed chartered to engage, in sophisticated lending transactions, has continuously appeared in these proceedings from the beginning, it has retained competent bankruptcy counsel in this District, and it has effectively protected its interests.

Most significantly, the Committee has not taken a position on the Venue Motions. As a fiduciary for all unsecured creditors, the Committee's indifference on the issue of venue is noteworthy. Accordingly, the Court is unable to conclude that the interests of justice mandate the transfer of this case to the District of Puerto Rico.

## Conclusion

The Movants have failed to demonstrate by a preponderance of the evidence that the transfer of this Chapter 11 case to Puerto Rico will promote the economic and efficient administration of this estate or the Debtor's reorganization efforts. Transfer of the Debtor's Chapter 11 case is neither required nor advisable. The Court notes that the Debtor has filed its Motion To Reject the Operating Agreement with Ritz-Carlton as an executory contract pursuant to 11 U.S.C. §365(a). The Debtor has further indicated its intentions to enter into an operating agreement with another entity, Wyndham Hotels. In consideration of these pending issues and in view of the foregoing, it is hereby,

ORDERED and ADJUDGED that the Venue Motions are DENIED. This denial is without prejudice to the Motions being renewed subsequent to the conclusion of the hearing on the Debtor's Motion To Reject the Operating Agreement with Ritz-Carlton.

DONE and ORDERED in the Southern District of Florida on

JAN - 4 2002

RAYMOND B. RAY

RAYMOND B. RAY, JUDGE
UNITED STATES BANKRUPTCY COURT

Copies furnished to:

- 20 -

Scott L. Baena, Esq.
Bilzin Sumberg Dunn Baena Price & Axelrod LLP
Attorneys for Debtor
2500 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131

Laurel Isicoff, Esq.
Kozyak Tropin & Throckmorton
200 S Biscayne Blvd #2800
Miami, FL 33131

*Attorney Baena* is hereby directed to give a conformed copy of this order on all interested parties immediately upon receipt.