**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| In re : | Chapter 11 |
| FONTAINEBLEAU LAS VEGAS HOLDINGS, LLC, et al., | Case No. 09-21481-AJC |
| Debtors. | (Jointly Administered) |
| _____/ | |

**MOTION OF TERM LENDER STEERING GROUP**
**FOR AN ORDER CONVERTING**
**THE DEBTORS' CHAPTER 11 BANKRUPTCY CASES TO CHAPTER 7**

Pursuant to 11 U.S.C. § 1112, the Term Lender Steering Group, whose members consist

of the funds listed on **Exhibit A** attached hereto, hereby moves this Court for an order to convert

these bankruptcy cases to chapter 7 of the Bankruptcy Code.  In support of this motion (the

"**Motion**"), the Term Lender Steering Group states as follows:

**PRELIMINARY STATEMENT**

More than three months have passed since the commencement of these bankruptcy cases.

Although more than $16 million of the Term Lenders' cash collateral has already been depleted,

no meaningful progress has been achieved by the Debtors and there is no reasonable likelihood

of their rehabilitation.  The Debtors pinned their hopes for reorganization on the success of

litigation against the Revolving Lenders; those hopes were dealt a major setback when the

District Court, after withdrawing the reference, denied the Debtors' partial motion for summary

judgment.   With completion of the Project by the Debtors not possible, a sale of the Project to a

third party and liquidation of the remaining assets is the only viable course to realize any

meaningful value for creditors.

758175.7

Based on the above, cause exists under section 1112(b)(4)(A) of the Bankruptcy Code to convert the case to chapter 7. Under different circumstances, the Term Lender Steering Group might consider foregoing such relief to allow the debtor-in-possession an opportunity to market and conduct a sale under section 363 while the case remained in chapter 11. But in these bankruptcy cases, the pervasive conflicts of interest that exist among the Debtors on the one hand, and their principals, officers, managers, affiliates and related parties on the other hand, compel the prompt appointment of an independent fiduciary to manage the sale and liquidation process. These conflicts result largely from the following: 1) the two individuals primarily in charge of the Debtors' management, Jeffrey Soffer (who has been referred to by counsel for the Debtors in these cases as the "ultimate controlling authority of the debtors") and Howard Karawan (who serves as the Debtors' chief restructuring officer), serve in a variety of other capacities for the Debtors' affiliates, including as managers or officers of the Debtors' non-debtor parent, Fontainebleau Resorts, LLC ("**Parent**"); and 2) Mr. Soffer, the Parent, and other entities related to the Debtors or Mr. Soffer are liable to third parties, including the Term Lenders, under various guaranty or indemnity agreements.

Unless this Court converts the case and appoints a trustee, the conflicts faced by the Debtors will poison any sale process, as illustrated by the following:

- Bidding by Insiders or Entities Connected to Insiders. Mr. Soffer has recently engaged in discussions with certain Term Lenders to promote a transaction in lieu of a sale under section 363. Given that the Debtors' shareholders lack any economic stake in the Debtors, efforts by Mr. Soffer to formulate a transaction under which he will receive some consideration or benefit will, unless he is forced to negotiate at arms-length with an independent trustee, divert value that belongs to the estate from creditors. *E.g., In re Hampton Hotel Investors, L.P.,* 270 B.R.

2

346, 360 (Bankr. S.D.N.Y. 2001) (fact that debtor's principal negotiated transaction with third party under which he would receive benefit supported conversion of the case to chapter 7).

- <u>Title Insurance Indemnities</u>.  In connection with the financing provided under the Credit Agreement, the Term Lenders and Revolving Lenders obtained title insurance to protect against claims of priority by holders of statutory liens.  As a condition to issuing that policy, the title insurers obtained indemnities from the Debtors and various affiliates and entities controlled by the Soffer (the "**Indemnitors**").  The non-debtor Indemnitors are all related to the Soffer family and include the Parent, Turnberry Residential Limited Partner, LP ("**Turnberry**"), and Turnberry West Construction, Inc. ("**TWC**"), the Debtors' general contractor.  Because any "loss" to the Lenders under the title insurance policy is arguably measured, at least in part, by the value of the real property, *a higher sale price generated for the sale of the Project may lead to a larger indemnity claim by the title insurers against the Indemnitors*.  With the Debtors' principals out of the money, a conflict of interest exists between the Debtors' fiduciary obligation to maximize the sale price, and the desire of Mr. Soffer and Mr. Karawan to minimize the liability of the Indemnitors under their indemnity agreement.

- <u>Allocation of Sale Proceeds To Benefit Insiders</u>.  Any sale of the Project may include not only the assets of the Debtors but also the assets of the so-called "Retail entities."  Because Mr. Soffer appears to have personally guaranteed loans made to the Retail entities, but not any of the loans to the Debtors, it is in his self-interest to allocate greater value to the Retail entities.   Likewise, any sale of

3

assets will likely include both personal property in which the lenders under the

Credit Agreement have an indisputable first lien, and real property which is

subject to competing priority claims by holders of statutory liens – including

TWC. Again, Mr. Soffer and entities related to the Soffer family stand to benefit

from an allocation of sale proceeds that favors real property over personal

property.

The Debtors' management team has already, during these cases, proven itself to be

influenced by conflicting interests, to the detriment of the Debtors and their creditors, as

evidenced by the following examples:

Completion Guaranty Proceeds Account.  In order to induce the lenders under the Credit

Agreement to provide financing, Turnberry provided a "Completion Guaranty," under which it

agreed to provide up to $100 million in cash support to pay for "Applicable Project Costs" to

help complete the Project if the available financing proved to be insufficient.  Of that amount,

$50 million was secured by a letter of credit issued by Deutsche Bank.  Mr. Soffer

unconditionally guaranteed Turnberry's obligation to reimburse Deutsche for that $50 million if

the letter of credit was drawn.  Deutsche Bank also received $30 million in cash collateral from a

subsidiary of the Parent.

The letter of credit was drawn before the Petition Date, and the proceeds were deposited

into a Turnberry bank account, the "Completion Guaranty Proceeds Account" ("**CGPA**"), which

is pledged to Bank of America, N.A., as the disbursement agent (the "**Disbursement Agent**"),

for the benefit of the lenders under the Credit Agreement.  Deutsche Bank has applied the $30

million in cash collateral and sued Mr. Soffer and Turnberry for the remaining $20 million.  *See*

First Amended Complaint at ¶¶ 4 and 5, *Deutsche Bank Trust Co. Americas v. Soffer*, Index No.

601109-09 (N.Y. Sup. Ct. June 3, 2009), attached as **Exhibit B**.  The Term Lender Steering

4

Group has proposed to the Debtors and their affiliates that some of the proceeds in the CGPA available to pay "Applicable Project Costs" be used as intended to fund the continuing administration of the bankruptcy cases, including the cost of a sale process. Mr. Soffer's personal liability to Deutsche Bank and the Debtors' insistence that this issue be addressed by the Term Lenders has, unfortunately, proven to be a significant impediment to efforts to utilize those proceeds, leading to the current impasse over cash collateral.[1]

Refusal to Agree to Appointment of Wilmington Trust as Successor Administrative Agent and Successor Disbursement Agent.   At the first day hearing, counsel for the debtors explained to this Court that a process was already under way to replace Bank of America, N.A., the original administrative agent and disbursement agent, with Wilmington Trust:

> [Bank of America] recently issued a notice of its resignation as administrative agent and a process is under way to replace them with Wilmington Trust and *Mr. Bennett and I will likely be back here shortly with motions and proposed orders to effectuate that.*

D.E. 79 (6/11/09 Tr.), at 18:25-19:5 (emphasis added). That process turned out to be more involved than anybody anticipated, and the negotiations with Bank of America and exchange of documentation to effectuate the transition took several weeks. Eventually, agreement on the substance of the documents was reached with  all parties, including the Debtors. But at that

---

[1] Another potential conflict exists with respect to Deutsche Bank's claim against Mr. Soffer on the one hand, and the Debtors' separate claims of misconduct against Deutsche Bank that were asserted in the adversary proceeding against the Revolving Lenders, on the other.  The Debtors recently dismissed, without prejudice, their separate claims leveled against Deutsche Bank. *See* Order Granting Stipulation of Dismissal of Claims Five and Six of Plaintiff's Amended Complaint, *Fontainebleau Las Vegas, LLC. v. Bank of America, N.A., et al.*, Adv. Proc. No. 09-21879, Docket No. 70 (S.D. Fla. Sep. 23, 2009). It is unclear to what extent that dismissal may have been influenced by Deutsche Bank's claims against Mr. Soffer, and whether that dismissal was an effort to curry favor with Deutsche Bank for Mr. Soffer's benefit.

point, the Debtors took the position that its agreement involving Wilmington Trust was conditioned upon reaching "global agreement" on a cash collateral order. *See* **Exhibit C**.[2]

The refusal of the Debtors to move forward with the process to appoint Wilmington as a replacement for Bank of America to serve as administrative agent and disbursement agent provides another potential benefit to the Parent and Turnberry. In a lawsuit brought in New York by the Term Lenders against the Parent to recover on the guaranty, the Parent has taken the position that the Term Lenders lack standing to bring the lawsuit because only an administrative agent can do so, and it moved to dismiss the lawsuit on that basis. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint, *Avenue CLO Fund, Ltd., et al. v. Fontainebleau Resorts, LLC*, Index No. 650435/2009, Docket No. 31 (N.Y. Sup. Ct. Sep. 11, 2009), attached as **Exhibit D**. While the Parent's position is incorrect as a matter of law, the appointment of Wilmington would eliminate the issue altogether and thus facilitate the prompt exercise of remedies against the Parent. In similar fashion, unless and until a substitute disbursement agent is appointed, Turnberry may try to argue that the Term Lenders can neither enforce its Completion Guaranty, nor even access the $50 million now sitting in the CGPA and pledged to the disbursement agent to fund administration of the bankruptcy cases.

Fontainebleau Miami Beach. The Parent owns both the Debtors and a 50% joint interest in the entity that owns the Fontainebleau Miami Beach hotel, making the Debtors and Fontainebleau Miami sister companies. Mr. Soffer is the chairman of the Parent's board of managers, and Mr. Karawan is the Parent's Chief Restructuring Officer and Chief Operating Officer. **Exhibit E**, ¶¶ 1, 3. In that capacity, both have the ability to allocate expenses between the Debtors and the Parent. During the evidentiary hearing on the venue motion held September

---

[2] As noted above, Mr. Soffer's personal liability to Deutsche Bank in connection with the Completion Guaranty has been a major roadblock to any such agreement.

22, 2009, it was disclosed that, not long before the bankruptcy filing, Mr. Soffer negotiated an

employment agreement with Mr. Karawan under which all of his salary is allocated to the

Debtors, even though Mr. Karawan continues to perform services for the Parent related to the

Fontainebleau Miami property.  There may be other expenses as well that have been

disproportionately allocated to the Debtors.  For example, it appears that both of the Debtors

proposed financial advisors, Moelis & Company and Citadel Derivatives Group, have performed

services for the Parent and Debtors related not only to the Project but also to the Fontainebleau

Miami Beach property – a fact disclosed nowhere in either of the applications filed by the

Debtors to employ those advisors.[3]  It is not clear how the allocation of the cost of the services

performed by those advisors, both before and since the Petition Date, has been allocated between

the Debtors and Fontainebleau Miami Beach.

    Turnberry West Construction, Inc.  TWC, the general contractor of the Project, is related

to the Soffer family; according to filings with the Nevada Secretary of State, Mr. Soffer is listed

as President, Secretary, Treasurer and a director of TWC.  As noted above, TWC has asserted a

statutory lien in the amount of $675,260,793.68 against the Debtors,[4] of which $63,898,461.19

relates to TWC's own fee.[5]  TWC has also asserted that its statutory lien has priority over the

---

[3] See Emergency Application By Debtors For Entry Of An Interim Order Authorizing The Employment And
Retention Of Moelis & Company LLC As Financial Advisors And Investment Bankers To The Debtors Nunc Pro
Tunc To The Petition Date And For Entry Of A Final Order, In re Fontainebleau Las Vegas Holdings, LLC., et al.,
Case No. 09-21481, Docket No. 37; Emergency Application By Debtors For Entry Of An Interim Order Authorizing
The Employment And Retention Of Citadel Derivatives Group LLC As Financial Advisors And Investment Bankers
To The Debtors Nunc Pro Tunc To The Petition Date And For Entry Of A Final Order, In re Fontainebleau Las
Vegas Holdings, LLC., et al., Case No. 09-21481, Docket No. 28.

[4] The amount of the recorded lien is 668,990,933.27, but TWC is seeking to record an amended lien in the larger
amount of $675,260,793.68.  See Complaint at ¶¶ 41, 45, Turnberry West Construction, Inc. v. Fontainebleau Las
Vegas Holdings, LLC et al., Adv. Proc. No. 09-01762 (Bankr. S.D. Fla. July 20, 2009).

[5] According to the complaint filed by TWC it is "entitled to a fee of $62,431,561,43 and a soft cost fee of
$1,466,899.76 for the construction of the Project."  See Complaint at ¶¶ 41, Turnberry West Construction, Inc. v.
Fontainebleau Las Vegas Holdings, LLC et al., Adv. Proc. No. 09-01762 (Bankr. S.D. Fla. July 20, 2009).

Debtors, and that a subordination agreement entered into by TWC should be invalidated under Nevada law. The Soffer family will benefit if TWC prevails in those claims against the Debtors and the Term Lenders.[6]

\* \* \*

In light of the continuing diminution of the estates, the absence of any reasonable prospect of rehabilitation, and the conflicts of interest described above, "cause" exists under section 1112(b)(4) of the Bankruptcy Code and mandates conversion of these cases to chapter 7. This Court offered that choice to the Term Lenders in late July, after the third hearing on cash collateral, stating that it would convert the bankruptcy cases if the Term Lenders did not consent to the use of cash collateral on the terms approved by this Court at that hearing. (7/27/09 Tr., at 108:9-13). At that time, the Term Lenders relented and agreed to authorize the continued use of cash collateral, subject to the grant of a priming lien on any new cash advanced. But based upon the events that have occurred (and not occurred) since the end of July, the Term Lenders have concluded that they are not prepared to consent to any further use of their cash collateral so long as the debtors remain in possession.

The Term Lenders may be prepared to consent to further use of cash collateral subject to certain terms and conditions, but only if a chapter 7 trustee is appointed with the independence to deal at arms' length with the Debtors' insiders and affiliates, and to run a sale process where the primary objective is maximizing value for the estate and its creditors rather than promoting and protecting the self-interest of Mr. Soffer and his family of companies. Conversion of the

---

[6] Likewise, there have been allegations leveled with respect to the Project and whether overpayments were made to various parties, highlighting the need for a forensic investigation to determine what happened to the $2 billion that was loaned to the Debtors. *See* Complaint, *CCCS Int'l v. Fontainebleau Las Vegas, LLC et al.*, Case No. 09-00853 (D. Nev. May 12, 2009).

bankruptcy cases will provide for immediate appointment of a trustee, and thus achieve that benefit. Accordingly, the Motion should be granted.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.    Debt Financing for the Project.

2.      The Project as conceived consists of a 3,889-room, 68-story hotel/condo-hotel/casino resort, situated near the north end of the Las Vegas Strip. The Project also includes 180,000 square feet of retail space to be constructed on the second floor (the "**Retail Space**").

3.      In June 2007, to finance the cost of development and construction of the Project, the Debtors entered into a series of debt financing agreements.

4.      <u>Credit Agreement</u>. Under the Credit Agreement dated June 6, 2007 (the "**Credit Agreement**") among Fontainebleau Las Vegas, LLC and Fontainebleau Las Vegas II, LLC as borrowers, certain lenders and Bank of America, N.A. (in all capacities, "**BofA**"), the Debtors had the right to borrow $700 million in Initial Term Loans, $350 million in Delayed Draw Loans, and $800 million in Revolving Loans. All of the obligations under the Credit Agreement are equally and ratably secured by a first priority security interest and mortgage against all of the Debtors assets, other than the Retail Space

5.      In addition, the obligations under the Credit Agreement are guaranteed by the Debtors' parent, Fontainebleau Resorts, LLC (the "**Parent**"), as well as Fontainebleau Resort Properties I, LLC. As noted above, Mr. Soffer is the chairman of the board of managers for the Parent, and Mr. Karawan is the Chief Operating Officer and Chief Restructuring Officer. *See*

**Exhibit E**, at ¶¶ 1, 3.  Mr. Soffer is <u>not</u> a personal guarantor of the obligations under the Credit Agreement.

6.      As additional security, another affiliate of the Debtors, Turnberry Residential Limited Partner, LP ("**Turnberry**"), provided a Completion Guaranty, under which Turnberry agreement to provide "Cash Support" in the amount of $100 million to pay for Applicable Project Costs incurred in connection with the Project.  Of the $100 million in Cash Support promised by Turnberry, $50 million was backed by a letter of credit issued by Deutsche Bank. Mr. Soffer provided Deutsche Bank with an unconditional guaranty of Turnberry's obligation to reimburse Deutsche Bank if the letter of credit was drawn.  **Exhibit B**, at ¶ 5.

7.      BofA served as Administrative Agent under the Credit Agreement and as Disbursing Agent under the Master Disbursement Agreement.  However, in early May, BofA submitted a resignation notice with respect to both of those roles.  Under the Credit Agreement, Bof A continues to serve as the Administrative Agent, but it ceased to serve as Disbursement Agent 45 days after issuing its notice of resignation.

8.      <u>Bonds</u>.  The Debtors also issued certain Second Mortgage Notes due 2015 in the principal amount of $675 million pursuant to that certain Second Mortgage Indenture with Wells Fargo Bank, National Association as Indenture Trustee (the "**Bonds**").  The Bonds are also collateralized by the same real property as the Credit Agreement, but are junior to the loans collateralizing the Credit Agreement.[7]

9.      <u>Retail Facilities</u>.  A separate set of corporations which are affiliated with but not owned by the Debtors (the "**Retail Affiliates**") lease the Retail Space.  To fund the construction of the Retail Space, the Retail Affiliates entered into two loan facilities with certain lenders (the

---

[7] The Bonds are also contractually subordinated to the obligations under the Credit Agreement.

"**Retail Lenders**"). The first, a loan agreement dated as of June 6, 2007 between Fontainebleau Las Vegas Retail, LLC, as Borrower and Lehman Brothers Holdings, Inc. (the "**Primary Retail Facility**"), provided for an initial advance of $125.4 million and $189.6 million of subsequent borrowings. The Primary Retail Facility is secured by a first priority security interest in the Retail Affiliates' leasehold interest in the Retail Space and certain accounts. The Primary Retail Facility identifies Mr. Soffer as a "Guarantor." As of the Petition Date, about $165 million was outstanding under the Primary Retail Facility.

10.     In addition to the Primary Retail Facility, one of the Retail Affiliates, Fontainebleau Las Vegas Retail Mezzanine, LLC entered into a Mezzanine Loan Agreement with Lehman Brothers Holdings, Inc. (the "**Mezzanine Retail Facility**," and together with the Primary Retail Facility, the "**Retail Facilities**"), which provided for a single borrowing of $85 million and is secured by a pledge of the equity interests in Fontainebleau Las Vegas Retail LLC, and Fontainebleau Las Vegas Retail Mezzanine, LLC. The Mezzanine Retail Facility, like the Primary Retail Facility, identifies Mr. Soffer as a "Guarantor."[8]

**B.      The Bankruptcy Filing and Events Since the Petition Date.**

11.     On June 9, 2009, the Debtors filed for bankruptcy protection under chapter 11 of the Bankruptcy Code. The Debtors are currently led by Mr. Soffer, whose role was explained by Debtors' counsel to this Court on the first day as the "ultimate controlling person of the debtors":

> *Mr. Soffer is the ultimate controlling person of the debtors*. He's chairman of the board of manager of Fontainebleau Resorts, LLC, which is the ultimate parent of the debtor, Fontainebleau Las Vegas Holding, LLC and he is also a director of Fontainebleau Las Vegas Capital, which is also one of the debtors."

---

[8] The agents under the Credit Agreement, the Second Mortgage Indenture, and the Retail Facilities entered into that certain Intercreditor Agreement (Retail) (the "**Intercreditor Agreement**"), under which the parties acknowledged (among other terms) that the Retail Facilities are not secured by any of the collateral securing the Credit Agreement and the Credit Agreement is not secured by any collateral securing the Retail Facilities.

(6/11/09 Tr., at 10:8-15)(emphasis added). The Debtors' Chief Restructuring Officer, Howard

Karawan, also serves in the dual capacity as the Chief Restructuring Officer and Chief Operating

Officer for Fontainebleau Resorts, LLC ("**Parent**"). **Exhibit E**, at ¶ 1. As explained to this

Court by Mr. Karawan in July 2009, "I report directly to the Board of Managers and generally

work side-by-side with members of the Board of Managers, including the Chairman of FBR,

Jeffery Soffer . . ." **Exhibit E**, at ¶ 3.

12.    As this Court may recall from the first-day hearing, counsel for the Debtors

identified "three critical things that we need to accomplish over the next 30 days." D.E. 79

(6/11/09 Tr.), at 27:4-6. First, the Debtors made clear they needed to kick start the adversary

proceeding against the Revolving Lenders, which was to serve as the centerpiece of these

bankruptcy cases. As Debtors' counsel observed:

> I cannot overstate the significance of that litigation, not simply
> because of its potential to provide the estate with a significant
> damage recovery, but also because under current market
> conditions, *a favorable resolution of this litigation may well be
> the only means by which we obtain funds to resume construction
> of the project*.

D.E. 79 (6/11/09 Tr.), at 24:16-23 (emphasis added). Litigation counsel for the Debtors

subsequently told this Court that the money committed by the Revolving Lenders was "the

platform. This is where we start. *Because there is no more money here without the revolvers'

money*." D.E. 261 (7/13/09 Tr.), at 10:3-10 (emphasis added).

13.    The adversary proceeding has not achieved the Debtors' aims. The mediation

ordered by this Court in advance of ruling on the Debtors' partial motion for summary judgment

did not pry loose any of the Revolving Lenders' $800 million commitment. The withdrawal of

the reference of the adversary proceeding, followed by Judge Gold's order on August 26, 2009

denying the Debtors' motion for partial summary judgment, appears to have shut the door on any

negotiations to obtain the financing promised by the Revolving Lenders on the terms promised

under the Credit Agreement.  The Debtors (along with the Term Lenders) are left with their claims for damages.

14.    Second, the Debtors said that they needed to stabilize the Project, and expressed the hope that a consensual stabilization program would emerge within the first four weeks.  D.E. 79 (6/11/09 Tr.), at 27:17-28:12.  But as it turned out, the Debtors' proposed cost to stabilize the Project was substantial and, if implemented, would have required depletion of most of the cash collateral held by the Term Lenders.  Given the then-uncertainty over the outcome of the adversary proceeding, and the inability to obtain financing from the Revolving Lenders, the Term Lenders were hesitant to risk tens of millions of dollars of their cash collateral to stabilize a project for which financing to complete the project might not be available.  That hesitation became even more pronounced after the Debtors' contractors, materialmen and vendors on the Project began arguing that, under Nevada law, they hold statutory liens on the Project that they claim have priority over the Term Lenders.   One of those contractors was Turnberry West Construction, Inc. ("**TWC**"), an affiliate of the Debtors and a general contractor on the Project, which has filed a complaint on July 14, 2009 asserting a statutory lien with priority of $675 million over the Term Lenders, including almost $64 million owed to TWC.  See Complaint ¶¶ 41, 45, *Turnberry West Construction, Inc. v. Fontainebleau Las Vegas Holdings, LLC et al.*, Adv. Proc. No. 09-01762, Docket No. 1 (Bankr. S.D. Fla. July 20, 2009).  That claim obviously did nothing to encourage the Term Lenders to consent to the use of their cash collateral to fund the cost of stabilization.

15.    Third, the Debtors told this Court at the First-Day Hearing that "we need to resolve, and this is our challenge, we need to resolve the pre-filing issues concerning the retail affiliates so that we can get those before you, as well."  D.E. 79 (6/11/09 Tr.), at 28:13-17.  According to Debtors' counsel, the Retail Affiliates are "like the proverbial hole in the donut, as

13

it is an essential piece of the overall package, but without the hotel, it doesn't really exist." D.E. 79 (6/11/09 Tr.), at 19:20-23. Debtors' counsel predicted that "[w]e will likely be filing those three affiliates shortly," (D.E. 79 (6/11/09 Tr.), at 19:23-24), but as this Court knows, no such filing has occurred, reflecting an inability of the Debtors to reach agreement with the Retail Lenders to fund even the administrative cost of a bankruptcy filing by the Retail Affiliates.

16.     The Term Lenders have consented to the entry of four orders authorizing the use of cash collateral, subject to certain terms and conditions. Each of those orders was for a limited fixed duration of no more than four weeks, the last extending only two weeks. The Term Lender Steering Group was unwilling to consent to longer periods so that it could closely monitor the progress of the bankruptcy cases and, if progress was not achieved, reevaluate whether to provide further consent.

17.     Since July, the Term Lenders have made clear to the Debtors that they need to find an alternative source of funding, other than the Debtors' cash collateral, to pay the administrative expenses. Beginning in mid-July, the Term Lenders proposed that the Debtors and their affiliates agree to make available certain funds in the CGPA that Turnberry pledged to the Term Lenders to secure Turnberry's obligations under the Completion Guaranty. Unfortunately, Mr. Soffer's personal liability to Deutsche Bank has proven to be a major impediment to those discussions that has not been overcome, and as a result, discussions regarding further use of cash collateral have reached an impasse.

18.     The Debtors now refuse to provide any meaningful cooperation to the Term Lender Steering Group. For example, the Debtors have, in violation of the Prior Cash Collateral Orders, obstructed efforts by the Term Lender Steering Group to obtain site access and information for one of their construction consultants (Tishman Construction) whose work is critical to enable the Term Lender Steering Group to finish their cost to complete analysis – a

14

critical data point in determining whether the sale price offered by potential bidders reflects the fair value of the Project.[9]  The Debtors have also refused to move forward with replacing Bank of America with Wilmington Trust to serve as administrative agent and disbursement agent, which provides the Debtors' affiliates the additional benefit of frustrating the Term Lenders' efforts to enforce rights under the existing payment and completion guaranties.

19.    On September 14, 2009, faced with the absence of any hope of rehabilitation and having only received "preliminary draft term sheets" for a potential transaction, the Debtors nonetheless sought authority for use of cash collateral on a nonconsensual basis, rather than proceed forward with the Term Lender Steering Group's proposal to use the funds in the CGPA. By putting the interests of their affiliates ahead of the estate, the Debtors have set these bankruptcy cases on a course of self destruction that will deprive these estates of substantial value that could otherwise be realized for the benefit of creditors.

## ARGUMENT

### I.    SECTION 1112(B) OF THE BANKRUPTCY CODE, AS REVISED UNDER BAPCPA, REQUIRES CONVERSION TO CHAPTER 7 UPON A SHOWING OF CAUSE UNLESS THERE ARE "UNUSUAL CIRCUMSTANCES" PRESENT.

20.    Section 1112(b)(1) of the Bankruptcy Code was amended in 2005 and now provides:

> Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interest of creditors and the estate, the court *shall* convert a case under this Chapter to a case under Chapter 7 or dismiss a case under this

---

[9] The Debtors have, in refusing to provide Tishman with access to the site and to information related to the Project, offered the pretense that Tishman and its consultants are designing and building a competing casino project in Atlantic City and thus cannot be provided with such access and information even pursuant to a confidentiality agreement – while ignoring the fact that the Debtors have shared confidential information with strategic purchasers located in Las Vegas.

> Chapter, whichever is in the best interests of creditors and the
> estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1)(emphasis added).

21.    The 2005 amendments to Section 1112(b) substituted the word "shall" for "may."
*In re Products Int'l Co.*, 395 B.R. 101, 107 (Bankr. D. Ariz. 2008).  Based on that change,
numerous bankruptcy courts have recognized that the discretion to dismiss or convert predating
the enactment of BAPCPA no longer exists, and that "Section 1112(b), as amended, provides
that once cause has been shown, the Court's discretion is limited." *Id.*, citing *In re AmeriCERT,
Inc.*, 360 B.R. 398, 401 (Bankr. D. N.H. 2007) and *Nester v. Gateway Access Solutions, Inc.* (*In
re Gateway Access Solutions, Inc.*), 374 B.R. 556, 560 (Bankr. M.D. Pa. 2007) (noting the
statutory language change "from permissive to mandatory"); *see also In re Broad Creek
Edgewater, L.P.*, 371 B.R. 752, 759 (Bankr. D.S.C. 2007).  Under section 1112(b) as amended, if
cause is shown, the Court must convert this bankruptcy case "absent unusual circumstances
specifically identified by the court that establish that the requested conversion or dismissal is not
in the best interests of creditors and the estate."  11 U.S.C. § 1112(b)(1).

## II.    UNDER SECTION 1112(B)(4), CAUSE EXISTS TO CONVERT THESE BANKRUPTCY CASES TO CHAPTER 7.

22.    Section 1112(b)(4) provides that "for purposes of this subsection, the term 'cause'
***includes***" several factors.  11 U.S.C. § 1112(b)(4)(emphasis added).  Section 102(3) of the
Bankruptcy Code expressly provides that the word "includes" is "not limiting."  11 U.S.C.
§ 102(3).  Consistent with that provision, numerous courts have recognized that the list of factors
under section 1112(b)(4) "is not exhaustive and the court may consider other factors as they arise
and use its equitable powers to reach an appropriate result in individual cases."  *Colonial
Daytona Ltd. Partnership v. American Sav. of Fla., F.S.B.*, 152 B.R. 996, 1001 (M.D. Fla. 1993)
(citing *In Re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir. 1984)); *In re Hampton Hotel*

16

*Investors, L.P.,* 270 B.R. 346, 358 (Bankr. S.D.N.Y. 2001); *Carolin Corp. v. Miller,* 886 F.2d

693, 698-99 (4th Cir. 1989); *Gateway Access Solutions,* 374 B.R. at 561; *Santa Fe Minerals, Inc.*

*v. BEPCO, L.P.* (*In re 15375 Mem. Corp.*), 382 B.R. 652, 682 (Bankr. D. Del. 2008).

23.     There are two specific factors that, separately or together, establish cause to

convert the Debtors' bankruptcy cases to chapter 7.  First, cause exists under section

1112(b)(4)(A) as a result of "substantial or continuing loss to or diminution of the estate and the

absence of a reasonable likelihood of rehabilitation."  See 11 U.S.C. § 1112(b)(4)(A).  Second,

although not one of the enumerated factors, courts have recognized that conflicts of interest such

as the pervasive ones in these bankruptcy cases constitute "cause."  Each of these factors is

addressed below.

> **A.      The Substantial or Continuing Diminution of the Estates, and the Absence of
>          Any Reasonable Likelihood of Rehabilitation, Constitute Cause Under
>          Section 1112(b)(4)(A).**

24.     Under section 1112(b)(4)(A), cause is established upon a showing of "substantial

or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of

rehabilitation."  11 U.S.C. § 1112(b)(4)(A).  This factor requires the court to conduct a two-part

inquiry, under which it first examines the debtor's track record to determine whether it is

suffering losses or making gains, and then decides whether rehabilitation is likely given the

evidence presented at the hearing.  *See In re Gateway Access Solutions, Inc.*, 374 B.R. 556, 562

(Bankr. M.D. Pa. 2007).  For the reasons set forth below, both of the prongs support conversion

of the bankruptcy cases to chapter 7.

> **1.      Substantial or Continuing Loss to or Diminution of the Estate.**

25.     As described in one treatise, "[i]f the estate has sustained a substantial loss

following the commencement of the case, or the debtor is operating with a sustained negative

cash flow after the commencement of the case, these facts are sufficient to justify a finding of

'substantial or continuing loss… to the estate.'" *See* <u>Collier on Bankruptcy</u>, ¶1112.04[5][a] at 1112-34 (15th ed. rev'd 2008).

26.    Continuing loss to or diminution of the estate can be evidenced by lack of operating cash flow, accumulation of administrative expenses, and deterioration of property due to deferred maintenance. *E.g., In re Blunt*, 236 B.R. 861, 866 (Bankr. M.D. Fla. 1999) (diminution established by mounting administrative expenses and deferred maintenance); *In re Terry Mfg. Co.*, 2004 Bankr. LEXIS 1170, *4 (Bankr. M.D. Ala. 2004) (ordering conversion because, where the case "assumes a liquidating posture," the "additional administrative expenses inherent in Chapter 11 would unreasonably diminish" the estate); *In re Schriock Constr.*, 167 B.R. 569, 575 (Bankr. D.N.D. 1994) (negative post-petition cash flow establishes diminution of the estate); *In re Pappas*, 17 B.R. 662, 666 (Bankr. D. Mass. 1982) (diminution established where the debtor had no unencumbered assets and "[i]nterest on the secured debt has been accruing daily, taxes continue to come due, and insurance and other costs assessable to the debtor are being incurred by mortgagees"); *In re Denrose Diamond*, 49 B.R. 754, 757 (Bankr. S.D.N.Y. 1985) (diminution of the estate exists where secured creditor's collateral is depreciating, no unencumbered assets remain, and no prospects exist to produce income); *In re Gateway Access Solutions, Inc.*, 374 B.R. 556, 560 (Bankr. M.D. Pa. 2007) (noting the statutory language change "from permissive to mandatory" and finding cause existed to convert the debtor's cases where the estate was diminishing rapidly at the expense of creditors as extensive administrative costs from the professional fees were accumulating while the case lingered in Chapter 11); *In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003) (negative postpetition cash flow and inability to pay current expenses are "cause" for conversion); *In re 3868-70 White Plains Road, Inc.*, 28 B.R. 515, 519 (Bankr. S.D.N.Y. 1983) (conversion warranted where the debtor's assets were fully collateralized and it had negative cash flow and

18

inability to pay current expenses); *In re 865 Centennial Avenue Assocs. Ltd. P'ship*, 200 B.R. 800, 811 (Bankr. D.N.J. 1996) (ordering conversion where the debtor had no cash flow, no source of income, and claims against property exceeded property's value).

27.     The facts in these bankruptcy case fall squarely within these cases. According to the Debtors, the Project is only 70% complete, and the prospect of generating any income (let alone enough to pay expenses) is, even under the most optimistic scenarios, more than a year away. In the meantime, there is no dispute that the Debtors' assets have been diminished rapidly during the three-plus months that the Debtors have been in bankruptcy. According to the Debtors, they will have, by the end of the current nonconsensual cash collateral period, depleted more than $17 million under the previous cash collateral orders, and have nothing to show for it since none of the money has been used to actually improve the Project; rather, it has funded the administrative expenses of the bankruptcy cases and some preservation (but not improvement) of the assets. The Debtors cannot provide the Term Lenders with adequate protection for the use of their cash collateral or the priming of their liens, including the Adequate Protection Liens granted under the Interim Orders. As this Court has observed, the state of the Project, if left incomplete, will not improve over the course of time and will instead deteriorate further, particularly without any unencumbered cash available to fund such preservation.

28.     Accordingly, the first prong under section 1112(b)(4)(A) is satisfied.

### 2.     Absence of a Reasonable Likelihood of Rehabilitation

29.     The second prong of § 1112(b)(4)(A) requires an "absence of a reasonable likelihood of rehabilitation." As noted in Collier, "the standard under section 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." Collier on Bankruptcy, ¶1112.04[5][a] at 1112-36 (15th ed. rev'd 2008). *E.g., Quarles v. United States Trustee*, 194

B.R. 94, 97 (W.D. Va. 1996) (no likelihood of rehabilitation where debtor was losing money and

only hope of reorganization depended on speculative outcomes in pending litigation); *In re*

*Imperial Heights Apartments, Ltd.*, 18 B.R. 858, 863-864 (Bankr. S.D. Ohio 1982) (no

"reasonable likelihood of rehabilitation" where debtor's only asset was a potential lawsuit).

30.     Importantly, "rehabilitation" as used in section 1112(b)(4)(A) is not synonymous

with "reorganization," as rehabilitation does not include liquidation and distribution of assets. *In*

*re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988); *In re The Ledges Apartments*, 58 B.R. 84, 87

(Bankr. D. Vt. 1986).  Instead, "rehabilitation signifies that the debtor will be reestablished on a

second (sic.) financial basis, which implies establishing a cash flow from which current

obligations can be met." *In re Rundlett*, 136 B.R. 376, 380 (Bankr. S.D.N.Y. 1992); *In re Ad-*

*Brite Corp.*, 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003).

31.     A debtor "should not continue in control of the business beyond a point at which

reorganization no longer remains realistic," if creditor recoveries are eroding. *In re AdBrite*

*Corp.*, 290 B.R. at 215; *In re Johnston*, 149 B.R. 158, 161 (B.A.P. 9th Cir. 1992) (granting

motion to convert debtor's Chapter 11 case to a Chapter 7 where the debtor lacked the ability to

effectuate plan of reorganization because it had no income and further delay would prejudice

creditors by eroding their position); *Colonial Daytona Ltd. Partnership v. American Sav. of Fla.,*

*F.S.B.*, 152 B.R. 996, 1003 (M.D. Fla. 1993) ("[T]he Debtor's sincere desire to reorganize means

little without the Debtor's actual ability to reorganize").  This Court need look no further than the

record already before it to find that no reasonable prospect of rehabilitation exists in these

bankruptcy cases.  About $17 million in the Term Lenders' cash collateral – the last $2 million

over the vigorous objection of the Term Lender Steering Group -- has been depleted without

accomplishing any of the "critical things" that the Debtors said needed to be accomplished in the

first 30 days of the case.  Notably, the Debtors' principals have refused to contribute a dime to

this process, even the funds sitting in the CGPA that are pledged to the disbursement agent for

the benefit of the Term Lenders, thus further confirming that rehabilitation will never occur.

32.     Because both prongs of section 1112(b)(4)(A) have been established, cause exists

under section 1112(b)(4)(A) to convert these bankruptcy cases to chapter 7.

**B.      Cause Also Exists to Convert These Bankruptcy Cases to Chapter 7 Based on the Pervasive Conflicts of Interest Between the Debtors and Their Insiders and Affiliates.**

33.     A debtor-in-possession is a fiduciary of the estate and its creditors. *In re 239*

*Worth Avenue Corp.*, 236 B.R. 492, 494 (Bankr. S.D. Fla. 1999) ("once the Debtor filed its

bankruptcy petition, it became a fiduciary to its creditors"); *In re Madison Hotel Corp.*, 175 B.R.

94, 97 (Bankr. N.D. Ala. 1994) (collecting cases).   As explained by this Court, a fiduciary

cannot place his own self interest ahead of the interests which he is obligated to protect:

> [A] fiduciary - the debtor in possession - is proscribed from acting solely in its self interest to the exclusion of the other interests which the debtor in possession has the fiduciary obligation to protect. *Fiduciary obligations include the duty of loyalty and good faith which forbid "directors and other business operators from using their position of trust and control over the rights of other parties to further their own private interest, either by usurping opportunities, holding undisclosed conflicts, or otherwise exploiting their position."*

*In re SunCruz Casinos, LLC*, 298 B.R. 821, 830 (Bankr. S.D. Fla. 2003)(emphasis added).

34.     Under that rationale, courts have held that conflicts of interest between the

debtors' fiduciary obligations to its creditors and the interests of the debtor's principals constitute

cause under section 1112(b)(4) that warrant conversion (or dismissal). *E.g., Hampton Hotel*

*Investors*, 270 B.R. at 360 ("conversion is particularly appropriate, in the Court's view, because

given the extraordinary conflicts of interest affecting [debtor principal's] past conduct and

reasonably foreseeable future conduct, it is only with the appointment of a trustee that the Court

can feel confident that creditor interests, rather than [the debtor principal's], are being

advanced"); *In re Natrl Plants and Lands Management Co., Ltd.*, 68 B.R. 394, 396 (Bankr. S.D.N.Y. 1986) (cause under section 1112(b)(4) to dismiss found where "the debtor's principal shareholder is in no position to exercise undivided loyalty to the rights of all interested parties"); *In re Prods. Int'l Co.*, 395 B.R. 101, 107 (Bankr. D. Ariz. 2008).

35.     In *Natrl Plants*, the court found cause to exist under section 1112(b)(4) (in that case, for dismissal) where "the debtor's principal shareholder is in no position to exercise undivided loyalty to the rights of all interested parties." *Natrl Plants*, 68 B.R. at 396. The same is true here – the Debtor's principals are in no position to exercise undivided loyalty, and as a result, cause exists to convert the Debtors' bankruptcy cases to chapter 7 without further delay.

36.     The need for an independent trustee in the face of conflicts of interest has frequently been addressed in the context of motions to appoint chapter 11 trustees. Courts have, in that context, recognized that management must be replaced when it is no longer in a position to exercise undivided loyalty to the estate and its creditors. For example, in *SunCruz Casinos*, this Court appointed a trustee where the "DIP's ability to fulfill its fiduciary obligations to the creditors is understandably called into questions by the competing interests" of the debtor's principal, including his indemnity obligations to the debtor's estate, conflicting claims to the use of the debtor's trade name, and failure by the debtor to vigorously investigate and pursue claims against the principal. *SunCruz Casinos*, 298 B.R. at 831. Other courts have appointed trustees in similar circumstances. *E.g.*, *In re Tel-Net Hawaii, Inc.*, 105 B.R. 594, 595 (Bankr. D. Haw. 1989) (appointing trustee where debtor failed to make any effort to avoid preferential transfers to its largest shareholder, because "***an entity cannot adequately serve two masters***") (emphasis added); *In re L.S. Good & Co.*, 8 B.R. 312, 314-15 (Bankr. N.D. W.Va. 1980) (appointing trustee where the need to sue the debtor's affiliate suggested a strong probability of conflict of interest such as to hinder management's ability to make impartial investigations and decisions in

pursuing claims on behalf of the estate); *In re Bowman*, 181 B.R. 836, 844-45 (Bankr. D. Md. 1995); *Matter of Cajun Elec. Power Co-op, Inc.*, 74 F.3d 599 (5th Cir. 1996); *In re Bellevue Place Associates*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994) ("inability to fulfill fiduciary duties of a debtor-in-possession [due to conflict of interest] is itself cause to appoint a trustee"); *Matter of Fiesta Homes of Georgia, Inc.*, 125 B.R. 321, 323 (Bankr. S.D. Ga. 1990) ("the presence of a conflict of interest constitutes cause for removal of the debtor-in-possession from administration of this case").

37.    In these bankruptcy cases, the number of actual and potential conflicts of interest, both with respect to the sale process and other issues, is overwhelming: 1) the interest of Mr. Soffer in purchasing the Project (and, if that is the case, discouraging other potential suitors from doing so); 2) the benefit that the Indemnitors under the title policy will receive if the sale price is lower rather than higher; 3) the benefit to Mr. Soffer, by virtue of his individual guarantee of the loans to the Retail Affiliates and his ownership of TWC, from an allocation of the sale proceeds that favors the Retail Affiliates and the liens asserted against the Debtors' real property, at the expense of the Debtors and the liens asserted against the Debtors' personal property; 4) the interest of Mr. Soffer in avoiding his personal liability to Deutsche Bank related to the Completion Guaranty; 5) the interest of the Parent and Turnberry in preventing the appointment of a successor administrative agent and successor disbursement agent under the Credit Agreement; 6) the Debtors' disproportionate assumption of expenses that properly should be shared or borne by Fontainebleau Miami Beach; and 7) the interest of TWC in asserting its massive $675 million claim against the estate, and in defending against claims belonging to the estate.

38.    Many of those conflicts directly impact the sale process, and if not eliminated by converting the bankruptcy cases and appointing a chapter 7 trustee, will prevent maximization of

value for the benefit of the estate and its creditors.  Even the most well intended fiduciary cannot

serve "two masters" whose interests are in conflict.  Given the conflicts in these cases and what

has already occurred, the Debtors' current management team cannot remain in possession and

continue to serve as a fiduciary of the Debtors.  Accordingly, "cause" exists for conversion of the

case, to allow for appointment of a chapter 7 trustee to administer the bankruptcy cases.

### III.    NO "UNUSUAL CIRCUMSTANCES" EXIST TO PREVENT CONVERSION OF THESE CASES TO CHAPTER 7.

39.    Under section 1112(b) as amended by BAPCPA, if cause is shown, this Court

must convert the bankruptcy case "absent unusual circumstances specifically identified by the

court that establish that the requested conversion or dismissal is not in the best interests of

creditors and the estate."  11 U.S.C. § 1112(b)(1).

40.    Section 1112(b) does not define unusual circumstances, "but the phrase

contemplates conditions that are not common in chapter 11 cases." *See, e.g., In re Prods. Int'l

Co.*, 395 B.R. 101, 109 (Bankr. D. Ariz. 2008); *In re New Towne Dev., LLC*, 404 B.R. 140, 147

(Bankr. M.D. La. 2009) (citing *In re Pittsfield Weaving Co.*, 393 B.R. 271, 274 (Bankr. D.N.H.

2008)).  In order for the Court to deny conversion, it must be able to "specifically identify"

factors establishing that conversion is not in the best interest of the creditors and the estate.  *See

Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.)*, 374 B.R. 556,

567 (Bankr. M.D. Pa. 2007).  The burden of proof on the issue of "unusual circumstances" is on

the Debtors, *id.* at 560, and they cannot sustain their burden under the facts of this case.

41.    An example of an unusual circumstance, rare in chapter 11 proceedings, is a

debtor with sufficient assets to pay all unsecured creditors in full.  *In re New Towne Dev., LLC*,

404 B.R. 140, 147-48 (Bankr. M.D. La. 2009) (unusual circumstances are present where the

order for relief was entered days before the hearing on the motion to convert, the debtor had

sufficient equity to repay all administrative expenses and all unsecured claims, none of the

unsecured parties were insiders, and conversion would reduce the likelihood of repaying the unsecured creditors); *In re Orbit Petroleum, Inc.*, 395 B.R. 145, 149 (Bankr. D. N.M. 2008) (plan that proposes to pay all creditors in full on the effective date is an unusual circumstance sufficient to deny conversion or dismissal even in the face of demonstrated "cause").

42.    On the other hand, circumstances that typically exist in large Chapter 11 case are, by definition, not unusual. *In re Fall*, 405 B.R. 863, 871 (Bankr. N.D. Ohio 2009) (the fact that the estate may have equity in the project or a plan has been filed in the case do not "rise to the level of an 'unusual circumstance,' as both events are commonly encountered in Chapter 11 cases"). Undisclosed buyers that are about to materialize, asset sales out of the ordinary course of business, and protracted litigation are a fact of life in Chapter 11 cases. There is nothing uncommon or unusual about such circumstances.

43.    Moreover, the "unusual circumstances" must be such that conversion "is not in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1). In this case, the principals have no remaining economic interest in the project. Therefore, the only parties whose interests are relevant are creditors, such as Term Lenders and, perhaps, the statutory lienholders. It is axiomatic that creditors are in the best position to judge what is "in the best interests of creditors," and any purported showing of "unusual circumstances" by the Debtors must be viewed with skepticism. *See, e.g., Arkansas, Inc. v. United States Trustee (In re Camden Ordnance Mfg. Co. of Arkansas, Inc.)*, 245 B.R. 794, 802 (E.D. Pa. 2000) (approving conversion over dismissal, stating "the creditors favored conversion and the creditors are the best judge of their own best interests").

44.    Based upon the above, no unusual circumstances exist in this bankruptcy case to prevent conversion to Chapter 7.

## CONCLUSION

For the reasons set forth above, the Term Lender Steering Group respectfully requests that the Court enter an order converting these chapter 11 cases to chapter 7, and granting such other relief as is just and proper.

Dated:  September 25, 2009

Respectfully submitted,

**I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rules 2090-1(A).**

AKERMAN SENTERFITT
Michael I. Goldberg
James H. Fierberg
Las Olas Centre II
One Southeast Third Avenue, 25th Floor
Miami, Florida 33131-1714
Telephone: (305) 374-5600
Facsimile: (305) 374-5095


By:____/s/ Michael I. Goldberg_____
        Michael I. Goldberg
        Florida Bar No. 886602

                    -and-

HENNIGAN, BENNETT & DORMAN LLP
Bruce Bennett
Sidney P. Levinson
Joshua M. Mester
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone: (213) 694-1200
Facsimile:  (213) 694-1234

Attorneys for Term Lender Steering Group

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing *Motion of Term Lender Steering Group for an Order Converting the Debtors' Chapter 11 Bankruptcy Cases to Chapter 7* was served via electronic ECF notice to all parties receiving such notices and a true and correct copy of the foregoing via regular U.S. delivery, postage prepaid, addressed to those parties listed on the attached Service List this 25th day of September 2009.

/s/ Michael I. Goldberg

**09-21481-AJC Notice will be electronically mailed to:**

Brett M Amron on behalf of Creditor Aurelius Capital Management, LP
bamron@bastamron.com, jrivera@bastamron.com,jeder@bastamron.com

Scott L Baena on behalf of Debtor Fontainebleau Las Vegas Capital Corp.
sbaena@bilzin.com, lflores@bilzin.com;eservice@bilzin.com

Carla M Barrow on behalf of Creditor Fisk Electric Company
cbarrow@wsh-law.com, mmartinez@wsh-law.com

Paul J. Battista on behalf of Creditor Committee Creditors Committee
pbattista@gjb-law.com, ctarrant@gjb-law.com;gjbecf@gjb-law.com

Brian S Behar on behalf of Creditor ThyssenKrupp Safway Inc.
bsb@bgglaw.net

Richard J Bernard on behalf of Creditor QTS Lotigistics, Inc.
rbernard@bakerlaw.com

Mark D Bloom on behalf of Creditor Barclays Bank PLC
bloomm@gtlaw.com, phillipsj@gtlaw.com;MiaLitDock@gtlaw.com;miaecfbky@gtlaw.com

Jacqueline Calderin on behalf of Creditor Absocold Corporation, d/b/a Econ Appliance
jc@ecccounsel.com, phornia@ecccounsel.com;nsocorro@ecccounsel.com

Candace C Carlyon on behalf of Creditor Young Electric Sign Company
ccarlyon@sheacarlyon.com,
ltreadway@sheacarlyon.com;ggianoulakis@sheacarlyon.com;ssherman@sheacarlyon.com;mant
hony@sheacarlyon.com;rmsmith@sheacarlyon.com

Robert P Charbonneau on behalf of Creditor Absocold Corporation, d/b/a Econ Appliance
rpc@ECCcounsel.com,
nsgm0024@aol.com;dgold@ECCcounsel.com;scunningham@ECCcounsel.com;phornia@eccco
unsel.com;nsocorro@ecccounsel.com;msardinas@ecccounsel.com

David A Colvin on behalf of Creditor DANA KEPNER COMPANY
dcolvin@marquisaurbach.com

Sara D Cope on behalf of Creditor Southern Nevada Glaziers Trust Funds
saradcope@gmail.com, kbchrislaw@aol.com

Ryan E Davis on behalf of Creditor Cemex Construction Materials Florida, LLC
rdavis@whww.com, rwilliams@whww.com

Thomas H. Fell on behalf of Creditor M&M Lienholders
bknotices@gordonsilver.com, bankruptcynotices@gordonsilver.com

James H. Fierberg on behalf of Creditor Term Lender Steering Group
james.fierberg@akerman.com

Robert G Fracasso Jr on behalf of Defendant Sumitomo Mitsui Banking Corporation
rfracasso@shutts.com

Thomas Joseph Francella on behalf of Interested Party Minibar Systems and Minibar N.A., Inc
tfrancella@wtplaw.com

Robert C Furr on behalf of Creditor MB Financial Bank NA
bnasralla@furrcohen.com

Jay M Gamberg on behalf of Creditor Mechanical Systems West Inc.
Lbernstein@gamberglaw.com

James D Gassenheimer on behalf of Interested Party Turnberry Residential Limited Partner, L.P.
jgassenheimer@bergersingerman.com,
efile@bergersingerman.com;lmerida@bergersingerman.com;cweisz@bergersingerman.com;ebro
wn@bergersingerman.com

Daniel L. Gold on behalf of Creditor Absocold Corporation, d/b/a Econ Appliance
dgold@ecccounsel.com, scunningham@ecclegal.com

Michael I Goldberg on behalf of Creditor Term Lender Steering Group
michael.goldberg@akerman.com, charlene.cerda@akerman.com

Alvin S. Goldstein on behalf of Creditor MB Financial Bank NA
mmitchell@furrcohen.com

Ross R Hartog on behalf of Creditor Aderholt Specialty Company, Inc.
rhartog@mdrtlaw.com,
gguenechea@mdrtlaw.com;ecfnotices@mdrtlaw.com;mdrtlaw@yahoo.com

Thomas E Kaaran on behalf of Creditor Southwest Gas Corporation
kthomas@mcdonaldcarano.com, dsmith-
power@mcdonaldcarano.com;mmorton@mcdonaldcarano.com

John W. Kozyak on behalf of Creditor Apollo Investment Fund, VII, LP
jk@kttlaw.com, ycc@kttlaw.com;la@kttlaw.com

Philip J Landau on behalf of Creditor M&M Lienholders
plandau@sfl-pa.com, lmelton@sfl-pa.com;lrosetto@sfl-pa.com

David M Levine on behalf of Interested Party Commonwealth Land Title Insurance Company
dml@tewlaw.com, msanchez@tewlaw.com;rjr@tewlaw.com;amj@tewlaw.com

Paul J McMahon on behalf of Creditor Colasanti Specialty Services, Inc.
pjm@pjmlawmiami.com

Robert C Meacham on behalf of Creditor Derr and Gruenewald Construction Co.
rmeacham@mmdpa.com, lraymond@mmdpa.com;mdieguez@mmdpa.com

Lawrence H Meuers on behalf of Interested Party CCCS International
lmeuers@meuerslawfirm.com,
lcastle@meuerslawfirm.com;snurenberg@meuerslawfirm.com;sdefalco@meuerslawfirm.com

Harold D Moorefield Jr. on behalf of Defendant Bank of Scotland
hmoorefield@swmwas.com,
cgraver@swmwas.com;larrazola@swmwas.com;rross@swmwas.com

Mindy A. Mora on behalf of Debtor Fontainebleau Las Vegas Holdings, LLC
mmora@bilzin.com, eservice@bilzin.com;lflores@bilzin.com;laparicio@bilzin.com

Glenn D Moses on behalf of Creditor Committee Creditors Committee
gmoses@gjb-law.com, ctarrant@gjb-law.com;gjbecf@gjb-law.com

Kenneth E Noble on behalf of Defendant Bank of Scotland
kenneth.noble@kattenlaw.com, NYC.BKNotices@kattenlaw.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Becky Pintar on behalf of Creditor D'Alessio Contracting, Inc.
bpintar@gglts.com

Craig V Rasile on behalf of Creditor Bank of America, N.A.
crasile@hunton.com,
mtucker@hunton.com,mmannering@hunton.com,keckhardt@hunton.com,adeboer@hunton.com

Robert F. Reynolds on behalf of Creditor American Crane & Hoist, LLC
rreynolds@slatkinreynolds.com, imalcolm@slatkinreynolds.com

Arthur H Rice on behalf of Defendant HSH Nordbank AG, New York Branch
arice.ecf@rprslaw.com

Peter J Roberts on behalf of Creditor MB Financial Bank NA
proberts@shawgussis.com

Ralf R Rodriguez on behalf of Creditor Colasanti Specialty Services, Inc.
rrodriguez@pecklaw.com, sdumbar@pecklaw.com;jfried@pecklaw.com

Rex E Russo on behalf of Creditor Bradford Products, LLc
rexlawyer@prodigy.net

Michael L Schuster on behalf of Creditor Committee Creditors Committee
mschuster@gjb-law.com, ctarrant@gjb-law.com;gjbecf@gjb-law.com;mpacheco@gjb-law.com

Shlomo S. Sherman on behalf of Creditor Young Electric Sign Company
ssherman@sheacarlyon.com

Paul Steven Singerman on behalf of Interested Party Turnberry Residential Limited Partner, L.P.
singerman@bergersingerman.com, efile@bergersingerman.com

Tina M. Talarchyk on behalf of Creditor U.S. Bank National Association
TTalarchyk@ssd.com, amazzini@ssd.com;dfoley@ssd.com

Charles M Tatelbaum on behalf of Creditor Johnson Controls, Inc.
ctatelbaum@adorno.com, smerrill@adorno.com

Diane Noller Wells on behalf of Creditor Young Electric Sign Company
dwells@devinegoodman.com, efiling@devinegoodman.com

**09-21481-AJC Notice will not be electronically mailed to:**

AKFCF, Inc
10432 N Lake Vista Cr
Davie, FL 33328

Noah G. Allison on behalf of Creditor Colasanti Specialty Services, Inc.
3191 E Warm Springs Rd
Longford Plaza East, Bldg 13
Las Vegas, NV 89120

Jean Marie L Atamian on behalf of Defendant Sumitomo Mitsui Banking Corporation
1675 Broadway
New York, NY 10019

Christopher R Belmonte on behalf of Creditor Moody's Investors Service
230 Park Ave
New York, NY 10169

Bruce Bennett on behalf of Creditor Term Lender Steering Group
865 S Figueroa Ave
Los Angeles, CA 90017

Jed I. Bergman on behalf of Plaintiff Fontainebleau Las Vegas, LLC
1633 Broadway
New York, NY 10019

Bradley Butwin on behalf of Defendant Bank of America, N.A.
7 Times Square
New York, NY 10036

Daniel Cantor on behalf of Defendant Bank of America, N.A.
7 Times Square
New York, NY 10036

Candace Carlyon
701 Bridger #850
Las Vegas, NV 89101

Kevin B. Christensen on behalf of Creditor Southern Nevada Glaziers Trust Funds
7440 W Sahara Ave
Las Vegas, NV 89117

Kelly M. Cooper on behalf of Creditor Committee Creditors Committee
1301 Atlantic Ave
Atlantic City, NJ 08401

Eric Dobberstein on behalf of Creditor Insulpro Projects, Inc.
8965 S Eastern Ave #280
Las Vegas, NV 89123

Jeff J. Friedman on behalf of Interested Party Bank of Scotland plc
575 Madison Ave
New York, NY 10022-2585

David M. Friedman on behalf of Plaintiff Fontainebleau Las Vegas, LLC
1633 Broadway
New York, NY 10019

Garces Restaurant Group LLC
c/o Robert W Keddie III, Esq
502 Carnegie Center #103
Princeton, NJ 08540

Gregory E Garman on behalf of Creditor M&M Lienholders
3960 Howard Hughes Pkwy 9 Fl
Las Vegas, NV 89109

Phillip A. Geraci on behalf of Defendant HSH Nordbank AG, New York Branch
425 Park Ave
New York, NY 10022

Robert W. Glantz on behalf of Creditor MB Financial Bank NA
321 North Clark St #800
Chicago, IL 60654

HSH Nordbank AG, New York Branch
c/o Aaron Rubinstein, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

HSH Nordbank AG, New York Branch
c/o Andrew A. Kress, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

Frederick D. Hyman on behalf of Interested Party Sumitomo Mitsui Banking Corporation
1675 Broadway
New York, NY 10019

IKON Financial Services
1738 Bass Rd
POB 13708
Macon, GA 31208

Todd Kaplan
Citadel Derivatives Group LLC
131 Dearborn St
Chicago, IL 60603

Marc E. Kasowitz on behalf of Plaintiff Fontainebleau Las Vegas, LLC
1633 Broadway
New York, NY 10019

Jack J. Kessler
19950 AW Country Club Dr #101
Aventura, FL 33180

Jason I. Kirschner on behalf of Interested Party Sumitomo Mitsui Banking Corporation
1675 Broadway
New York, NY 10019

Jason I. Kirshner on behalf of Defendant Sumitomo Mitsui Banking Corporation
1675 Broadway
New York, NY 10019

Joshua T Klein on behalf of Creditor Committee Creditors Committee
2000 Market St - 10th Floor
Philadelphia, PA 19103

Andrew A Kress on behalf of Defendant HSH Nordbank AG, New York Branch
425 Park Ave
New York, NY 10022

Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245

Sidney P. Levinson on behalf of Creditor Term Lender Steering Group
865 S. Figueroa Ave
Los Angeles, CA 90017

Arthur S. Linker on behalf of Interested Party Bank of Scotland plc
575 Madison Ave
New York, NY 10022-2585

Jennifer R. Lloyd-Robinson on behalf of Creditor Derr and Gruenewald Construction Co.
6750 Via Austi Parkway #170
Las Vegas, NV 89119

Alan H Martin on behalf of Creditor Bank of America, N.A.
650 Town Center Dr, 4 Fl
Costa Mesa, CA 92626

Kyle Mathews on behalf of Creditor Bank of America, N.A.
333 S Hope St, 48 Fl
Los Angeles, CA 90071

Josefina Fernandez McEvoy on behalf of Creditor Committee Creditors Committee
1800 Century Park East #300
Los Angeles, CA 90067-1506

Sharon Merrill
Adorno & Yoss LLP
350 East Las Olas Blvd
Suite 1700
Fort Lauderdale, FL 33301

Joshua M. Mester on behalf of Creditor Term Lender Steering Group
865 S Figueroa Ave
Los Angeles, CA 90017

Seth A. Moskowitz on behalf of Plaintiff Fontainebleau Las Vegas, LLC
1633 Broadway
New York, NY 10019

Barry E Mukamal
1 SE 3rd Ave 9th Floor
Miami, FL 33131

Michael R. Mushkin on behalf of Creditor Illuminating Concepts Ltd
4475 S. Pecos Rd
Las Vegas, NV 89121

Matthew D. Novello on behalf of Interested Party CCCS International
3201 University Dr #100
Auburn Hills, MI 48326

Anthony L. Paccione on behalf of Interested Party Bank of Scotland plc
575 Madison Ave
New York, NY 10022-2585

Matthew D. Parrott on behalf of Interested Party Bank of Scotland plc
575 Madison Ave
New York, NY 10022-2585

Robin E. Perkins on behalf of Creditor Ahern Rentals Inc
221 N. Buffalo Dr #A
Las Vegas, NV 89145

Bryan J. Pezzillo on behalf of Creditor Derr and Gruenewald Construction Co.
6750 Via Austi Parkway #170
Las Vegas, NV 89119

Thomas C Rice on behalf of Creditor Barclays Bank PLC
425 Lexington Ave
New York, NY 10017

Jason A. Rose on behalf of Creditor Bradford Products, LLc
327 California Ave
Reno, NV 89502

Jonathan Rosenberg on behalf of Defendant Bank of America, N.A.
7 Times Square
New York, NY 10036

Alan Rubin
100 Second St 34th Fl
Miami, FL 33131

Aaron Rubinstein on behalf of Defendant HSH Nordbank AG, New York Branch
425 Park Ave
New York, NY 10022

Lenard E Schwartzer on behalf of Creditor Air Design Technologies LLC
2850 S Jones Blvd #1
Las Vegas, NV 89146

Justin S Stern on behalf of Creditor Barclays Bank PLC
425 Lexington Ave
New York, NY 10017

William Sushon on behalf of Defendant Bank of America, N.A.
7 Times Square
New York, NY 10036

Kesha Tanabe on behalf of Creditor U.S. Bank National Association
90 South Seventh St
3300 Wells Fargo Center
Minneapolis, MN 55402

Charles M. Tatelbaum
Adorno & Yoss LLP
350 East Las Olas Blvd
17th Floor
Fort Lauderdale, fl

Michael J. Viscount on behalf of Creditor Committee Creditors Committee
1301 Atlantic Ave
Atlantic City, NJ 08401-7212

Clark T Whitmore on behalf of Creditor U.S. Bank National Association
90 S 7 St #3300
Minneapolis, MN 55402

Donald H. Williams on behalf of Creditor Absocold Corporation, d/b/a Econ Appliance
612 South 10th St
Las Vegas, NV 89101

Eric D. Winston on behalf of Creditor Aurelius Capital Management, LP
865 S. Figueroa St 10th Fl
Los Angeles, CA 90017

David J Woll on behalf of Creditor Barclays Bank PLC
425 Lexington Ave
New York, NY 10017

# EXHIBIT A

# Exhibit A:  Term Lender Steering Group

| Fund Manager(s) | Funds |
|---|---|
| **Brigade Capital Management LLC**<br>717 5th Avenue, Suite 1301<br>New York, NY  10022<br>Telephone:  (212) 745-9754<br>Facsimile:  (212) 745-9701 | Brigade Leveraged Capital Structures Fund, Ltd.<br>Battlion CLO 2007-1 Ltd. |
| **Canyon Capital Advisors, LLC**<br>2000 Avenue of the Stars, 11th Floor<br>Los Angeles, CA  90067<br>Telephone:  (310) 272-1000 | Canpartners Investments IV, LLC<br>Canyon Special Opportunities Master Fund<br>(Cayman), Ltd. |
| **The Carlyle Group**<br>c/o Carlyle Investment Management LLC<br>520 Madison Avenue, 41st Floor<br>New York, NY  10022<br>Telephone:  (212) 813-4900 | Carlyle High Yield Partners 2008-1, Ltd.<br>Carlyle High Yield Partners VI, Ltd.<br>Carlyle High Yield Partners VII, Ltd.<br>Carlyle High Yield Partners VIII, Ltd.<br>Carlyle High Yield Partners IX, Ltd.<br>Carlyle High Yield Partners X, Ltd. |
| **Guggenheim Investment Management, LLC**<br>135 East 57th Street, 6th Floor<br>New York, NY  10022<br>Facsimile:  (212) 644-8107 | Green Lane CLO Ltd.<br>Copper River CLO Ltd.<br>Sands Point Funding Ltd.<br>Kennecott Funding Ltd.<br>1888 Fund, Ltd.<br>Orpheus Funding LLC<br>Orpheus Holdings LLC<br>NZC Opportunities (Funding) II Limited<br>LFC2 Loan Funding LLC |

| Fund Manager(s) | Funds |
|---|---|
| **Highland Capital Management, LP**<br>**Nexbank Tower**<br>  13455 Noel Road, 8th Floor<br>  Dallas TX 75240<br>  Telephone: (972) 628-4100<br>  Facsimile: (972) 628-4147 | Aberdeen Loan Funding, Ltd.<br>Armstrong Loan Funding Ltd.<br>Brentwood CLO, Ltd.<br>Eastland CLO, Ltd.<br>Emerald Orchard Limited<br>Gleneagles CLO, Ltd.<br>Grayson CLO, Ltd.<br>Greenbriar CLO, Ltd.<br>Highland Credit Opportunities CDO, Ltd.<br>Highland Loan Funding V, Ltd.<br>Jasper CLO, Ltd.<br>Liberty CLO, Ltd.<br>Loan Funding IV LLC<br>Loan Funding VII LLC<br>Loan Star State Trust<br>Longhorn Credit Funding, LLC<br>Red River CLO, Ltd.<br>Rockwall CDO, Ltd.<br>Rockwall CDO II, Ltd.<br>Southfork CLO, Ltd.<br>Stratford CLO, Ltd.<br>Westchester CLO, Ltd. |

# EXHIBIT B

ORIGINAL

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

DEUTSCHE BANK TRUST COMPANY
AMERICAS,

            *Plaintiff*,

  - against -

JEFFREY SOFFER, and TURNBERRY
RESIDENTIAL LIMITED PARTNER, L.P.,

            *Defendants*.

Index No. 601109-09

**FIRST AMENDED COMPLAINT**

Plaintiff, Deutsche Bank Trust Company Americas, by its attorneys,

LeClairRyan, a Professional Corporation, complaining of Defendants Jeffrey Soffer and

Turnberry Residential Limited Partners, L.P., states as follows:

    1.    Plaintiff Deutsche Bank Trust Company Americas is a New York

State banking entity, having an office at 280 Park Avenue, New York, New York 10017

("Plaintiff").

    2.    Defendant Jeffrey Soffer is, upon information and belief, an

individual having a principal place of business at 19501 Biscayne Boulevard, Suite 400,

Aventura, Florida 33180 ("Soffer").

    3.    Defendant Turnberry Residential Limited Partner, L.P., is, upon

information and belief, a foreign limited partnership organized under the laws of the State

of Delaware, having a principal place of business at 19501 Biscayne Boulevard, Suite 400,



Aventura, Florida 33180 ("Turnberry"). Upon information and belief, Turnberry is not

qualified to do business in the State of New York.

4.    Turnberry entered into a certain Letter of Credit and Reimbursement

Agreement (the "LCRA"), dated as of June 6, 2007, by and between Turnberry and

Plaintiff, whereby Plaintiff agreed to issue on behalf of and at the request of Turnberry, a

Fifty Million Dollar ($50,000,000.00) irrevocable letter of credit to Bank of America,

N.A., as Disbursement Agent (the "LC"). Pursuant to the terms of the LCRA, the LC was

extended for one year periods, and was to expire on or about June 8, 2009.

5.    Pursuant to a guaranty, dated as of June 6, 2007, as amended May

15, 2008, Soffer agreed to unconditionally guarantee to Plaintiff all of the obligations of

Turnberry under the LCRA (the "Guaranty").

6.    Pursuant to an amendment to the Guaranty dated May 15, 2008 (the

"Amendment to the Guaranty"), and a certain Third party Security Agreement, dated May

15, 2008, (the "Pledge Agreement"), Fontainebleau Resort Properties I, LLC

("Fontainebleau"), an entity related and/or affiliated with Soffer, pledged to the Plaintiff a

certificate of deposit in the amount of Thirty Million Dollars ($30,000,000.00) as collateral

to partially secure the repayment of the obligations of Soffer and/or Turnberry under the

LCRA, the Guaranty and the Amendment to the Guaranty (the "Collateral").

7.    Pursuant to the Pledge Agreement, the LCRA, the Guaranty and the

Amendment to the Guaranty, Soffer and Fontainebleau agreed that if Soffer and Turnberry

defaulted under the LCRA, then Plaintiff could utilize the Collateral to pay sums which

were outstanding under the LCRA, the Guaranty and the Amendment to the Guaranty.

- 2 -



8.    On May 26, 2009, the beneficiary under the LC, Bank of America, N.A., as Disbursement Agent (the "Beneficiary"), presented Plaintiff with its sight draft and drawing certificate request in accordance with the terms of the LC, and requested payment of the entire stated amount of the LC, Fifty Million Dollars ($50,000,000.00) (the "Reimbursement Amount").

9.    On May 26, 2009, upon receipt of the sight draft and drawing certificate request, plaintiff called a representative of Soffer to inform Soffer and Turnberry of the receipt of the sight draft and drawing certificate request.

10.    In accordance with the terms of the LC, Plaintiff paid over to Beneficiary the Reimbursement Amount on May 27, 2009.

11.    Pursuant to Section 2.8(a) of the LCRA, Turnberry was required to reimburse Plaintiff on the same Business Day (i.e., May 27, 2009) of such Draw in the full amount of the Reimbursement Amount.  The Reimbursement Amount has not been received.  Further, if such Reimbursement Amount is not so reimbursed to Plaintiff as aforesaid, then pursuant to Section 2.8(c) of the LCRA, Turnberry is required to make such payment no later than May 29, 2009, at 11:00 A.M. (New York City time) (the "Reimbursement Payment Date"), together with interest thereon at the Prime Rate (as defined in the LCRA).  Further, in the event that such payment is not made by the Reimbursement Payment Date, Borrower, in accordance with Section 2.8(c) of the Credit Agreement, is required to pay not only such Reimbursement Amount, but interest thereon at the Default Rate (which Default Rate is equal to the Prime Rate plus 3%).

- 3 -



12. By letter dated May 27, 2009, Plaintiff informed Turnberry and Soffer of the Draw, and demanded payment of the Reimbursement Amount by the Reimbursement Repayment Date. Despite such demand, Turnberry and Soffer failed and refused to pay the Reimbursement Amount.

13. Pursuant to the terms of the LCRA, the Pledge Agreement, the Guaranty and the Amendment to the Guaranty, Plaintiff exercised its rights under the Pledge Agreement and utilized the Collateral thereunder, in the principal amount of Thirty Million Dollars ($30,000,000.00), to repay a portion of the Reimbursement Amount. Additionally, interest had accrued on the Collateral in the amount of Fifty Five Thousand, Six Hundred and Seventy-six dollars and Ninety-six cents ($55,676.96), which was also applied to repay a portion of the Reimbursement Amount.

14. Accordingly, there remains due from Turnberry and Soffer the remainder of the Reimbursement Amount, being the principal of Nineteen Million, Nine Hundred and Forty-four Thousand, Three Hundred and Twenty-three Dollars and Four cents ($19,944,323.04), plus interest and other sums due under the terms of the LCRA, the Guaranty and the Amendment to the Guaranty.

15. Pursuant to Section 8.11 of the LCRA, Turnberry and Soffer agreed to pay Plaintiff's reasonable attorneys' fees and cost, incurred by Plaintiff as a result of any default and any enforcement or collection proceedings resulting from the LCRA.

16. Pursuant to Section 26 of the Guaranty, Soffer agreed to pay Plaintiff's reasonable attorneys' fees and cost, incurred by Plaintiff for the perfection and preservation of, and enforcement of Plaintiff's, rights under the Guaranty.

- 4 -



17.     Despite demand, Turnberry and Soffer have failed and refused to pay the sums due to Plaintiff.

WHEREFORE, Plaintiff Deutsche Bank Trust Company Americas, demands judgment of defendants Jeffrey Soffer and Turnberry Residential Limited Partners, L.P., jointly and severally, for (1) compensatory damages, including, without limitation, the principal amount of Nineteen Million, Nine Hundred and Forty-four Thousand, Three Hundred and Twenty-three Dollars and Four cents ($19,944,323.04), interest accrued to the date hereof, interest accruing hereafter at the Default Rate, and attorneys fees and costs, (2) costs of suit and (3) such other and further relief as the Court may deem just and equitable.

DATED:      New York, New York
            June 3, 2009

LeClairRyan
A Professional Corporation

By: _____
    David W. Phillips, Esq..
    830 Third Avenue, Fifth Floor
    New York, New York  10022
    212-446-5030
    Attorneys for Deutsche Bank Trust
        Company Americas

- 5 -

# EXHIBIT C

**From:**       Robert Siegel [rsiegel@bilzin.com]
**Sent:**       Wednesday, September 02, 2009 3:04 PM
**To:**         Berman, Jeffrey
**Cc:**          Cioffi, Greg; Sagalyn, David H.; Sidney P. Levinson; Jeffrey Snyder
**Subject:**    RE: Fontainebleau
**Attachments:** img-9010945-0001.pdf; img-9010945-0001.pdf; img-9010943-0001.pdf; ATT17943.txt

Hi-pls see attached comments. Also, please make the same change I made to Sect 9 of the Disbursement Agreement to the corresponding provision of the Admin Agreement. We will provide you with a draft motion asap.

We do not have additional substantive comments, but please note that execution of these agreements is subject to our reaching a global resolution regarding the further use of cash collateral.



**Bilzin Sumberg**
ATTORNEYS AT LAW

Robert Siegel
**Bilzin Sumberg Baena Price & Axelrod LLP**
200 South Biscayne Boulevard, Suite 2500        Tel 305.350.2421
Miami, Florida 33131-5340                       Fax 305.351.2257
www.bilzin.com                                  rsiegel@bilzin.com

---

**From:** Berman, Jeffrey [mailto:bermanj@sewkis.com]
**Sent:** Wednesday, September 02, 2009 10:58 AM
**To:** Robert Siegel
**Cc:** Cioffi, Greg; Sagalyn, David H.; Sidney P. Levinson
**Subject:** RE: Fontainebleau

Any update?  Thanks.

---

**From:** Robert Siegel [mailto:rsiegel@bilzin.com]
**Sent:** Tuesday, September 01, 2009 11:04 AM
**To:** Berman, Jeffrey; Sidney P. Levinson
**Cc:** Tally, Nicholas; Jay M. Sakalo; Rose, Jeffery; Finkel, Peter F.; Clark, Joseph H.; Cioffi, Greg; Sagalyn, David H.; Bruce Bennett; Scott L. Baena
**Subject:** RE: Fontainebleau

Don't know until I speak to our group.

---

**Bilzin Sumberg**
ATTORNEYS AT LAW

Robert Siegel

9/25/2009

**Bilzin Sumberg Baena Price & Axelrod LLP**
200 South Biscayne Boulevard, Suite 2500          Tel 305.350.2421
Miami, Florida 33131-5340                         Direct Fax 305.351.2257
www.bilzin.com                                    rsiegel@bilzin.com

**Please consider the environment before printing this e-mail. Bilzin Sumberg Cares.**

**From:** Berman, Jeffrey [mailto:bermanj@sewkis.com]
**Sent:** Tuesday, September 01, 2009 10:58 AM
**To:** Robert Siegel; Sidney P. Levinson
**Cc:** Tally, Nicholas; Rose, Jeffery; Finkel, Peter F.; Clark, Joseph H.; Cioffi, Greg; Sagalyn, David H.; Bruce Bennett; Scott L. Baena
**Subject:** RE: Fontainebleau

If there are going to be substantive changes, we would rather wait. If you don't expect major comments, we will distribute. Please advise. Thanks.

**From:** Robert Siegel [mailto:rsiegel@bilzin.com]
**Sent:** Tuesday, September 01, 2009 10:57 AM
**To:** Berman, Jeffrey; Sidney P. Levinson
**Cc:** Tally, Nicholas; Rose, Jeffery; Finkel, Peter F.; Clark, Joseph H.; Cioffi, Greg; Sagalyn, David H.; Bruce Bennett; Scott L. Baena
**Subject:** RE: Fontainebleau

I have a few nits but also need to circle back with our group- you may wish to send the docs subject to our comments.

**Bilzin Sumberg**
ATTORNEYS AT LAW

Robert Siegel
**Bilzin Sumberg Baena Price & Axelrod LLP**
200 South Biscayne Boulevard, Suite 2500          Tel 305.350.2421
Miami, Florida 33131-5340                         Direct Fax 305.351.2257
www.bilzin.com                                    rsiegel@bilzin.com

**Please consider the environment before printing this e-mail. Bilzin Sumberg Cares.**

**From:** Berman, Jeffrey [mailto:bermanj@sewkis.com]
**Sent:** Tuesday, September 01, 2009 9:27 AM
**To:** Sidney P. Levinson
**Cc:** Tally, Nicholas; Rose, Jeffery; Finkel, Peter F.; Clark, Joseph H.; Cioffi, Greg; Sagalyn, David H.; Bruce Bennett; Robert Siegel; Scott L. Baena
**Subject:** RE: Fontainebleau

Thanks. Upon confirmation from Bob, we will distribute.

Jeff

9/25/2009

**From:** Sidney P. Levinson [mailto:LevinsonS@hbdlawyers.com]
**Sent:** Tuesday, September 01, 2009 12:48 AM
**To:** Berman, Jeffrey
**Cc:** Tally, Nicholas; Rose, Jeffery; Finkel, Peter F.; Clark, Joseph H.; Cioffi, Greg; Sagalyn, David H.; Bruce Bennett; Robert Siegel; Scott L. Baena
**Subject:** RE: Fontainebleau

Jeff – I have reviewed the changes in the attached revised drafts and, from my perspective, they can be distributed to Bank of America for their review/comment.  Sid.

**From:** Berman, Jeffrey [mailto:bermanj@sewkis.com]
**Sent:** Monday, August 31, 2009 2:59 PM
**To:** Sidney P. Levinson; Bruce Bennett; Robert Siegel; Scott L. Baena
**Cc:** Tally, Nicholas; Rose, Jeffery; Finkel, Peter F.; Clark, Joseph H.; Cioffi, Greg; Sagalyn, David H.
**Subject:** Fontainebleau

As discussed this afternoon, attached are revised drafts of the Successor Administrative Agent Agreement, Successor Disbursement Agent Agreement and Order regarding Appointment.

Please note that these drafts are being distribute to all parties simultaneously, and as such, remain subject to Wilmington's review and comment.

Upon your review, we will distribute to Bank of America and Sheppard Mullin.

Best regards.

Jeff

---

**Jeffrey Berman**

Tel: (212) 574-1232
Email: bermanj@sewkis.com

**SEWARD & KISSEL LLP**
One Battery Park Plaza
New York, NY 10004
Fax: (212) 480-8421
Web: www.sewkis.com

---

**Confidentiality Notice:** This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. If you have received this e-mail in error, please notify Seward & Kissel LLP by return e-mail and destroy the original message and all copies thereof.

**Circular 230 Notice:** To ensure compliance with Treasury regulations regarding practice before the IRS, we inform you that, unless expressly stated otherwise, any federal tax advice contained in this communication was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under United States federal tax law, or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.



## Hennigan Bennett & Dorman LLP

**865 South Figueroa Street**
**Suite 2900**
**Los Angeles, California 90017**
**Telephone: (213) 694-1200**
**Facsimile: (213) 694-1234**

This e-mail was sent by a law firm and may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately. Thank you.

***TAX ADVICE DISCLOSURE***

Pursuant to Internal Revenue Service Circular 230, we are required to advise you that if there is any tax advice contained herein, it is not intended to be used, and cannot be used, by the addressee or any taxpayer, for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code.

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in this message. If you have received this message in error, please advise the sender by reply e-mail or reply to info@bilzin.com, and delete the message. Thank you very much...

***TAX ADVICE DISCLOSURE***

Pursuant to Internal Revenue Service Circular 230, we are required to advise you that if there is any tax advice contained herein, it is not intended to be used, and cannot be used, by the addressee or any taxpayer, for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code.

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in this message. If you have received this message in error, please advise the sender by reply e-mail or reply to info@bilzin.com, and delete the message. Thank you very much...

# EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

---

AVENUE CLO FUND, LTD., *et al.*,

        Plaintiffs,

  - against -

FONTAINEBLEAU RESORTS, LLC, a Delaware
limited liability company, *et ano.*,

        Defendants.

---

Index No. 650435/2009

Hon. Richard B. Lowe III, J.S.C.

Motion Sequence # 4

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE AMENDED COMPLAINT

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP

1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................... 4

A.   The Fontainebleau Las Vegas Project And The Operative
Financing Agreements ............................................................................... 4

    1.   The Credit Agreement........................................................................ 4

    2.   The Guarantees ................................................................................. 5

B.   The Revolver Banks Breach The Credit Agreement ................................. 6

C.   Fontainebleau Files For Bankruptcy ........................................................ 7

D.   The Individual Lenders Purport To Bring Suit .......................................... 8

ARGUMENT ..................................................................................................... 8

I.   Standards For Dismissal ........................................................................... 8

II.   The Complaint Must Be Dismissed Because Plaintiffs,
As Individual Lenders, Lack Standing To Enforce The Guarantees .................... 10

    A.   New York Law Precludes Individual Lender Action
Where Loan Documents Demonstrate An Overall
Scheme Of Collective Action ............................................................. 10

    B.   The Credit Agreement And The Guarantees Unambiguously
Demonstrate An Overall Scheme Of Collective Action That
Bars Plaintiffs' Individual Claims ...................................................... 14

        1.   Applicable Provisions Of New York Contract Interpretation .................... 14

        2.   The Credit Agreement Contemplates Collective Action............................ 15

        3.   The Guarantees Likewise Contemplate Collective Action ........................ 19

        4.   The Individual Lenders' Right Of Set-Off Is The Exception
That Proves The Rule ................................................................... 22

    C.   Even If Plaintiffs Control A Majority Of The Outstanding Loans,
They Cannot Proceed Directly On Their Own Behalf................................. 23

CONCLUSION................................................................................................... 25

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Beal Sav. Bank v. Sommer,*
  29 A.D.3d 388 (1st Dep't 2006) ........................................................... 12

*Beal Sav. Bank v. Sommer,*
  8 N.Y.3d 318 (2007) ..................................................................... *passim*

*Cornhusker Farms. Inc. v. Hunts Point Coop. Mkt., Inc.,*
  2 A.D.3d 201 (1st Dep't 2003) ............................................................... 9

*Credit Francais International, S.A. v. Sociedad Financiera de Comercio, C.A.,*
  128 Misc. 2d 564 (Sup. Ct. N.Y. Cty. 1985) .................................... *passim*

*Excess Ins. Co. Ltd. v. Factory Mut. Ins. Co.,*
  3 N.Y.3d 577 (2004) ......................................................................... 17

*Goldman v. Metro. Life Ins. Co.,*
  5 N.Y.3d 561 (2005) ......................................................................... 14

*Goldman v. White Plains Ctr. for Nursing Care, LLC,*
  11 N.Y.3d 173 (2008) ........................................................................ 14

*Goldsmith v. Metro. Fiber Network,*
  293 A.D.2d 383 (1st Dep't 2002) ............................................................ 9

*Held v. Kaufman,*
  91 N.Y.2d 425 (1998) .......................................................................... 8

*Helmsley-Spear, Inc. v. New York Blood Ctr., Inc.,*
  257 A.D.2d 64 (1st Dep't 1999) ............................................................ 15

*Matter of Westmoreland Coal Co. v. Entech, Inc.,*
  100 N.Y.2d 352 (2003) ....................................................................... 15

*McGuire v. Sterling Doubleday Enters., L.P.,*
  19 A.D.3d 660 (2d Dep't 2005) .............................................................. 9

*Mizuho Corporate Bank, LTD. v. Enron Corp.,*
  302 B.R. 463 (Bankr. S.D.N.Y. 2003) ...................................................... 14

*Morgenthow & Latham v. Bank of N.Y. Co.,*
  305 A.D.2d 74 (1st Dep't 2003) ............................................................. 4

ii

*New Bank of New England, N.A. v. Toronto-Dominion Bank,*
    768 F. Supp. 1017 (S.D.N.Y. 1991)................................................................13, 14

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,*
    46 A.D.3d 530 (2d Dep't 2007) ..........................................................................9

*Reznikov v. Walowitz,*
    63 A.D.3d 1134 (2d Dep't 2009) ........................................................................9

*Robinson v. Robinson,*
    303 A.D.2d 234 (1st Dep't 2003) ......................................................................8, 9

*Zurich Depository Corp. v. Iron Mtn. Info. Mgt., Inc.,*
    61 A.D.3d 750 (2d Dep't 2009) ..........................................................................9

**STATUTES**

CPLR 3211(a)(1) ........................................................................................ *passim*

CPLR 3211(a)(7) ........................................................................................ *passim*

Defendants Fontainebleau Resorts, LLC ("Resorts") and Fontainebleau Resort Properties I, LLC ("Properties," and collectively with Resorts, the "Guarantors") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint with prejudice pursuant to CPLR 3211(a)(1) and (7).[1]

## PRELIMINARY STATEMENT

This case involves an attempt by individual members of a lending syndicate to recover their own *pro rata* shares of the outstanding debt under a construction loan from two of the borrower's guarantors. But these plaintiffs lack standing to assert individual claims. Under the unambiguous provisions of the parties' agreements, and a squarely applicable 2007 decision of the New York Court of Appeals, only the administrative agent, acting to enforce the lending syndicate's collective rights, is authorized to bring suit. Accordingly, the complaint must be dismissed with prejudice.

The financing giving rise to this litigation was provided in connection with the development and construction of the multi-billion-dollar Fontainebleau Las Vegas casino and resort (the "Project") -- a 63-story, 3,800-room luxury casino and destination resort located at the north end of the "Strip" in Las Vegas. The operative June 6, 2007 Credit Agreement (the "Credit Agreement" or "CA"), contemplated $1.85 billion in three senior secured credit facilities, by a syndicated consortium of lenders, with Bank of America, N.A. serving as administrative agent (the "Administrative Agent"). One set of lenders (the "Term Lenders") has already provided $1.05 billion in funding to the Project. Another set of lenders (the "Revolver Banks") has refused to fund its $800 million revolving loan commitment.

---

[1] Submitted herewith in support of the motion is the Affirmation of Matthew A. Kraus, dated September 11, 2009 (the "Kraus Aff."), and accompanying exhibits. Unless otherwise specified, exhibit citations herein are to the exhibits accompanying the Kraus Aff.

As a result of the Revolver Banks' failure to honor their funding commitments, the Project's developer, Fontainebleau Las Vegas LLC ("Fontainebleau"), has filed for bankruptcy, thus triggering an Event of Default under the operative loan agreements. The Project, which was originally scheduled to open in October 2009, has not been completed.

The plaintiffs here are a group of individual Term Lenders. They purport to bring suit to recover their own shares of the outstanding loan obligations under two guarantees of repayment (the "Guarantees") that were provided by affiliates of Fontainebleau. According to the amended complaint (the "Complaint"), plaintiffs collectively control approximately $640 million out of the $1.05 billion in term loans outstanding.[2] The Administrative Agent is not a party to the case. Nor are the remaining Term Lenders or the Revolver Banks.

As set forth more fully below, the Complaint must be dismissed with prejudice because the operative loan documents bar these lender plaintiffs from asserting individual claims against the borrower or its guarantors. This result is dictated by the New York Court of Appeals' 2007 decision in *Beal Savings Bank v. Sommer*, 8 N.Y.3d 318 (2007) ("*Beal*"). The decision in *Beal* affirmed the dismissal, for lack of standing, of a claim by an individual member of a lender syndicate under an ancillary guaranty agreement. *Id.* at 332. The Court of Appeals held explicitly that where parties have entered into a syndicated bank loan and related agreements, the remedies in the event of a default can *only* be exercised -- absent explicit contractual language to the contrary -- by the Administrative Agent, on behalf of all lenders, and not by each lender individually. *Beal*, which was decided in March 2007 -- while the operative agreements here

---

[2]    Since the filing of the Complaint, one affiliated group of eight plaintiffs has apparently sold its positions and, accordingly, discontinued its claims. (*See* Ex. E)

2

were being negotiated -- made clear that if parties wish to afford lenders an individual right to sue, they "should expressly state their intention in this regard." *Id.* at 332 n.3.

The parties here did no such thing. To the contrary: the relevant agreements identified in and attached to the Complaint -- the Credit Agreement and the Guarantees -- unambiguously demonstrate that the parties contracted for a *collective* action scheme, whereby only the Administrative Agent, rather than individual lenders, may act to enforce contractual remedies. Thus, the Credit Agreement explicitly provides that each of the lenders "irrevocably appoints" the Administrative Agent to act on behalf of the lending syndicate, and "to take such actions on its behalf and to exercise such powers" as are delegated to it under the Credit Agreement and the other "Loan Documents," including the Guarantees.

The Guarantees themselves, to which the individual lenders are not even parties but are at best beneficiaries, provide guarantees of repayment "to the Administrative Agent" for the ratable benefit of all guaranteed parties. Any such payments must be made "to the Administrative Agent," not to individual lenders. And the waiver of jury-trial rights -- one of the few provisions of the Guarantees that deals directly with potential litigation -- only contemplates litigation by the Administrative Agent.

In sum, because the express terms of the parties' agreements unambiguously demonstrate a scheme of collective action whereby the Administrative Agent -- and only the Administrative Agent -- can enforce the rights of the Lenders in the event of a borrower default, this action by the individual lenders must be dismissed for lack of standing.

## STATEMENT OF FACTS[3]

**A.    The Fontainebleau Las Vegas Project And The Operative Financing Agreements**

This action arises out of the financing for construction and development by Fontainebleau of the Project in Las Vegas.  The agreements governing the financing for the Project were all entered into as of June 6, 2007.

### 1.    The Credit Agreement

The Credit Agreement provides for $1.85 billion in bank financing by a syndicated consortium of lenders, in three senior secured credit facilities.  (Compl. (Ex. D) ¶ 2)  The first two, which have been funded by the Term Lenders, were a $700 million term loan facility, and a $350 million delay draw term loan facility.  (Compl. (Ex. D) ¶ 2)  The third facility, an $800 million revolving loan, was to be provided by the Revolver Banks.  (Compl. (Ex. D) ¶ 2)

The lending syndicate that is responsible for funding the term loan facilities comprises over one hundred different financial institutions, of which the plaintiffs in this action are only a subset.  As is customary, interests in these loans were intended to be, and are, freely traded.  The Credit Agreement itself does not list the individual lenders; its title page refers to the "Lenders referred to herein," and the term "Lenders" is defined as "each lender from time to time party hereto."  (Ex. A (CA) at title page, p.1)  Specific provisions of the Credit Agreement govern the assignment by Lenders of all or a portion of their respective interests and the sale of participations from one Lender to another.  (Ex. A (CA) §§ 10.6(b), (d))  The Administrative

---

[3]    Unless otherwise noted, the matters set forth in the Statement of Facts are drawn from (i) the Complaint in this action (Ex. D); (ii) the undisputed terms of contracts referenced in the Complaint (Exs. A, B, and C); and (iii) allegations by the plaintiffs in another, related action, filed by the very same plaintiffs in the District of Nevada, *Avenue CLO Fund, LTD et al. v. Bank of America, N.A., et al.*, No. 09-CV-01047-KJD-PAL (D.Nev. 2009) (Ex. F). Such allegations constitute binding judicial admissions on the part of plaintiffs here.  *See Morgenthow & Latham v. Bank of N.Y. Co.*, 305 A.D.2d 74, 80 (1st Dep't 2003) (allegations made by plaintiffs in their complaint in a separate action constitute informal judicial admissions and may be considered documentary evidence under CPLR 3211).

Agent is responsible for maintaining a Register identifying all Lenders and their respective participations. (Ex. A (CA) §§ 2.7, 10.6)

As discussed more fully below (*see* Point II.B.2, infra), the Credit Agreement provides that upon an Event of Default, "the Administrative Agent and the Lenders" -- notably, employing the conjunctive "and" and the plural "Lenders" -- may exercise all rights "available under applicable law, in equity or otherwise," under the Loan Documents, which includes the Guarantees. (Ex. A (CA) §§ 8, 1.1 p.20) The Credit Agreement also explicitly delegates this collective right to the Administrative Agent: "[e]ach of the Lenders . . . irrevocably appoints Bank of America to act on its behalf as Administrative Agent . . . and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent" under the Credit Agreement and the other Loan Documents. (Ex. A (CA) § 9.1(a))

The Credit Agreement contains New York forum and choice-of-law provisions, and New York law applies to its interpretation. (*See* Ex. A (CA) § 10.11)

### 2.    The Guarantees

In connection with the execution of the Credit Agreement, two Fontainebleau affiliates -- Resorts and Properties -- provided separate guarantees of Fontainebleau's repayment obligations. (Exs. B, C) Plaintiffs attached the Guarantees to their Complaint.

Only Bank of America, and not the individual lenders, is a signatory to the Guarantees. (Ex. B (Resorts Guaranty) at p.12; Ex. C (Properties Guaranty) at p.14) Bank of America is a party to both Guarantees in its capacity "as Administrative Agent" for "the banks and other financial institutions or entities (the 'Lenders') from time to time parties to the Credit Agreement." (Ex. B (Resorts Guaranty) at p.1; Ex. C (Properties Guaranty) at p.1) Both

5

Guarantees are for the benefit of the "Guaranteed Parties," defined to include not only the Lenders, but also the Administrative Agent, the Specified Hedge Affiliates and the Specified Cash Management Affiliates as well. (*See* Ex B (Resorts Guaranty) § 1.1; Ex C (Properties Guaranty) § 1.1)

By their express terms, the Guarantees and the Credit Agreement are interrelated and are to be interpreted together. Section 1.1 of the Credit Agreement defines the "Loan Documents" to include the "Guarantees," which in turn is defined to include both the Resorts Guaranty and the Properties Guaranty. (Ex. A (CA) § 1.1 pp. 26, 20) The Credit Agreement's integration clause likewise encompasses both the Credit Agreement and the Loan Documents. (Ex. A (CA) § 10.10) And each of the Guarantees provides that its execution and delivery was a condition precedent to the obligations of the Lenders to make their respective extensions of credit to the Borrowers under the Credit Agreement. (Ex. B (Resorts Guaranty) at 1; Ex. C (Properties Guaranty) at 1)

Like the Credit Agreement, the Guarantees are governed by New York law and provide for a New York forum. (See. Ex. B (Resorts Guaranty) § 5.12; Ex. C (Properties Guaranty) § 6.12)

**B.    The Revolver Banks Breach The Credit Agreement**

From the time these financing agreements were signed until March 2009, the parties performed their obligations under the agreements and construction on the Project moved forward. Beginning no later than March 2009, however, the Revolver Banks -- including Bank of America, which is also individually a Revolver Bank -- breached the Credit Agreement by refusing to fund their $800 million lending commitment. As the Term Lender plaintiffs in this action have alleged in a complaint they filed against the Revolver Banks in Federal District

Court in Nevada, the "[the Revolver Banks] breached the Credit Agreement by refusing to fund their respective shares of the loan commitments under the Revolver Facility, and thereafter purportedly terminating altogether their loan commitments under the Credit Agreement." (Ex. F (Nev. Compl.) ¶ 169)

Fontainebleau has also filed suit against the Revolver Banks, alleging violations of the Credit Agreement in connection with the very same breaches. *See Fontainebleau Las Vegas LLC v. Bank of America, N.A., et al.,* No. 09-cv-21879-ASG (S.D. Fla.).

## C.     Fontainebleau Files For Bankruptcy

On June 9, 2009, following these and other breaches, Fontainebleau filed a voluntary petition in the United States Bankruptcy Court for the Southern District of Florida, Miami Division, Case No. 09-21482-BKC-AJC (Bankr. S.D. Fla.), seeking relief under chapter 11 of the Bankruptcy Code. (Compl. (Ex. D) ¶ 130)  Fontainebleau filed for bankruptcy because, among other things, the Revolver Banks had refused to fund their $800 million commitments under the Credit Agreement, and as a consequence, Fontainebleau was left with virtually no source of funding for the continuing construction of the Project.

Under the Credit Agreement, Fontainebleau's filing for bankruptcy triggered an immediate Event of Default. (*See* Ex. A (CA) § 8(f)(i))  Accordingly, by operation of the agreement, all amounts owed by Fontainebleau under the Credit Agreement and other Loan Documents became due and payable. (*See* Ex. A (CA) § 8)  Under the Guarantees, the occurrence of an Event of Default under the Credit Agreement also triggers the Guarantors' payment obligations.[4]  (Ex. B (Resorts Guaranty) § 2.1(a); Ex. C (Properties Guaranty) § 2.1(a))

---

[4]     Defendants do not concede hereby that they are obligated to make payment, even to the Administrative Agent, under the Guarantees. Where, as here, an Event of Default was caused by a Lender breach -- *i.e.,* the

**D.      The Individual Lenders Purport To Bring Suit**

Plaintiffs commenced this action on July 20, 2009, and filed an amended complaint on July 23, 2009.  When this action was initially filed, plaintiffs consisted of 117 individual term lenders.  Since that time, eight of the lenders have voluntarily dismissed their claims with prejudice, apparently because they sold their positions.  (Ex. E)

The Complaint seeks to recover $640 million under the Guarantees, allegedly reflecting the "ratable amount due" to the collection of individual lenders that are parties here.  (Compl. (Ex. D) ¶¶ 134, 139, 144)  Plaintiffs have made no claim for the interests of any other lenders. The Complaint does not allege that plaintiffs have asked the Administrative Agent to bring suit on behalf of the Lenders -- not that such a demand alone would confer standing on plaintiffs -- and the Administrative Agent is not a party to this lawsuit.[5]

## ARGUMENT

**I.      Standards For Dismissal**

"[I]t is settled law that a CPLR 3211 dismissal may be granted where documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law." *Held v. Kaufman*, 91 N.Y.2d 425, 430-31 (1998) (internal quotation omitted).  "While a complaint is to be liberally construed in favor of [a] plaintiff on a CPLR § 3211 motion to dismiss, the court is not required to accept factual allegations that are plainly contradicted by the documentary evidence or legal conclusions that are unsupportable based upon the undisputed facts." *Robinson v. Robinson*, 303 A.D.2d 234, 235 (1st Dep't 2003) (citation omitted).

---

Revolver Banks' refusal to fund their commitments -- the Lenders cannot invoke that same Event of Default to demand payment.  Defendants fully reserve their rights as to this and any other defenses not expressly raised herein.

[5]      In May 2009, Bank of America submitted its resignation as Administrative Agent.  The Credit Agreement provides that in the event of such resignation, the resigning Administrative Agent shall serve until a successor is appointed.  (Ex. A (CA) § 9.6)  A successor Administrative Agent has not yet been appointed.

The "documentary evidence" that may be considered on a motion under CPLR 3211(a)(1) includes the contracts at issue in the Complaint.  If the plaintiff cannot recover under the contract as a matter of law, the court must dismiss the complaint.  *See Reznikov v. Walowitz*, 63 A.D.3d 1134, 1135 (2d Dep't 2009) (dismissing plaintiff's claims for interference with easement based on documentary evidence -- a signed cancellation agreement terminating the easement); *Robinson*, 303 A.D.2d at 235 (dismissing breach of contract claims based on a finding that the terms of the contract "amply demonstrate[] that plaintiff's claims against appellant are unsupportable"); *Cornhusker Farms. Inc. v. Hunts Point Coop. Mkt., Inc.*, 2 A.D.3d 201, 203-05 (1st Dep't 2003) (dismissing multiple breach of contract claims based on the unambiguous language of a Subscription Agreement and a letter agreement); *Goldsmith v. Metro. Fiber Network*, 293 A.D.2d 383, 384 (1st Dep't 2002) (affirming dismissal of complaint where "documentary evidence relied upon by defendants conclusively establishes the defense contention that no reasonable reading of the subject agreement permits the construction urged by plaintiffs") (internal citation omitted).

Thus, on a motion addressed to the sufficiency of a complaint pursuant to CPLR 3211(a)(1) and (7), "[i]f the documentary proof disproves an essential allegation of the complaint, dismissal pursuant to CPLR 3211(a)(7) is warranted even if the allegations, standing alone, could withstand a motion to dismiss for failure to state a cause of action." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 46 A.D.3d 530, 530 (2d Dep't 2007).  *See also Zurich Depository Corp. v. Iron Mtn. Info. Mgt., Inc.*, 61 A.D.3d 750 (2d Dep't 2009) (dismissing plaintiff's breach of contract and tortious interference claims because documentary evidence submitted by the defendant established that no enforceable contract was in effect); *McGuire v. Sterling Doubleday Enters., L.P.*, 19 A.D.3d 660, 661-62 (2d Dep't 2005) (dismissing plaintiff's

third-party-beneficiary claims after lease agreement presented by defendants demonstrated that the plaintiff was no more than an incidental beneficiary).

II.    **The Complaint Must Be Dismissed Because Plaintiffs, As Individual Lenders, Lack Standing To Enforce The Guarantees**

The individual lenders that are plaintiffs here cannot maintain this action because under New York law and the express terms of the relevant agreements, the right to enforce the Guarantees is a *collective* right, vested solely in the Administrative Agent.  Because this action is brought only by individual lenders on their own behalf, and not by the Administrative Agent for the benefit of *all* Lenders, it must be dismissed.

A.    **New York Law Precludes Individual Lender Action Where Loan Documents Demonstrate An Overall Scheme Of Collective Action**

New York law clearly holds that where a syndicated loan agreement designates one bank to act as agent -- as is the case here -- then, absent unequivocal language to the contrary, *only* that agent can enforce the lenders' collective rights under the operative agreements.

The Court of Appeals' recent decision in *Beal Savings Bank v. Sommer*, 8 N.Y.3d 318 (2007) ("*Beal*"), is squarely on point.  In *Beal*, the Court of Appeals held that an individual lender could not bring suit under an ancillary guaranty agreement where the authority to pursue remedies under a syndicated lending agreement was delegated to the Administrative Agent, and the explicit language of the lending agreements likewise demonstrated an overall scheme of collective lender action.

Much like the present case, *Beal* involved a syndicate of lenders that invested hundreds of millions of dollars in the construction and development of a resort/casino (the Aladdin) in Las Vegas. *Id.* at 321.  Shortly after opening, following the events of September 11, 2001, the project went into bankruptcy.  Thereafter, the Administrative Agent under the Credit Agreement

10

and thirty-six out of thirty-seven syndicate lenders entered into a settlement agreement with the project's parent company. *Id.* at 323. One individual lender, Beal Savings Bank, did not join the settlement and brought suit for breach of an ancillary guaranty agreement (the "Keep-Well Agreement"). *Id.* at 324. Defendant moved to dismiss, pursuant to CPLR 3211(a)(1) and (7), on the ground that a single lender lacked standing to enforce the Keep-Well Agreement. Supreme Court granted the motion, and the Appellate Division affirmed. *Id.*

The Court of Appeals affirmed the dismissal, holding that "the lenders intended to act collectively in the event of the borrower's default and to preclude an individual lender from disrupting the scheme of the agreements at issue." *Id.* at 321. In so holding, the Court of Appeals focused both on the terms of the Keep-Well Agreement and on the underlying Credit Agreement. Even though neither agreement contained an explicit provision governing an individual lender's right to sue directly, the Court looked to "other specific clauses and the agreements as a whole to ascertain the parties' intent." *Id.* at 326. That review, concluded the Court, made clear that the operative agreements had an "unequivocal collective design." *Id.*

The *Beal* court focused on Section 8.3 of the Credit Agreement, which stated that:

> [i]f any Event of Default . . . shall occur for any reason . . . the Administrative Agent upon direction of the Required Lenders may . . . exercise any or all rights and remedies at law or in equity . . . including . . . recover judgment on the Completion Guaranty or the Keep-Well Agreement either before, during or after proceedings for the enforcement of the Lenders' right and remedies hereunder or under the other Loan documents.

*Id.* at 326-27. The Court of Appeals interpreted this language to mean that in the event of a default, the Administrative Agent, upon the direction of the Required Lenders, was empowered to exercise all rights and remedies on behalf of the Lenders, including recovering judgment on the Keep-Well Agreement. *Id.* at 327-28.

11

The Court in *Beal* also concluded that the provisions of both agreements, read as a whole, demonstrated that the parties "contemplated unified action by the Administrative Agent." *Id.* at 328. The Court determined that the Administrative Agent "does not perform merely mechanical or technical functions," but rather received "a broad grant of power," including specific authorization to act on behalf of the Lenders, the ability to set rates of interest and review the Borrower's financial statements, and the right to exercise both "discretionary power and power under the direction of the Required Lenders." *Id.* at 328-29.

The Court of Appeals thus found that the overall language of the lending agreements demonstrated that the parties intended for collective, rather than individual, action in the wake of an Event of Default, and affirmed the Appellate Division's holding that the "broad grant of authority upon the administrative agent conditioned upon a supermajority vote evinces a clear intention that enforcement of the loan documents, including the keep-well agreement, be collective, and that a minority lender, such as plaintiff, be prohibited from acting unilaterally to recover a judgment." *See Beal Sav. Bank v. Sommer*, 29 A.D.3d 388, 389 (1st Dep't 2006).

*Beal* was simply the latest and most authoritative pronouncement of New York law in the context of syndicated loan agreements. Where, as here, loan documents demonstrate an overall scheme of collective lender action, courts applying New York law have held as a matter of law that individual lender action is precluded. In *Credit Francais International, S.A. v. Sociedad Financiera de Comercio, C.A.*, 128 Misc. 2d 564, 581 (Sup. Ct. N.Y. Cty. 1985) ("*Credit Francais*"), for example, the Supreme Court granted defendant's motion to dismiss claims brought by an individual lender in a bank consortium. The court ruled that the individual lender did not have standing under a loan agreement whose "over-all design . . . is to have unified action handled by a single agent who will proceed for all, so that no individual lending bank

12

would gain a preference over the others." *Id.* at 581. The court noted, in analyzing the relevant loan agreement, that the title page stated that it was an agreement between the defendant and administrative agent, and that lenders were not named individually but collectively as the "Depositors." *Id.* at 577. The court concluded that "[t]he very nature of the agreement indicates it is not between the defendant borrower and the nine individual lenders . . . [but rather] between the borrower and a consortium of lending banks." *Id.* at 577.

In determining that the loan documents exhibited a collective scheme, the *Credit Francais* court also relied upon the many substantive rights and objections of the administrative agent under the loan agreement. *Id.* at 577-78. The court ultimately concluded that the loan agreement was "quite clear that in virtually all aspects of the relationship there is only one institution empowered to act on behalf of all the lending banks, and that is the [Administrative Agent] as the duly designated agent for such banks" and that "the parties contemplated that there would be collective action taken by the agent on behalf of all members of the consortium." *Id.* at 577-79. Accordingly, the *Credit Francais* court dismissed the complaint.

Similarly, in *New Bank of New England, N.A. v. Toronto-Dominion Bank*, 768 F. Supp. 1017 (S.D.N.Y. 1991), the court dismissed an action brought by a minority lender under a syndicated loan agreement, against the wishes of the majority of lenders in the syndicate, seeking to compel the acceleration of a loan and the foreclosure on collateral. *Id.* at 1019-20. The underlying credit agreement specifically provided that upon the borrower's default "the vote of a majority of the Lenders is required in order to exercise the remedies of acceleration and foreclosure." *Id.* at 1022. However, there existed no provision in the credit agreement permitting a minority lender to compel acceleration or foreclosure and there was "no provision which even suggest[ed] such authority." *Id.* In addition, the intercreditor agreement provided

13

that "the agent may act in certain circumstances in accordance with the directions of the majority

of lenders," but was silent as to the ability of an individual to compel acceleration of the loan.

*Id.* at 1020-21. Because the unambiguous language demonstrated that acceleration and

foreclosure were collective remedies and could not be exercised without a majority vote of

lenders, the court determined that the individual lenders lacked the proper standing to compel

such actions. *Id.* at 1022. *See also Mizuho Corporate Bank, LTD. v. Enron Corp.*, 302 B.R. 463,

477 (Bankr. S.D.N.Y. 2003), *aff'd*, 2005 U.S. Dist. LEXIS 2134 (S.D.N.Y. 2005) (granting

motion to dismiss because individual members of a banking group lacked standing to sue

obligors for collateral pledged under certain security instruments).

**B.      The Credit Agreement And The Guarantees Unambiguously Demonstrate
          An Overall Scheme Of Collective Action That Bars Plaintiffs' Individual
          Claims**

This case falls squarely within the rule of *Beal*, *Credit Francais*, and *New Bank of New*

*England.* Just as in those cases, the agreements here unambiguously contemplate a scheme of

collective action whereby the Administrative Agent -- and only the Administrative Agent -- can

enforce the collective rights of the Lenders. Accordingly, the Term Lender plaintiffs lack

standing to assert individual claims, and this action must be dismissed.

**1.      Applicable Provisions Of New York Contract Interpretation**

The principles governing construction of the operative agreements under New York law

are well-settled. "[A] written agreement that is complete, clear and unambiguous on its face

must be enforced according to the plain meaning of its terms, without reference to extrinsic

materials outside the four corners of the document." *Goldman v. White Plains Ctr. for Nursing*

*Care, LLC*, 11 N.Y.3d 173, 176 (2008). The fact that parties to a litigation may dispute the

interpretation of a contract does not render it ambiguous. *See Goldman v. Metro. Life Ins. Co.*, 5

14

N.Y.3d 561, 571 (2005) ("[m]ere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact").

In general, courts should construe agreements "so as to give meaning to all of its language and avoid an interpretation that effectively renders meaningless a part of the contract." *Helmsley-Spear, Inc. v. New York Blood Ctr., Inc.*, 257 A.D.2d 64, 69 (1st Dep't 1999). *See also Beal*, 8 N.Y.3d at 324 (courts should interpret a contract so as not to render any portion meaningless or surplusage). Further, a contract should be "read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose." *Id.* at 324-25 (citing *Matter of Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003)).

### 2.    The Credit Agreement Contemplates Collective Action

Much like the loan agreements in *Beal* and *Credit Francais*, the unambiguous language of the Credit Agreement (i) grants to the Administrative Agent, acting upon the direction of the Required Lenders, the exclusive ability to exercise all rights and remedies under the Loan Documents upon an Event of Default, (ii) places substantial responsibility in the hands of the Administrative Agent, and (iii) reflects an overall structure dictating collective lender action. The language and structure of the Credit Agreement thus unambiguously requires dismissal.

Section 8 of the Credit Agreement, which deals with Events of Default, provides to "the Administrative Agent and the Lenders," collectively, the right to exercise remedies under the Loan Documents. (*See* Ex. A (CA) § 8) This includes all rights "available under applicable law, in equity or otherwise," including the right to pursue claims under the Loan Documents (which includes the Guarantees), as well as "to enter into possession of the Project and perform any and

15

all work and labor necessary to complete the Project or to operate and maintain the Project . . . ."
(Ex. A (CA) § 8)

Sections 9.1 and 9.3 of the Credit Agreement set forth an irrevocable delegation of these rights by the "Lenders" -- collectively -- to the Administrative Agent.  Section 9.1(a) provides:

> Each of the Lenders and the Issuing Lender hereby irrevocably appoints Bank of America to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.

(Ex. A (CA) § 9.1(a))  Thus, the Administrative Agent is expressly authorized by the plain terms of the Credit Agreement to act on behalf of the Lenders with respect to the "Loan Documents," including the Guarantees.

The Credit Agreement also specifies the mechanism whereby a majority of Lenders can instruct the Administrative Agent to take such action.  Under Section 9.3, the Administrative Agent can generally be directed to exercise its discretionary authority under the Loan Documents by written direction of the "Required Lenders," *i.e.*, non-defaulting Lenders holding more than 50% of the outstanding obligations.  (Ex. A (CA) § 1.1, p.33)  Section 9.3(b) states:

> The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent . . . shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise *as directed in writing by the Required Lenders* (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents). . . .

(Ex. A (CA) § 9.3(b) (emphasis added))  Read together, these provisions make clear that the Administrative Agent is to act on behalf of *all* Lenders, when so directed by a majority (the

16

"Required Lenders"). That is the same collective-action scheme enforced by the Court of Appeals in *Beal*.

The collective rights set forth in Section 8 of the Credit Agreement -- referring to "the Administrative Agent and the Lenders," with the conjunctive "and" and the plural "lenders" -- are clearly inconsistent with direct actions by one or more individual Lenders. If the Lenders were permitted to bring suit individually, then each lender could pursue its own chosen remedies and there would be no need for the provisions in Section 9.3 of the Credit Agreement allowing a majority of "Required Lenders" to direct the actions of the Administrative Agent. As the Court of Appeals explained in *Beal*, an interpretation allowing individual suits "would render [Section 9.3] meaningless because there would be no reason to provide that the Required Lenders could enforce the agreements by a supermajority vote directing the Administrative Agent to act." 8 N.Y.3d at 328 (citing *Excess Ins. Co. Ltd. v. Factory Mut. Ins. Co.*, 3 N.Y.3d 577, 582 (2004)).

Perhaps the most compelling evidence that these remedies were intended to be collective are the enumerated rights to "enter into the possession of the Project" and to "perform any and all work and labor necessary to complete the Project." (Ex. A (CA) § 8) How could each Lender separately be entitled to take possession? Or to make the design decisions necessary to complete the Project? The *only* reasonable construction of the phrase "the Administrative Agent and the Lenders" in Section 8 is the one that takes account of the "irrevocable appointment" in Section 9: the Administrative Agent must act on behalf of *all* Lenders, collectively.

As the *Credit Francais* court recognized, a contrary interpretation that allowed lenders to exercise remedies individually would fly in the face of the practical realities of a syndicated financing like this one. "It would, indeed, be chaotic if each participating bank were to take separate action." *Credit Francais*, 128 Misc. 2d at 579. If one bank were permitted to bring an

17

action individually, "the other banks would be required, as a matter of self-protection, to bring their own lawsuits, confronting the defendant with disparate and mutually antagonistic claims and making impossible an orderly approach to the refinancing of the debt." *Id.* at 581.

Particularly where, as here, a borrower and its guarantors are in bankruptcy or financial distress, allowing individual lenders to pursue their own actions would trigger a "race to the courthouse" in an attempt to recover against a limited pool of assets. Preclusion of individual action where a collective scheme is established thus "prevent[s] the possibility of multiplicity of suits by individual banks working at cross purposes for their own individual benefit," *id.* at 579, as well as the risk of inconsistent judgments. The only reasonable interpretation of the Credit Agreement is that the remedies under Section 8 would be pursued solely through collective action by the Administrative Agent, acting at the direction of the Required Lenders for the benefit of all lenders in accordance with Section 9.

The overall structure of the Credit Agreement likewise makes clear that it is the Administrative Agent, and not individual lenders who might trade their interests at any time, that acts on behalf of the Lenders in dealing with the borrower and its Guarantors. Under the Credit Agreement, the Administrative Agent is the sole entity that:

- receives each notice of borrowing from the Borrower, and in turn collects each Lender's *pro rata* share of the funds necessary to satisfy each borrowing (Ex. A (CA) § 2.4);

- collects payment and pre-payment on the various loans from the Borrower, and under the term of the Credit Agreement the Borrower promises to repay the Administrative Agent for the accounts held by the Lenders (Ex. A (CA) § 2.7(a));

- maintains the "Register" containing all of the relevant information for each loan including the type, the amount of any interest or principal due, and the amount paid to the Administrative Agent. (Ex. A (CA) § 2.7(c)) The Administrative Agent also is required to keep track of each lender assignment and assumption of its obligations under the Credit Agreement, and the entries in the Register are treated as the lenders for all purposes under the Credit Agreement (Ex. A (CA) § 10.6);

18

- sets the interest rates and applicable fees for the loans  (Ex. A (CA) § 2.15); and

- is empowered to act as the "collateral agent" under the Loan Documents, and is thereby authorized to act on the collective behalf of the lenders "for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto  (Ex. A (CA) § 9.1(b))

As in *Beal* and *Credit Francais*, the delegation of so many significant responsibilities to the Administrative Agent confirms the collective nature of the Credit Agreement as a whole.  *See Beal*, 8 N.Y.3d at 328-29 (noting that "[t]he Agent does not perform merely mechanical or technical functions but rather has a broad grant of power"); *Credit Francais,* 128 Misc. 2d at 578-79 ("It is apparent that the parties contemplated that there would be collective action taken by the Agent on behalf of all members of the consortium").  Thus, only the Administrative Agent is empowered to act on behalf of the Lenders.

### 3.    The Guarantees Likewise Contemplate Collective Action

The plain terms of the Guarantees likewise make clear that the Administrative Agent, rather than individual lenders, must act on behalf of the Lenders.  Plaintiffs concede, as they must, that they are not actually *parties* to the Guarantees; they allege only that they are "beneficiaries" thereunder.  (Compl. (Ex. D) ¶ 121)  And indeed, the only signatories to the Guarantees are Bank of America (as Administrative Agent) and the respective Guarantors.  (Ex. B (Resorts Guaranty) at pp.11, 12; Ex. C (Properties Guaranty) at pp.13, 14)  Moreover, the preamble to each Guaranty provides that it is made "in favor of BANK OF AMERICA, N.A., as administrative agent ... for ... the banks and other financial institutions or entities (the "Lenders") from time to time parties to the Credit Agreement . . . ."  (Ex. B (Resorts Guaranty) at p.1; Ex. C (Properties Guaranty) at p.1)

19

The fact that the lenders are not even specified by name, and may change "from time to time," underscores the contractual importance of having a single continuing agent to act on the Lenders' behalf. *See Credit Francais*, 128 Misc. 2d at 577 (noting that, among other things, the agreement refers to the lending banks collectively as "Depositors" indicates that the agreement is between the borrower and a consortium of lenders, not the nine individual banks).

Tellingly, two provisions of the Guarantees that relate specifically to litigation contemplate suit by the Administrative Agent, but not by individual Lenders. First, both Guarantees include an explicit waiver of jury trial rights in the event of litigation. But the waiver makes no mention of individual Lenders. The *only* parties covered by the jury-trial waivers are the Administrative Agent and the Guarantors. (Ex. B (Resorts Guaranty) § 5.16; Ex. C (Properties Guaranty) § 6.16) If individual Lenders were permitted to bring suit, surely they would have been included in the waiver. The fact that they were not is strong evidence that the parties did not intend to permit individual lenders to bring suit.

Second, the Guarantees provide that a Guarantor may provide a new address for notice purposes *to the Administrative Agent*, which may then be used for service of process in any litigation. (Ex. B (Resorts Guaranty) § 5.13(c); Ex. C (Properties Guaranty) § 6.13(c)) There is no requirement that the new address be provided to individual lenders, and no way for such lenders to avail themselves of this service-of-process provision. Again, if the parties had intended to permit individual lenders to bring suit, then they would have been afforded the benefits of this provision.

Even outside the context of litigation, the Guarantees are replete with provisions confirming the Administrative Agent's unique status as representative of the Lenders' collective rights. Thus, the Recitals to the Guarantees provide that as a condition to receiving the agreed-

20

upon financing, each Guarantor "shall have executed and delivered this Agreement *to the Administrative Agent* for the ratable benefit of the Guarantied Parties," and that each Guarantor "hereby agrees *with the Administrative Agent*, for the ratable benefit of the Guaranteed Parties," as follows. (Ex. B (Resorts Guaranty) at p.1; Ex. C (Properties Guaranty) at p.1) (emphases added))

The operative guaranty provision itself, Section 2.1, provides that each Guarantor "unconditionally and irrevocably guarantees *to the Administrative Agent*, for the ratable benefit of the Guaranteed Parties and their respective successors, indorsees, transferees and assigns" the payment of the defined obligations. (Ex. B (Resorts Guaranty) § 2.1(a); Ex. C (Properties Guaranty) § 2.1(a) (emphasis added)) And Section 2.6 ("Payments") of each Guaranty makes clear that "payments hereunder will be paid *to the Administrative Agent* . . . at the payment office of the Administrative Agent specified in Section 10.2 of the Credit Agreement." (Ex. B (Resorts Guaranty) § 2.6; Ex. C (Properties Guaranty) § 2.6 (emphasis added))

Similarly, each Guaranty provides in a "Further Assurances" section that the respective Guarantor will, among other things, "ensure that any of the rights granted or intended to be granted *to the Administrative Agent* under this Agreement or under any instrument executed in connection herewith are protected and enforced." (Ex. B (Resorts Guaranty) § 3; Ex. C (Properties Guaranty) § 3.3 (emphasis added)) There is no parallel provision for rights granted to individual Lenders.

Moreover, the provisions governing "notices, requests and demands" only contemplate the delivery of such correspondence to the Administrative Agent or the respective Guarantors, not individual lenders. (Ex. B (Resorts Guaranty) § 5.2; Ex. C (Properties Guaranty) § 6.2) And each Guarantor may assign its rights or obligations with the prior written consent of the

Administrative Agent -- not the consent of the individual lenders. (Ex. B (Resorts Guaranty) § 5.5; Ex. C (Properties Guaranty) § 6.5)

In short, the Guarantees are entirely and unambiguously consistent with the Credit Agreement -- they provide for a scheme whereby only the Administrative Agent on behalf of all the Lenders, and not individual Lenders in their own right, can enforce contractual provisions.

### 4.    The Individual Lenders' Right Of Set-Off Is The Exception That Proves The Rule

There is one notable exception to the Loan Documents' collective-action scheme: upon an Event of Default, each Lender is afforded an individual right of set-off. (*See* Ex. A (CA) § 10.7(b); *see also* Ex. A (CA) § 8) The right of set-off is also granted to the Guaranteed Parties under each Guaranty. (*See* Ex. B (Resorts Guaranty) § 5.6; Ex. C (Properties Guaranty) § 6.6) In each case, the relevant agreement is careful to delineate that these are additional, individual rights. Thus, the Credit Agreement provides that "[i]n addition to any rights and remedies of the Lenders provided by law" -- collectively, as "Lenders" -- "*each* Lender shall have the right" to set-off Borrower funds against existing obligations. (Ex. A (CA) § 10.7(b) (emphasis added)) The Guarantees similarly authorize "*each* Guaranteed Party" to exercise a right of set-off. (Ex. B (Resorts Guaranty) § 5.6; Ex. C (Properties Guaranty) § 6.6) (emphasis added)) Where individual rights are intended, the agreements clearly so provide.

The existence of this limited right of self help is the exception that proves the rule that collective action is required to exercise rights under the agreements. If each Lender could pursue individual suits under the Credit Agreement, then the explicitly individual right of set-off would be superfluous. *Beal*, 8 N.Y.3d at 328 (rejecting interpretation that would afford individual rights because it would render other contractual provisions superfluous).

22

Additionally, this limited right of set-off is further conditioned by Section 2.24 of the Credit Agreement. That provision requires each of the Lenders to notify the Administrative Agent if it obtains payments from the borrowers in excess of its ratable share, so that adjustments can be made to ensure that the benefit of all such payments is shared ratably by all of the lenders. (*See* Ex. A (CA) § 2.24) The court in *Beal* addressed a similar sharing provision, and determined that it "underscores the collective design of the agreements that Lenders share the risks of potentially unequal treatment." *See Beal*, 8 N.Y.3d at 329. The right of set-off and the sharing provision within the Credit Agreement thus provide further evidence of the collective scheme under which the loan documents operate.

### C. Even If Plaintiffs Control A Majority Of The Outstanding Loans, They Cannot Proceed Directly On Their Own Behalf

Plaintiffs will no doubt argue that because they allegedly hold more than 50% of the outstanding loan obligations -- *i.e.*, the threshold provided under the Credit Agreement for action by the "Required Lenders" (Ex. A (CA) § 9.3) -- they have standing to bring suit in their own right. Any such argument must fail. For while the Credit Agreement authorizes the Required Lenders to *direct* the Administrative Agent in writing to take action, any such action must still be taken *by the Administrative Agent itself*, for the benefit of *all* Lenders. (Ex. A (CA) §§ 8, 9.1, 9.3)

The distinction between a suit by the Required Lenders on their own behalf, and a suit by the Administrative Agent for the benefit of all lenders, is not merely technical. Any recovery by these lender plaintiffs -- assuming they were entitled to recover, which they are not -- would reduce the funds available for other lenders to recover. If these lenders were to recover $640 million from the Guarantors, other non-party lenders in the future would run the risk of being unable to achieve a full "100 cents on the dollar" recovery.

23

The policy justifications behind the Court of Appeals' decision in *Beal* are thus fully applicable here. Collective action by the Administrative Agent ensures that all lenders retain equal rights, bear equal risks, and share fairly in any recovery. Particularly where -- as here -- a borrower is in bankruptcy and its guarantors may be in financial distress, this structure "is meant to protect all Lenders in the consortium from a disaffected Lender seeking financial benefit perhaps at the benefit of other debtholders." *Beal*, 8 N.Y.3d at 332.

The requirement of collective action also protects borrowers and guarantors from a multiplicity of suits. If individual lenders were permitted to bring suit in their own right, the Guarantors would face the risk of numerous lawsuits, all arising out of the same agreements, exposing them to enormous legal expenses and the risk of inconsistent rulings. This Court should not lightly infer such a construction of the parties' agreements. *See Credit Francais*, 490 N.Y.S.2d at 579 ("The parties herein were seeking to resolve in advance not only the possibilities of competing choice of forum and of governing law, but also to prevent the possibility of a multiplicity of suits by individual banks working at cross purposes for their own individual benefit.").

Accordingly, the fact that plaintiffs may control more than 50% of the outstanding obligations does not allow them to bypass the contractually mandated collective-action scheme.

24

## CONCLUSION

The Court of Appeals' decision in *Beal*, as well as the unambiguous language of the relevant agreements, establish conclusively that only the Administrative Agent -- and not the individual plaintiffs here -- may assert claims under the Guarantees.  Because plaintiffs cannot assert these claims, the Complaint should be dismissed with prejudice.

Dated: September 11, 2009

                                        Respectfully submitted,

                                        KASOWITZ, BENSON, TORRES
                                          & FRIEDMAN LLP

                                        By:   /s/ Jed I. Bergman
                                              Marc E. Kasowitz
                                              David M. Friedman
                                              Jed I. Bergman

                                        1633 Broadway
                                        New York, New York 10019
                                        (212) 506-1700
                                        jbergman@kasowitz.com

                                        *Attorneys for Defendants Fontainebleau*
                                        *Resorts, LLC and Fontainebleau Resort*
                                        *Properties I, LLC*

25

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                                    Chapter 11

FONTAINEBLEAU LAS VEGAS
HOLDINGS, LLC, ET AL.,[1]                                 Case No. 09-21481-BKC-AJC

              Debtors.                                    (Jointly Administered)
_____/

DECLARATION OF HOWARD C. KARAWAN IN OPPOSITION
TO MOTION FOR TRANSFER OF VENUE OF THE
CHAPTER 11 CASES TO THE DISTRICT OF NEVADA

Howard C. Karawan, being duly sworn, hereby deposes and says:

1.      I am the Chief Operating Officer and the Chief Restructuring Officer of
Fontainebleau Resorts, LLC ("Fontainebleau Resorts" or "FBR"), the indirect parent company of
Fontainebleau Las Vegas Holdings, LLC ("Resort Holdings"), Fontainebleau Las Vegas, LLC
("Resort") and Fontainebleau Las Vegas Capital Corp. ("Capital"; and, together with Resort
Holdings and Resort, the "Debtors"). I have been the Chief Operating Officer of Fontainebleau
Resorts since September 2007 and was officially designated the Chief Restructuring Officer in
May 2009. I also serve as the Chief Restructuring Officer of each Debtor, as well as three
affiliates of the Debtors, namely Fontainebleau Las Vegas Retail Parent, LLC, Fontainebleau Las
Vegas Retail Mezzanine, LLC and Fontainebleau Las Vegas Retail, LLC. I submit this
Declaration in support of the Debtors' Opposition to Motion for Transfer of Venue of the

_____

[1] The last four digits of each Debtor's tax identification number are: (i) Fontainebleau Las Vegas Holdings,
LLC [9337]; (ii) Fontainebleau Las Vegas, LLC [9332]; and (iii) Fontainebleau Las Vegas Capital Corp. [7822].
The Debtors' current mailing address is 19950 West Country Club Drive, Aventura, Florida 33180.

Chapter 11 Cases to the District of Nevada (the "Objection").[2]

2.     I am familiar with each of the matters set forth below based on personal knowledge, from review of the Debtors' relevant business records, information supplied to me by others at the Debtors' businesses, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called to testify, I could and would testify competently to the facts set forth herein.

3.     As I previously stated in my *Declaration in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [D.E. # 5], FBR is headquartered in Miami, Florida. All major decisions in respect of the Project have been and are made by the Board of Managers of FBR. The Board of Managers has continuously exercised its ultimate control over the management, business activities (including the design and development of the Project) and capital structure/financing of the Debtors. Overall responsibility within the Fontainebleau family of companies for managing, directing and coordinating reorganization efforts has been entrusted to me by the Board of Managers. My office is in Miami, Florida. I report directly to the Board of Managers and generally work side-by-side with members of the Board of Managers, including the Chairman of FBR, Jeffery Soffer, as well as with Albert Kotite, an Executive Vice President of FBR. The Board of Managers is also comprised of Messrs. Bruce Weiner and Ray Parello. Messrs. Soffer, Weiner and Parello are world-renowned developers. All other personnel critical to the reorganization of the Debtors either work from or report to others situated in Miami, Florida.

4.     At this stage, no decisions are made in respect of the Project other than by the Board of Managers or me. Indeed, FBR, through its Board of Managers, determined that the

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to such terms as set forth in the Objection.

filing of the Chapter 11 Cases was in the best interests of each of the Debtors (other than Capital) and authorized all such acts as were necessary for each of the Debtors (other than Capital) to file chapter 11 petitions.  Capital's decision to file for chapter 11 protection was made by its Board of Directors, the members of whom also serve on the Board of Managers.

5.      The Board of Managers meets at least twice a week to manage the Debtors' reorganization process.  Since the inception of the Project, the Board of Managers has been critically involved in every aspect of the Project.  Most recently, since the collapse of Lehman Brothers – the largest lender to the "retail" affiliates – in 2008, and the Revolver Lenders' subsequent refusal to fund their $800 million of financing commitments to the Debtors, the members of the Board of Managers have continuously met with lenders in these cases and utilized their relationships to meet with other sources of credit and equity all over the world; they have authorized and approved the reductions in the Debtors' workforce; they have been intimately involved in the development of the stabilization model the Debtors wish to employ; and they are considering design alternatives to ameliorate the cost of construction.  The Board of Managers' control over the Project has continuously existed since the Project's inception.

6.      The Debtors' Control Group has worked tirelessly, both pre- and post-petition, to restructure existing indebtedness and to obtain new equity financing to complete the Project. These efforts are all occurring in Miami.  For instance, the Debtors commenced the Adversary Proceeding in this Court against the Revolver Lenders for failing to advance nearly $800 million in construction financing.  The Control Group, all of whom are situated in Miami, is in constant dialogue with the Term Lenders over the use of cash collateral, the stabilization of the Project, as well as with additional sources of financing and equity to enable the Debtors to complete the Project.

3

7/2/2009 2:11 PM    Fontainebleau    Received 07/02/2009 02:11PM in 00:28 on line [7] for SBAENA * Pg 2/2    -> 93053512203    2

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Further deponent says not.

Howard C. Karawan

4