

**ORDERED in the Southern District of Florida on October 26, 2009.**

_____
A. Jay Cristol, Judge
United States Bankruptcy Court

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| FONTAINEBLEAU LAS VEGAS HOLDINGS, LLC, ET AL., | Case No. 09-21481-BKC-AJC |
| Debtors. | (Jointly Administered) |
| _____/ | |

**ORDER DENYING MOTION TO TRANSFER VENUE UNDER 28 U.S.C. § 1408**

THIS MATTER came before the Court for an evidentiary hearing on September 22, 2009 (the "Evidentiary Hearing") to consider the *Motion to Transfer Venue to the District of Nevada* (CP 133) (the "Motion") and the *Debtors' Opposition to Motion for Transfer of Venue of the Chapter 11 Cases to the District of Nevada* (CP 236). The Motion, filed by certain purported holders of mechanics' and materialmen's liens generally referred to as the "M&M Lienholders," and joined in by certain other purported holders of mechanics' liens (collectively, the "Movants"), seeks an order of this Court transferring these Chapter 11 cases from Florida to Nevada. The Motion seeks to transfer venue under both 28 U.S.C. § 1408 and 28 U.S.C. § 1412. On July 22, 2009, the Court entered an Order (CP 309) (the "First Venue Order") denying the portion of the Motion that sought to transfer venue to Nevada pursuant to 28 U.S.C. § 1412. The

Court found that such transfer would neither be in the interest of justice nor convenient to the parties in these Chapter 11 cases. The Court reserved ruling on the location of the Debtors' principal place of business during the 180 day period immediately preceding the commencement of these Chapter 11 cases (the "Venue Period") until after the Evidentiary Hearing.

Following the evidentiary hearing, the Court received proposed orders in the form of memorandum opinions from both the Debtors and the moving parties and commends all counsel involved for their excellent and persuasive presentations.

Venue in bankruptcy cases is authorized in many different places. The site of the principal asset of the debtor does not control. Almost daily, cases with major assets all over the United States, in fact all over the world, are appropriately filed in Delaware and southern New York.

The law favors the venue selection of the debtor.

In this case, the Court must decide if it should favor form over substance. Clearly, if this project was encompassed by only one corporation and its offices and the decision-makers were located in southern Florida, there would be no issue to decide. Because of the complex corporate structure involving multiple corporations, the Movants argue that the venue decision should be based on the tip of the spear – the discrete corporation and its asset, officers and employees located in Nevada – and should ignore the power holding the handle of the spear, and directing and controlling it. The simple fact of the matter is that the idea for the project came from Florida, the initial money invested came from Florida, borrowings for construction were negotiated from Florida and finally, what went on in Las Vegas was ultimately controlled from the nerve center in Florida.

The evidence presented is essentially not in dispute. The simple question is whether control of this enterprise was in southern Florida. The Court finds as a matter of fact that it was.

Thus, the Court, having considered the Motion and Debtors' response thereto, as well as the evidence adduced at the Evidentiary Hearing, determines that the Movants failed to meet their burden of demonstrating that venue in Florida is improper under 28 U.S.C. § 1408. The Court finds that the Debtors' "nerve center" and thus its principal place of business has always been in southern Florida. As a result, these Chapter 11 cases were properly commenced in the Southern District of Florida. For the reasons set forth below, the Motion is DENIED.

## Discussion

Under section 1408, of title 11, of the United States Code,

a case under title 11 may be commenced in the district court for the district –
(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district. . . .

28 U.S.C. § 1408 (2009).

As the Court stated in the First Venue Order, the Eleventh Circuit is bound by the Fifth Circuit's decision in *Commonwealth of Puerto Rico v. Commonwealth Oil Refining Company, Inc. (In re Commonwealth Oil Refining Co.)*, 596 F.2d 1239, 1244 (5th Cir. 1979) ("*CORCO*"), which found that the location of the debtor's production facilities "has greatly diminished in significance" and the location of the decision-making authority is more appropriate for venue purposes in the context of a financial restructuring. *Id.* at 1245-46.

Over the objections of both the Government of Puerto Rico and the Puerto Rico Water

3

Resources Authority, the Fifth Circuit held that CORCO's principal place of business existed in San Antonio, the locus of its executive offices, as opposed to Puerto Rico, the locus of its principal asset, a billion-dollar oil refinery. In support of its holding, the Fifth Circuit found that "CORCO's corporate structure demonstrates that it manages most of its affairs from San Antonio." *Id.* at 1246. CORCO's executives in San Antonio, along with the senior vice president of operations who lived in Puerto Rico, prepared operating plans for the refinery. Operations personnel at the refinery could not substantially deviate from the plan without approval from San Antonio. Loan agreements were likewise negotiated in San Antonio. *Id.* at 1242-46.

The Fifth Circuit affirmed the lower courts' finding that San Antonio constituted an appropriate venue for the debtor's bankruptcy case even though numerous activities occurred in Puerto Rico, including marketing, sales, production and location of employees, the generation of invoices, the maintenance of books and records, the housing of the data processing center, audits, stockholders and directors meetings, and most of CORCO's extensive litigation. In addressing the argument that many more of the debtor's workers resided in Puerto Rico than San Antonio, the Fifth Circuit responded that, naturally, "[m]any more workers are needed to run a refinery than to manage one." *Id.* at 1246. Although a majority of CORCO's creditors resided in Puerto Rico, and the debtor was incorporated in Puerto Rico, those facts did not sway the Fifth Circuit from allowing the reorganization to proceed close to the debtor's nerve center. *Id.* at 1242-46. More recently, the Eleventh Circuit found that "[w]here a company's activities are not concentrated in one place, a district court is entitled 'to give these nerve-center-related facts greater significance in determining principal place of business." *MacGinnitie v. Hobbs Group,*

*LLC,* 420 F.3d 1234, 1239 (11th Cir. 2005) (citing *Sweet Pea Marine, Ltd. V. APJ Marine, Inc.,* 411 F.3d 1242, 1247 (11th Cir. 2005)).

Similar to *CORCO,* Howard Karawan, the Chief Restructuring Officer of the Debtors and Fontainebleau Resorts, LLC ("FBR"), the Debtors' ultimate parent company, as well as the Chief Operating Officer of FBR and related non-debtor affiliates, provided ample testimony that major decision making authority over the Debtors occurred far from the location of the Debtors' principal asset. Major decision making over the Debtors' affairs occurred in Florida during the Venue Period, as opposed to in Nevada where the Debtors' principal asset exists.

Mr. Karawan testified that FBR possesses a Board of Managers, and that he reports to the Board of Managers.[1] Mr. Karawan has always maintained an office while employed as Chief Operating Officer and Chief Restructuring Officer in Florida. He has never maintained an office in Nevada.[2] During the Venue Period, Mr. Karawan met with members of the Board of Managers on nearly a daily basis regarding the Project in Nevada.[3] With the exception of one of the five members of the Board of Managers, each of the other four members of the Board of Managers maintained his office in Florida during the Venue Period. The fifth member, no longer with the Board of Managers, maintained an office in both Florida and Nevada.[4] These meetings occurred at all relevant times in Florida and with greater frequency during the Venue Period than prior to the Venue Period.[5] Mr. Karawan explained that meetings became increasingly frequent

---

[1] *See* Tr. at 16:21-25; 17:1-4.

[2] *See id*. at 17:5-13.

[3] *See id*. at 19:8-12.

[4] *See id*. at 18:18-24.

[5] *See id*. at 19:21-25; 20:1-1.

5

as early as September 2008 with the Lehman Brothers' Chapter 11 filings. According to Mr. Karawan, Lehman Brothers was a lender on a significant portion of the Project. Thereafter, in February or March 2009, the Revolver Lenders terminated their commitment to fund the Project, putting the Debtors in a situation where they required much attention and focus in finding alternative sources of financing. The Board of Managers directed those financing efforts from Florida.[6]

The efforts undertaken by the Board of Managers to obtain financing for the Debtors was the most important endeavor affecting the Debtors during the Venue Period.[7] Mr. Karawan testified that two members of the Board of Managers, Messrs. Soffer and Kotite, along with Mr. Karawan, spearheaded Project financing efforts and Project completion alternatives from Florida.[8] During the Venue Period, the Board of Managers retained financial advisors, bankruptcy and litigation counsel, and made strategic litigation and tactical decisions, including the decision to commence litigation against the Revolver Lenders.[9] The Board of Managers made the decision to halt construction during the Venue Period and to file the Chapter 11 cases.[10] All of these decisions were made by the Board of Managers in Florida.[11]

Mr. Karawan also testified that no strategic decisions regarding the Debtors were made in Nevada. In terms of what was being built in Nevada, how it was going to be built, when it was

---

[6] *See id*. at 20:4-25; 21:1-5.

[7] *See id.*

[8] *See* id. at 21:11-25; 22:1-1.

[9] *See id.* at 22:2-25; 23:1-5.

[10] *See id.* at 23:9-17.

[11] *See id.* at 23:20-25.

6

going to be built, and when construction was to cease – all of these decisions were made in Florida by the Board of Managers.[12]

Staffing decisions during the Venue Period were made by Mr. Karawan and presented to the Board of Managers for approval in Florida.[13] Mr. Karawan likewise oversaw from Florida reductions in force of Nevada staff and marketing efforts.[14] With the exception of finance and legal, senior staff persons residing in Nevada reported directly to Mr. Karawan in Florida.[15] For instance, Audrey Oswell, the Chief Operating Officer of Fontainebleau Las Vegas, LLC ("Resort"), the operating entity for the Project, reported to Mr. Karawan.[16] Ms. Oswell had no authority to make any critical decisions in respect of the operations of the Debtors or the planned resort without Mr. Karawan's approval.[17] Mr. Karawan also testified that the Vice President of Hotel Operations, the Chief Information Officer, and the Chief Marketing Officer likewise had no authority to make strategic decisions without approval of Mr. Karawan. Indeed, all of the brand decisions were made by Mr. Karawan and another individual from Florida.[18]

In sum, for the greater part of the 180 day period prior to the Debtors' bankruptcy filing, all decisions concerning the development, financing, and management of the Project, as well as

---

[12] *See id.* at 24:1-14; 56:5-8.

[13] *See id.* at 25:1-12.

[14] *See id.* at 26:1-17.

[15] *See id.*

[16] *See id.* at 55:13-25; 56:1-8.

[17] *See id.*

[18] *See id.* at 56:1-25; 57:1-25; 58:1-5. Mark Lefever, the Chief Financial Officer of FBR and Resort, testified at his deposition that he viewed Mr. Karawan as having "ultimate responsibility" over Resort. *See* Movants' Ex. 28 (September 2, 2009, deposition transcript of Mark Lefever, Tr. 20:6-15.) Mr. Lefever also testified that during the Venue Period, FBR "had the ultimate oversight over [the debtors]," and that the Board of Managers and Mr. Karawan were leading discussions with the Debtors' lenders during the Venue Period. Tr. 34:11-20;36:4-17.

7

the restructuring of the Debtors' balance sheets, were made outside of Las Vegas and almost always from Miami. Those in the Debtors' employ situated in Las Vegas were generally preparing for the opening of the hotel/casino resort and the day-to-day operations of the same once it opened but, of course, over time, those plans became more and more tenuous and systematic reductions in force of Las Vegas-based employees were implemented.

Upon the conclusion of Mr. Karawan's testimony, the Movants' counsel conceded in closing argument that decision making authority resided in Florida during the Venue Period.[19] Counsel for the Movants argued, however, that the Board of Managers' control over the Debtors during the Venue Period is irrelevant because FBR is not a debtor and because several non-debtor entities exist within the corporate trail between FBR and the Debtors. In short, Movants argued that decision making authority of a non-debtor affiliate over a debtor is not and has never been found to be the proper basis for venue. The Movants are incorrect.

The Court finds persuasive the Seventh Circuit's opinion in *In re Peachtree Lane Associates, Ltd.*, 150 F.3d 788, 790-91 (7th Cir. 1998). There, the Seventh Circuit affirmed, in the context of a venue dispute, both the bankruptcy and district courts' findings that the debtor's principal place of business existed where non-debtor personnel made significant decisions on behalf of the debtor. In so holding, the Seventh Circuit relied heavily on *CORCO*: "We are in agreement with the Fifth Circuit [in *CORCO*] that the 'most important, consequential, or influential' place where a corporation or partnership does its business is likely to be the place where its management decisions are made. . . ." *Id.* at 795 (quoting *Comm'r of Internal Revenue v. Soliman*, 506 U.S. 168, 174 (1993)).

---

[19] *See id.* at 62:25; 63:1-5.

In *Peachtree*, non-debtor personnel "retained ultimate financial control over Peachtree's operations" during the applicable venue period. *Id.* at 791. The Seventh Circuit found that the non-debtors controlled the debtor by renegotiating the debtor's note obligation to the debtor's largest secured creditor, attempting to dispose of the debtor's asset, and determining that the debtor should file a petition in bankruptcy. *Id.* at 792. Similarly, negotiations and strategy decisions in respect of the Debtors' lenders, the decision to file bankruptcy petitions, and financing decisions relating to the Project's continued viability all occurred in Florida under the auspices of the Board of Managers and Mr. Karawan.

The Court also notes the similarities between the corporate trail before the Seventh Circuit in *Peachtree* and the corporate trail here. The Seventh Circuit described the corporate trail in *Peachtree* as follows:

> During the venue period, Peachtree was a limited partnership whose sole asset was an apartment complex in Webster, Texas. Peachtree ultimately was controlled by what the bankruptcy court referred to as the "Kemper Group," a series of limited partnerships and corporate entities that eventually linked Peachtree to the Kemper Corporation. The link between the two followed this trail: Kemper/Cymrot Partners PT, Ltd., Peachtree's sole general partner; Kilico Realty Corporation, Kemper/Cymrot's sole general partner; Kemper Financial Companies, Inc., KFC Portfolio's parent company; and Kemper Corporation, Kemper Financial's parent company. All of these Kemper entities were headquartered in Chicago or Long Grove, Illinois.

*Id.* at 790. Based on this corporate trail, the Seventh Circuit concluded as follows:

> The major business decisions in this case, according to the court's undisputed factual findings, were made by Kemper personnel in Chicago or Long Grove, Illinois. Given those findings, it was not clearly erroneous for the bankruptcy court then to conclude that Peachtree's principal place of business during the venue period was in the Northern District of Illinois.

*Id.* at 796.

Here, a similar corporate trail exists that links FBR to the Debtors.[20] The Board of Managers of FBR was authorized, *both by the applicable operating agreements and state law*, to exert control over the Debtors and, in fact, the Board of Managers exerted such control over the Debtors during the Venue Period. The limited liability company agreement of FBR, a Delaware limited liability company, specifically provides that "[FBR] shall be managed by a Board of Managers that acts in accordance with the terms of the agreement."[21] All of FBR's powers as a limited liability company under the Delaware Act are exercised by or under the direction of the Board of Managers. Moreover, the Board of Managers has the complete and exclusive right, power and authority to manage and control all of FBR's business, affairs, assets and properties.[22]

Working down through the corporate trail below FBR,[23] each of its direct and indirect limited liability company subsidiaries is a member managed limited liability company. Fontainebleau Resort Holdings, LLC ("Fontainebleau Resort Holdings"), a Delaware limited liability company, is wholly-owned by its sole member, FBR. FBR has complete control over the business and affairs of Fontainebleau Resort Holdings. Pursuant to Section 3(a) of

---

[20] *See id.* at 48:6-18; *see also* Debtors' Ex. 2 (corporate organizational chart).

[21] *See* Debtors' Ex. 8 (Fourth Amended and Restated Limited Liability Company Agreement of Fontainebleau Resorts, LLC, dated as of June 6, 2007, § 5.1). The owners or "members" of a limited liability company can elect to manage the limited liability company directly by themselves or indirectly through managers. The limited liability company statutes of most states, including Delaware and Nevada, provide for the management of the limited liability company directly by the members. *See* Larry E. Ribstein and Robert R. Keatinge, *Ribstein and Keatinge on Limited Liability Companies* § 1:6 (June 2009). Management authority of a limited liability company can be vested in a single member. *Id.* at § 8:3. In addition, the members may provide in the articles of organization or operating agreement to have the limited liability company managed by one or managers selected by the members. J. William Callison and Maureen A. Sullivan, *Limited Liability Companies: A State by State Guide to Law and Practice* §8:3 (2009). The members may "apportion decision-making between the representative mangers and the members in any manner that the members desire." *Ribstein and Keatinge* at §2:3.

[22] *See id.* at § 5.2; *see also* Tr. at 13:23-25.

[23] The Debtors' corporate chart is attached to the *Declaration of Howard C. Karawan in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (CP 5).

Fontainebleau Resort Holdings' Operating Agreement, Fontainebleau Resorts has all "power to do any and all acts necessary or incidental to, or for the furtherance of, the business and affairs" of Fontainebleau Resort Holdings.[24]

Fontainebleau Resort Properties I, LLC, a Delaware limited liability company ("Resort Properties I"), is wholly-owned by its sole member, Fontainebleau Resort Holdings, LLC. Fontainebleau Resort Holdings has complete control over the business and affairs of Resort Properties I. Pursuant to Section 3(a) of Resort Properties I's Operating Agreement. Fontainebleau Resort Holdings has all "power to do any and all acts necessary or incidental to, or for the furtherance of, the business and affairs" of Resort Properties I.[25]

Resort Properties I is the sole managing member of Debtor Fontainebleau Las Vegas, Holdings, LLC, a Nevada limited liability company ("Resort Holdings") and has complete control over the business and affairs of Resort Holdings. Pursuant to Section 3(a) of Resort Holdings' Operating Agreement, Resort Properties I has all "power to do any and all acts necessary or incidental to, or for the furtherance of, the business and affairs" of Resort Holdings.[26]

Resort Holdings is the sole managing member of Resort, a Nevada limited liability company. Resort Holdings has complete control over the business and affairs of Resort. Pursuant to Section 3(a) of Resort's Amended and Restated Operating Agreement, Resort

---

[24] *See* Debtors' Ex. 5 (Operating Agreement of Fontainebleau Resort Holdings, LLC).

[25] *See* Debtors' Ex. 6 (Operating Agreement of Fontainebleau Resort Properties I, LLC).

[26] *See* Debtors' Ex. 4 (Operating Agreement of Fontainebleau Las Vegas Holdings, LLC).

Holdings has all "power to do any and all acts necessary or incidental to, or for the furtherance of, the business and affairs" of Resort.[27]

Both Fontainebleau Resort Holdings, LLC and Fontainebleau Resort Properties I, LLC are Delaware limited liability companies that have not opted to be manager-managed and, therefore, by default are member-managed.[28] Similarly, both Resort Holdings and Resort are Nevada limited liability companies that have not opted to be manager-managed and, also therefore are member-managed.[29] Thus, each limited liability company subsidiary operates through its parent-member until you reach FBR. As explained above, FBR operates through the Board of Managers, and, therefore, acts as the decision making body for each of its subsidiary member-managed limited liability companies.

Capital, a Delaware corporation, is the only indirect subsidiary of FBR that is not governed through or by the Board of Managers. Instead, as a corporation, it is governed by its own board of directors, which in this case, is comprised of Messrs. Kotite and Soffer, two of the members of the Board of Managers.[30] Thus, for purposes of this opinion, that is a distinction without a difference. Similar to *Peachtree*, the corporate trail before the Court fully supports the notion of the Board of Managers' dominance over the Debtors' affairs from Florida during the Venue Period.

---

[27] *See* Debtors' Ex. 3 (Amended and Restated Operating Agreement of Fontainebleau Las Vegas, LLC).

[28] *See* 6 Del. C. § 18-402. *See also* Tr. at 14:3-24; 15:1-10.

[29] *See* NRS 86.291(2). *See also* Tr. at 15:15-23; 16:1-7.

[30] *See* Tr. at 16:8-14.

12

**Conclusion**

While the Debtors' corporate structure may seem somewhat Byzantine, the issue before the Court does not require that we second guess the corporate purposes intended by the Debtors and its affiliates to be served by that structure. The Court finds no inconsistency between Mr. Karawan's testimony that the Board of Managers exerted substantial control over the Debtors during the Venue Period and the applicable operating agreements and state law, which authorized such control rights by the Board of Managers over the Debtors. Indeed, the operating agreements lend further support to the Board of Managers' control over the Debtors during the Venue Period. Since the major decisions affecting the Debtors during the Venue Period occurred in Florida, the Court concludes that the Debtors' principal place of business resided in Florida during the Venue Period under 28 U.S.C. § 1408.

# # #

Submitted by:

Scott L. Baena (Florida Bar No. 186445)
Bilzin Sumberg Baena Price & Axelrod LLP
200 S. Biscayne Boulevard, Suite 2500
Florida, FL 33131
Telephone: (305) 374-7580
Facsimile: (305) 375-7593

Copies to:
Scott L. Baena, Esq.
(Attorney Baena shall upon receipt serve a copy of this Order upon all interested parties and file a certificate of service.)