**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:                                          Chapter 11

FONTAINEBLEAU LAS VEGAS
HOLDINGS, LLC, ET AL.,[1]                       Case No.  09-21481-BKC-AJC

            Debtors.                            (Jointly Administered)
_____/


**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER SECTIONS**
**105(a), 362, 363, 364(c), 364(d), AND 364(e) OF THE BANKRUPTCY CODE, AND**
**FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 4001 AND 9014 AND**
**LOCAL BANKRUPTCY RULE 9013-1(F), (I) AUTHORIZING DEBTORS TO INCUR**
**POST-PETITION SECURED INDEBTEDNESS ON SUPER-PRIORITY PRIMING LIEN**
**BASIS AND MODIFYING THE AUTOMATIC STAY, (II) AUTHORIZING THE**
**DEBTORS TO REPAY USED CASH COLLATERAL AND UNUSED CASH**
**COLLATERAL, AND (III) PRESCRIBING FORM AND MANNER OF NOTICE AND**
**SETTING FINAL HEARING, AND NOTICE OF EVIDENTIARY HEARING THEREON**

---

**NOTICE OF EVIDENTIARY HEARING**

**NOTICE IS HEREBY GIVEN that an evidentiary hearing will be held on**
**November 23, 2009 at 1:00 P.M. at the Claude Pepper Federal Building, 51**
**SW First Avenue, Room 1410, Miami, FL 33130 to consider this Motion.**

---

**SUMMARY STATEMENT[2] OF RELIEF REQUESTED PURSUANT TO**
**FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(c)(1)(B) AND**
**THE COURT'S GUIDELINES FOR MOTIONS SEEKING**
**APPROVAL OF POSTPETITION FINANCING**

In accordance with Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-3 and the Bankr.

---

[1]        The last four digits of each Debtor's tax identification number are: (i) Fontainebleau Las Vegas Holdings, LLC [9337]; (ii) Fontainebleau Las Vegas, LLC [9332]; and (iii) Fontainebleau Las Vegas Capital Corp. [7822]. The Debtors' current mailing address is 19950 West Country Club Drive, Aventura, Florida 33180.

[2]        In the event of any conflict between this Summary Statement and the Motion, the Motion shall govern.

S.D. Fla. Guidelines, the Debtors provide the following statement summarizing the material provisions of the Proposed Interim Financing Order,[3] the terms of which are elaborated in the body of the Motion and a copy of which is annexed as Exhibit "A".

By way of this Motion, the Debtors seek authority to borrow up to $51,503,734 from the DIP Lenders, including Nevada Gaming Ventures, Inc., the DIP Agent, pursuant to the terms and conditions set forth in the DIP Credit Agreement attached hereto as Exhibit "B" to be utilized in accordance with the Budget attached hereto as Exhibit "C" and the Stabilization Plan attached hereto as Exhibit "D" (the "Stabilization Plan").  Nevada Gaming Ventures, Inc. is also the Stalking Horse Bidder in connection with a proposed sale of the Purchased Assets as set forth in further detail in the Bidding Procedures Motion filed contemporaneously herewith.

Among other things, the DIP Credit Agreement provides for an interest rate of 10% per annum (12% in respect of amounts overdue or after default).  In addition, the DIP Credit Agreement requires the payment, by making of Loans under the DIP Credit Facility, of (a) an Upfront Fee of 2% of the aggregate amount of the Commitments due and payable on the Closing Date; (b) Commitment Fees in an amount equal to .50% per annum of the Available Unused Commitment of each Lender assessed on the last day of each month for the preceding month or on the date upon which the commitments of all DIP Lenders terminate; and (c) all reasonable out-of-pocket expenses (including reasonable fees, charges and disbursements of Wachtell, Lipton, Rosen & Katz and any local counsel to the DIP Agent) of the DIP Agent, and after the occurrence of an Event of Default, the DIP Lenders, as required to be reimbursed or paid under any DIP Document.  In addition, the DIP Credit Agreement provides for an Exit Fee in an amount equal to 5% of the total Commitments outstanding at the Termination Date, however, the Exit Fee is not provided for under the Agreed Budget and no Loans shall be made to pay the Exit Fee.

The Debtors generally intend to utilize the proceeds of Loans under the DIP Credit Facility (a) to fund (by way of one or more intercompany loans) the costs and expenses related to the chapter 11 cases of the Retail Entities, (b) to pay the costs and expenses related to the restructuring of Resort Holdings and its subsidiaries, (c) to fund the stabilization of the Project in accordance with the Stabilization Plan, (d) within two Business Days after the Retail Entities Guarantee Date, to indefeasibly repay in full, in cash, the Used Cash Collateral, (e) to pay the Upfront Fee and certain other fees and expenses relating to the DIP Credit Facility when, as and to the extent set forth in the DIP Documents and (f) to pay all other present and future costs and expenses of the DIP Lenders, including all reasonable fees and expenses of consultants, advisors and attorneys paid or incurred at any time in connection with the financing transactions when, as and to the extent provided for in the DIP Documents.

The DIP Credit Facility shall terminate upon the earliest to occur of (a) February 9, 2010, (b) the closing date of a sale of any of the Purchased Assets with a value in excess of $100,000 in the aggregate since the Closing Date, (c) the date that is fifteen (15) Business Days after the date of entry of the Interim DIP Order in these cases, if a Final DIP Order has not been entered by the Bankruptcy Court on or before such date, and (d) the acceleration of the Loans upon the occurrence or the continuance of an Event of Default.

Notwithstanding the foregoing, under certain circumstances the Commitments will terminate but the maturity of the Obligations under the DIP Credit Facility may be extended for a period up to sixty days as set forth in further detail at paragraph 36 hereof.

---

[3]     All capitalized terms used in this Summary Statement that are not defined herein are defined in the body of the Motion or in the DIP Credit Agreement, as applicable.

The Proposed Interim Financing Order includes the following provisions set forth in Federal Rule of Bankruptcy Procedure 4001(c)(1)(b):

(a) a grant, in favor of the DIP Agent (for the benefit of the DIP Lenders), of a joint and several super-priority administrative claim in each of the Debtors' chapter 11 cases pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all Obligations; provided however, that such super-priority administrative claims shall not have priority over any adequate protection claims previously granted in favor of the Prepetition Lenders pursuant to the Prior Cash Collateral Orders, which adequate protection claims shall be deemed satisfied upon the repayment of such obligations in full from proceeds of a Loan made under the DIP Credit Facility;

(b) a grant, in favor of the DIP Agent (for the benefit of the DIP Lenders), pursuant to section 364(c)(2) of the Bankruptcy Code, of perfected, first-priority, valid, enforceable, and non-avoidable liens on and security interests in all of the property of each of the Debtors' estates in these chapter 11 cases that is not subject to valid, perfected and non-avoidable liens in existence at the time of the Closing Date or to valid liens in existence at the time of the Closing Date that are perfected subsequent to the Closing Date as permitted by section 546(b) of the Bankruptcy Code, if any, excluding avoidance actions, it being understood that, notwithstanding such exclusion of avoidance actions, the proceeds of such actions (including, without limitation, assets as to which liens are avoided) shall be subject to such liens under section 364(c)(2) of the Bankruptcy Code and available to repay the Loans and all of the other Obligations;

(c) a grant to the DIP Agent (for the benefit of the DIP Lenders), pursuant to section 364(d)(1) of the Bankruptcy Code, of perfected, first-priority, valid, enforceable and non-avoidable senior priming liens on and security interests in all property of each of the Debtors' estates in these chapter 11 cases; provided, however, that such liens shall not attach to the Cash Collateral of the Prepetition Lenders and shall not prime any adequate protection liens granted pursuant to the Prior Cash Collateral Orders, which liens shall be automatically released upon the repayment of the Cash Collateral utilized pursuant to the Prior Cash Collateral Orders;

(d) a waiver of the right of the Debtors to seek to surcharge the DIP Secured Parties, their claims, or the DIP Collateral pursuant to section 105 or section 506(c) of the Bankruptcy Code (or otherwise);

(e) provisions providing for the priority, perfection, and validity of the liens, mortgages, deeds of trust, deeds to secure debtors, and security interests in and upon the DIP Collateral granted pursuant to the Interim and Final Financing Orders or the DIP Documents (i) without the necessity of the DIP Agent filing, recording, taking possession, or otherwise taking action to validate or perfect its liens, mortgages, deeds of trust, deeds to secure debtors, and security interests as may otherwise be required by applicable nonbankruptcy law; and (ii) notwithstanding any nonbankruptcy law that would otherwise restrict the grant, scope, enforceability, attachment or perfection of the liens, mortgages, deeds of trust, deeds to secure debts and security interests authorized or created by the Interim and Final Financing Orders or the DIP Documents, or otherwise would impose filing or registration requirements with respect thereto;

(f) provisions modifying the automatic stay to provide remedies to the DIP Agent and the DIP Lenders after the occurrence of an Event of Default; and

(g) repayment of the Prepetition Lenders' Used Cash Collateral and Unused Cash Collateral, in the total amount of $173,199,017.63.

3

## MOTION

Fontainebleau Las Vegas Holdings, LLC ("Resort Holdings"), Fontainebleau Las Vegas, LLC ("Resort") and Fontainebleau Las Vegas Capital Corp. ("Capital"; and, together with Resort Holdings and Resort, the "Debtors"), debtors and debtors-in-possession in the above-captioned chapter 11 cases, hereby file this *Motion for Interim and Final Orders Under Sections 105(a), 362, 363, 364(c), 364(d) and 364(e) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002, 4001, and 9014 and Local Bankruptcy Rule 9013-1(F), (I) Authorizing Debtors to Incur Post-Petition Secured Indebtedness on Super-Priority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing the Debtors to Repay Used Cash Collateral and Unused Cash Collateral, and (III) Prescribing Form and Manner of Notice and Setting Final Hearing* (the "Motion") and state as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### BACKGROUND

**A.      Introduction**

2.      On June 9, 2009 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

3.      Each of the Debtors continues to operate its business and manage its financial affairs and possessions as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   An Official Committee of Unsecured Creditors (the "Committee") was

MIAMI 1968331.5 7650831854

appointed on June 17, 2009 [Dkt. No. 97].  Pursuant to the Court's *Order Appointing Examiner to Examine, Negotiate and Supervise § 363 Sale of Assets* [Dkt. No. 770] (the "Examiner Order"), the United States Trustee appointed Jeffrey R. Truitt as Chapter 11 Examiner (the "Examiner") on October 16, 2009 [Dkt. No. 814].

4.      The Debtors' chapter 11 cases are being administered jointly pursuant to the *Order Jointly Administering Debtors' Chapter 11 Cases* [Dkt. No. 10] pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1(B).

5.      Prior to the Petition Date, the Debtors were actively engaged in ongoing construction and development of "Fontainebleau Las Vegas," conceived as a signature "Tier A" casino hotel resort with gaming, lodging, convention and entertainment amenities (the "Project").

6.      The Project is situated on approximately 24.4 acres at the sites of the former El Rancho Hotel and Algiers Hotel on the north end of the Las Vegas Strip.  The current plans for the Project include a 63-story glass skyscraper, featuring, among other things: (a) approximately 3,815 stylishly furnished guest rooms; (b) an approximately 100,000 square-foot casino with an approximately 40-foot tall ceiling, featuring 1,700 slot machines, 125 table games, a 14-table poker room and a race and sports book; (c) approximately 394,000 square feet of class "A" convention, meeting and pre-function space; (d) an approximately 60,000 square-foot state-of-the-art spa; (e) a rooftop pool; and (f) a state-of-the-art theater featuring live entertainment and shows.   At the time that construction of the Project was reduced to a stabilization effort as a result of the unjustified failure of certain of the Debtors' lenders to fulfill their loan commitments, the Project was approximately 70% complete.

7.      The Debtors' non-debtor affiliates, Fontainebleau Las Vegas Retail Parent, LLC ("Retail Parent"), Fontainebleau Las Vegas Retail Mezzanine, LLC ("Retail Mezzanine") and

MIAMI 1968331.5 7650831854

Fontainebleau Las Vegas Retail, LLC ("Retail"; and, together with Retail Parent and Retail Mezzanine, the "Retail Entities"), have been engaged in the development of approximately 286,500 square feet of the Project's retail component, consisting of signature restaurants, marquee nightclubs and related amenities (the "Retail Component").

8.        The Asset Purchase Agreement requires that chapter 11 cases be filed shortly on behalf of the Retail Entities and that the Retail Entities' chapter 11 cases be jointly administered with those of the Debtors.

**B.        Description of the Debtors' Prepetition Credit Facilities and Collateral**

9.        On June 6, 2007 (the "Existing Credit Facility Closing Date"), Resort and Fontainebleau Las Vegas II, LLC ("FBLV II"),[4] as borrowers, and certain lenders (each, or its respective assignees, a "Prepetition Lender" and, collectively, the "Prepetition Lenders") and Bank of America, N.A., as administrative agent for the Prepetition Lenders (including any successors, the "Existing Credit Facility Agent"; the Existing Credit Facility Agent and the Prepetition Lenders collectively being referred to as the "Prepetition Secured Parties"), entered into a $1.85 billion senior secured credit facility (the "Existing Credit Facility"), comprised of a (a) seven-year, $700 million term loan facility (the "Term Loan Facility"), which was fully funded on the Existing Credit Facility Closing Date, (b) seven-year, $350 million delay draw term loan facility (the "Delayed Draw Facility"), and (c) five-year, $800 million revolving credit facility (the "Revolver Facility"; the Revolver Facility, the Term Loan Facility and the Delayed Draw Facility being collectively referred to as the "Facilities").   As of the Petition Date, approximately $700 million was outstanding under the Term Loan Facility; approximately

---

[4]        On February 4, 2009, FBLV II was merged into Resort.

$336.7 million was outstanding under the Delayed Draw Facility;[5] and, other than letters of credit in the aggregate face amount of approximately $13 million,[6] nothing was outstanding under the Revolver Facility.[7]

10.    In connection with the Facilities, Resort and FBLV II entered into that certain Credit Agreement  dated June 6, 2007 (the "Prepetition Credit Agreement"), together with all schedules and exhibits thereto, guarantees, subordination agreements, deeds of trust, control agreements, guarantee and collateral agreements, intercreditor agreements, indentures, contractor undertakings, notes, instruments, reaffirmations, certificates, and any other agreements and documents delivered pursuant thereto or in connection therewith (collectively, the "Prepetition Loan Documents").

11.    In addition, on the Existing Credit Facility Closing Date, Resort Holdings and Capital, jointly and severally, issued $675 million of 10.25% Second Mortgage Notes Due 2015 (the "Junior Mortgage Notes"), for which U.S. Bank, National Association serves as Trustee (the "Trustee").  The obligations under the Junior Mortgage Notes are primarily secured by a second priority mortgage lien on substantially all of the Project's assets, other than the air rights comprising the Retail Component of the Project.  As of the Petition Date, the full $675 million principal amount of the Junior Mortgage Notes, and accrued interest thereon, was outstanding.

---

[5]    Of that amount, approximately $136.5 million was held in the Bank Proceeds Account (as defined in Disbursement Agreement, as hereinafter defined) on the Petition Date and had not been released to the Resort Debtors for use in the Project.  Pursuant to the Prior Cash Collateral Orders (as hereinafter defined), funds from the Bank Proceeds Account have been utilized for budgeted expenses and for authorized interest payments.  The balance of the Bank Proceeds Account was approximately $104.3 million as of November 12, 2009.

[6]    Since the Petition Date, approximately $11.5 million of the letters of credit were drawn upon by the beneficiaries thereunder.

[7]    As noted, the Debtors believe that the unjustified and impermissible failure and refusal of the Prepetition Revolver Lenders (as hereinafter defined) to make revolving loans under the Revolver Facility notwithstanding their commitments to lend, ultimately resulted in the suspension of construction of the Project and the commencement of these chapter 11 cases.  Litigation relating to this matter was commenced before this Court as Adversary Proceeding No. 09-01621-AJC (the "Revolver Litigation").  The District Court subsequently withdrew the reference in respect of the Revolver Litigation, which remains pending as case no. 09-21879-CIV-GOLD/McALILEY.

12.     The Junior Mortgage Notes and the Existing Credit Facility are subject to an intercreditor agreement between the Trustee of the Junior Mortgage Notes and the Existing Credit Facility Agent (the "Intercreditor Agreement").

13.     The Existing Credit Facility, the Junior Mortgage Notes and a credit facility extended to Retail are subject of a Master Disbursement Agreement (the "Disbursement Agreement") that established the conditions to and the order of funding of such credit facilities.

14.     The Prepetition Lenders and the Existing Credit Facility Agent made, in addition to the Term Loans (as defined in the Prepetition Credit Agreement), certain loans, advances, and other financial accommodations, including, without limitation, derivatives, letters of credit and other financial products (the "Other Obligations"), to the Debtors to fund, among other things, the construction and development of the Project and other related costs.  The Prepetition Lenders under the Prepetition Credit Agreement include those lenders under the Term Loan Facility (the "Prepetition Term Lenders"), as well as those lenders who made commitments under the Revolver Facility (the "Prepetition Revolver Lenders").

15.     Prepetition, each of the Debtors granted the following liens and security interests in substantially all of their assets comprising the Project other than the air rights comprising the Retail Component of the Project (the "Resort Collateral"): (a) a first priority lien on, and continuing pledge and security interest in, the Resort Collateral to and/or for the benefit of the Prepetition Secured Parties to secure, among other obligations, the Prepetition Term Obligations and any guarantees thereof; (b) a ratable interest in the Resort Collateral to the holders or issuers of the Other Obligations; (c) a second priority lien on, and continuing pledge and security interest in, the Resort Collateral to and/or for the benefit of the holders of the Junior Mortgage Notes (collectively, (a), (b) and (c) are referred to as the "Prepetition Liens").

16.     Among other things, the Resort Collateral includes cash collateral consisting of:  (a) all funds of the Debtors (including any funds subject to a right of setoff in favor of any Prepetition Lender, any funds on deposit or maintained in any account subject to a control agreement with the Existing Credit Facility Agent, and any proceeds of the Prepetition Collateral) as of the Petition Date, including the contents of all of the Accounts identified in Section 2.2 of the Disbursement Agreement as to which the Existing Credit Facility Agent is listed as pledgee (but excluding funds in Accounts identified in Section 2.2 of the Master Disbursement Agreement as to which only the Retail Agent is pledgee and the Completion Guaranty Proceeds Account (which is the encumbered property of Turnberry Residential Limited Partner, LP)) and (b) all cash proceeds of Prepetition Collateral received after the Petition Date (the "Cash Collateral").

17.     Specifically, at the Petition Date, the Cash Collateral primarily consisted of the following:

A.     Approximately $136.6 million – *Bank Proceeds Account* – Funds lent by the participating lenders under the Existing Credit Facility pursuant to a Notice of Borrowing are deposited in this account.

B.     Approximately $14.5 million – *Resort Payment Account* – Funds advanced by the participating lenders under the Existing Credit Facility that were the subject of a prepetition Advance Request (as such term is defined under the Existing Credit Facility).

C.     $50 million – *Liquidity Reserve Account* – Security for Resort's obligation to complete the Project.

18.     Since construction of the Project was interrupted in or about May 2009, numerous Notices of Liens have been filed against the Project and may signify the existence of mechanics' and/or materialmen's liens on the Project pursuant to sections 108.221 through 108.246 of the Nevada Revised Statutes (the "Mechanic Liens").  The holders of such Mechanic

Liens claim seniority over the Prepetition Liens of the Prepetition Lenders with respect to the Project (but not with respect to the Cash Collateral).[8]

### C.     Procedural History and Prior Cash Collateral Orders

19.     On June 11, 2009, this Court entered the *Interim Order (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (II) Providing Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 362, and 363 of the Bankruptcy Code, and Scheduling Final Hearing* [Dkt. No. 49] (the "First Interim Cash Collateral Order").

20.     On July 7, 2009, the Court entered the *Second Interim Order (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (II) Providing Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 362, and 363 of the Bankruptcy Code, and Scheduling Final Hearing* [Dkt. No. 242] (the "Second Interim Cash Collateral Order").

21.     On July 31, 2009, the Court entered the *Third Interim Order (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (II) Providing Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 362, and 363 of the Bankruptcy Code, and Scheduling Final Hearing* [Dkt No. 359], which order was subsequently amended by the *Amended Third Interim Order (I) Authorizing Use of Cash Collateral Pursuant*

---

[8]     On July 14, 2009, Turnberry West Construction commenced an adversary proceeding seeking, among other things, a determination that the Mechanic Liens of Turnberry West Construction and its subcontractors are valid liens, superior to the liens of the Prepetition Lenders (Adv. Pro. 09-01762-AJC). On October 14, 2009, the Contractor Claimants commenced an adversary proceeding seeking a declaration that the statutory liens of construction claimants are superior in validity, priority, and extent to the liens of the term lenders. (Adv. Pro. 09-02179-AJC). On October 15, 2009, certain other Mechanic Lien claimants filed a complaint to determine the validity, priority and extent of their liens. (Adv. Pro. 09-02187). Moreover, under the Prior Cash Collateral Orders, the Court imposed the deadline of October 15, 2009 for statutory lienholders to file a complaint against the Prepetition Lenders if they contest the validity, priority, extent, or enforceability of the Prepetition Liens and claims, unless they have filed a proof of claim by October 13, 2009, asserting the amount of their statutory lien(s) which they claim to be senior to the liens of the Prepetition Lenders. A number of statutory lienholders filed proofs of claim asserting priority over the liens of the Prepetition Lenders.

*to Section 363 of the Bankruptcy Code, (II) Providing Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, and (III) Scheduling Final Hearing* [Dkt. No. 389] (as amended, the "Third Interim Cash Collateral Order").

22.     On August 27, 2009, the Court entered the *Fourth Interim Order (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (II) Providing Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, and (III) Scheduling Final Hearing* [Dkt No. 454] (the "Fourth Interim Cash Collateral Order").

23.     On September 18, 2009, the Court entered the *First Interim Order (I) Authorizing the Nonconsensual Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (II) Providing Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code, and (III) Scheduling Final Hearing* [Dkt. No. 565] (the "First Non-Consensual Interim Cash Collateral Order").

24.     On October 8, 2009, the Court entered the *Interim Order (I) Authorizing the Consensual Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (II) Providing Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code, and (III) Scheduling Final Hearing* [Dkt. No. 730] (the "October 8 Consensual Interim Cash Collateral Order").

25.     On October 15, 2009, the Court entered the *Second Interim Order (I) Authorizing the Consensual Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code and (II) Providing Adequate Protection to Prepetition Secured Parties Pursuant to*

11

*Sections 361, 363 and 364 of the Bankruptcy Code* [Dkt. No. 811] (the "October 15 Consensual Interim Cash Collateral Order").

26.    On October 26, 2009, the Court entered the *Third Interim Order (I) Authorizing the Consensual Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code and (II) Providing Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code* [Dkt. No. 852] (the "October 26 Consensual Interim Cash Collateral Order").

27.    On November 2, 2009, the Court entered the *Fourth Interim Order (I) Authorizing the Consensual Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code and (II) Providing Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code* [Dkt. No. 901] (the "November 2 Consensual Interim Cash Collateral Order").

28.    On November 11, 2009, the Court entered the *Fifth Interim Order (I) Authorizing the Consensual Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code and (II) Providing Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code* [Dkt. No. 953] (the "November 11 Consensual Interim Cash Collateral Order").

29.    On November 16, 2009, the Court entered the *Sixth Interim Order (I) Authorizing the Consensual Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code and (II) Providing Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code* [Dkt. No. 987] (the "November 16 Consensual Interim Cash Collateral Order" and, together with each of the orders defined in paragraphs 19-28 hereof, the "Prior Cash Collateral Orders").

## RELIEF REQUESTED

30.     The Debtors seek authority to (a) enter into the DIP Credit Agreement (as hereinafter defined) and obtain loans and other financial accommodations thereunder, (b) grant super-priority priming liens to the DIP Agent (as hereinafter defined) for the benefit of the DIP Secured Parties (as hereinafter defined) pursuant to section 364(d) of the Bankruptcy Code, (c) cause the payment of the Unused Cash Collateral[9] to the Prepetition Lenders and (d) repay the Used Cash Collateral.

31.     On an interim basis, consistent with the terms of the DIP Documents, the Debtors seek authority to borrow from the DIP Lenders (a) up to $6,815,129 from the Closing Date until the Retail Entities Guarantee Date, and (b) an amount of Loans up to $26,721,674 outstanding at any one time from the Retail Entities Guarantee Date through the Final Order Date, which amount shall include amounts to be used to repay the Used Cash Collateral when and as described herein.  Accordingly, the Debtors respectfully request that the Court enter an interim financing order substantially in the form and containing the terms of the proposed Order attached hereto as Exhibit "A" (the "Proposed Interim Financing Order") and set a final hearing on the Motion.

32.     The requested relief is necessary to preserve and protect the Debtors' assets, including stabilization of the Project, meet the Debtors' obligations under the Prior Cash Collateral Orders, fund the chapter 11 filing and administrative expenses of the Retail Entities, and fund the sale process proposed and described in further detail in the *Debtors' Motion for Entry of Orders, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002, 6004, and 6006, (a) Establishing Bidding Procedures for*

---

[9]     Capitalized terms not defined herein shall have the meanings set forth in the DIP Credit Agreement unless otherwise specified.

MIAMI 1968331.5 7650831854

*the Sale of All or Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances, (b) Authorizing the Debtors to Provide Certain Stalking Horse Bid Protections, (c) Scheduling a Final Hearing to Consider Approval of the Sale of All or Substantially All of the Debtors' Assets; and (d) Approving the Form and Manner of Notice Thereof* (the "Bidding Procedures Motion") filed contemporaneously herewith.

33.    Absent approval of the relief requested herein, the Debtors can no longer fund basic expenses such as payroll, security, and utilities, let alone the stabilization costs that are necessary to protect the Project, particularly in the face of the impending winter season, or the sale process set forth in the Bidding Procedures Motion.  As a result, the Debtors' estates would suffer immediate and irreparable harm including, at a minimum, a substantial diminution in value of the Project as a result of physical degradation and, without an ability to fund the sale process set forth in the Bidding Procedures Motion, a likely abandonment of the Project, absent the Retail Component, and ensuing extensive lien priority litigation.  As set forth below, such a result is plainly not in the best interests of the Debtors' estates or creditors claiming liens on the Project.

### THE PROPOSED DIP CREDIT FACILITY

#### A.    Parties, Terms and Uses

34.    Accordingly, the Debtors seek authority to enter into the Debtor-in-Possession Credit Agreement (as the same may hereafter be amended, modified, ratified, extended, renewed, restated or replaced, in each case subject to the limitations in the Proposed Interim Financing Order, the "DIP Credit Agreement" and, together with the Loan Documents being referred to as the "DIP Documents"),[10] dated as of November 16 2009, by and among Resort, as Borrower, the Guarantors, the Lenders (the "DIP Lenders") and NGV, as administrative agent, collateral agent

---

[10]    A copy of the DIP Credit Agreement is attached hereto as Exhibit "B".

and arranger (the "DIP Agent", and together with the DIP Lenders, the "DIP Secured Parties"),
pursuant to which the DIP Lenders shall extend postpetition loans, advances and other financial
accommodations to Resort in an amount of up to $51,503,734 at an interest rate of 10% per
annum[11] and on the terms set forth in the DIP Credit Agreement and the other Loan Documents
(collectively, the "DIP Credit Facility").

35.     The funds drawn under the DIP Credit Facility shall be utilized strictly in
accordance with an Agreed Budget, a copy of which is annexed hereto as Exhibit "C" (the
"Agreed Budget") (a) to fund (by way of one or more intercompany loans) the costs and
expenses related to the filing and administration of  the chapter 11 cases of the Retail Entities, (b)
to pay the costs and expenses related to the restructuring of Fontainebleau Las Vegas Holdings,
LLC and its subsidiaries, (c) to fund the stabilization of the Project in accordance with the
Stabilization Plan attached hereto as Exhibit "D", (d) within two Business Days after the Retail
Entities Guarantee Date, to indefeasibly repay in full, in cash, the Used Cash Collateral, (e) to
pay the Upfront Fee and certain other fees and expenses relating to the DIP Credit Facility when,
as and to the extent set forth in the DIP Credit Agreement, and (f) to pay all other present and
future costs and expenses of the DIP Lenders, including all reasonable fees and expenses of
consultants, advisors and attorneys paid or incurred at any time in connection with the financing
transactions when, as and to the extent provided for in the DIP Documents.

36.     The DIP Credit Facility shall terminate upon the earliest to occur of (a) the
Stated Maturity Date, (b) the closing date of a sale of any of the Purchased Assets with a value in
excess of $100,000 in the aggregate since the Closing Date, (c) the date that is fifteen (15)
Business Days after the date of entry of the Interim DIP Order in these cases, if a Final DIP

---

[11]     The interest rate under the DIP Credit Agreement is 12% per annum in respect of amounts overdue or after
the occurrence of a default.

Order has not been entered by the Bankruptcy Court on or before such date and (d) the acceleration of the Loans upon the occurrence or the continuance of an Event of Default.

37.        Notwithstanding the foregoing, as more particularly described in the DIP Credit Agreement, if (a) (i) NGV fails to close on the Sale on or before the Stated Maturity Date after having been determined to be the Successful Bidder, (ii) an Event of Default occurs on the Stated Maturity Date as a result of the failure by the Resort to repay all Obligations hereunder (the "Specified Event of Default"), and (iii) the Debtors and the Retail Entities allege in good faith in a written notice that NGV's failure to close was in violation of its obligations under the Asset Purchase Agreement, the maturity of the Loans will not be accelerated and the DIP Lenders will not otherwise enforce payment of the Obligations or exercise any other rights and remedies (other than the right to terminate the Commitments) on account of the Specified Event of Default until the earliest of (i) the date that is 60 days from the Stated Maturity Date, (ii) the date that the a suit is commenced against NGV or any of its Affiliates relating to its failure to close the Sale, (iii) the date upon which any Event of Default (other than the failure to repay all Obligations on the Stated Maturity Date) has occurred and is continuing, and (iv) the date upon which the Debtors sell any Purchased Assets, or (b) (i) the Auction has not yet occurred or the Auction has occurred and NGV was named the Successful Bidder at the Auction, (ii) NGV alleges in good faith in a written notice (the "MAE Notice") that NGV is not obligated to close the Sale because of a Specified APA Material Adverse Effect, (iii) the Debtors and the Retail Entities agree in a written notice delivered within 5 Business Days of the delivery of the MAE Notice that NGV is not obligated to close the Sale because of the occurrence of such a Material Adverse Effect, and (iv) an Event of Default occurs on the Stated Maturity Date as a result of the failure by Resort to repay all Obligations on such date (the "Agreed Non-Payment Event of Default"), the maturity

of the Loans will not be accelerated and the DIP Lenders will not otherwise enforce payment of the Obligations or exercise any other rights and remedies (other than the right to terminate the Commitments) on account of the Agreed Non-Payment Event of Default until the earliest of (i) (i) the later of (a) the Stated Maturity Date, and (b) the date that is 60 days from the date that NGV delivers the MAE Notice, (ii) the date upon which any Event of Default (other than the failure to repay all Obligations on the Stated Maturity Date) has occurred and is continuing, and (iii) the date upon which the Debtors sell any Purchased Assets.

38.    The DIP Credit Agreement requires the payment, by making of Loans under the DIP Credit Facility, of (a) an Upfront Fee in the amount of 2% of the aggregate amount of the Commitments, due and payable on the Closing Date; (b) Commitment Fees at the rate of .50% per annum of the Available Unused Commitment of each Lender, assessed on the last day of each month for the preceding month or on the date upon which the commitments of all DIP Lenders terminate; and (c) all reasonable out-of-pocket expenses of the DIP Agent (including reasonable fees, charges and disbursements of Wachtell, Lipton, Rosen & Katz and any local counsel to the DIP Agent) and, after the occurrence of an Event of Default, the DIP Lenders, as required to be reimbursed or paid under any DIP Document.  In addition, the DIP Credit Agreement provides for an Exit Fee in an amount equal to 5% of the total Commitments outstanding at the Termination Date, however, the Exit Fee is not provided for under the Agreed Budget and no Loans shall be made to pay the Exit Fee.

**B.    Super-Priority Claims, Security Interests, Priming Liens, and Carve-Out**

39.    As a condition precedent, the DIP Credit Agreement requires the Debtors to grant the DIP Secured Parties a joint and several super-priority administrative claim in each of the Debtors' chapter 11 cases pursuant to section 364(c)(1) of the Bankruptcy Code in respect of

17

all of the Obligations; provided, such super-priority administrative claim shall not have priority over any Adequate Protection Obligations (as such term is defined in the Prior Cash Collateral Orders) in respect of the Used Cash Collateral, which shall be automatically deemed satisfied and paid in full without any action by any person upon the repayment of the Used Cash Collateral in full, in cash, as provided in the Proposed Interim Financing Order.

40.    In addition, pursuant to the DIP Credit Agreement and section 364(c)(2) of the Bankruptcy Code, the Debtors seek authority to grant the DIP Agent (for the benefit of the DIP Secured Parties) perfected, first priority, valid, enforceable and non-avoidable liens on and security interests in all property of each of the Debtors' chapter 11 estates, excluding avoidance actions (the "DIP Collateral"), it being understood that, notwithstanding such exclusion of avoidance actions, the proceeds of such actions (including, without limitation, assets as to which liens are avoided) shall be subject to such liens under section 364(c)(2) of the Bankruptcy Code and available to repay the Obligations.

41.    As further required by the DIP Credit Agreement, the Debtors seek authority to grant to the DIP Agent (for the benefit of the DIP Secured Parties), pursuant to section 364(d)(1) of the Bankruptcy Code, perfected, first-priority, valid, enforceable and non-avoidable senior priming liens on and security interests in all property of each of the Debtors' chapter 11 estates excluding the Unused Cash Collateral or property that is subject to any existing lien, right or interest; provided that such senior priming liens in favor of the DIP Agent shall not prime any Adequate Protection Obligations previously granted to the Prepetition Lenders in respect of the Used Cash Collateral, which shall, as further described herein, be automatically deemed released without any action by any person upon the repayment of the Used Cash Collateral, in cash, in full, as provided in the Proposed Interim Financing Order.

42.        Notwithstanding the foregoing, the Proposed Interim Financing Order and the DIP Credit Agreement provide, subject to additional restrictions and terms set forth in the Proposed Interim Financing Order, that the liens, mortgages, deeds of trust and deeds in respect of the DIP Collateral to secure the Obligations, and the Super-Priority Claim, shall be subordinate to the following (collectively, the "Carve-Out"): (i) the allowed and unpaid professional fees and disbursements incurred by the Debtors, the Examiner and, solely with respect to the amount described in clause (b) of the proviso below, any statutory committees appointed in the Debtors' chapter 11 cases, in an aggregate amount not in excess of $550,000 (the "Total Carve Out Amount"), incurred after the first Business Day following delivery of a Carve-Out Trigger Notice (as defined in the Proposed Interim Financing Order), plus all unpaid professional fees and disbursements incurred prior to the delivery of a Carve-Out Trigger Notice in an amount no greater than that set forth in the Agreed Budget and allowed by the Bankruptcy Court; provided, neither the Agreed Budget nor the Carve-Out shall include any fees or expenses incurred for any purpose that is prohibited under paragraph 4(d) of the Fourth Interim Cash Collateral Order with respect to Adequate Protection Obligations (as defined therein), except (a) in furtherance of the transactions described in or contemplated by the Proposed Interim Financing Order, a final order on the Motion, the DIP Documents, the Asset Purchase Agreement, the Sale Procedures Order or the Sale Order, and (b) that a sum not to exceed $50,000 of the Carve-Out may be used by the Committee to investigate (but not to commence or prosecute an action with respect to) Claims and Defenses (as such terms are defined in paragraph 19(a) of the Fourth Interim Cash Collateral Order) that may exist against the Released Parties (as defined in paragraph 19(a) of such Fourth Interim Cash Collateral Order), and (ii) the payment of fees pursuant to 28 U.S.C. § 1930.

C.    **Surcharge Waiver**

43.    Pursuant to the DIP Credit Agreement, the Debtors are waiving their rights to seek to charge or assert costs or expenses of administration that already have been, or may hereafter be, incurred in the Debtors' chapter 11 cases or in any subsequently converted cases under chapter 7 of the Bankruptcy Code against the DIP Secured Parties or the DIP Collateral.

D.    **Repayment of Used Cash Collateral from DIP Facility Proceeds and Disbursement of Unused Cash Collateral**

44.    The holders of a majority in aggregate principal amount of obligations under the Existing Credit Facility have, subject to the provisions of paragraphs 43-46 hereof, irrevocably consented to (a) allow their pre-petition liens in the Collateral (as defined in the Existing Credit Facility) to be primed by the liens granted in favor of the DIP Agent (for the benefit of the DIP Secured Parties) upon the entry of the Proposed Interim Financing Order; (b) the DIP Credit Facility and any DIP Secured Party's exercise of remedies pursuant to the terms of any DIP Document, the Interim Order or the Final Order, and (c) the Sale, the Asset Purchase Agreement and the procedures described in the Sale Procedures Motion and Sale Procedures Order (each of the transactions described in clauses (a) through (c), a "Subject Transaction", and each of the transactions described in clause (c), a "Subject Sale Transaction").

45.    In exchange for and in order to induce the consent of the Prepetition Lenders, and in lieu of the Debtors' obligation to provide the Existing Credit Facility Lenders with adequate protection pursuant to section 364(d)(1)(B) of the Bankruptcy Code, the Debtors and the DIP Secured Parties have agreed that (a) within two (2) Business Days of the Retail Entities Guarantee Date (the "Deadline"),[12] the Debtors shall use the proceeds of Loans, to the extent

---

[12]    Paragraph 11(e) of each of the Prior Cash Collateral Orders provides, *inter alia*, that (a) "[n]o Lien having a priority superior to or pari passu with those granted by this Order with respect to the Adequate Protection Obligations shall be granted or allowed until the indefeasible payment in full in cash and satisfaction in the manner

available at such time pursuant to the terms and conditions of the DIP Credit Agreement, to indefeasibly pay to the Existing Credit Facility Agent (who shall disburse such amounts to the Prepetition Secured Parties entitled thereto subject to and strictly in accordance with paragraph 32 of the Proposed Interim Financing Order) cash in an amount sufficient to repay the Used Cash Collateral in full, and (b) upon the entry of the Proposed Interim Financing Order, the Debtors shall cause the indefeasible payment of the Unused Cash Collateral to the Existing Credit Facility Agent (who shall disburse such amounts to the Prepetition Secured Parties entitled thereto subject to and strictly in accordance with paragraph 32 of the Proposed Interim Financing Order).  Upon receipt by the Existing Credit Facility Agent of the payment of the Used Cash Collateral and the Unused Cash Collateral, each of the Prepetition Secured Parties shall be deemed to have irrevocably directed the Existing Credit Facility Agent not to object to any of the Subject Transactions (such direction, the "Agent Direction"); provided, further, that subject to the prior orders of this Court, the Proposed Interim Financing Order is not intended to limit, alter or expand any person's right to object to or seek subordination of any claim of any Prepetition Secured Party.  The DIP Credit Agreement does not, however, restrict or limit any Existing Credit Facility Lender's right to object to the following aspects of the Sale on the following grounds: (w) a Person deemed to be a Qualified Bidder is not a Qualified Bidder, (x) the bid deemed the Successful Bid is not the highest or best bid, (y) the allocation of the proceeds of the Sale among the Debtors is inappropriate or inequitable, or (z) the term of a bid is inconsistent with the Asset Purchase Agreement materially and adversely affects the Existing Credit Facility Lenders.

---

provided in this Order of the Adequate Protection Obligations", and (b) "[n]o claim having a priority superior to or *pari passu* with the Superpriority Claims granted by this Order with respect to the Adequate Protection Obligations shall be granted or allowed until the indefeasible payment in full in cash and satisfaction in the manner provided in this Order of the Adequate Protection Obligations."

MIAMI 1968331.5 7650831854

46.     In the event that any order is entered by any court of competent jurisdiction requiring any Existing Credit Facility Lender to return any payment of Used Cash Collateral to the Debtors, (i) with respect to any such payment so returned, the adequate protection claims and liens of such Existing Credit Facility Lender shall be automatically reinstated with the same validity and priority that existed prior to the repayment of such Used Cash Collateral by the Debtors, (ii) any such payments that are returned by an Existing Credit Facility Lender shall be treated as Extraordinary Receipts and used to repay the DIP Credit Facility pursuant to the terms thereof, and (iii) the consent of the Existing Credit Facility Lenders to the Subject Sale Transaction (including the Credit Bid (as defined in the Bidding Procedures attached to the Sale Procedures Order (the "Credit Bid"))), any borrowing of Loans under the DIP Credit Facility occurring after the entry of such order and the grant of liens to the DIP Secured Parties in respect of any such borrowing, and the Agent Direction insofar as it relates to the Subject Sale Transaction only, shall automatically terminate and be of no further effect.

47.     In the event that any order is entered by any court of competent jurisdiction requiring any Existing Credit Facility Lender to return any payment of Unused Cash Collateral to the Debtors, (a) the Debtors will be obligated to hold any such amounts so returned to the Debtors aside in a segregated cash collateral account for the benefit of the applicable Existing Credit Facility Lender, and such cash collateral will not be subject to the liens in respect of the Obligations, and (b) the consent of the Existing Credit Facility Lenders to the Subject Sale Transaction (including the Credit Bid), any borrowing of Loans under the DIP Credit Facility occurring after the entry of such order and to the grant of Liens in respect of any such borrowing, and the Agent Direction insofar as it relates to the Subject Sale Transaction only, shall automatically terminate and be of no further effect.

## AUTHORITY FOR RELIEF REQUESTED

48.        Pursuant to the DIP Credit Agreement, the DIP Lenders require, *inter alia*, that they be provided with (a) super-priority administrative claims in each of the Debtors' estates, (b) first priority liens on all unencumbered property of each of the Debtors' estates, and (c) priming first priority liens on all other property of each of the Debtors' estates subject to the payment in full of the liens heretofore granted in such property to the Prepetition Lenders as adequate protection for the use of the Used Cash Collateral.

49.        The obtaining of postpetition credit by a debtor-in-possession is governed by section 364 of the Bankruptcy Code, which provides in pertinent part:

> (c)        If the [debtor-in-possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or incurring of debt –
>> (1)        with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>> (2)        secured by a lien on property of the estate that is not otherwise subject to a lien; or
>> (3)        secured by a junior lien on property of the estate that is subject to a lien.
>
> (d)(1)  The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal to lien on property of the estate that is subject to a lien only if –
>> (A)        the [debtor-in-possession] is unable to obtain such credit otherwise; and
>> (B)        there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

50.        In sum, approval of the DIP Credit Facility by the Court requires that the Debtors were unable to obtain such credit on an unsecured basis and, if not, that any creditor with a previous interest in the property in which a priming lien is being granted to the DIP Lenders either consents to such priming lien or be provided adequate protection of its interest in such property.

MIAMI 1968331.5 7650831854

51.      The DIP Credit Facility is the product of over two months' of arm's length, good faith negotiations, consistent with section 364(e) of the Bankruptcy Code. Creditors (as well as the Committee) executing confidentiality agreements prescribed by the Purchaser have been provided with iterative drafts of the Sale and DIP Documents, the opportunity to confer with the Purchaser/DIP Agent and the Debtors about the proposed transactions, as well as to provide comments. Certain parties in interest, including numerous of the Prepetition Term Lenders have been actively engaged in negotiations, and even the title insurers have provided comments in respect of transactional documents.   Since his appointment on October 16, 2009, the Examiner, personally and through his eminently capable counsel, has been an active participant in the process of negotiating the terms of the DIP Credit Facility, as well as the Sale. While counsel to numerous of the holders of Mechanic Liens (and certain of their clients) executed confidentiality agreements and been provided with drafts of the Sale and DIP Documents, they apparently made the tactical decision not to be active participants in the process.   Moreover, as the negotiation process neared closure, the so-called "Contactor Claimants" chose to object to the entry of the November 16 Consensual Interim Cash Collateral Order.

52.      In negotiating debtor-in-possession financing arrangements, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties." *In re Ames Department Store, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).  In this instance, the Examiner's involvement ensured that the interests of the Debtors' estates were especially well represented, free of any claim of conflict of interests.

53.      Courts will evaluate the facts and circumstances of a debtor's case, and will accord significant weight to the necessity for obtaining financing so long as it does not run afoul

of the provisions of and policies underlying the Bankruptcy Code. *See, e.g., In re Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085 (4th Cir. 1986) (approving postpetition financing necessary to sustain seasonable business); *In re Ames Dept. Store, Inc.*, 115 B.R. at 40 ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.") Courts generally will not override a debtor's prudent and responsible exercise of its business judgment consistent with its fiduciary duties to the bankruptcy estate and its creditors in negotiating an appropriate financing package. *See In re Simasko Prod Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) (noting that business judgment should be left to the boardroom and not to the bankruptcy courts).   In this case, the Debtors' sound business judgment is informed and supported by the Examiner's judgment in respect of the proposed financing.

### A.    Credit Was Unavailable to the Debtors On Any Other Basis

54.     Under Bankruptcy Code sections 364(c) or 364(d), a debtor must make a reasonable effort to seek other sources of unsecured credit available but "is not required to seek credit from every possible lender." *In re Snowshoe Co.*, 789 F.2d at 1088; *In re Ames Department Store, Inc.*, 115 B.R. at 37.

55.     As a result of general economic conditions, the decline in the Las Vegas hospitality market, the incomplete state of the Project, the cost to complete the Project, the Debtors' financial condition and contraction in the credit markets, there simply is no prospect of the Debtors obtaining credit either in the form of unsecured credit allowable as an administrative

expense under section 503(b) of the Bankruptcy Code.  Indeed, the pursuit of unsecured financing would be a fool's errand in the circumstances.

56.     The use of Cash Collateral is not a solution.  The Prepetition Secured Parties have recently concluded to curtail the Debtors' use of Cash Collateral on the very limited basis of the last several Prior Cash Collateral Orders and made it plain that they have no appetite at all to provide the further use of Cash Collateral.  An attempt to use the Cash Collateral without the consent of the Prepetition Secured Parties would result in costly and risky litigation, during which it would be impossible for the Debtors to continue any operations or to actively pursue a sale of the Project.

57.     A fulsome and value-maximizing sale process cannot be undertaken without sufficient cash to (a) preserve and stabilize the Project to ensure the condition of the Project does not materially deteriorate while the sale process unfolds; and (b) fund the costs associated with commencing chapter 11 proceedings in respect of the Retail Entities in order to include the Retail Component as part of the sale.

58.     Therefore, the Debtors and their financial advisor have engaged in discussions with prospective lenders and equity and plan sponsors both prior to and since the Petition Date. In addition, the Court-ordered mediation of the Revolver Litigation provided an opportunity to explore the willingness of the Prepetition Lenders to provide additional financing.  Upon information and belief, the Examiner has also attempted to obtain debtor-in-possession financing to facilitate the Sale on more favorable terms than those proposed by the DIP Lenders.

**B.     Consent of the Prepetition Secured Parties**

59.     As stipulated by the Debtors and acknowledged in each of the Prior Cash Collateral Orders, the Prepetition Lenders hold valid, perfected and enforceable first priority

prepetition liens on the property that is to serve as the DIP Collateral. Moreover, by the Prior Cash Collateral Orders, the Prepetition Lenders, including the Prepetition Term Lenders, were granted priming liens on the same property as adequate protection for the use of Cash Collateral.

60.     In addition, Paragraph 11(e) of each of the Prior Cash Collateral Orders provides, *inter alia*, that (a) "[n]o Lien having a priority superior to or pari passu with those granted by this Order with respect to the Adequate Protection Obligations shall be granted or allowed until the indefeasible payment in full in cash and satisfaction in the manner provided in this Order of the Adequate Protection Obligations," and (b) "[n]o claim having a priority superior to or *pari passu* with the Superpriority Claims granted by this Order with respect to the Adequate Protection Obligations shall be granted or allowed until the indefeasible payment in full in cash and satisfaction in the manner provided in this Order of the Adequate Protection Obligations." Paragraph 11(e) has been included in every single Prior Cash Collateral Order and, with respect to its restriction on the granting of priming liens and superpriority claims absent indefeasible payment in full and it cash of the Adequate Protection Obligations, ***has never been the subject of any objection by any party***.

61.     The Prepetition Lenders have made clear that they are unwilling to waive or modify the protections afforded by this Court under Paragraph 11(e) and as to which no other party ever objected. Thus, in order for the Debtors to grant the DIP Lenders the priming liens and superpriority liens that they have insisted upon receiving in order to enter into the DIP Credit Agreement, the Debtors have (a) agreed to repay all Used Cash Collateral to the Prepetition Lenders, thereby freeing the Debtors of any restrictions against granting priming liens in the DIP Collateral to the DIP Lenders, and (b) obtained the consent of the Required Lenders (as defined in the Prepetition Credit Agreement) to the DIP Credit Facility and the liens granted thereunder

27

to the DIP Secured Parties in the DIP Collateral.  Thusly, the Debtors have satisfied section 364(d) of the Bankruptcy Code as to the Prepetition Lenders.

      **C.**      **Mechanic Lien Claimants Holding Disputed Claims to Priority Cannot Hijack the Sale Process That is in Creditors' Best Interests**

      62.      In stark contrast, the holders of Mechanic Liens have not signified their consent to the priming liens being granted to the DIP Lenders on the DIP Collateral which is purportedly subject to the interests of those Mechanic Liens.  This despite the fact that the DIP Credit Facility and the Sale process set forth in the Bidding Procedures Motion enhance the value of the Project as compared to the horrific alternatives.  Thus, the issue is whether the Mechanic Liens are entitled to adequate protection due to the priming liens being granted to the DIP Lenders and, if so, whether adequate protection is being provided.

      63.      As the Court is well aware, the Mechanic Liens are contested at least as to priority (by the Prepetition Secured Parties) and extent and amount (by the Debtors and the Prepetition Secured Parties).  As of the date hereof, each of the Prior Cash Collateral Orders has found that the Prepetition Liens are first-priority, valid, perfected, and enforceable, subject to the rights of parties-in-interest to challenge the priority, validity, extent, or enforceability of such liens by the Third Party Challenge Deadline (as defined in the Prior Cash Collateral Orders).  Indeed, as noted in footnote 8, *supra*, there are presently three adversary proceedings pending before this Court concerning the relative priority of the Mechanic Liens and many other challenges that have been asserted through the proof of claim process authorized by the Prior Cash Collateral Orders.

      64.      Moreover, the Debtors believe that certain of the Mechanic Liens are substantially overstated and/or duplicative and include, among other things, amounts that are only payable upon completion of the Project or that are in respect of work that remains

unperformed.  In addition, the Debtors' assets that are to be sold include personal property in and on the Project site as well as other personalty, including parts, supplies, equipment, and intangible assets, that is not on the Project site.  Although it is clear that the liens of the Prepetition Secured Parties cover all of the aforementioned assets, the applicability of the Mechanic Liens to all such assets is disputed.

65.    In addition, no holder of a Mechanic Lien has proven that it holds a valid security interest in any of the Debtors' assets, let alone an interest that is afforded priority over the Prepetition Liens.

66.    Further, under the Nevada statutes governing statutory liens (N.R.S. 108.221, *et seq.*), there exists a predetermined priority scheme amongst all holders of Mechanic Liens.  *See* N.R.S. 108.236.  Under that statute, claims for labor come first, followed by claims for materials. Claims for services come last.  Until the relative priorities of all Mechanic Liens are determined, the ability to determine which, if any, particular Mechanic Lien is entitled to adequate protection is impracticable.[13]

67.    Moreover, the Mechanic Liens are only entitled to adequate protection to the extent of the value of their interest in the collateral securing those liens.  *See United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 372 (1988) (holding that

---

[13]    The failure of the holders of Mechanic Liens to demonstrate their relative priorities is particularly ironic in these cases.  At the onset of the cases, the Debtors filed a motion to establish a streamlined procedure to develop the critical information necessary to make that determination. *See* Motion by Debtors for Entry of an Order (A) Establishing a New and Earlier Bar Date for Filing Mechanic's and Materialmen's Lien Claims; (B) Approving Proof of Claim Form for Mechanic's and Materialmen's Lien Claims; and (C) Approving Form and Manner of Notice Thereof [Dkt. No. 277] (the "Mechanic's Lien Bar Date Motion").  Nevertheless, the Mechanic Liens vehemently opposed that motion and contended they should not be required to provide such fundamental information to the Debtors.  *See* Contractor Claimants Response in Opposition to Mechanic's Lien Bar Date Motion [Dkt. No. 322]; M&M Lienholders' Objection to Mechanic's Lien Bar Date Motion [Dkt. No. 324]; Colasanti Specialty Services, Inc's Joinder in Contractor Claimants Response in Opposition to Mechanic's Lien Bar Date Motion and M&M Lienholders' Objection to Mechanic's Lien Bar Date Motion [Dkt. No. 325]; and Joinder of Aderholt Specialty Company, Inc. in Objections to Motion to Mechanic's Lien Bar Date Motion [Dkt. No. 331].  The holders of Mechanic Liens, not the Debtors and their estates, should be made to suffer the consequences of their resistance and inability to provide the information necessary to determine priorities.

"[t]he phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral'"); *In re Gallegos Research Group, Corp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995) (noting that all forms of adequate protection are designed to protect secured creditors from diminution in the value of their collateral); *In re Hollins*, 185 B.R. 523, 524 (Bankr. N.D.Tex. 1995) ("Adequate protection seeks to protect a creditor from an [sic] decline in the value of its collateral . . . ."). This standard applies equally with respect to "priming" financing section 364(d)(1)(B) of the Bankruptcy Code.  *See, e.g., In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection for purposes of the provision entitling a debtor to obtain financing secured by liens senior to all other interests is to safeguard the secured creditor from diminution in the value of its interests.").  Thus, if all Mechanic Liens are not entitled to *pari passu* treatment by virtue of the foregoing analysis under Nevada mechanic lien law, and the value of the Project is less than the value of the most senior Mechanic Liens in the Nevada priority queue, the junior-most Mechanic Liens are worthless and not entitled to any protection whatsoever.

D.    **A Sale of the Project is Necessary and the Sale Process Proposed by the Debtors and the Examiner Will Maximize the Value of the Project**

68.    Despite the priority dispute between the Prepetition Secured Parties, who have consented to the relief requested herein, and the holders of Mechanic Liens, who have not consented, there does not appear to be disagreement even among those constituencies about the wisdom of selling the Project pursuant to section 363 of the Bankruptcy Code.[14]  Indeed this Court, by appointing the Examiner with a mandate to "examine, negotiate and supervise" a section 363 sale of assets, has implicitly endorsed the concept of a sale of the Project in chapter 11. *See* Dkt. No. 770.

---

[14]    MR GARMAN:   " . . . Again, I will remind you, the ultimate fear that I have is that sale doesn't come through."  Tr. of Sept. 16, 2009 Hrg. at p. 59, ll.2-3.

69.     Although the Debtors are admittedly without equity in the Project, no Mechanic Lien party has sought stay relief or to dismiss these cases in order to pursue a foreclosure remedy in an alternative forum.  Although the so-called "M&M Lienholders" filed a stay relief motion on September 11, 2009, that motion expressly sought relief limited to "permitting the Nevada state courts to determine the extent, validity, and priority of all of the liens against the [Project]" and did not seek "to foreclose on the Project or obtain payment of their claims without further order of this Court."  Dkt. No. 506 at p. 2.  Moreover, the M&M Lienholders requested an adjournment of the hearing on their stay relief motion.

70.     Indeed, it is telling that not a single holder of a Mechanic Lien has sought relief from stay to foreclose its purported lien, but rather, all Mechanic Lien holders seem content to argue the priority of their liens without offering a dime to preserve the Project or subsidize the Debtors' infrastructure for the costs to maintain, let alone stabilize the Project, while bitterly complaining throughout about the priming liens granted to the Prepetition Secured Parties for the use of their Cash Collateral to defray such expenses.

71.     Specifically, expenditures in accordance with the Agreed Budget would constitute the "reasonable, necessary costs and expenses of preserving, or disposing of" the Project.  The Agreed Budget provides for expenditures that are necessary to preserve the value of the Project until the Sale can be completed and all those claiming a security interest in the Project benefit therefrom.   Accordingly, the expenses in the Agreed Budget would be recoverable from the Project by surcharge under section 506(c) of the Bankruptcy Code.  *See Official Comm. of Unsecured Creditors of Toy King Distribs. v. Liberty Sav. Bank (In re Toy King Distribs.)*, 256 B.R. 1, 193 (Bankr. M.D. Fla. 2000) ("If the plaintiff successfully argues that the secured creditor received a quantifiable benefit from the sale or disposition of its

collateral, then the fees and costs of the sale that inured to the secured creditor's benefit may be surcharged from the value of its collateral."); *In re Hemisphere Int'l Ctr., Inc.*, 59 B.R. 289, 295 (Bankr. S.D. Fla. 1986) ("A secured creditor must not be 'unjustly enriched' by the expenditures and services rendered by a debtor or trustee.").

72.     Indeed, Mechanic Lien claimants would have their proverbial cake and eat it too by participating in the bankruptcy process when it is convenient, seeking to go to Nevada when it is not, and refusing to acknowledge that if they are indeed in the first-position they claim, they must bear the costs of preserving, maintaining, and protecting their collateral as is clearly permitted by section 506(c) of the Bankruptcy Code and as would occur in a Nevada foreclosure or receivership process.

73.     The alternatives to conducting a sale are very limited and lead to the same result – a liquidation of the Project sometime in the distant future sans an organized sale effort or stabilization.  Whether that liquidation occurs by an abandonment of the Debtors' interest in the Project and, thus, an exceedingly complex foreclosure and then a foreclosure sale in state court, or through a conversion of these cases and a sale by a chapter 7 trustee, there is no basis to doubt that the results of liquidation will be materially worse.

74.     First, it cannot be gainsaid that the state court foreclosure process in Nevada will take substantially longer than the sale process set forth in the Bidding Procedures Motion. This matter would become just another foreclosure case in a backlogged system in one of the cities hardest-hit by the real estate crisis.  Any sale will be 1-2 years off at the earliest and the product of years of litigation over the proceeds including the battles over the priority of liens that have been commenced in this Court.

75.      Second, a foreclosure sale will yield substantially less to whoever is entitled to the sales proceeds.  During the delay attendant to the foreclosure sale, the Project will need to be maintained to prevent degradation and erosion in value occasioned by exposure to the elements, accidents and vandalism.  Moreover, utilities will need to be paid for to protect the almost 30 stories of completed rooms, the central plant operations and fire and safety systems.  In addition, due to the geological streams running underneath the Project that wind down to Lake Mead, constant dewatering services must be employed to protect against contamination.  Someone has to pay for these services.  The DIP Credit Facility facilitates that.

76.      For an entirely different but equally important reason, the sale value of the Project is maximized by the process set forth in the Bidding Procedures Motion.  As structured, the DIP Credit Facility provides the necessary resources to accomplish the Sale of the Project, inclusive of the Retail Component.  It is indisputable that the value of the Project without the Retail Component, if the Project could even be sold without the Retail Component, is greatly diminished.  As the Court well knows, the Debtors have sought such resources since before the Debtors' chapter 11 cases were filed without any success.

77.      It should not be overlooked that in a non-363 sale setting, the critical mass of human capital and "corporate memory" about the Project that the Court has taken great pains to retain, will all be lost.  Neither a receiver nor a trustee will have those resources available to manage and protect the Project.  Worse yet, none of that human capital will be available to prospective buyers who will be left to bid on a "pig in a poke."

78.      The principal purpose of adequate protection "is to assure that the lender's economic position is not worsened because of the bankruptcy case."  *In re DeSardi*, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006); *In re Coors of the Cumberland*, 19 B.R. 313 (Bankr. M.D.

Tenn. 1982). A secured creditor is entitled to adequate protection only against diminution in its interest in its asserted collateral. *Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. at 369-73. The interest in property that is entitled to protection is value of the collateral securing such claim. *Id.* It follows therefore that where a secured creditor's interest and the value of the collateral is not diminishing by its use, sale, or lease, the secured creditor's interest is adequately protected. *Id.*

79.     Because the term "adequate protection" is not defined in the Bankruptcy Code, the precise contours of the concept are necessarily determined on a case-by-case basis. *M Bank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1995) (same); *In re Senior Care Properties, Inc.*, 137 B.R. 527, 528 (Bankr. N.D. Fla. 1992) (same); *see also* S. Rep. No. 95-989, 95th Cong., 2d Sess. 54 (1978). Preserving the value of collateral against the decline in value that would result from a precipitous liquidation is a crucial factor to consider in making an adequate protection determination. *See, e.g.*, Norton, et al., *2 Norton Bankruptcy Law and Practice 2d*, § 38:7, p. 38-17 (1994); *Snowshoe*, 789 F.2d at 1087 (section 364(d) order affirmed where the trustee reported that the collateral would lose from 50% to 90% of its fair market value if it ceased operating); *495 Central Park Ave.*, 136 B.R. at 631 (proceeds of priming financing utilized to improve collateral transfers into value that serves as adequate protection); *In re Relar Distribs., Inc.*, 166 B.R. 3, 6 (Bankr. D. Mass. 1994), *aff'd*, 182 B.R. 81 (D. Mass. 1995), *aff'd*, 69 F.3d 1200 (1st Cir. 1995) (the activities of a debtor can enhance collateral value and thereby provide adequate protection).

80.     Here, approval of the DIP Credit Facility will (a) preserve and enhance the value of the Project, (b) achieve a superior return for creditors even after the DIP Credit Facility

34

is retired, (c) do so more quickly than a state court foreclosure process, and (d) avoid exposing parties-in-interest and the Project to the myriad risks associated therewith. The Stalking Horse Bid and the upside available through higher bids achieved in the sale process is the very essence of adequate protection because they will return to creditors the market-determined value of their collateral. *In re Levitt and Sons, LLC*, 384 B.R. 630, 641 (Bankr. S.D. Fla. 2008); *In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (when considering authorization of a priming lien, courts have flexibility to allow such relief as will result in the realization of the protected entity of the value of its interest in the property involved).

81.     In a recent and very similar case, *In re Yellowstone Mountain Club, LLC*, Case No. 08-61570 (Bankr. D. Mont. Nov. 10, 2008), a debtor proposed debtor-in-possession financing that would give a DIP lender a superpriority lien over all other lienholders. A prepetition lender objected, arguing that its position was not adequately protected. In support of the motion, the debtor argued that the maximization and preservation of the debtors' going-concern value must be juxtaposed with the diminution in value of the debtors' assets if the debtors closed their doors and ceased operations.

82.     The Court in *Yellowstone* authorized the financing and granted the priming lien and, in doing so, acknowledged that "[t]he whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy," and that "value is the linchpin of adequate protection." *See In re Yellowstone Mountain Club, LLC*, Case No. 08-61570, 2008 WL 5875547, at \*8 (Bankr. D. Mont. Dec. 17, 2008) (citing *In re O'Connor*, 808 F.2d at 1396-97). The court considered adequate protection in terms of "maintain[ing] the debtors' going concern value." *Id.* at \*9 (discussing testimony and conclusions of the debtor's Chief Restructuring Officer). While acknowledging that the pre-

petition lender would receive no additional liens to protect its position as a prepetition secured lender, the court concluded that the continued operation of the debtor's business "provide[d] for better value enhancement, less risk and better protection of Credit Suisse's liens." *Id.* at *10. Additionally, the court determined that the "DIP financing proposal [provided] prepetition secured creditors . . . with at least the same level of protection they would have absent [the] superpriority financing that primes the pre-petition lender's position." *Id.* at *11.

83.    The evidence is overwhelming that condemning all parties to years of foreclosure litigation would be a value-destroying exercise as compared to the value-maximizing proposal crafted by the Debtors, the Examiner and certain participating creditors that preserves, indeed maximizes, the value of the Project and delivers to lienholders the indubitable equivalent of their interests in the Project – whatever the market determines that interest is worth in a well-marketed sale process that includes the Retail Component, including any amounts in excess of the Stalking Horse Bid, dollar for dollar.

84.    It is against the backdrop of these competing alternatives that the Debtors and the Examiner, after thorough analysis and consultation with their respective professionals, have determined that the sale process set forth in the Bidding Procedures Motion funded by the DIP Credit Facility results in a better outcome for creditors, including the party ultimately determined to be in the first-lien position, than any foreclosure process in state court in Nevada, even when the magnitude of the incremental priming lien proposed herein is fully taken into account.

## NOTICE

85.    The Debtors have served, or will serve, this Motion, the Proposed Interim Financing Order, the DIP Credit Agreement (without exhibits thereto, which will be made available upon request of Debtors' counsel or at http://www.kccllc.net/FBLV), and the Agreed

Budget on the following entities: (a) the Office of the United States Trustee; (b) counsel to the Committee; (c) those parties listed on the List of Creditors Holding the 20 Largest Unsecured Claims Against the Debtors, as identified in the Debtors' Chapter 11 petitions; (d) counsel to Wilmington Trust, FSB, as successor administrative agent and disbursement agent under the Existing Credit Facility (as defined herein); (e) counsel to Bank of America, N.A. in all of its capacities under the Existing Credit Facility and as an individual Prepetition Lender (as defined in the Motion); (f) counsel to the Trustee for the Existing Mortgage Notes (as defined herein); (g) counsel to the Examiner; (h) counsel to the DIP Agent and DIP Lenders; (i) counsel for Aurelius Capital Management, LP; (j) counsel for Turnberry West Construction, Inc.; (k) counsel for the Contractor Claimants (as defined in the Motion); (l) counsel for the M&M Lienholders (as defined in the Motion); (m) counsel to the Term Lender Steering Group (as defined in the Motion); (n) counsel to Fidelity National Title Insurance Company, Lawyers Title Insurance Corporation, Commonwealth Land Title Insurance Company, Transnation Title Insurance Company, and First American Title Insurance Company (o) all parties who are known to assert liens on assets of the Debtors including all known parties asserting Mechanic's Liens; (p) Existing Credit Facility Lenders as noted in the certificate of service of the Motion; (q) the U.S. Treasury; (r) the Internal Revenue Service; (s) all applicable state and local taxing authorities; (t) known creditors of the Retail Entities (as defined herein); (u) counsel to Lehman Brothers Holdings, Inc., in all of its capacities under (1) that certain Loan Agreement, dated as of June 6, 2007, by and between Fontainebleau Las Vegas Retail, LLC, the lenders party thereto and Lehman Brothers Holdings Inc., as administrative agent (2) that certain Mezzanine Loan Agreement, dated as of June 6, 2007, by and between Retail Holdings, Retail Mezzanine, the lenders party thereto and Lehman Brothers Holdings Inc., as administrative agent; (v) the entities

37

set forth in the Master Service List established in the Debtors' chapter 11 cases; and (w) all entities that have requested notice in the Debtors' chapter 11 under Bankruptcy Rule 2002 (the "Notice Parties").  Service of this Motion, the Proposed Interim Financing Order, the DIP Credit Agreement, and the Budget, upon the Notice Parties complies with Federal Rules of Bankruptcy Procedure 2002 and 4001(c).

86.     The Debtors have requested an expedited interim hearing to consider this Motion.  This request is consistent with Federal Rule of Bankruptcy Procedure 4001(c)(2), which authorizes an interim hearing to consider the relief requested herein to authorize relief necessary to avoid immediate and irreparable hear to the Debtors' estates pending a final hearing, which final hearing must not be on fewer than 15 days notice from the date of this Motion.  The Debtors anticipate that the Bankruptcy Court will set a final hearing on the Motion at the interim hearing, and notice of such final hearing shall be served upon each of the Notice Parties.

87.     Accordingly, the Debtors respectfully submit that notice of the Motion, the relief sought therein, and of the interim hearing on the Motion is adequate and appropriate under the circumstances and that that no further notice of this Motion or of the relief sought herein is necessary or appropriate under the circumstances.

## CONCLUSION

WHEREFORE, based on the foregoing, the Debtors respectfully request the entry of the Proposed Interim Financing Order in the form attached hereto as Exhibit "A" (a) authorizing the Debtors to enter into the DIP Credit Agreement and obtain loans and other financial accommodations thereunder, (b) authorizing the Debtors to grant super-priority priming liens to the DIP Agent for the benefit of the DIP Secured Parties pursuant to section 364(d) of the Bankruptcy Code, (c) authorizing the Debtors to cause the payment of the Unused Cash

MIAMI 1968331.5 7650831854

Collateral to the Prepetition Lenders and repay the Used Cash Collateral; (d) approving the form

and matter of notice; (e) setting a final hearing, and (f) granting such other and further relief as is

just and proper.

Dated:  November 16, 2009

Respectfully submitted,

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
*Counsel for the Debtors*
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131
Telephone: (305) 374-7580
Facsimile: (305) 375-7593

By: /s/  Scott L. Baena
       Scott L. Baena
       Fla. Bar No. 186445
       sbaena@bilzin.com
       Jay M. Sakalo
       Fla. Bar No. 0156310
       jsakalo@bilzin.com
       Jeffrey I. Snyder
       Fla. Bar No. 21281
       jsnyder@bilzin.com