UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.usgourts.gov

In re:

FONTAINEBLEAU LAS VEGAS        CASE NO. 09-21481-BKC-AJC
HOLDINGS, LLC, *et al*.,        CHAPTER 7
       (Jointly Administered)

       Debtors.

_____/

**TERM LENDERS' 1) PRELIMINARY OBJECTION
TO TRUSTEE'S MOTION (I) FOR APPROVAL OF A SETTLEMENT AND
COMPROMISE OF CERTAIN DIRECTOR, OFFICER AND MANAGER LITIGATION
PURSUANT TO FED. R. BANKR. P. 9019, AND (II) FOR ENTRY OF BAR ORDER
RELATED THERETO; AND 2) DEMAND FOR ADEQUATE PROTECTION UNDER 11
U.S.C. § 363(e).**

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ................................................................ 2

II.     BACKGROUND ................................................................................ 9

        A.      The Bankruptcy Cases ........................................................ 9

        B.      The Nevada Action ............................................................ 9

        C.      The Remand Motions......................................................... 11

        D.      The Trustee Action ........................................................... 14

        E.      Term Lenders' Lawsuit Against BofA ................................ 16

        F.      The Term Sheet Executed by the Trustee and the Term Lenders....................... 18

        G.      The Comprehensive Settlement Agreement ...................... 20

        H.      The Exclusion of the Term Lenders From Mediation Sessions and Settlement Discussions ........................................... 21

        I.      In the Absence of the Bar Order, the Term Lenders are Likely to Prevail at Trial in the Nevada Action.................................. 22

III.    PRELIMINARY OBJECTION .......................................................... 25

        A.      The Term Lenders' Have Asserted Independent and Direct Claims in the Nevada Action that Cannot Be Enjoined Without the Term Lenders' Consent ................................................ 26

        B.      The Proposed Bar Order Is Also Impermissible Because It Is Not "Fair And Equitable" To Term Lenders....................... 32

                1.      The Claims in the Nevada Action and the Miami Action are not Interrelated ................................................ 32

                2.      The Term Lenders' are Likely to  Succeed in the Nevada Action........... 34

                3.      Neither the Nevada Action nor the Trustee Action, Nor Both of Them Considered Together, Involve the Complexity that Courts Require as a Precondition to the Entry of a Non-Consensual Bar Order ................................................ 38

                4.      There is no Evidence at all That the Assets of Settling Defendants Will Be Depleted in the Absence of Approval of the Settlement Agreement................................................ 39

        C.      The Settlement Agreement Does Not Meet the Justice Oaks Requirements....... 39

IV.     DEMAND FOR ADEQUATE PROTECTION............................................. 41

i

**TABLE OF CONTENTS**
(continued)

**Page**

V.     RESERVATION OF RIGHTS ........................................................................... 42

VI.    CONCLUSION.............................................................................................. 42

## <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*AAL High Yield Bond Fund v. Deloitte & Touche LLP*,
    361 F.3d 1305 (11th Cir. 2004) ...............................................................................7, 31, 36

*Allianz Ins. Co. v. Gagnon*,
    109 Nev. 990, 860 P.2d 720 (1993) ........................................................................27

*America Capital Corp. v. Marlin* (*In re America Capital Corp.*),
    Case No. 06-126445-AJC, 2011 Bankr. LEXIS 1799 (May 3, 2011) ....................................33

*Apps v. Morrison* (*In re Superior Homes & Investments, LLC*),
    521 Fed. Appx. 895 (11th Cir. 2013)............................................................. passim

*Apps v. Morrison* (*In re Superior Homes & Investments, LLC*),
    Case No. 6:11-CV-1575-Orl-36 (M.D. Fla. Sep. 20, 2012), at *3, 12 ...................................39

*Ave. CLO Fund, Ltd. v. Sumitomo Mitsui Banking Corp.*,
    723 F.3d 1287 (11th Cir. 2013) ..............................................................................20

*Behrmann v. Nat'l Heritage Found., Inc.*,
    663 F.3d 704 (4th Cir. 2011) ...................................................................................29

*Berman v. Smith*,
    No. 13-81150-CIV, 2014 WL 1745361 (S.D. Fla. May 1, 2014)............................................32

*Class Five Nev. Claimants (00-2516) v. Dow Corning Corp. (In re Dow Corning Corp.)*,
    280 F.3d 648 (6th Cir. 2002) ..................................................................................29

*Davies v. Butler*,
    95 Nev. 763, 602 P.2d 605 (1979) .........................................................................27

*Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network*),
    416 F.3d 136 (2d Cir. 2005)....................................................................... passim

*FDIC v. Anderson*,
    No. 2:11-cv-1061-GEB-EFB, 2011 U.S. Dist. LEXIS 144599 (E.D. Cal. Dec. 15, 2011) ......................................................................................................27

*FDIC v. Munoz*,
    No. CV 11-04971 ODW, 2011 U.S. Dist. LEXIS 105500 (C.D. Cal. Sept. 19, 2011) ..........27

*FDIC v. Oakes*,
 No. 2:11-cv-1455-JCM-CWH, 2012 U.S. Dist. LEXIS 54220 (D. Nev. Mar. 19,
 2012) .................................................................................................................................28

*FDIC v. Warren*,
 2011 U.S. Dist. LEXIS 123489 (N.D. Cal. 2011) ............................................................28

*Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
 203 F.3d 203 (3d Cir. 2000)..............................................................................................29

*In re Adelphia Comm. Corp.*
 364 B.R. 518 (Bankr. S.D.N.Y 2007) ..........................................................................44, 45

*In re CHS Elecs., Inc.*,
 261 B.R. 538 (Bankr. S.D. Fla. 2002)...............................................................................32

*In re Fontainebleau Las Vegas Contract Litig.*,
 No. 09-CV-23835 ASG, 2012 WL 930290 (S.D. Fla. Mar. 19, 2012)...............................20

*In re Gunnallen Financial, Inc.*,
 443 B.R. 908 (Bankr. M.D. Fla. 2011) .........................................................................33, 34

*In re Healthsouth Corp. Sec. Litig.*,
 572 F.3d 854 (11th Cir. 2009) .......................................................................................7, 31

*In re Ingersoll, Inc.*,
 562 F.3d 856 (7th Cir. 2009) .............................................................................................29

*In re Justice Oaks II, Ltd.*,
 898 F.2d 1544 (11th Cir. 1990) .................................................................................7, 42, 43

*In re Laminate Kingdom LLC*,
 No. 07-10279-BKC-AJC, 2008 Bankr. LEXIS 1594 (Bankr. S.D. Fla. Mar. 13, 2008).........32

*In re Laminate Kingdom*,
 LLC, No. 07-10279-BKC-AJC, 2011 Bankr. LEXIS 4773 (Bankr. S.D. Fla. Dec. 5,
 2011) ...............................................................................................................................7, 28

*In re Munford Inc.*,
 172 B.R. 404 (N.D. Ga. 1993) ...........................................................................................38

*In re Se. Banking Corp.*,
 314 B.R. 250 (Bankr. S.D. Fla. 2004)................................................................................43

*In re Solar Cosmetic Labs, Inc.*,
 No. 08-15793-BKC-LMI, 2010 WL 3447268 (Bankr. S.D. Fla. Aug. 27, 2010) ..................38

*In re Specialty Equip. Cos.*,
 3 F.3d 1043 (7th Cir. 1993) ...............................................................................................35

*In re United States Oil & Gas Litig.*,
  967 F.2d 489 (11th Cir. 1992) .................................................................................7, 30, 31

*In re Xenerga, Inc.*,
  449 B.R. 594 (Bankr. M.D. Fla. 2011) .................................................................................33

*Kapila v. Soffer et al.*,
  Adv. No. 11-02102-BKC-AJC-A (Bankr. S.D. Fla.) (the "Trustee Action")........................17

*Kapila v. Turnberry Associates et al.*,
  Adv. No. 11-02105-BKC-AJC-A (Bankr. S.D. Fla.).............................................................17

*MacArthur Co. v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*),
  837 F.2d 89 (2d Cir. 1988)...................................................................................40, 41, 44

*Medkser v. Feingold*,
  307 Fed. Appx. 262 (11th Cir. 2008)................................................................................29, 30

*Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*),
  880 F.2d 694 (4th Cir. 1989) ..............................................................................................41

*Moody v. Manny's Auto Repair*,
  110 Nev. 320, 871 P.2d 935 (1994) ("follow[ing] the lead of the California Supreme
  Court" in determining landowner liability)..........................................................................27

*Munford v. Munford, Inc.* (*In re Munford, Inc.*),
  97 F.3d 449 (11th Cir. 1996) ........................................................................... passim

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  429 B.R. 423 (Bankr. S.D.N.Y. 2010) ................................................................................32

*Sheriff, Clark Cty. v. Morris*,
  99 Nev. 109, 659 P.2d 852 (1983) ......................................................................................27

*Teriano v. Nev. State Bank* (*In re Harrison Living Trust*),
  121 Nev. 217, 112 P.3d 1058 (2005) ..................................................................................28

*Van Meter v. Bent Constr. Co.*,
  46 Cal. 2d 588, 297 P.2d 644 (1956) ..................................................................................27

**STATUTES**

11 U.S.C. § 363........................................................................................................................41

11 U.S.C. § 363(e) ..........................................................................................................5, 7, 12, 44

11 U.S.C. § 509........................................................................................................................12

11 U.S.C. § 523........................................................................................................................33

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 9019, and (II)...............................................................................................5, 7

The Term Lenders[1] submit this preliminary objection to the "Motion of Chapter 7 Trustee, Soneet R. Kapila, for (I) for Approval of a Settlement and Compromise of Certain Director, Officer and Manager Litigation Pursuant to Fed. R. Bankr. P. 9019, and (II) For Entry of Bar Order Related Thereto" (ECF 4470) (the "9019 Motion"), filed by Soneet R. Kapila, the Chapter 7 Trustee in these bankruptcy cases.  This objection is preliminary mainly because the Term Lenders have not had the benefit of any disclosure of facts relating to the relief requested by the Trustee in the 9019 Motion.  The Term Lenders will supplement this objection when discovery is complete and in advance of the trial on the 9019 Motion.

In addition, pursuant to 11 U.S.C. § 363(e) the Term Lenders demand that the Trustee provide adequate protection to the Term Lenders on account of the use and disposal of the Term Lenders' claims in Nevada state court (the "Nevada Action") that would  result from the entry of a bar order as requested in the 9019 Motion in the form of a lien on the proceeds of the Settlement Agreement to secure a claim equal to the value of the claims asserted by the Term Lenders in the Nevada Action.

## I.    PRELIMINARY STATEMENT

The Settlement Agreement is conditioned upon the defendants obtaining an order of this court that enjoins the prosecution of, and therefore grants the defendants in the Nevada Action (the "Nevada Defendants"), a complete and total release and discharge of all claims asserted against them in the Nevada Action.  The Nevada Defendants and their Insurers have not been able to obtain similar relief the Nevada Action.  Indeed, although the Nevada Defendants have filed numerous motions seeking dismissal of claims and summary judgment, the Term Lenders have five causes of action that are now ready for trial in January.

---

[1]  The Term Lenders are listed in Exhibit D to the Joint Motion to Approve the Comprehensive Settlement Agreement (ECF 3129, Ex. D).

  
The claims that the Bar Order would extinguish do not belong to the estate, but rather are independent and direct claims of non-debtor parties.  Those claims allege fraud and negligent misrepresentation by the Nevada Defendants, who induced the Term Lenders to loan more than $1 billion while concealing the fact that they were maintaining two sets of books – one which fraudulently showed the Project to be fully funded, the other which demonstrated that the Project was hundreds of millions of dollars short.  The Term Lenders, who have spent millions of dollars in attorneys' fees pursuing their claims in Nevada seek damages in excess of $1 billion that, by the Trustee's own admission, are distinct from any damages suffered by the Debtors.  The Trustee is not a party in the Nevada Action and has no interest in the outcome of that case.

The Term Lenders are not parties to the Settlement Agreement.  They were excluded from the mediation sessions that led to the Settlement Agreement.  The deal reached neither respects nor accounts for the Term Lenders' rights.  If the Settlement Agreement is approved, the Term Lenders will receive no payment or other consideration in exchange for the effective release and discharge of claims owned by them and not by the estate.[2]  Instead, the entire amount will be paid to the estate whose claims have not advanced past the pleading stage and without the Term Lenders' claims would have generated only a fraction of the payment to be made under the Settlement Agreement.

Under the law of this circuit and others, the bar order proposed by the Trustee is unlawful and unnecessary.  There is no apparent reason why the Trustee could not have settled his own claims without releasing the Term Lender claims as well.  Even after the settlement proposed here, there remains more than $45 million in unused insurance coverage.

---

[2] As explained, *infra*, any distribution of proceeds of the Settlement Agreement received by the Term Lenders  from the Debtor on account of their unsecured claims against the Debtor does not constitute payment or consideration for their claims asserted in the Nevada Action.

As this Court and many other courts have recognized, a bar order is an "extraordinary remedy" granted only in "unusual circumstances."  *In re Laminate Kingdom*, LLC, No. 07-10279-BKC-AJC, 2011 Bankr. LEXIS 4773, at *14-15 (Bankr. S.D. Fla. Dec. 5, 2011).  A "bar order" is not a device to grant non-debtor defendants otherwise prohibited releases or discharges of claims belonging to non-debtor third parties.  *Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network*), 416 F.3d 136, 142 (2d Cir. 2005).  Indeed, the Eleventh Circuit has repeatedly questioned the power of bankruptcy courts to enjoin, over the objection of non-settling parties, "truly independent claims" such as the fraud and negligent misrepresentation claims asserted by the Term Lenders in the Nevada Action.  *E.g.*, *In re United States Oil & Gas Litig.*, 967 F.2d 489, 496 n.5 (11th Cir. 1992); *AAL High Yield Bond Fund v. Deloitte & Touche LLP*, 361 F.3d 1305, 1311-12 (11th Cir. 2004); *In re Healthsouth Corp. Sec. Litig.*, 572 F.3d 854, 865 (11th Cir. 2009).  Moreover, the Trustee has repeatedly acknowledged, by word and deed, that the Term Lenders' claims are independent, and that their damages are distinct, from those asserted by the Trustee.  As a consequence, the Term Lenders' claims are not subject to the entry of a bar order.

Even if this Court has jurisdiction to bar third party claims, the "bar order" sought under the Settlement Agreement is not "fair and equitable" to the Term Lenders under the *Munford* test.  *Munford v. Munford, Inc.* (*In re Munford, Inc.*), 97 F.3d 449, 455 (11th Cir. 1996).  Nor does the settlement meet the *Justice Oaks* standard for approval of a compromise under Rule 9019.  *In re Justice Oaks II, Ltd.*, 898 F.2d 1544 (11th Cir. 1990).  Finally, the bar order sought in the 9019 Motion cannot be granted because the Trustee has failed to provide the Term Lenders with adequate protection, as required under 11 U.S.C. § 363(e), on account of the use, sale and/or disposition of the Term Lenders' claims in the Nevada Action that will result from the imposition of a bar order.

For all of these reasons, the request for the entry of a bar order contained in the 9019 Motion should be denied.

\*         \*         \*

Apart from the forgoing, the 9019 Motion includes an incomplete and misleading description of the facts and law that are central to the adjudication of the 9019 Motion. Here are some examples.

Defendants' Remand Motion in Nevada Action. The Trustee argues that the claims asserted by the Term Lenders and the Trustee are "interrelated" under the *Munford* test. But the 9019 Motion does not mention the remand proceedings that followed the removal of the Nevada Action to the Nevada bankruptcy court by a defendant that has since settled. The Nevada Defendants (as well as the Term Lenders) moved to remand the Nevada Action to State Court arguing that the Nevada Action was ***not*** related to this bankruptcy case. Exhibit A, at 11:20-21. The Nevada Defendants pressed this argument even after the Trustee filed his own lawsuit before this Court. Exhibit B, at 8:16-9:2. The Trustee appeared at the remand hearing and advised the Nevada bankruptcy court that the Trustee did not object to remand of the Nevada Action, noting that he did not believe the Term Lenders' claims were property of the estate. Exhibit C, at 6:11-12, 21:22-23 ("We agree with you that we do not think property of the Estate is involved. . . ."). The presiding bankruptcy judge (the Honorable Lloyd King) granted Defendants' motion to remand, ruling that the Term Lenders' claims were not related to this bankruptcy case and that the claims were not property of the Debtors' estate. *Id.* at 7:7-16, 15:10-14, 17:14-19. The 9019 Motion discloses none of this history.

Term Sheet Executed by Trustee and Term Lenders. The 9019 Motion fails to disclose the existence of an agreement, memorialized in a term sheet (the "Term Sheet"), that was executed by the Trustee and Term Lenders in June 2013. Under the Term Sheet, the Trustee and

Term Lenders agreed to a split of proceeds in the event of "*any* settlement reached between the Trustee and Term Lenders jointly, on the one hand, and the [Defendants] and/or their insurers, on the other hand."  Exhibit E, ¶ 2 (emphasis added).  The Term Sheet provides that 57.5% of any settlement shall be paid to the Term Lenders in settlement of their claims in the Nevada Action; and the remaining 42.5% shall be paid to the estate in settlement of the estate's claims.  The Term Sheet also specifies that the Term Lenders are entitled to share, like all other unsecured creditors of the Debtor, in any distribution made from the Debtor's 42.5% share.  The Term Sheet thus confirms not only that the Term Lenders' claims are independent and direct, but also memorializes the Trustee's recognition that the claims asserted by the Term Lenders are more valuable than those asserted by the Trustee.

<u>Reconsideration of Ruling in Nevada Action Based Upon Reversal By Nevada Supreme Court</u>.  The 9019 Motion questions the viability of the Term Lenders' claims in the Nevada Action by citing to and quoting (repeatedly) from an order issued on January 29, 2014 (the "<u>Schaeffer Order</u>") in which, according to the Trustee, the court held that the Term Lenders are "judicially estopped" from arguing that BofA's negligence should not be imputed to the Term Lenders, based on allegations made in the Term Lenders' lawsuit against BofA.  9019 Motion, at 9-10, 13-14, 27-28, 30, & Ex. E.  The Trustee fails to note, however, that on the same day the Nevada court entered the Schaeffer Order, the Nevada Supreme Court reversed a prior order entered in favor of another defendant in the Nevada Action (the "<u>ULLICO Order</u>") that was based on the same (faulty) legal grounds as the Schaeffer Order.  Exhibit F.  That reversal led the Nevada court to reconsider the Schaeffer Order and conclude that, contrary to the Trustee's

statement in the 9019 Motion, the doctrine of judicial estoppel does **not** apply with respect to the Term Lenders' allegations against BofA.  Exhibit G, at 8.[3]

Insurance Coverage.  The 9019 Motion states that certain of the Insurers under the "National Union Tower" take the position that the claims asserted by the Trustee and the Term Lenders are not covered by the D&O Policies.  9019 Motion, at 11-12.  Missing from the 9019 Motion is any description of the Insurers' position that the Defendants somehow were not acting as "Executives" of the Debtors (which is nonsense), or that the Trustee has repeatedly taken the position that "THE COVERAGE DEFENSES ASSERTED ARE MERITLESS IN LIGHT OF THE AVAILABLE EVIDENCE, THE LANGUAGE OF THE POLICY, AND APPLICABLE LAW."  Exhibit H (capitalization in original).  Moreover, according to the Trustee, as of May 31, 2014, there was a total of $125 million of remaining insurance coverage under the National Union Tower and the Illinois National Tower, far more than the $80 million to be paid by the Insurers under the Settlement Agreement that, if approved, would result in a massive windfall for the Insurers.  9019 Motion, at 12.

Bad Faith Insurance Claims Filed By Trustee Against D&O Insurers.  Also missing from the 9019 Motion is any mention by the Trustee of the multiple "Civil Remedy Notices of Insurer Violations" that he filed with the Florida Office of Insurance Regulation against the D&O Insurers, asserting that the D&O Insurers violated Florida statutes by failing to negotiate in good faith.  Exhibit H; *see also* Settlement Agreement, at 3.  Such violations, if proven, could effectively remove any ceiling on the amount of insurance coverage available to pay any judgments obtained by the Trustee or the Term Lenders.

---

[3] On reconsideration, the Nevada court did leave in place its determination regarding the question of negligence based upon what it ruled were "admissions" made by Term Lenders.  As explained below, that rationale is also contrary to the Nevada Supreme Court's decision reversing the ULLICO Order.

Financial Condition of Defendants.  The 9019 Motion offers no information about the financial condition of the Nevada Defendants, or any explanation why the Term Lenders (or, for that matter, the Trustee) would not be able to recover any judgment they might obtain from them. Incredibly, the 9019 Motion suggests that, at least as of the date of the 9019 Motion, the Trustee has not been provided with the documentation sufficient for him to evaluate Soffer's or any other Nevada Defendant's financial condition.

Description of Comprehensive Settlement Agreement.  The Trustee compares the "bar order" proposed under the Settlement Agreement with the bar orders agreed to under Comprehensive Settlement Agreement (the "CSA") that this Court approved in November 2013. Left unmentioned in the 9019 Motion are the following significant differences between the CSA and the "Settlement Agreement":  1) each of the major constituencies (Contractors, Term Lenders, Wilmington, Turnberry Parties, Title Companies and Trustee) participated in all of the mediations that led to the CSA; all of those parties were parties to the CSA, and all consented in writing to the CSA bar orders; 2) no creditor having independent, direct claims objected to the entry of the CSA bar orders; 3) the CSA created segregated "settlement funds" in the amount of $174.7 million for the parties who were subject to the bar orders ($85.3 million for the Contractors, $89.4 million for Wilmington and the lenders under the Credit Agreement); 4) the CSA involved complexity in terms of the number of parties and integration of interests that simply is not present in negotiating the Settlement Agreement; and 5) under the CSA, the Term Lenders' claims against Defendants in the Nevada Action were expressly preserved by agreement of all of the parties, who included the Trustee and Jeffrey Soffer.

Duplicative Claim of Turnberry West Construction ("TWC").  The Trustee claims that one benefit of the "Settlement Agreement" is the agreement by the general contractor for the Project, TWC, to withdraw its claims for "over $675,000,000.00" filed against the Debtors.

9019 Motion, at 2.  TWC's claim, however, is largely duplicative of those asserted by the Contractors, who were all, or substantially all, subcontractors and vendors engaged by TWC. Those subcontractors' and vendors' claims are not being withdrawn.  Nor does the Trustee explain how TWC could ever recover on its claim, given that the subcontractors' and vendors' claims have not been satisfied (*e.g.*, 11 U.S.C. § 509) and the misconduct of TWC alleged by the Trustee.

Adequate Protection.  Because the Term Lenders exclusively own the claims asserted in the Nevada Action, Section 363(e) of the Bankruptcy Code prohibits the Trustee from selling, otherwise disposing of or otherwise using those claims without providing the Term Lenders with adequate protection which, based on the value of the claims, would require that, at an absolute minimum, the Term Lenders be paid or granted a lien on the entire amount of $83.3 million to be paid under the Settlement Agreement to compensate the Term Lenders for the use of their property to facilitate the Settlement Agreement.

## II.    BACKGROUND

### A.    The Bankruptcy Cases.

On June 9, 2009, Fontainebleau Las Vegas, LLC and certain affiliated entities (the "Resort Debtors") filed Chapter 11 petitions.  On November 25, 2009, certain affiliates of the Resort Debtors (the "Retail Debtors," and together with the Resort Debtors, the "Debtors") filed Chapter 11 petitions with this Court.  On April 12, 2010, these bankruptcy cases were converted to chapter 7, and Soneet R. Kapila was appointed as the Chapter 7 Trustee for each of the Debtors.

### B.    The Nevada Action.

The Resort Debtors were borrowers or guarantors under a $1.8 billion credit facility dated June 7, 2007 (the "Credit Agreement") intended to be used for the development and construction

of Fontainebleau Resort and Casino in Las Vegas, Nevada (the "Project").  The Term Lenders

(or their predecessors) were lenders under the Credit Facility, who along with others advanced

more than $1 billion to the Debtors in reliance upon false and misleading representations made

by Defendants regarding the cost to complete the Project.

The Nevada Defendants accomplished their scheme, in part, through false certifications

to the lenders in connection with monthly draw requests and through a fraudulent set of books

that hid the true progress, scope and cost of the project.  Had the Nevada Defendants revealed the

truth, funding would have ceased.  Instead, the Term Lenders continued to disburse funds

unwittingly into a woefully under-funded project.

The fraud was conceived by Jeffrey Soffer and is described in a memorandum produced

from the files of TWC, written by Roger McElfresh, which provides a summary of the fraud that

was perpetrated against the Term Lenders:

> The deception of [Defendant] FBR [Fontainebleau Resorts LLC] began
> when the Project budget and schedule was developed by [Defendant]
> TWC Inc and presented to FBR management for approval.  [Defendants]
> Jeff Soffer, Sonny Kotite, Glen[n] Scha[e]ffer and other FBR senior
> management who insisted budget and schedule must meet cost and
> schedule guidelines that would satisfy financial support and funding for
> the Project.  Despite months of rebuttal and supporting documentation
> ***FBR insisted that TWC Inc must manipulate the cost and schedule
> estimates and projections to meet the guidelines dictated by Jeff Soffer,
> Sonny Kotite and Glen[n] Scha[e]ffer***.
>
> \* \* \*
>
> ***During monthly Draw reviews conducted by Inspection Valuation
> International Inc. on behalf of the Lenders, FBR repeatedly
> misrepresented cost and schedule information***.  This charade began in
> August 2007 and continued until January 2009.  TWC Inc repeatedly
> warned FBR that the farce was ill advised and that IVI was growing
> suspicious of the apparent misrepresentations.  ***FBR insisted that
> additional investors and other sources of funding was forthcoming and
> directed TWC Inc to with hold cost and schedule information from the
> Lenders***.  FBR informed TWC Inc that they would inform the Lenders of
> the cost and schedule issues only after the expended funding reached a
> point that would make it difficult for the Lenders to stop funding."

9019 Motion, Ex. D, at 1 (emphasis added).

In March 2011, the Term Lenders commenced the Nevada Action in order to recover hundreds of millions of dollars that they (and their predecessors-in-interest) were induced to lend as a result of the Nevada Defendants' fraud and negligent misrepresentations.  Following multiple rounds of motions to dismiss and motions for summary judgment, the Term Lenders' surviving claims include three counts for fraud and/or aiding and abetting fraud (Counts I, II and III), one count for negligent misrepresentation (Count IV), and one count for conspiracy to commit fraud (Count V).  9019 Motion, Ex. D, ¶¶ 245-286.  The Term Lenders seek damages in the Nevada Action that, including pre-judgment interest, exceed $1 billion, and reflect the direct losses to the Term Lenders resulting from Nevada Defendants' fraud and negligent misrepresentations.

Discovery has been underway in the Nevada Action for more than a year and a half. Expert witness reports were due July 17, 2014 and, presumably, are nearly completed.  Trial was set to begin on January 27, 2015.  Two days ago, the Nevada state court granted a motion to stay the Nevada action for 90 days pending the outcome of the 9019 Motion.  It has not yet moved the trial date.

### C.    The Remand Motions.

Shortly after the filing of the Nevada Action, certain Nevada Defendants not sued by the Trustee, known as the "Crown Defendants," removed the Nevada Action to the Nevada Bankruptcy Court, arguing that this Court had jurisdiction and should adjudicate the Nevada Action.

In response, the Nevada Defendants filed a motion to remand the Nevada Action back to the Nevada state court.  Exhibit A.[4]  Defendants took the position that the Nevada Action was "remote" from the Debtors' bankruptcy case.  *Id.* at 11:20-21.  Defendants admitted: "[t]he State Court Action is remote from the main bankruptcy case administered in Miami, Florida.  Given the fact that [the Term Lenders] are nondebtors making state law claims against nondebtor Defendants, ***Plaintiffs' claims are clearly remote from the main bankruptcy cases of the Debtors***, and accordingly this factor favors remand."  *Id.* at 11:20-24.  (Underline in original, bold and italics added).

The Nevada Defendants did not change their position even after the Trustee filed his own lawsuit against them in this Court, insisting that "the Trustee's Action does not connect the [Nevada] Action to the main bankruptcy case":

> The happenstance of the Trustee's Action does not change the fact that this action remains remote from the main bankruptcy case.  The main bankruptcy case proceeded for two years before the Trustee filed his latest complaint.  The main bankruptcy case involves the liquidation of the assets of the debtor for the benefit of all the creditors.  ***This action, by contrast, involves the claims of specific creditors against non-debtors.  A recovery by the Plaintiffs here will not benefit the debtors' estates***.

Exhibit B, at 8:16-24 (emphasis added).  Responding to arguments by the Crown Defendants that there were "overlapping underlying facts" in the Nevada Action and the Trustee Action, the Nevada Defendants explained that "historical facts do not establish that this action is related to the main bankruptcy case, nor is relatedness created by the fortuitous fact that the Trustee chose to file its adversary complaint in the main bankruptcy case.  Whatever relation exists between the [Nevada] Action and the main bankruptcy case *is too remote* to deny remand."  *Id*. at 8:24-9:2 (emphasis added).  In the Nevada Defendants' own words:

---

[4] The Term Lenders filed a separate motion to remand the Nevada Action to Nevada state court.  The motions for remand filed by the Term Lenders and Defendants are referred to herein as the "Remand Motions."

> The complaint centers on the contention that Plaintiffs suffered damages as a result of alleged misrepresentations made by non-debtors to them, the Term Lenders. *No misrepresentations were made to the debtors. The outcome of the fraud claims does not "alter the debtor's rights, liabilities, options or freedom of action. . ." in the bankruptcy because the debtors are not a party to the State Court Action.*

*Id.* at 5:1-6 (emphasis added). The Nevada Defendants also stated that "Crown has not made a factual showing that this action affects or is 'related to' the administration of the debtors' estates in Florida." *Id.* at 13:6-7.

The Trustee appeared at the hearing on the Remand Motions. Counsel for the Trustee, David Cimo, told Judge King that "We agree with you that we do not think property of the Estate is involved. . . ." Exhibit C, at 21:22-23. Although the order granting the Remand Motions provided at the Trustee's request that "[n]othing in this order and nothing stated during the course of the hearing of the remand motions shall in any way affect the rights or legal positions of Trustee in Bankruptcy, Soneet Kapila," Exhibit D, at 3, the Trustee's counsel explained that this "clarification" was prompted by concern about future amendments to the complaint or claims brought by other creditors, and not the claims already asserted by the Term Lenders:

> I discussed this with Mr. Dillman, and we – we are both pretty sure there's no property of the Estate involved, but the primary – the primary reason is we'd like to have this clarification. We don't know whether another Creditor is going to file another lawsuit and make some more allegations. We just want to make sure no one tries to use this ruling against the Trustee when he was not a party to this litigation.

Exhibit C, at 22:14-21.

After considering the positions taken by Defendants and the Trustee, Judge King granted the Remand Motions. Exhibit C, at 7:3-8:6, 14:19-20:13; Exhibit D, at 3. At the hearing held July 11, 2011, Judge King expressly rejected the argument that the Trustee's separate lawsuit might create jurisdiction in this Court, finding that "I think that the related to jurisdiction based upon the suggestion that there may be some problem caused by the Trustee's attempt to recover

any judgment that the Trustee might get against some common defendants is both remote, and speculative, and not sufficient to support a claim related to jurisdiction."  Exhibit C, at 7:7-12.  In addition, Judge King rejected the argument of the Crown Defendants that any of the claims asserted by the Term Lenders were property of the bankruptcy estate of the Debtors, finding that "I believe that [Plaintiffs] are asserting their own rights against the defendants in this matter."  *Id*. at 7:13-16, 15:10-14.  Finally, in applying the 14-factor test to support its finding that remand is appropriate, Judge King adopted Defendants' position that the Nevada Action is "remote" from the Debtors' bankruptcy case:

> Number six, the degree of relatedness or remoteness from the main bankruptcy case.  I think that it really is, from a legal standpoint remote, *because these plaintiffs are asserting their own rights as Creditors*, and to the extent that there is factual overlap, again, that can be handled through coordinated discovery.

*Id*. at 17:14-19.

**D.    The Trustee Action.**

On June 8, 2011, a month before the hearing on the Remand Motions, the Trustee filed an adversary proceeding in this Court styled as *Kapila v. Soffer et al.*, Adv. No. 11-02102-BKC-AJC-A (Bankr. S.D. Fla.) (the "Trustee Action") asserting claims against some, but not all, of the Nevada Defendants.[5]

By the Trustee's own admission, the Trustee Action is separate and distinct from the Nevada Action.  First, the Trustee Action does not assert any claims for fraud and negligent misrepresentation such as the ones that belong to the Term Lenders in the Nevada Action.  Instead, the Trustee Action alleged that the Miami Defendants in that case caused the Debtors to

---

[5]    The common defendants include Fontainebleau Resorts, LLC, Turnberry, Ltd., Turnberry Residential Limited Partner, L.P., Turnberry West Construction, Inc., Jeffrey Soffer, Sonny Kotite, Bruce Weiner, Glenn Schaeffer, James Freeman and Deven Kumar.  Howard Karawan, the Crown Defendants, and ULLICO were named only by the Plaintiffs and Ray Parello was named only by the Trustee.  The defendants in the Trustee Action are referred to as the "Miami Defendants."

incur additional obligations for their own benefit, at times when they knew or should have known the Debtors were insolvent.[6]

The Trustee has also consistently taken the position that his claims are separate from those asserted by the Term Lenders in the Nevada Action.  During a hearing in the Trustee Action in January 2012 (ECF 165), counsel for the Trustee told this Court: "I just want to add that *term lenders out in Nevada is not the trustee*.  *The trustee has separate standing to prosecute these claims.  These claims are unique*.  These people were de facto and de jure officers and directors of this entity -- these entities.  *Whatever they're doing out there has nothing to do with what the trustee's doing here*."  Exhibit I, at 32:8-4 (emphasis added).  At a later hearing (ECF 237), in response to the Miami Defendants' first motion to dismiss, the Trustee argued that comparing the "fraud case out there" in Nevada with the "breach of fiduciary duty here" in the Trustee Action was "like measuring apples to oranges."  Exhibit J, at 16:12-14.

The Trustee also repeatedly told this Court that the damages incurred by the Term Lenders are "distinct" than those asserted by the Trustee.  In a pleading filed in the Trustee Action (ECF 73), the Trustee stated that "the Trustee is not bringing claims for damages suffered by the creditors; rather, the Trustee is bringing claims for damages suffered by the Debtors as a result of FBR and the other D&O Defendants' breaches of fiduciary duties."  Exhibit K, at 4.  As further explained by the Trustee:

> These damages [to the Debtors] are not predicated solely on "alleged misrepresentations of the D&O Defendants to the lenders of the Debtors," as suggested by FBR.  Instead, the Amended Complaint clearly alleges that FBR also breached fiduciary duties by, among other things, failing to

---

[6] *Second Amended Complaint* (Docket No. 287).  The Trustee further alleges, in a separate action, that certain affiliated companies of the Debtors transferred assets to themselves or to related companies at times when the Debtors were insolvent, giving rise to fraudulent transfer claims under federal bankruptcy law.  *Kapila v. Turnberry Associates et al.*, Adv. No. 11-02105-BKC-AJC-A (Bankr. S.D. Fla.).  By agreement of the parties, that action was abated nearly two years ago and there have been no material entries in the docket of this case since that time.  *Order Granting Agreed Motion Of Plaintiff, Chapter 7 Trustee Soneet R. Kapila, To Abate Adversary Proceeding* (ECF 20).

> implement adequate safeguards and controls in regard to the Project.  The
> Amended Complaint further alleges that, as a result of these breaches, the
> Trustee is seeking damages for, among other things, the loss of the
> Debtors' enterprise value, as well as for payments (including construction
> funds) that the D&O Defendants caused the Debtors to inexplicably make
> to, among others, FBR, the other D&O Defendants and their affiliates.
> ***These are damages clearly suffered by the Debtors, which are distinct
> from the injuries suffered by the creditors***.  Therefore, the Trustee plainly
> has standing to redress FBR's conduct in this action.

*Id*. at 10 (emphasis added).[7]

Unlike the Term Lenders in the Nevada Action, the Trustee has made very little progress in prosecuting the Trustee Action.  As admitted in the 9019 Motion, the matters in the Trustee Action, which has been pending for three years, are "not yet at issue and no significant discovery has been taken."  9019 Motion, at 12.  Indeed, it remains unknown whether the claims in the Trustee Action will survive dismissal.  At the hearing held in April 2012 on the Miami Defendants' first round of motions to dismiss, this Court stated that "I see persuasive arguments as to why we should dismiss the complaint with leave to amend."  Exhibit J, at 101:21-23. Before that motion was decided, the Trustee was granted leave to file a second amended complaint.  *Plaintiff's Motion For Leave To File Second Amended Adversary Complaint* (ECF 258); *Agreed Order Granting Motion For Leave To File Second Amended Adversary Complaint* (ECF 259).  The Miami Defendants again moved to dismiss.  *Motion To Dismiss Adversary Proceeding Filed By Defendants James Freeman, Albert Kotite And Glenn Schaeffer* (ECF 280); *Motion To Dismiss Filed By Defendant Jeffrey Soffer* ) (ECF 284).  In November 2013, this Court held a hearing on those motions (as well as a motion for a more definitive statement filed by the Miami Defendants), but has yet to issue any ruling.

---

[7] As discussed below, the primary reason that the allegations in the Nevada complaint resemble those in the Trustee's complaint is that the Trustee's litigation counsel plagiarized much of the Term Lenders' earlier filed complaint and other work product in preparing the Trustee's later-filed complaint.

E.        **Term Lenders' Lawsuit Against BofA.**

On June 9, 2009, the Term Lenders filed an action against BofA (the "BofA Action") in the United States District Court for the District of Nevada styled as *Avenue CLO Fund, Ltd., et al. v. Bank of America, N.A.*, et al., Case No. 2:09-cv-01047-KJD-PAL.[8]  BofA served as the Administrative Agent under the Credit Agreement and as Disbursement Agent under the Disbursement Agreement.  The Disbursement Agreement governed the disbursement of funds to the Fontainebleau borrowers under the Credit Agreement.  Each month from September 2008 through March 2009, BofA disbursed portions of the Term Loan Facilities funds to Fontainebleau.

The Term Lenders allege that BofA wrongfully disbursed Term Lender loan proceeds knowing that certain conditions precedent to disbursement under the Disbursement Agreement had not been satisfied.  The Term Lenders also alleged that BofA's wrongful disbursements were grossly negligent and/or willful.  BofA contends that if any particular condition precedent failed in a given month, it did not actually know of that failure.  BofA further contends that that it did not act with gross negligence, or willfully.

In December 2009, the Judicial Panel on Multidistrict Litigation transferred the BofA Action to the Southern District of Florida for pre-trial co-ordination with other actions. Following discovery, BofA moved for summary judgment, which was granted.  *In re Fontainebleau Las Vegas Contract Litig.*, No. 09-CV-23835 ASG, 2012 WL 930290 (S.D. Fla. Mar. 19, 2012).  The Eleventh Circuit reversed, holding that there were disputed issues of material fact regarding whether BofA improperly disbursed loan proceeds in breach of the Disbursement Agreement and, if so, whether its conduct was grossly negligent or willful.  *Ave.*

---

[8]  A copy of the BofA Complaint is attached to the 9019 Motion as Exhibit C.

*CLO Fund, Ltd. v. Sumitomo Mitsui Banking Corp.*, 723 F.3d 1287 (11th Cir. 2013).  On

December 13, 2013, the MDL Panel transferred the action back to the District of Nevada.

The Term Lenders have requested an August 25, 2014, trial date.  BofA has requested

that trial commence following the trial in the *Brigade* action.  The Court in the BofA Action has

not yet scheduled a trial date.

### F.    The Term Sheet Executed by the Trustee and the Term Lenders.

Although the Term Lenders and Trustee were pursuing independent claims, they both

saw a potential benefit in joining forces to negotiate a truly global settlement with the

Defendants and their Insurers that all parties would support.  As described in the 9019 Motion,

there are two "towers" of D&O Insurance, one in the amount of $76 million and the other in the

amount of $75 million.  9019 Motion, at 10-11.  Accordingly, on May 31, 2013, the Trustee and

the Term Lenders entered into a written Term Sheet memorializing an agreement, negotiated

over several months, to pursue jointly a global settlement of their separate claims against the

Defendants and their Insurers.[9]

The Term Sheet memorializes the Trustee's agreement that the Term Lenders' claims

against Defendants are independent of – and indeed more valuable than – those asserted by the

Trustee.  Specifically, the Trustee agreed to allocate 57.5% of any settlement to the Term

Lenders to settle their claims in the Nevada Action, with the remaining 42.5% to be paid to the

Trustee in settlement of the claims asserted in the Trustee Action.  Exhibit E, ¶ 2.  Because the

57.5% portion allocated to the Term Lenders is paid directly to them, *Id* at ¶ 4, such amounts are

not subject to dilution by any statutory fee asserted by the Trustee (which could be as much as

3%), any contingent fee asserted by Trustee's litigation counsel (which could be as much

---

[9] The Term Sheet was negotiated and finalized outside of any mediation for the express purpose, in part, of making a policy limits demand on the Insurers outside of any mediation process, which the Term Lenders and the Trustee jointly did.

as 35%), or any payment to other creditors, including the Contractors or the Title Companies that have already released their independent claims against Defendants.

The Term Sheet expressly distinguishes between, on the one hand, Term Lenders' direct recovery of 57.5% allocated to them versus, on the other hand, Term Lenders' indirect recovery, as creditors of the Debtors, from the 42.5% to be allocated to the Trustee. Exhibit E, ¶ 6 ("the Term Lenders shall retain all rights to participate, to the extent of their allowed claims, as creditors in the estate's share of the Settlement Amount."). The Term Sheet thus entitles Term Lenders to both a direct payment (unencumbered by any fees payable to the Trustee and his litigation counsel) on account of their Nevada Action claims, and an indirect recovery as creditors of the Debtors on account of the Debtors' Trustee Action claims.

The Term Sheet further provides that the agreed-upon split applies to any settlement reached jointly of their respective claims. Exhibit E, ¶ 2 ("This Split shall apply to any settlement reached between the Term Lenders and the Trustee jointly, on the one hand, and the Ds & Os and/or their insurers, on the other hand.").

On June 6, 2013, the Trustee and the Term Lenders sent joint written demands to the Defendants and their Insurers reflecting the terms to which they had agreed in the Term Sheet. Those demands were rejected by the Insurers, triggering potential bad faith claims against those Insurers that, if found to exist, could leave the Insurers liable for any judgment against Defendants, even if it exceeds the $138 million then remaining under the D&O insurance policies. The Trustee advised the Insurers that their "conduct in failing to accept a reasonable settlement within the policy limits brings the portent of a bad faith claim for extra-contractual liability." *See* Exhibit M, at 32. The Trustee in fact filed multiple "Civil Remedy Notice of Insurer Violations" (the "Insurer Notices") against each of the Insurers, all of which were accepted by the Florida Department of Financial Services. Settlement Agreement, at 3; Exhibit

H.  In the Insurer Notices, the Trustee alleged that the D&O insurers had acted in bad faith and in violation of statute, not only with respect to the Trustee's claims *but also with respect to the Term Lenders' claims*:

> IN ADDITION TO THE TRUSTEE'S CLAIMS, THE "TERM LENDERS" HAVE ALSO ASSERTED CLAIMS AS PLAINTIFFS IN THE ACTION STYLED BRIGADE LEVERAGED CAPITAL STRUCTURES FUND, LTD., ET AL. V. FONTAINEBLEAU RESORTS, LLC, ET AL., NO. A-11-637835-B, PENDING IN THE DISTRICT COURT FOR CLARK COUNTY, NEVADA. THE CLAIMS ASSERTED THEREIN SEEK DAMAGES FAR IN EXCESS OF THE REMAINING POLICY LIMITS. THOUGH THE REMAINING POLICY LIMITS CONSTITUTE A FRACTION OF THE EXPOSURE FACED BY THE D&O AND INDEPENDENT MANAGER DEFENDANTS, THE TERM LENDERS AND TRUSTEE HAVE JOINTLY OFFERED TO ACCEPT TENDER OF THOSE REMAINING LIMITS AS PART OF A GLOBAL SETTLEMENT.

*Id*. (capitalization in original).

In the Insurer Notices, the Trustee characterized the Insurers' coverage defenses as "meritless in light of the available evidence, the language of the policy, and applicable law." Exhibit H (original in capitals).  The Trustee offered one option for each Insurer to "cure its statutory violations and protect its Insured's from an excess judgment," and that was "by tendering the remaining amount of its policy limits *jointly to the Trustee and Term Lenders as part of a Global Settlement*" that would be subject to approval by this Court "and would include an appropriate bar order agreeable to the Trustee, Term Lenders and D&O Defendants."  *Id*. (emphasis added, original in capitals).

### G.    The Comprehensive Settlement Agreement.

In October 2013, the major constituencies in these bankruptcy cases entered into the CSA.  Under the CSA, each of the parties (the Contractors, the Term Lenders, Wilmington, the Title Companies, the Trustee, and the Turnberry Parties) specifically consented in writing to the imposition of  certain bar orders.  Thus, all of the relevant constituencies were represented at the

bargaining table and consented to the bar orders. Moreover, the CSA created segregated "Settlement Funds" for the Contractors and for Wilmington and the Lenders who were subject to the bar orders. Importantly, the claims of the Term Lenders against Defendants were expressly preserved and not made subject to any bar orders. With nearly unanimous consent, this Court approved the bar orders under the CSA (ECF 4185).

> **H.    The Exclusion of the Term Lenders From Mediation Sessions and Settlement Discussions.**

Following the Insurers' rejection of the joint written demands of the Trustee and Term Lenders, the parties in the Nevada Action and in the Trustee Action, including the Term Lenders, continued their efforts to settle jointly with the Nevada Defendants and the other Defendants in the Trustee Action, including additional mediation sessions in New York on October 3 and 4 and November 18, 2013.

At some point thereafter, the Term Lenders were excluded from further participation in the mediation or settlement discussions. On June 2, 2014, the Trustee notified the Term Lenders that, after a mediation session attended by the Nevada Defendants and the other Defendants in the Trustee Action from which the Term Lenders were excluded, he was agreeing to a "settlement" with the Defendants that, if approved, would transfer the entire value of the Term Lenders' claims in the Nevada Action to the Nevada Defendants and the Insurers (who underpaid) and the Trustee (who was overpaid for his claims.). On June 26, 2014, the Trustee filed the 9019 Motion.

As described by the Trustee, the "settlement" totals $83.3 million: $80 million from the D&O carriers (leaving more than $45 million remaining on the policies), $3 million from Jeff Soffer (a real estate developer with a net worth reputed to be in excess of a billion dollars),[10] and $100,000 each from defendants Schaeffer, Weiner and Parello. The total of $83.3 million is far

---

[10] *See* Exhibit L.

lower than any number the Trustee ever previously indicated would be reasonable for a global settlement. The Settlement Agreement also provides for the withdrawal of a claim in excess of $675 million asserted by TWC, which provides little or no value to the estate given that it is largely duplicative of claims of other Contractors and subject to disallowance or equitable subordination. The Term Lenders have no objection to the Trustee's settlement of the Trustee Action. The Term Lenders' objection is based on the fact that their own independent claims were tossed into the deal by a person (the Trustee) that does not own those Nevada claims.

> **I.      In the Absence of the Bar Order, the Term Lenders are Likely to Prevail at Trial in the Nevada Action.**

In its 9019 Motion, the Trustee asserts that the Term Lenders "have serious issues with their claims against the [Ds & Os] because of the positions that the Term Lenders have taken" in their action against BofA for disbursing Term Lender loan proceeds in breach of its contractual obligations under the Disbursement Agreement. 9019 Motion, at 9. The Trustee cites to a January 29, 2014 order of the Nevada court in the Nevada Action granting, in part, a summary judgment motion brought by Defendant Glenn Schaeffer on the ground that the Term Lenders were "judicially estopped" by their allegations against BofA that it was negligent (the "Schaeffer Order").

In fact, the Nevada state court subsequently reconsidered the Schaeffer Order based on an intervening Order of Reversal and Remand issued by the Nevada Supreme Court on that same day, January 29, 2014, in the same action (the "ULLICO Order"). Exhibit F. The ULLICO Order rejected a prior order of the Nevada state court dismissing defendant Union Life Insurance Company ("ULLICO") on the same ground later asserted by Schaeffer: that the Term Lenders were judicially estopped by their allegations against BofA. Citing *Mainor v. Nault*, 120 Nev. 750, 765, 101 P.3d 308, 318 (2004), the Nevada Supreme Court held that the doctrine of judicial estoppel did not apply because the allegations in the Nevada state court action were not

inconsistent with the allegations in the BofA Action and because the BofA court never adopted the Term Lender's position, thereby failing the requirement that "the party [against whom judicial estoppel is asserted] was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true)."

The Term Lenders moved the trial court to reconsider the Schaeffer Order in light of the Nevada Supreme Court's ULLICO Order. The trial court did reconsider, acknowledging that judicial estoppel did not apply with respect to the BofA allegations (the "Reconsideration Order"). Exhibit G, at 8. The court nonetheless concluded that those allegations were "admissions" that established BofA's negligence, which the court in turn "imputed" to the Term Lenders. The court further stated, in dicta, and without citation to any authority, that "the doctrine of comparative negligence may serve as a bar to Plaintiffs' claims." Exhibit G, at 9.

There are many flaws in the Nevada state court's position, even as revised. First, the court incorrectly concluded that the allegations in the BofA action were judicial "admissions." The court had used that same formulation in dismissing the claims against ULLICO. In reversing the trial court and reinstating the claims against ULLICO, the Nevada Supreme Court implicitly rejected the trial court's application of a judicial "admission" theory to the allegations against BofA. Moreover, the Term Lenders' allegation that BofA was grossly negligent in performing its duties under the Disbursement Agreement is not a "concrete fact within [the Term Lenders'] knowledge," it is a highly disputed conclusion that will be determined in the BofA action upon all of the evidence. The fact that the Term Lenders believe and allege and expect to prove that BofA was grossly negligent does not convert this conclusion into a "concrete fact within their knowledge" such that the doctrine of judicial admissions applies.

Second, even if the Term Lenders' allegations against BofA were judicial admissions, the doctrine of comparative negligence will not "serve as a bar to Plaintiffs' claims." The only

claims the Schaeffer Order purported to affect were the Term Lenders' negligent misrepresentation claims for a simple reason:  the doctrine of comparative negligence does not apply to intentional tort claims, such as fraud.[11]  Accordingly, comparative negligence cannot serve as a bar to the Term Lenders' more potent fraud claims.

More importantly, the Nevada misrepresentations began long before BofA breached its obligations under the Disbursement Agreement.  As outlined in the McElfresh memo, "[t]he deception of [Defendant] FBR [Fontainebleau Resorts LLC] began when the Project budget and schedule was developed by [Defendant] TWC Inc and presented to FBR management for approval."  The Term Lenders have alleged, and will prove at trial, that this "deception" induced them to enter into the Credit Facility in the first instance.  Accordingly, all of their damages will be available on theories that do not implicate BofA's purported negligence in any way.

But comparative fault also appears not to apply even to the Term Lenders' negligent misrepresentation claims.  There are no Nevada cases addressing the issue.  California law, to which Nevada looks favorably,[12] holds that it does not.[13]  In the absence of Nevada law, a Nevada federal court applying California law has recognized: "the California Supreme Court held that a

---

[11] *Davies v. Butler*, 95 Nev. 763, 772, 602 P.2d 605 (1979) ("We conclude that the legislature, by including the term 'gross negligence' in the comparative negligence statute, . . . has left the law unchanged with regard to the conduct in which the defendant's culpability more closely approaches that of one who intentionally inflicts damage."); *see also FDIC v. Anderson*, No. 2:11-cv-1061-GEB-EFB,  2011 U.S. Dist. LEXIS 144599, at *3 (E.D. Cal. Dec. 15, 2011) ("It is the general rule that the negligence of a plaintiff is not a defense where the defendant with intent to deceive has falsely represented as a fact something which he does not believe to be true," *quoting Van Meter v. Bent Constr. Co.*, 46 Cal. 2d 588, 593, 297 P.2d 644 (1956).).

[12] *Moody v. Manny's Auto Repair*, 110 Nev. 320, 331-33, 871 P.2d 935 (1994) ("follow[ing] the lead of the California Supreme Court" in determining landowner liability); *Allianz Ins. Co. v. Gagnon*, 109 Nev. 990, 994-95, 860 P.2d 720 (1993) (finding "we find the above reasoning to be persuasive" with respect to offers of judgment); *Sheriff, Clark Cty. v. Morris*, 99 Nev. 109, 114, 659 P.2d 852 (1983) (following the jurisprudence of California, which "has adopted a persuasive position" on the felony-murder rule, where "[t]here appears to be no Nevada cases which address" the issue).

[13] *See FDIC v. Munoz*, No. CV 11-04971 ODW (SSx), 2011 U.S. Dist. LEXIS 105500, at *5 (C.D. Cal. Sept. 19, 2011) ("Under California law, the principles of comparative negligence are not applicable in actions based upon deceit . . . . California law recognizes negligent misrepresentation as a form of deceit.  Thus, comparative negligence may not serve as an affirmative defense for a claim of negligent misrepresentation.") (citations omitted).

defendant who misrepresents facts and induces the plaintiff to rely on the misrepresentations is barred from asserting that the plaintiff's reliance was negligent unless the plaintiff's conduct in light of his or her intelligence and information, *is preposterous or irrational*."[14]

One way or the other, there is little likelihood that a jury would conclude that BofA's liability for negligently disbursing funds based on the facts it did know was greater than Defendants' failure to disclose other facts, which BofA did not know.  There is no suggestion that BofA was aware that Defendants were concealing the anticipated cost to complete the Project through a second, and false, set of books created to make it appear that the Project was on time and on budget.  Neither is there any suggestion that when the Nevada Defendants falsely certified that all conditions had been satisfied for the disbursement of funds that BofA was aware that each certificate was false.  The Term Lenders do not allege that BofA knew about the two sets of books or Defendants' elaborate scheme, and the Nevada Defendants have never submitted evidence that it did.  Under these circumstances, it is the Nevada Defendants, not the Term Lenders, who will be equitably estopped from arguing that BofA should have figured it all out.[15]

## III.    PRELIMINARY OBJECTION

Based on precedent in the Eleventh Circuit and elsewhere, this Court has held previously that "a non-debtor release is an ***extraordinary remedy*** that is available, if at all, only upon a showing of ***unusual circumstances***."  *In re Laminate Kingdom,* 2011 Bankr. LEXIS 4773, at

---

[14] *FDIC v. Oakes*, No. 2:11-cv-1455-JCM-CWH, 2012 U.S. Dist. LEXIS 54220, at *6 (D. Nev. Mar. 19, 2012) (emphasis in original), *citing FDIC v. Warren*, 2011 U.S. Dist. LEXIS 123489 (N.D. Cal. 2011).

[15] "Equitable estoppel functions to prevent the assertion of legal rights that in equity and good conscience should not be available due to a party's conduct." *Teriano v. Nev. State Bank (In re Harrison Living Trust)*, 121 Nev. 217, 222-23, 112 P.3d 1058, 1061-62 (2005).  A party is equitably estopped where (1) it knows the true facts, (2) it intended others to act upon its conduct, or acted so that the party asserting estoppel has the right to believe it was so intended, (3) the party asserting estoppel is ignorant of the true state of facts, and (4) the party asserting estoppel has detrimentally relied on the other party's conduct.  *Id.*

*14-15 (emphasis added).[16]  That stringent standard is necessary given the "potential for abuse" that can result from the imposition of bar orders and other nondebtor releases:

> [A] nondebtor release is a device that lends itself to abuse.  By it, a nondebtor can shield itself from liability to third parties.  In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code.  The potential for abuse is heightened when releases afford blanket immunity.

*Metromedia Fiber Network*, 416 F.3d at 142.  The Settlement Agreement involves such abuse.

A.    **The Term Lenders' Have Asserted Independent and Direct Claims in the Nevada Action that Cannot Be Enjoined Without the Term Lenders' Consent.**

The claims in the Nevada Action, alleging that the Term Lenders were induced by Nevada Defendants' fraud and negligent misrepresentations, are direct and independent claims that belong exclusively to the Term Lenders.  The Eleventh Circuit has recognized that such claims are not derivative, but rather are direct and independent.  *E.g., Medkser v. Feingold*, 307 Fed. Appx. 262 (11th Cir. 2008).  In *Medkser*, the Eleventh Circuit held that claims for intentional misrepresentation by investors who received fraudulent materials involved "direct injuries sustained by these plaintiffs based [on] their own reliance," noting that the fact other investors "may also have been similarly injured does not transform these direct claims into derivative ones":

> The injuries alleged in counts 1, 2, and 3 constitute direct injuries sustained by these plaintiffs.  The complaint states that the defendants made intentional misrepresentations to these plaintiffs and thereby

---

[16] The Second Circuit has held that "A nondebtor release in a plan of reorganization should not be approved absent the finding that *truly unusual circumstances* render the release terms important to success of the plan." *Metromedia Fiber Network*, 416 F.3d at 143 (emphasis added).  Other circuits have employed similar restrictive language.  *E.g., Behrmann v. Nat'l Heritage Found., Inc.*, 663 F.3d 704, 712 (4th Cir. 2011) ("we agree with Appellants that approval of nondebtor releases in this context should be granted *cautiously and infrequently*") (emphasis added); *In re Ingersoll, Inc.*, 562 F.3d 856, 865 (7th Cir. 2009) (approving bar order as justified by "the unique circumstances of this case"); *Class Five Nev. Claimants (00-2516) v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 658 (6th Cir. 2002) ("Because such an injunction is a dramatic measure to be used cautiously, we follow those circuits that have held that enjoining a non-consenting creditor's claim is only appropriate in 'unusual circumstances.'"); *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 212-13 (3d Cir. 2000) (stating that nondebtor releases have been approved only in "extraordinary cases").

fraudulently induced them to invest their money into IDT and Brandaid which they would not otherwise have done. This is not an injury to the corporation, but to these investors, and the suit may be brought as a direct action. Although the magistrate judge characterized the allegations in the complaint as common to 'all investors,' this was inaccurate. The complaint states merely that 'other investors' may have heard the misrepresentations in addition to the plaintiffs, but specifically alleges that these plaintiffs relied upon the misrepresentations and invested their money. ***The claims involve direct injuries sustained by these plaintiffs based their own reliance on fraudulent statements and misrepresentations made to them. The fact that some other investors may also have been similarly injured does not transform these direct claims into derivative ones.*** The corporate entity could not bring suit to recover the investment that these plaintiffs made relying on the fraudulent actions of the defendants; thus, these claims may be maintained in this direct action.

*Id*. at 265 (emphasis added).

The Trustee has previously conceded that the Term Lenders' claims are independent from those asserted by the Trustee. At the hearing on the Remand Motions in this bankruptcy case, the Trustee's counsel told Judge King that "[w]e agree with you that we do not think property of the Estate is involved. . . ." Exhibit C, at 21:22-23. The Trustee then told this Court that comparing the "fraud case out there" in Nevada with the "breach of fiduciary duty here" in the Trustee Action is "like measuring apples to oranges," Exhibit J, at 16:12-14. He has also stated that the damages incurred by the creditors such as the Term Lenders are "distinct" from those incurred by the Trustee. Exhibit K, at 4 ("the Trustee is not bringing claims for damages suffered by the creditors; rather, the Trustee is bringing claims for damages suffered by the Debtors as a result of FBR and the other D&O Defendants' breaches of fiduciary duties"). Given that history, it is understandable why Judge King, in granting the Remand Motions, expressly ruled that the claims asserted by the Term Lenders were not property of the estate of the Debtors. Exhibit C, at 7:13-16, 15:10-14.

No explicit authority exists under the Bankruptcy Code to enjoin independent non-debtor claims. Although the Eleventh Circuit has permitted bar orders that enjoin cross-claims for

indemnity and contribution among co-defendants, *e.g.*, *Munford*, 97 F.3d at 455, that court has not directly ruled on whether "independent claims" may be barred. If anything, the Eleventh Circuit has repeatedly expressed skepticism for the idea. In *United States Oil & Gas*, 967 F.2d 489, for example, the Eleventh Circuit, in approving a bar order, noted that the case was not "one of those rare instances" involving an order barring claims "unrelated to defendants' liability to the plaintiffs," (*i.e.*, a claim other than for contribution or indemnity), and questioned whether it would be appropriate to bar such "truly independent claims." *Id.* at 496 n.5.

Thereafter, in *AAL High Yield Bond Fund*, 361 F.3d 1305, the Eleventh Circuit confirmed that *U.S. Oil & Gas* did not approve a bar of independent claims, but rather found that the barred fraud and negligence claims were not, in fact, independent. *Id.* at 1311-12. In *AAL*, the Eleventh Circuit defined "truly independent claims" to mean "claims which are not based on the claimants' liability to the instant plaintiffs *or claims based on damages completely separate from the instant damages*." *Id.* at 1311 (emphasis added). Based on the absence of controlling authority and detailed findings of fact, the court in *AAL* vacated the lower court ruling.

More recently, in *Healthsouth*, 572 F.3d at 865, the Eleventh Circuit warned that it "might be *per se* inappropriate to bar" independent claims, but authorized a bar order of claims for advancement of attorneys' fees incurred by a non-settling defendant to defend against suits brought against him. Such claims were found to be "so close to the nature of the claims which established case law holds are appropriately barred that our application of that case law here constitutes a minimal and reasonable extension thereof." *Id.* at 864-65. The same cannot be said of the fraud and misrepresentation claims that Term Lenders have pursued against the Defendants in the Nevada Action.

The Trustee relies heavily upon a recent unpublished decision by the Eleventh Circuit, *Apps v. Morrison* (*In re Superior Homes & Investments, LLC*), 521 Fed. Appx. 895 (11th Cir.

2013), but that case, which involved the kind of "unusual circumstances" required for a bar order, did nothing to expand the narrow category of permissible bar orders. In *Superior Homes*, the Debtor had transferred its assets to non-debtor defendants in a manner that made the assets "indistinguishable," and there was no other source of recovery from insurance or otherwise. *Id.* at 897. The settlement involved distribution of the "indistinguishable" assets to the trustee, who sought a bar order to enjoin the non-debtor plaintiffs from suing the non-debtor defendants. Other courts have recognized that claims by non-settling parties against non-debtor defendants that ultimately seek recovery from assets transferred by the debtor are claims that belong to the estate and are thus subject to a bar order. *E.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. 423, 433 (Bankr. S.D.N.Y. 2010) ("even if the Florida Plaintiffs' claims assert direct injuries, they would nonetheless be deemed property of the estate under Seven Seas because they seek to recover fraudulently transferred funds"); *Berman v. Smith*, No. 13-81150-CIV, 2014 WL 1745361 (S.D. Fla. May 1, 2014) (where plaintiff brought claim against non-debtor party based on same transfer of funds from debtor that were subject to trustee's fraudulent transfer claim, district court held that plaintiff's claims were not "truly independent" from the trustee's fraudulent transfer claims and thus subject to bar order). Faced with those same facts, the court in *Superior Homes* found that the lower court did not abuse its discretion in granting the bar order. Here, there is no basis for the Trustee to raise such an argument. The most obvious source of recovery – the $126 million in remaining D&O insurance proceeds – is not property of the estate. *In re Laminate Kingdom LLC*, No. 07-10279-BKC-AJC, 2008 Bankr. LEXIS 1594 (Bankr. S.D. Fla. Mar. 13, 2008) (proceeds of D&O insurance policies held ***not*** to be property of the estate even though trustee, on behalf of debtor, made a direct claim to the policy proceeds) (citing *In re CHS Elecs., Inc*., 261 B.R. 538, 544 (Bankr. S.D. Fla. 2002) (Bankruptcy Code provides a trustee with no different status than a non-bankruptcy plaintiff with

an unliquidated claim which may be covered by insurance proceeds)).  And there has been no

showing that any assets of the Defendants that would provide a source of recovery came from the

Debtors.  Indeed, one of the Defendants, Jeffrey Soffer, is reported to be a billionaire, and as

noted infra, even if the assets currently owned by Mr. Soffer prove to be insufficient to satisfy all

claims against him, the Term Lenders' claims in the Nevada Action against Mr. Soffer would be

non-dischargeable under Section 523 of the Bankruptcy Code, meaning that the Term Lenders

could enforce their judgment against Mr. Soffer's future income and assets subsequently

acquired.

   At least one bankruptcy court in Florida refused to approve a settlement by a bankruptcy

trustee to the extent the trustee sought to compromise independent and direct claims.  *In re

Xenerga, Inc*., 449 B.R. 594 (Bankr. M.D. Fla. 2011).  In *Xenerga*, the settlement included some

"indirect claims derivative of an alter ego action" that required the court to pierce the debtor's

corporate veil, and other claims that were regarded as direct claims that "do not rely upon either

an alter ego finding or the debtor's independent liability."  *Id*. at 600.  The Florida bankruptcy

court held that the trustee lacked authority to settle the direct claims:

> Because two of the Claims the trustee seeks to settle are direct claims held
> by NTAE against non-debtors, the trustee cannot settle these two claims.
> The proposed compromise improperly attempts to settle claims that are not
> property of the debtor's estate under § 541 of the Bankruptcy Code.

*Id.* at 601.  This Court reached the same conclusion in *America Capital Corp. v. Marlin* (*In re

America Capital Corp.*), Case No. 06-126445-AJC, 2011 Bankr. LEXIS 1799 (May 3, 2011),

which involved claims that were personally owned and not derivative of the debtor.  This Court

held that the Liquidating Agent "simply does not have the power or authority to compromise or

dispose of [such personal claims] through any agreement to which [the owners of those personal

claims] were not parties."  *Id*., at *4-5, *12.  Under that same reasoning, the Trustee lacks

authority to settle the Term Lenders' claims that, like those in *Xenerga* and *America Capital*, were not property of and did not belong to the estate.

Likewise, in *In re Gunnallen Financial, Inc.*, 443 B.R. 908, 916-17 (Bankr. M.D. Fla. 2011), a Florida bankruptcy court refused to approve a settlement agreement sought by Soneet Kapila, acting as the liquidating trustee in that case, that included a bar order extinguishing independent causes of action against non-debtors. The court criticized the settlement proposed by Mr. Kapila, who, like here, sought to force non-settling parties to accept a settlement that would provide "little value" to the non-settling parties that could otherwise be made whole by pursuing the claims. The court aptly observed that "[t]he true beneficiaries under the settlement are not the Securities Claimants, but rather, the numerous individuals accused of causing their substantial losses through improper conduct." *Id*. By not approving the settlement, the bankruptcy court found that "all claims against nondebtors will remain intact, and the $1.7 million in policy proceeds will still be available to pay any claims that the Securities Claimants choose to settle (instead of being further depleted on defense costs)." *Id*. at 917. The court in *Gunnallen* emphasized that "[t]he decision to settle or not, however, should rest with each individual Securities Claimant, and not be forced by the Liquidating Agent." *Id*. The same is true here: the Term Lenders' decision to settle or not cannot settle and should not be forced upon it by the Trustee, the Defendants and the Insureds.

Faced with judicial hostility to bar orders that affect independent and direct claims, the Trustee argues that the Term Lenders' agreement to the bar orders under the CSA is a concession that such bar orders can be imposed over the objection of a non-settling party with independent claims. 9019 Motion, at 25. That is not correct. As the Trustee knows, the CSA enjoyed the support of every major constituency in the bankruptcy case, each of which was fully represented in the negotiations leading to execution of the CSA. Moreover, not a single creditor asserting

non-derivative claims objected to entry of the bar orders.[17]  Although courts have "tolerated" bar

orders in circumstances where the parties affected by the bar order consent to its entry (*e.g.,*

*Metromedia Fiber Network, Inc.*, 416 F.3d at 142 (citing *In re Specialty Equip. Cos.*, 3 F.3d

1043, 1047 (7th Cir. 1993)), such "tolerance" does not extend to bar orders to which parties

object, such as the Term Lenders to the bar order under the Settlement Agreement.  Under these

circumstances, and Eleventh Circuit precedent, this Court lacks any authority to approve the bar

order.

**B.      The Proposed Bar Order Is Also Impermissible Because It Is Not "Fair And Equitable" To Term Lenders.**

In the Eleventh Circuit, no bar order can be granted unless it is determined that the bar

order is "fair and equitable" to the affected non-settling defendant.  In *Munford*, which was

previously explained involved an injunction of contribution and indemnity claims (not direct and

independent claims), the Eleventh Circuit established a four-part test:  (1) the interrelatedness of

the claims that the bar order precludes; (2) the likelihood of nonsettling defendants prevailing on

the barred claim; (3) the complexity of the litigation, and (4) the likelihood of depletion of the

resources of the settling defendants.  *Munford*, 97 F.3d at 455 (citing *U.S. Oil & Gas*, 967 F.2d at

493-96).  The Trustee cannot carry its heavy burden to prove any, let alone all, of those elements.

**1.      The Claims in the Nevada Action and the Miami Action are not Interrelated.**

The Trustee's argument in the 9019 Motion that the claims of the Term Lenders and

Trustee are "interrelated" is a departure from the positions taken previously by the Trustee and

the Defendants.  In the Trustee Action, the Trustee has characterized as "apples to oranges" the

fraud claims asserted by the Term Lenders and breach of fiduciary duty claims asserted by the

---

[17]  The only creditor who did object to the bar orders under the CSA held a claim against the Defendants that was not independent but rather was derivative in nature, and thus could only be pursued by the estate.

Trustee, and has further argued that the damages suffered by creditors were "distinct" from those suffered by the Debtors' estates.  Exhibit J, at 16:12-14; Exhibit K, at 09-10.  In support of the Remand Motions, Defendants argued that the Term Lenders' claims are "clearly remote" from this bankruptcy case.  Exhibit A, at 11:22-23.  Even after the Trustee Action was filed, Defendants stated that "[t]he Trustee's Action does not connect the [Nevada] Action to the main bankruptcy case," and that "[a] recovery by the [the Term Lenders] here will not benefit the debtors' estate."  Exhibit B, at 8:16-24.

Ignoring all of the above, the Trustee now argues that the claims are interrelated, asserting that the lawsuits arise from a "common nucleus of operative facts."  9019 Motion, at 26.  That is not the correct standard to determine whether a claim is "truly independent."  Rather, as set forth in *AAL*, "truly independent claims" are "***claims which are not based on the claimants' liability to the instant plaintiffs or claims based on damages completely separate from the instant damages***."  *AAL High Yield Bond Fund,* 361 F.3d at 1311 (emphasis added). The Term Lenders' claims are not for indemnity or contribution based upon their own liability. Moreover, the damages sought by the Term Lenders are "completely separate" from the damages asserted by the Trustee.  Because the Term Lenders' claims in the Nevada Action are "truly independent," they cannot be regarded as "interrelated" to the Trustee Action.

As Defendants have previously observed, when they successfully fought to have Nevada state court decide the Nevada Action, relatedness is not determined by "overlapping underlying facts" or by "historical facts" or "the fortuitous fact that the Trustee chose to file its adversary complaint in the main bankruptcy case."  Exhibit B, at 8:24-9:2.  To the extent the allegations in the Trustee Action happen to resemble those in the Nevada Action, that is simply because the Trustee's litigation counsel borrowed heavily from Term Lenders' complaint when he prepared the Trustee's complaint.  Under the Trustee's reasoning, a trustee could, as the Trustee did here,

seize truly independent claims filed by a third party simply by copying its complaint filed in the separate action and then asserting the existence of a "common nucleus of operative facts." That is precisely the kind of abuse of bar orders that courts discourage, and the reason why bar orders are granted only as an "extraordinary remedy" in "unusual circumstances" not present here.

<strong>2.        The Term Lenders' are Likely to Succeed in the Nevada Action.</strong>

Substantial evidence exists of the fraud and misrepresentations perpetrated by the Defendants against the Term Lenders. The amended complaint filed by the Term Lenders and attached to the 9019 Motion details the misrepresentations made to the Term Lenders. The claims in the Nevada Action have already survived multiple dispositive motions. The only argument offered by the Trustee in opposition to the viability of the Term Lenders' claim is based on a ruling by the Nevada state court that was later reconsidered and modified, based on the Nevada Supreme Court's reversal of another prior ruling on the same issue. Thus, it cannot be said that Term Lenders are unlikely to prevail at trial.

If Term Lenders do prevail, they are entitled to recover substantial damages that, with interest, could exceed $1,000,000,000.00 (one billion dollars). There are multiple sources of recovery available to satisfy that judgment.

First, there are the proceeds under the D&O Policies. According to the Trustee, there remains about $125 million in available insurance coverage, approximately $45 million more than the Insurers' contribution to the Trustee Settlement. 9019 Motion, at 10-12. The Trustee asserts that, in the absence of the Settlement Agreement, the D&O Policies will be depleted, but that does not square with the fact that, in three-plus years of litigation, only $25 million has been used. Moreover, the Trustee fails to explain whether some portion of those fees would have been incurred in defending against claims brought in Florida state court by the Title Companies, which were pending for several years, but have since been released under the terms of the CSA.

The availability of insurance in this case readily distinguishes this case from *Superior Homes*, where the trustee, who sought the bar order, concluded that insurance coverage was not available.

Second, the Trustee has previously asserted that the Insurers' failure to accept the joint policy limits demand previously tendered by the Trustee and the Term Lenders pursuant to their Term Sheet exposes them to claims for bad faith refusal to settle, which could remove any ceiling on Defendants' payment of any judgment obtained by the Term Lenders or Trustee.

Third, Defendants appear to have substantial resources available to satisfy any judgment against them. One of the Defendants, Jeffrey Soffer is reported to be a billionaire with substantial holdings and investments and, as noted below, any fraud judgment obtained against him would not be dischargeable in bankruptcy.[18]

In the "unique" situations where bar orders have been granted, the party objecting to the bar order failed to muster adequate (or any) proof in support of the merits or collectability of their claims. For example, in *Munford*, the parties seeking the bar order asserted that the non-settling defendants were unlikely to prevail on their indemnity or contribution claims. Those claims were based on an allegation that the non-settling defendants relied on VRC's solvency opinion, but there, "(1) the solvency opinion included disclaimers which stated the solvency opinion was limited in scope and only intended to be relied upon by Citibank, the LBO lender; and (2) 'none of the [nonsettling] defendants saw or reviewed the opinion prior to consummation of the LBO.'" *Munford*, 97 F.3d at 456 (quoting *In re Munford Inc.*, 172 B.R. 404, 413 (N.D. Ga. 1993)). Based on part on the disclaimers, the Bankruptcy Court approved the bar order. *Accord In re Solar Cosmetic Labs, Inc*., No. 08-15793-BKC-LMI, 2010 WL 3447268, at *3

---

[18] The Term Lenders have already devoted five years and tens of millions of dollars seeking recovery for damages caused by the loans made to the Debtors.

(Bankr. S.D. Fla. Aug. 27, 2010) (approving a settlement agreement containing a bar order where the nonsettling defendant failed to provide a plausible basis for any claims against the settling defendants).

Similarly, in *Superior Homes*, which involved a settlement for $800,000, the evidence showed that only $1 million in cash and assets was available from the debtors and non-debtor defendants to satisfy judgments of the lawsuits brought by 560 creditors, and there was well supported concern that the entire amount would be exhausted by the non-debtor defendants defense of state-court cases filed by 560 creditors of the estate.  Moreover, as noted above, the insurers in that case denied the demands made by the trustee to indemnify and defend defendants under the policies, and the trustee "determined that pursuing the policies against National Union Fire would require 'expensive litigation over an essentially clear cut absence of coverage in the "claims made" policies.'"  *Apps v. Morrison* (*In re Superior Homes & Investments, LLC*), Case No. 6:11-CV-1575-Orl-36 (M.D. Fla. Sep. 20, 2012), at *3, 12.  Given the strong likelihood that the objecting creditors would not have anything to recover on account of their claims in the absence of a settlement, the Eleventh Circuit concluded that the bankruptcy court did not abuse its discretion in approving the bar order under that settlement.  No such concerns exist in this case, where the insurance proceeds far exceed the amount of the proposed settlement, and where Defendants have their own assets to satisfy any judgment obtained by the Term Lenders.

In cases where bar orders have been entered that involved legitimate claims, such approval is often conditioned upon "the enjoined claims [being] 'channeled' to a settlement fund rather than extinguished."  *Metromedia Fiber Network*, 416 F.3d at 142 (*citing MacArthur Co. v. Johns-Manville Corp.* (*In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) and *Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694, 701 (4th Cir. 1989)).  This is what in fact occurred under the CSA, which created a settlement fund of $85.3 million for the

sole benefit of the Contractors whose potential claims against the Defendants were subject to the bar order, and also created a settlement fund of $89.3 million for Wilmington Trust in connection with the bar orders applicable to Lenders under the Credit Agreement.  The Trustee and other parties to the CSA highlighted that "direct and substantial consideration" in requesting approval of the CSA.  (ECF 4129, ¶ 83).

No such settlement fund in favor of the Term Lenders is to be created under the Settlement Agreement.  Rather, as noted by the Trustee, any recovery by the Term Lenders would be indirect and limited to *pro rata* distributions paid to unsecured creditors (including those that previously agreed to bar orders in exchange for separate consideration), after payment of the Trustee's fee and the contingent fee to the Trustee's special litigation counsel.  Such distributions are not properly regarded as consideration payable to Term Lenders for purposes of evaluating whether the settlement is "fair and equitable" to them.  In *Metromedia Fiber Network*, the Second Circuit explained the difference between receiving a distribution from a debtor versus consideration for an enjoined claim:

> [W]e reject appellees' argument that because appellants were allocated a Plan distribution, they received consideration, and therefore cannot be heard to complain about the nondebtor releases.  Appellants' Plan distribution (ultimately *re*-distributed to other creditors, see supra, at 139), was on account of appellants' Notes, not on account of their claims against any nondebtor.  *See Cont'l Airlines*, 203 F.3d at 215 & n. 13 (differentiating between plan distribution and consideration for enjoined claims).  In any event, a nondebtor release is not adequately supported by consideration simply because the nondebtor contributed something to the reorganization and the enjoined creditor took something out.

*Metromedia Fiber Network*, 416 F.3d at 143.  Likewise, in *Johns-Manville*, the Court relied heavily on the fact that the objecting party was "not left without a remedy" and could "proceed in the Bankruptcy Court against the $770 million settlement fund."  *Johns-Manville*, 837 F.2d at 94.  The Second Circuit observed that "[i]t has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his

interest is assertable against the proceeds of the disposition." *Id.* Under that rationale, even if the Trustee were entitled to a bar order, the Trustee would be required to set aside all the settlement proceeds for the benefit of the Term Lenders in order to provide them with adequate protection on account of their claims under Section 363 of the Bankruptcy Code.

In short, the massive disparity between the potential recovery of more than $1 billion in the Nevada Action, versus the zero recovery that the Term Lenders would receive in exchange for their independent claims as a result of the bar order, compels a ruling by this Court that the proposed bar order is not fair and equitable to the Term Lenders, and thus cannot be approved.

> **3.  Neither the Nevada Action nor the Trustee Action, Nor Both of Them Considered Together, Involve the Complexity that Courts Require as a Precondition to the Entry of a Non-Consensual Bar Order.**

As the 9019 Motion makes clear, the bar order sought under the Settlement Agreement is targeted at claims asserted in a single lawsuit – the Nevada Action. Most of the claims that could otherwise be asserted by creditors of the Debtors against the Nevada Defendants have already been released or enjoined under the CSA. Unlike the Term Lenders, those other creditors did not insist on preserving their claims against the Nevada Defendants as a condition of the settlement.

Given that the Nevada Action and the Trustee Action are all that appear to remain, there is not the kind of "unique" complexity to justify the "extraordinary remedy" of a bar order. This case is unlike *Superior Homes*, where there were 560 pending state court actions against non-debtor defendants, 559 more than Defendants face here. Courts also have approved bar orders in the context of extraordinarily complex mass tort cases, where the bar order is essential to resolving tens of thousands of claims on a fair and proportional basis. *E.g., Johns-Manville*, 837 F.2d at 90 (asbestos); *A.H. Robins Co.*, 880 F.2d at 697 (Dalkon Shield).

The disputes that were resolved under the CSA involved the "unique" level of complexity required to justify a "bar order." Without a bar order, it would have been practically impossible

to obtain releases from every single one of the hundreds of Contractors and every single Lender. By providing those parties with notice of the bar orders and an opportunity to object, the parties to the CSA were able to obtain the consent of those parties.  In those circumstances, and with unanimous consent of all of the major constituencies who were represented in the mediations, the "bar orders" were necessary to ensure that the settlement was indeed comprehensive.  Where, as here, there is only the Nevada Action and the Trustee Action, a bar order is not a proper substitute for good faith bargaining and, in the absence of a settlement, litigation to determine the rights of the parties.

> **4.      There is no Evidence that the Assets of Settling Defendants Will Be Depleted in the Absence of Approval of the Settlement Agreement.**

Finally, the Trustee cannot show, as he must, that the Defendants' resources will be depleted absent approval of the Settlement Agreement.  As already discussed, there is $125 million of insurance coverage remaining under the two towers of D&O policies available to pay damages if the Term Lenders or the Trustee prevail at trial.  These are bad faith claims asserted by the Trustee that might generate additional insurance coverage if the policy limits turn out to be insufficient.  And, to the extent insurance proceeds are not sufficient to satisfy any judgment obtained by the Term Lenders or the Trustee, the Defendants, including Mr. Soffer, have their own substantial financial resources to satisfy any fraud judgment that, if not paid, will be non-dischargeable in bankruptcy.

> **C.      The Settlement Agreement Does Not Meet the *Justice Oaks* Requirements.**

In addition to including an improper "bar order" that cannot be approved by this Court, the "Settlement Agreement" cannot be approved based on consideration of the four factors set forth by the Eleventh Circuit in *In re Justice Oaks II, Ltd.*, 898 F.2d 1544 (11th Cir. 1990):

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily

attending it; [and] (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Id*. at 1549; *In re Se. Banking Corp*., 314 B.R. 250, 272 (Bankr. S.D. Fla. 2004) (applying *Justice Oaks* factors).

As already demonstrated: (a) the Term Lenders have a strong probability of success in the Nevada Action; (b) there is available insurance coverage of $125 million, along with potential bad faith insurance claims and wealthy defendants to enhance collection of any judgments obtained; and (c) there are only two pending litigation matters, one of which is scheduled for trial soon.

The fourth factor, the "paramount interest of the creditors and a proper deference to their reasonable views in the premises," also weighs against approval of the Settlement Agreement. As the Trustee acknowledges, the Settlement Agreement is not in the interests of the Term Lenders, who comprise a large percentage of claims and whose independent claims would be released and discharged by the bar order. 9019 Motion, at 23. Instead, all of the proceeds of the settlement will be paid to the estate and distributed under the priority schedule set forth in Section 726. This means that unsecured creditors will receive nothing until payment in full of chapter 7 and chapter 11 administrative expenses.

By diverting the proceeds through the Debtors' estates, the Term Lenders anticipate that the Trustee and his litigation counsel will request fees that equal 38% of the total proceeds, or $31,654,000.00.[19] Of the remaining $51,646,000.00, the Term Lenders would, after payment of other chapter 7 and chapter 11 administrative expenses and other priority expenses, be required to share pro rata with other unsecured creditors who, unlike the Term Lenders, previously

---

[19] Of that amount, 3% would be sought by the Trustee as a "commission" under Sections 326 and 330, and the remaining 35% would be sought by the Trustee's litigation counsel as a "contingent fee" under the order approving its retention.

received consideration in exchange for their agreements to relinquish their claims against the

Nevada Defendants and have not expended millions of dollars in fees pursuing the claims in the

Nevada Action that brought the Defendants to the negotiation table.

## IV.    DEMAND FOR ADEQUATE PROTECTION

The Term Lenders hereby demand and are entitled to adequate protection on account of

the Trustee's proposed use or disposal of their independent direct claims.

Section 363(e) provides:

> Notwithstanding any other provision of this section, at any time, on
> request of an entity that has an interest in property used, sold, or leased, or
> proposed to be used, sold or leased, by the trustee, the court, with or
> without a hearing, shall prohibit or condition such use, sale, or lease as is
> necessary to provide adequate of such interest.

11 U.S.C. § 363(e).  In *Johns-Manville*, the Second Circuit recognized that holders of claims

against non-debtors (in that case, insurers) made subject to bar orders are entitled to receive

adequate protection.  *Johns-Manville*, 837 F.2d at 94.  In that case, the court found that the

claimant was adequately protected because "his interest is assertable against the proceeds of the

disposition."  *Id*.

Another court found that a channeling injunction requested in favor of D&O insurers who

agreed to deposit $23.5 million into a fund for the benefit of a litigation did ***not*** provide adequate

protection to non-debtors with separate claims against the proceeds of the D&O policies.  *In re*

*Adelphia Comm. Corp*. 364 B.R. 518, 527 (Bankr. S.D.N.Y 2007).  Distinguishing *Johns-*

*Manville*, the court based its finding, in part, on the fact that the objecting parties were limited

"to recovery from a corpus less than the total remaining under the Policies."  *Id*.  In addition, the

court in *Adelphia* noted that the proposed transaction lacked the "unique" hallmarks required for

a bar order, such as "payment in full" to affected creditors, the existence of mass tort claims, or

the need for the injunction to enable reorganization.  *Id*. at 529-30.  Thus, despite the court's

finding that the settlement was "plainly in the interests of the Adelphia estate," the court denied approval of the settlement transaction.

The Settlement Agreement at issue here does not even pretend to provide adequate protection to the Term Lenders on account of their independent claims, in the form of a payment, a lien or some other manner of adequate protection.  Just as Judge Gerber denied approval of the settlement in *Adelphia*, this Court must deny approval of the Settlement Agreement based on that statutory failure.

## V.    RESERVATION OF RIGHTS

This Preliminary Objection is preliminary in nature, and all rights, remedies and objections of the Term Lenders are hereby reserved and not waived to the extent not included herein, including that this Court lacks jurisdiction to grant the bar order and that any injunction sought by the Trustee requires the commencement of an adversary proceeding.

## VI.    CONCLUSION

For the above stated reasons, 1) the 9019 Motion should be denied; and 2) in the event the 9019 Motion is granted, the Term Lenders are entitled to adequate protection of their independent direct claims, in the form of receiving payment of or a lien on any proceeds from the Settlement Agreement.

Dated:  Los Angeles, California
       July 1, 2014

JONES DAY

By:  */s/ Sidney P. Levinson*       
    Bruce S. Bennett (admitted *pro hac vice)*
    Sidney P. Levinson (admitted *pro hac vice*)
    555 South Flower Street, 50th Floor
    Los Angeles, CA 90071
    Telephone:  (213) 489-3939
    Facsimile:  (213) 243-2539
    bbennett@jonesday.com
    slevinson@jonesday.com

         -and-

    Joshua D. Morse (admission *pro hac vice* to
    be requested)
    555 California Street, 26th Floor
    San Francisco, CA 94104
    Telephone:  (415) 626-3939
    Facsimile:  (415) 875-5700
    *jmorse@jonesday.com*

         -and-

Dated:  Miami, Florida                              AKERMAN LLP (formerly known as Akerman
        July 1, 2014                              Senterfitt LLP or Akerman Senterfitt)


By: */s/ Michael I. Goldberg*            
      Michael I. Goldberg (FL Bar No. 886602)
      Las Olas Centre II
      One Southeast Third Avenue, 25th Floor
      Miami, Florida 33131-1714
      Telephone: (305) 374-5600
      Facsimile: (305) 374-5095
      *michael.goldberg@akerman.com*

-and-

By: */s/ Joanne Gelfand*               
      Joanne Gelfand (FL Bar No. 515965)
      One Southeast Third Avenue, 25th Floor
      Miami, Florida  33131-1714
      Telephone:  (305) 374-5600
      Facsimile:  (305) 982-5694
      *joanne.gelfand@akerman.com*

      *Counsel for the Term Lenders*

LAI-3218194v1
632669 - 600001

{29125952;1}

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by CM/ECF to all registered users in the above-captioned jointly administered cases, as set forth in the Service List provided herein on July 2, 2014.

_/s/ Michael I. Goldberg_
Email:  michael.goldberg@akerman.com

***In re Fontainebleau Law Vegas, Holdings, LLC, et al.***
***09-21481-AJC Notice will be electronically mailed to:***

*Thomas L Abrams, Esq.* tabrams@tabramslaw.com, fcolumbo@tabramslaw.com;dabrams@tabramslaw.com

*Ido J Alexander, Esq.* ialexander@aslawpllc.com, info@aslawpllc.com;csomodevilla@aslawpllc.com

*Andrew K Alper* aalper@frandzel.com, efiling@frandzel.com,ekidder@frandzel.com

*Brett M Amron, Esq.* bamron@bastamron.com, mdesvergunat@bastamron.com,jmiranda@bastamron.com,dtimpone@bastamron.com

*Johanna Armengol on behalf of U.S. Trustee Office of the US Trustee* Johanna.Armengol@usdoj.gov, johanna.armengol@usdoj.gov

*Robert C. Arnold, Esq.* bob@thevictorialawgroup.com, bankruptcy@thevictorialawgroup.com

*Eric N Assouline, Esq* ena@assoulineberlowe.com, ah@assoulineberlowe.com

*Kristopher Aungst, Esq.* kea@trippscott.com, dbg@trippscott.com

*Scott L. Baena, Esq.* sbaena@bilzin.com, eservice@bilzin.com;lflores@bilzin.com

*Ann M Batchelor* batchelor@clm.com

*Paul J. Battista, Esq* pbattista@gjb-law.com, gjbecf@gjb-law.com

*Brian S Behar, Esq* bsb@bgglaw.net

*Ira S Bergman* ibergman@moundcotton.com

*John G. Bianco III, Esq* jgb@trippscott.com, bankruptcynoticecenter@trippscott.com

*Russell M. Blain* rblain.ecf@srbp.com, rblain@srbp.com

*Leyza F. Blanco, Esq.* leyza.blanco@gray-robinson.com, jceide@gray-robinson.com;lnegron@gray-robinson.com;Ileana.Christianson@gray-robinson.com;Annika.Miranda@gray-robinson.com

*Alexandra D Blye* ablye@cfjblaw.com, kdemar@cfjblaw.com;wpbecf@cfdom.net

*Paul M Botros* pmb@botroslawfirm.com

*Alan M Burger* aburger@mcdonaldhopkins.com, jpaul@mcdonaldhopkins.com;mrose@mcdonaldhopkins.com

{29125952;1}

*Stephen D Busey* busey@smithhulsey.com, khettinger@smithhulsey.com

*Jacqueline Calderin, Esq.* jc@ecccounsel.com

*William E Calnan* wcalnan@waldmanlawfirm.com, Cardito@waldmanlawfirm.com

*Candace C Carlyon* ccarlyon@sheacarlyon.com,
nrodriguez@sheacarlyon.com;rmsmith@sheacarlyon.com

*Francis L. Carter, Esq.* flc@katzbarron.com, lcf@katzbarron.com

*Franck D Chantayan* franck@chantayan.com

*Robert P. Charbonneau, Esq.* rpc@ecccounsel.com, nsocorro@ecclegal.com;bankruptcy@ecclegal.com

*Jason M Chodos* jchodos@moundcotton.com

*Ileana Espinosa Christianson, Esq.* ileana.christianson@gray-robinson.com, jceide@gray-robinson.com;lnegron@gray-robinson.com;ileana.christianson@gray-robinson.com

*David C. Cimo, Esq* dcimo@gjb-law.com, gjbecf@gjb-law.com

*Charles I Cohen, Esq* pmouton@furrcohen.com,
pmouton@furrcohen.com;atty_furrcohen@bluestylus.com

*David A Colvin* dcolvin@marquisaurbach.com, mwalters@marquisaurbach.com

*Marissa C Corda* mcc@katzbarron.com, af@katzbarron.com

*John K Cunningham, Esq,* avenes@whitecase.com

*Ryan E Davis* rdavis@whww.com, thiggens@whww.com

*Adrian C. Delancy* adelancy@mrthlaw.com,
ycandia@mrthlaw.com,gruiz@mrthlaw.com,ecfnotices@mrthlaw.com;mrthbkc@gmail.com

*Patrick R Dorsey* pdorsey@sfl-pa.com, vchapkin@sfl-pa.com;dwoodall@sfl-pa.com;scusack@sfl-pa.com

*John C Dotterrer, Esq* dottj@dottlaw.com, luke.bovat@akerman.com

*John D Eaton* jeaton@shawde-eaton.com, sramirez@shawde-eaton.com

*Morgan B. Edelboim, Esq.* medelboim@bastamron.com,
mdesvergunat@bastamron.com;jmiranda@bastamron.com;dtimpone@bastamron.com

*Manuel Farach, Esq.* mfarach@richmangreer.com, cfeld@richmangreer.com

*Thomas H. Fell* bknotices@gordonsilver.com, bankruptcynotices@gordonsilver.com

*Jeffrey T Foreman* jforeman@kennynachwalter.com, pharris@kennynachwalter.com

*Michael Foster* mcf@trippscott.com

*Robert G Fracasso Jr, Esq* rfracasso@shutts.com, jgoodwin@shutts.com

Thomas Joseph Francella, Jr tfrancella@wtplaw.com

Carl J Gabrielse on carl@holland-law.com, jessica@holland-law.com

James D Gassenheimer, Esq. jgassenheimer@bergersingerman.com, lmerida@bergersingerman.com;ebrown@bergersingerman.com;efile@ecf.inforuptcy.com;efile@bergersingerman.com

David L Gay, Esq. dgay@bergersingerman.com, efile@bergersingerman.com;efile@ecf.inforuptcy.com

John H Genovese, Esq jgenovese@gjb-law.com, hburke@gjb-law.com;gjbecf@gjb-law.com

Randall L Gilbert, Esqrgilbert@theconstructionlawyers.com

Scott F Gilles sgilles@renovnlaw.com

Daniel L. Gold, Esq. dgold@ecccounsel.com, bankruptcy@ecclegal.com,nsocorro@ecclegal.com

Michael I Goldberg, Esq michael.goldberg@akerman.com, charlene.cerda@akerman.com

Marc I Goldsand, Esq. mgoldsand@mcdonaldhopkins.com, epeyton@mcdonaldhopkins.com;yguerra@mcdonaldhopkins.com;jbloor@mcdonaldhopkins.com

Alvin S. Goldstein, Esq mmitchell@furrcohen.com, atty_furrcohen@bluestylus.com

Douglas R. Gonzales dgonzales@wsh-law.com

Patricia A Gorham, Esq. patricia.gorham@sutherland.com, michelle.williams@sutherland.com,daniel.kent@sutherland.com

Emily L. Grant ecottrell@heroldsagerlaw.com, chendricks@heroldsagerlaw.com

Merrick L Gross mgross@cfjblaw.com, ppowers@cfjblaw.com;tjones@cfjblaw.com

Gregory S Grossman, Esq ggrossman@astidavis.com, ngonzalez@astidavis.com

Matthew W Hamilton, Esq e-notice@fulcruminv.com

Ross R Hartog rhartog@mrthlaw.com, ecfnotices@mrthlaw.com;ycandia@mrthlaw.com;gruiz@mrthlaw.com;jgarey@mrthlaw.com;mrthbkc@gmail.com;acastro@mrthlaw.com

Monique D Hayes mhayes@gjb-law.com, gjbecf@gjb-law.com

Phillip M. Hudson III pmhudson@arnstein.com, jtunis@arnstein.com;hpiloto@arnstein.com;befernandez@arnstein.com;cofalla@arnstein.com;bwilliams@arnstein.com

Jason A Imes bkfilings@s-mlaw.com

Kenneth B Jacobs kjacobs@gray-robinson.com, zhosseini@gray-robinson.com

Thomas E Kaaran kthomas@mcdonaldcarano.com, mmorton@mcdonaldcarano.com

Anthony Kang, Esq. _akang@arnstein.com_

Soneet Kapila _trustee@kapilaco.com_, _FL68@ecfcbis.com_

Mychal J Katz _mkatz@ralaw.com_

Mark B Kleinfeld _mkleinfeld@bellsouth.net_

Andrew R. Kruppa _Andrew.kruppa@squiresanders.com_

Philip J Landau _plandau@sfl-pa.com_, _lrosetto@sfl-pa.com;blee@sfl-pa.com;vchapkin@sfl-pa.com;pdorsey@sfl-pa.com_

Elisa R Lemmer, Esq _elisa.lemmer@weil.com_, _lori.seavey@weil.com_

Stephen R Leslie, Esq _sleslie.ecf@srbp.com_

David M. Levine, Esq_dml@lkllaw.com_, _lv@lkllaw.com_

Joan M Levit, Esq _joan.levit@akerman.com_, _charlene.cerda@akerman.com_

Sarah J Lis _slis@waldmanlawfirm.com_

Corali Lopez-Castro, Esq _clc@kttlaw.com_, _rcp@kttlaw.com_

Laudy Luna, Esq. _ll@lgplaw.com_, _de@lgplaw.com_

Isaac M Marcushamer, Esq. _imarcushamer@bergersingerman.com_, _fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com_

Aleida Martinez Molina _amartinez@wsh-law.com_, _jfuentes@wsh-law.com_

Jason S Mazer _jmazer@vpl-law.com_, _kshaw@vpl-law.com;csteklof@vpl-law.com;aHacker@vpl-law.com;mmoore@vpl-law.com;cgudaitis@vpl-law.com;lrodriguez@vpl-law.com;receptionist@vpl-law.com_

Frank F McGinn, Esq _ffm@bostonbusinesslaw.com_

Paul J McMahon, Esq _pjm@pjmlawmiami.com_

Robert C Meacham, Esq _rmeacham@mmdpa.com_, _lraymond@mmdpa.com;lbobrow@mmdpa.com;deanah@mmdpa.com_

Thomas M. Messana, Esq. _tmessana@messana-law.com_, _emair@messana-law.com;blieberman@messana-law.com;thurley@messana-law.com;tmessana@bellsouth.net;nbarrus@messana-law.com;ekates@bakerlaw.com;jmooremaley@messana-law.com;tzeichman@messana-law.com_

Lawrence H Meuers, Esq _lmeuers@meuerslawfirm.com_, _sdefalco@meuerslawfirm.com;lrogers@meuerslawfirm.com_

Harold D Moorefield Jr. _hmoorefield@stearnsweaver.com_, _cgraver@stearnsweaver.com;bank@stearnsweaver.com;larrazola@stearnsweaver.com;rross@stearnsweaver.com;dillworthcdp@ecf.epiqsystems.com_

*Glenn D Moses, Esq* gmoses@gjb-law.com, gjbecf@gjb-law.com

*Patrick M Mosley, Esq.* pmosley@hwhlaw.com, telam@hwhlaw.com

*Barry E. Mukamal* bemtrustee@kapilamukamal.com

*Michael R. Mushkin* michael@mushlaw.com, darrell@mushlaw.com;karen@mushlaw.com;marco@mushlaw.com;receptionist@mushlaw.com

*Arthur C. Neiwirth, Esq.* aneiwirthcourt@qpwblaw.com

*Ari Newman, Esq.* newmanar@gtlaw.com, crossmann@gtlaw.com;mialitdock@gtlaw.com;miaecfbky@gtlaw.com

*Ronald S. Nisonson* rnisonson@warddamon.com, khushower@warddamon.com;smccaulley@warddamon.com;ndalton@warddamon.com

*Kenneth E Noble* kenneth.noble@kattenlaw.com, NYC.BKNotices@kattenlaw.com

*Timothy J Norris, Esq* tjnorris@duanemorris.com

*Office of the US Trustee* USTPRegion21.MM.ECF@usdoj.gov

*R Shawn Oliphant* bankruptcy@renovlaw.com, dkent@renovlaw.com

*Paul L. Orshan, Esq.* paul@orshanpa.com, maria@orshanpa.com

*Edward A. Paez, Esq.* epaez@kgplegal.com

*Richard B. Parnell* rparnell@parnelllaw.com, denise@parnelllaw.com

*Jimmy D. Parrish* jparrish@bakerlaw.com, OrlBakerDocket@bakerlaw.com;genriquez@bakerlaw.com

*Allen P Pegg* apegg@mwbm.com

*Becky Pintar* bpintar@gglts.com

*James H Post, Esq* jpost@smithhulsey.com, busey@smithhulsey.com;tcopeland@smithhulsey.com;kdaw@smithhulsey.com;cdix@smithhulsey.com;kstewart@smithhulsey.com

*Moumita Rahman* moumita@rahmanlawpllc.com

*Craig V. Rasile, Esq.* craig.rasile@dlapiper.com, monica.tucker@dlapiper.com;jacqueline.figueroa@dlapiper.com;rachel.nanes@dlapiper.com;yohami.lamguerra@dlapiper.com

*David H Reimer, Esq* david@rrcounsel.com

*Robert F. Reynolds* rreynolds@slatkinreynolds.com, imalcolm@slatkinreynolds.com

*Richard Y Rho* rhorichard@hotmail.com

*Arthur H Rice, Esq* arice.ecf@rprslaw.com

Harley E. Riedel, Esq _hriedel.ecf@srbp.com_

Heather L. Ries, Esq. _hries@foxrothschild.com_, _ralbert@foxrothschild.com_

Seth P Robert _srobert@brownrobert.com_

Peter J Roberts _proberts@shawfishman.com_

Ralf R Rodriguez, Esq _rrodriguez@pecklaw.com_, _jfried@pecklaw.com_

Traci H Rollins _traci.rollins@squiresanders.com_,
_linda.parsons@squiresanders.com;carol.lesnick@squiresanders.com;shannon.munsell@squirepb.com_

Robin J. Rubens, Esq. _rjr@lklsg.com_, _esf@lklsg.com_

Amelia Toy Rudolph _amelia.rudolph@sutherland.com_,
_michelle.williams@sutherland.com,daniel.kent@sutherland.com_

Rex E Russo, Esq _rexlawyer@prodigy.net_

D Jean Ryan, Esq. _courtmail@ryanlawfirmpa.com_

Luis Salazar, Esq. _salazar@salazarjackson.com_,
_jackson@salazarjackson.com;dagley@salazarjackson.com;aguilar@salazarjackson.com;Lee-
Sin@SalazarJackson.com;pacetti@salazarjackson.com;cloyd@salazarjackson.com_

Carlos E. Sardi, Esq _csardi@gjb-law.com_, _gjbecf@gjb-law.com;ecastellanos@gjb-law.com_

Lisa M Schiller, Esq _lschiller.ecf@rprslaw.com_

Michael L Schuster _mschuster@gjb-law.com_, _gjbecf@gjb-law.com;mchang@gjb-law.com_

Samuel aaron Schwartz _sam@schwartzlawyers.com_, _ecf@schwartzlawyers.com;schwartzecf@gmail.com_

Matthew H Scott _mhs@trippscott.com_, _bankruptcy@trippscott.com_

Patrick S. Scott, Esq. _patrick.scott@gray-robinson.com_

Michael D. Seese, Esq. _mseese@seeselaw.com_, _sseward@seeselaw.com_

Susan H Sharp _ssharp.ecf@srbp.com_

Zach B Shelomith _zshelomith@lslawfirm.net_,
_jleiderman@lslawfirm.net;apopowitz@lslawfirm.net;dverde@lslawfirm.net_

Bradley S Shraiberg _bshraiberg@sfl-pa.com_, _dwoodall@sfl-pa.com;vchapkin@sfl-pa.com;lrosetto@sfl-
pa.com;scusack@sfl-pa.com;blee@sfl-pa.com_

Steven I Silverman _ssilverman@klugerkaplan.com_, _clong@klugerkaplan.com_

Paul Steven Singerman, Esq _singerman@bergersingerman.com_,
_mdiaz@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com_

Jeffrey W. Spear _jwspear@duanemorris.com_, _camartin@duanemorris.com_

Scott A Stichter *sstichter.ecf@srbp.com*

Frank Terzo, Esq. *frank.terzo@gray-robinson.com*, *lnegron@gray-robinson.com;jennifer.phillips@gray-robinson.com*

Cheryl Thompson *cthompson@anthonyandpartners.com*, *efiling@thompsonlawpractice.com*

Howard S Toland *htoland@mitrani.com*

Diane Noller Wells, Esq *dwells@devinegoodman.com*, *efiling@devinegoodman.com*

David M Zack *dmzack@mcalpinelawfirm.com*, *dwblevins@mcalpinelawfirm.com;dajaworski@mcalpinelawfirm.com*

Warren D Zaffuto *wzaffuto@phillipslawyers.com*, *crivera@phillipslawyers.com*

Joel C Zwemer, Esq *jzwemer@deanmead.com*